**FORM 1.997.    CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

I.    **CASE STYLE**

IN THE CIRCUIT/COUNTY COURT OF THE <u>FIFTEENTH</u>   JUDICIAL CIRCUIT,
IN AND FOR <u>PALM BEACH</u>   COUNTY, FLORIDA

<u>Timothy Piers Devalle, Donna Marie Devalle</u>
Plaintiff
                                                          Case # _____
                                                          Judge  _____

vs.

<u>Johnson and Johnson, Johnson and Johnson Holdco, Janssen Pharmaceutical Inc, Kenvue Inc, LTL</u>
<u>Management LLC, Imerys Talc America Inc, Publix Supermarkets Inc</u>
 Defendant

II.    **AMOUNT OF CLAIM**

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

☐  $8,000 or less
☐  $8,001 - $30,000
☐ $30,001- $50,000
☐ $50,001- $75,000
☐ $75,001 - $100,000
☒ over $100,000.00

**III.    TYPE OF CASE**    (If the case fits more than one type of case,   select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

- 1 -

**CIRCUIT CIVIL**

☐ Condominium
☐ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
    ☐ Business governance
    ☐ Business torts
    ☐ Environmental/Toxic tort
    ☐ Third party indemnification
    ☐ Construction defect
    ☐ Mass tort
    ☐ Negligent security
    ☐ Nursing home negligence
    ☐ Premises liability—commercial
    ☐ Premises liability—residential
☒ Products liability
☐ Real Property/Mortgage foreclosure
    ☐ Commercial foreclosure
    ☐ Homestead residential foreclosure
    ☐ Non-homestead residential foreclosure
    ☐ Other real property actions

☐Professional malpractice
    ☐ Malpractice—business
    ☐ Malpractice—medical
    ☐ Malpractice—other professional
☐ Other
    ☐ Antitrust/Trade regulation
    ☐ Business transactions
    ☐ Constitutional challenge—statute or ordinance
    ☐ Constitutional challenge—proposed amendment
    ☐ Corporate trusts
    ☐ Discrimination—employment or other
    ☐ Insurance claims
    ☐ Intellectual property
    ☐ Libel/Slander
    ☐ Shareholder derivative action
    ☐ Securities litigation
    ☐ Trade secrets
    ☐ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

NOT A CERTIFIED COPY

☐ Replevins
☐ Evictions
    ☐ Residential Evictions
    ☐ Non-residential Evictions
☐ Other civil (non-monetary)

## COMPLEX BUSINESS COURT

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

**IV.    REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☐ Nonmonetary declaratory or injunctive relief;
☐ Punitive

**V.    NUMBER OF CAUSES OF ACTION:** [    ]
(Specify)

<u>13</u>

**VI.    IS THIS CASE A CLASS ACTION LAWSUIT?**
    ☐ yes
    ☒ no

**VII.    HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
    ☒ no
    ☐ yes If "yes," list all related cases by name, case number, and court.

**VIII.    IS JURY TRIAL DEMANDED IN COMPLAINT?**
    ☒ yes
    ☐ no

**IX.    DOES THIS CASE INVOLVE ALLEGATIONS OF SEXUAL ABUSE?**
    ☐ yes
    ☒ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: <u>s/ Daniel J DiMatteo</u>      Fla. Bar # <u>114914</u>
      Attorney or party           (Bar # if attorney)

<u>Daniel J DiMatteo</u>      <u>10/02/2023</u>
  (type or print name)      Date

NOT A CERTIFIED COPY

IN THE CIRCUIT COURT OF THE
15TH JUDICIAL CIRCUIT IN AND FOR
PALM BEACH COUNTY, FLORIDA

TIMOTHY PIERS DEVALLE,
Individually and as Personal Representative
of the Estate of DONNA MARIE DEVALLE,

      Plaintiff,

v.

JOHNSON & JOHNSON;
JOHNSON & JOHNSON HOLDCO (NA) INC., f/k/a
    Johnson & Johnson Consumer Inc.,
    individually and as successor-in-interest to
    Johnson & Johnson subsidiary "Old JJCI";
JANSSEN PHARMACEUTICALS, INC., individually
    and as successor in interest to Johnson & Johnson
    subsidiaries named Johnson & Johnson Consumer Inc.,
    both prior to and after its 2021 restructurings and
    colloquially known as "Old JJCI and New JJCI";
KENVUE INC., individually and as successor-in interest
    to Johnson & Johnson Consumer Inc.;
LTL MANAGEMENT, LLC;
IMERYS TALC AMERICA, INC., f/k/a
    LUZENAC AMERICA, INC., f/k/a
    RIO TINTO MINERALS, INC;
PUBLIX SUPER MARKETS, INC.;

      Defendants.

_____/

CASE NO:

**WRONGFUL DEATH COMPLAINT FOR
DAMAGES; DEMAND FOR JURY
TRIAL**

## PLAINTIFF'S WRONGFUL DEATH COMPLAINT AND DEMAND FOR JURY TRIAL

    The Plaintiff, TIMOTHY PIERS DEVALLE ("Plaintiff"), Individually and as Personal
Representative of the Estate of DONNA MARIE DEVALLE ("Decedent"), by and through
undersigned counsel, hereby sues the Defendants, JOHNSON & JOHNSON ("J&J"), JOHNSON
& JOHNSON HOLDCO (NA) INC. ("Holdco"), JANSSEN PHARMACEUTICALS, INC.
("Janssen"), KENVUE INC. ("Kenvue"), LTL MANAGEMENT, LLC, IMERYS TALC
AMERICA, INC., f/k/a LUZENAC AMERICA, INC., f/k/a RIO TINTO MINERALS, INC.

1

("Imerys"), (collectively, "J&J" or "J&J Defendants"), and PUBLIX SUPER MARKETS, INC.

(collectively, "Defendants") and alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      This is an action for damages in excess of FIFTY THOUSAND DOLLARS

($50,000.00), exclusive of interest and costs.

2.      Plaintiff seeks an award of damages for the wrongful death of his wife, Decedent,

under the Florida Wrongful Death Statute, on behalf of Decedent's estate ("the Estate") and as

surviving spouse.

3.      Plaintiff and Decedent married on July 10, 2007.

4.      Plaintiff and Decedent resided together in Palm Beach County, Florida.

5.      From approximately 1992 until 2021, Decedent purchased and applied Johnson &

Johnson Baby Powder and Johnson & Johnson Shower to Shower (collectively, "the PRODUCTS")

to her body, including her perineal area, on a daily basis. Decedent purchased Johnson & Johnson

Baby Powder and Johnson & Johnson Shower to Shower at the Publix in Boca Raton, Florida located

on Federal Highway and Hidden Valley Boulevard.

6.      In or around October 2021, Decedent was diagnosed with ovarian cancer, which was

directly and proximately caused by her regular and prolonged exposure to talcum powder, contained

in the PRODUCTS, and developed in Florida.

7.      As a result of her ovarian cancer, Decedent passed away on January 28, 2022, at the

age of sixty-seven (67).

8.      Defendant J&J is a New Jersey corporation with its principal place of business at

One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933. Defendant J&J may be served

with process by serving its registered agent at One Johnson & Johnson Plaza, New Brunswick, New

Jersey 89033.

9.      At all relevant times, Defendant J&J was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling, and/or distributing the PRODUCTS. At all relevant times, Defendant J&J regularly transacted, solicited, and conducted business in all fifty States of the United States.

10.     Defendant J&J has had and continues to have substantial and not isolated contacts with Florida and is subject to the general jurisdiction of Florida.

11.     Defendant Johnson & Johnson Holdco (NA) Inc. is a New Jersey Corporation with its principal place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933. Holdco may be served with process by serving its Registered Agent, CT Corporation System, at 1200 South Pine Island Road, Plantation, FL 33324.

12.     At all relevant times, upon information and belief, Holdco, or its predecessors, was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling, and/or distributing the asbestos-containing PRODUCTS to which Decedent was exposed. At all relevant times, Holdco regularly transacted, solicited, and conducted business in all fifty States of the United States.

13.     Defendant Holco has had and continues to have substantial and not isolated contacts with Florida and is subject to the general jurisdiction of Florida.

14.     Defendant Janssen Pharmaceuticals, Inc. is a New Jersey Corporation with its principal place of business in the State of New Jersey. Janssen may be served with process by serving its Registered Agent, CT Corporation System, at 1200 South Pine Island Road, Plantation, FL 33324.

15.     At all relevant times, upon information and belief, Janssen, or its predecessors, was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling, and/or distributing the asbestos-containing PRODUCTS to which Decedent was exposed. At all relevant

3

times, Janssen regularly transacted, solicited, and conducted business in all fifty States of the United States.

16.     Defendant Janssen has had and continues to have substantial and not isolated contacts with Florida and is subject to the general jurisdiction of Florida.

17.     Defendant Kenvue Inc. is a Delaware Corporation with its principal place of business in the State of New Jersey. Kenvue may be served with process by serving 199 Grandview Road, Skillman, NJ 08558.

18.     At all relevant times, upon information and belief, Kenvue, or its predecessors, was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling, and/or distributing the asbestos-containing PRODUCTS to which Decedent was exposed. At all relevant times, Kenvue, or its predecessors, regularly transacted, solicited, and conducted business in all fifty States of the United States.

19.     Defendant Kenvue has had and continues to have substantial and not isolated contacts with Florida and is subject to the general jurisdiction of Florida.

20.     Defendant LTL Management, LLC is a New Jersey corporation with its principal place of business located in New Jersey. At all times material to this cause of action, Defendant designed, manufactured, sold, and/or distributed asbestos-containing products throughout the United States, including Florida, which Defendant knew or should have known contained asbestos, and which Decedent purchased, used, and was exposed to in her life, causing Decedent's ovarian cancer. Defendant's affiliations with the State of Florida are so continuous and systematic as to render it essentially at home in the State of Florida. Service of process on Defendant is predicated on Fla. Stat. § 48.081 and Fla. Stat. § 48.091.

21.     At all relevant times, Defendants have engaged in the research, development, formulation, manufacture, design, testing, licensing, sale, distribution, marketing and/or introducing

4

into interstate commerce, either directly or indirectly through third parties or related entities of the PRODUCTS.

22.    Defendant Imerys is a Delaware corporation with its principal place of business in California, located at 1732 North First Street, Suite 450, San Jose, CA 95112. At all relevant times, Defendant Imerys has maintained a registered agent in Delaware. Defendant Imerys may be served with process of this Court via service on its registered agent, Corporation Trust Company, at 1209 Miami-Dade Street, Wilmington, Delaware 19801.

23.    At all relevant times, upon information and belief, Defendant Imerys has been in the business of mining and distributing talc for use in talcum powder-based products, including the PRODUCTS.

24.    Defendant Imerys is the successor or continuation of Luzenac America, Inc. and Rio Tinto Minerals, Inc. Defendant Imerys is legally responsible for the conduct of Luzenac America, Inc. and Rio Tinto Minerals, Inc.

25.    Defendant Imerys has substantial and not isolated contact with the State of Florida and is subject to the general jurisdiction of Florida.

26.    The Personal Care Products Council ("PCPC") was formerly known as Cosmetic, Toiletry, and Fragrance Association ("CFTA"). PCPC is the successor or continuation of CTFA, and is legally responsible for CTFA's conduct.

27.    At all relevant times, upon information and belief, PCPC was and still is a national trade association representing the personal care and cosmetics industry for the purposes of interacting with and influencing, and in fact did interact with and influence, local, state and federal governmental agencies on issues related to, among other things, the regulation and marketing of talc based body powders, including the PRODUCTS.  The actions of Defendant PCPC in Washington DC has and have had repercussions throughout the talc industry, and in all states of the United States.

28.    At all relevant times, upon information and belief, the J&J Defendants have been active members of the PCPC.

29.    This Court has general personal jurisdiction over Defendants J&J, J&J Consumer, and Kenvue pursuant to § 48.193(1)(b)(2), Fla. Stat., as they are engaged in substantial and not isolated activity within Florida.  Alternatively, this Court has general personal jurisdiction over Defendants J&J, J&J Consumer, and Kenvue pursuant to §§ 48.193(1)(a)(1) and 48.193(1)(a)(2), Fla. Stat., as they operate, conduct, engage in, or carry on a business or business venture in Florida and have an office or agency in Florida and the cause of action arises from such activity, and because they committed a tortious act or tortious acts within Florida.  Finally, Defendants J&J, J&J Consumer, and Kenvue are subject to the specific personal jurisdiction of this Court pursuant to § 48.193(1)(a)(6)(b), Fla. Stat., as they processed, serviced, or manufactured products, materials, or things which were used or consumed within Florida in the ordinary course of commerce, trade, or use and which caused injury to persons within Florida arising out of an act or omission by them outside the state.

30.    Defendant PUBLIX is a Florida corporation, with its principal place of business in Polk County, Florida, which transacts substantial business in Palm Beach County, Florida. Defendant PUBLIX may be served with process of this Court via service on its registered agent, Attaway, John A., Jr., at 3300 Publix Corporate Pkwy., Lakeland, FL 33811-3311.

31.    At all material times, and at the time of Decedent's exposure to the PRODUCTS, Defendant PUBLIX had an office for the transaction of its customary business in Palm Beach County, Florida, had agents and other representatives in Palm Beach County, Florida, and was actually doing business in Palm Beach County, Florida by virtue of its promoting, selling, and/or placing into the stream of commerce the PRODUCTS in Palm Beach, Florida.

32.    At all material times, Decedent purchased the PRODUCTS from Defendant PUBLIX

6

in its Palm Beach County, Florida stores, among others.

33.    This Court has general personal jurisdiction over Defendant Publix because it is a Florida corporation and resident.

34.    Venue and jurisdiction are proper in Palm Beach County, Florida.

**FACTS RELATING TO CERTAIN DEFENDANTS' SUCCESSOR LIABILITY STATUS**

35.    The Declaration of John K. Kim in Support of First Day Pleadings in LTL's second Bankruptcy filing on April 4, 2023 ("Kim LTL Decl."), *In re: LTL Management LLC*, Case No.: 23-12825, United States Bankruptcy Court District of New Jersey ("LTL 2"), summarizes J&J's and its affiliates' corporate history that is pertinent to the claims alleged herein against Defendants as follows:

a.    "J&J, a New Jersey company incorporated in 1887, first began selling JOHNSON'S® Baby Powder in 1894, launching its baby care line of products."

b.    "In 1972, J&J established a formal operating division for its baby products business, which included JOHNSON'S® Baby Powder . . . . J&J transferred all its assets and liabilities associated with the baby products division to J&J Baby Products."

c.    "In 1981, J&J Baby Products transferred all its assets, except those assets allocated to its diaper programs, to Omni Education Corporation ("**Omni**"), a wholly owned subsidiary of J&J Baby Products. In turn, Omni assumed all liabilities of J&J Baby Products except those liabilities related to its diaper program. Immediately following the transaction, J&J Baby Products merged into another subsidiary of J&J and was renamed Personal Products Company, and Omni changed its name to Johnson & Johnson Baby Products Company."

d.    "In 1988, Johnson & Johnson Baby Products Company transferred all its assets in respect of its baby products business to Johnson & Johnson Dental Products Company, which assumed all of its liabilities and was renamed Johnson & Johnson Consumer Products, Inc."

e.    "In 1997, Johnson & Johnson Consumer Products, Inc. changed its name to Johnson

7

& Johnson Consumer Companies, Inc. ("**J&J Consumer Companies**")."

      f.      "In 2015, J&J Consumer Companies merged with and into an affiliate, which then merged into McNeil-PPC, Inc. The resulting entity was renamed Johnson & Johnson Consumer Inc. (including all former names and historical forms, "**Old JJCI**")."

      g.      "Old JJCI became responsible for all claims alleging that JOHNSON'S® Baby Powder and other talc-containing products cause cancer or other diseases . . . Old JJCI also became responsible for all claims alleging that Shower-to-Shower products, which contained talc, cause cancer or other diseases."

      36.      J&J and its subsidiary, "Johnson & Johnson Consumer, Inc.," both in the form of "Old JJCI" and "New JJCI" (which is identified and described below), were at all material times responsible for the design, labeling, marketing, distribution, and sale of J&J's body powder product lines, including the iconic Johnson & Johnson Baby Powder product line.

      37.      Every one of the J&J's corporate entities, including itself and its affiliated companies involved or associated with talc business and products, were at all times material to this case aware that raw talc ingredient and/or resulting talc-based products contained asbestos, and each and all collectively actively concealed such fact from the public for decades.

      38.      Prior to the implementation of J&J's multifaceted restructuring of its consumer product subsidiaries in 2021, Old JJCI and its predecessors milled, manufactured, labeled, sold, supplied, distributed, and/or marketed asbestos-containing products to which Decedent was exposed.

      39.      In an effort to avoid or eliminate J&J and Old JJCI's respective responsibility and liability for injuries and harm caused by Johnson's Baby Powder, as well as other talc products, in or about October 2021, Old JJCI underwent a series of corporate restructuring transactions under Texas state corporation and business law in which it split itself into two separate entities through a device referred to as a "divisive merger," more commonly known as the "Texas Two Step."

<div align="center">8</div>

40.     The corporate restructuring was designed and undertaken with the intent to isolate the talc liabilities of Old JJCI into a newly invented company created by J&J called "LTL Management LLC" ("LTL"). "LTL" is an acronym for "Legacy Talc Liability."

41.     LTL was immediately thereafter put into a Chapter 11 Bankruptcy wherein LTL and other J&J entities sought the protection of the Bankruptcy Code's processes and machinery to obtain a stay of all pending litigation and construct an aggregate resolution of its outstanding present and future asbestos liabilities that would foreclose jury trials and reduce the compensation they would owe to those harmed by its talc products and their families, given that J&J and its subsidiaries were increasingly being held liable by juries in lawsuits brought by talc asbestos claimants and were being ordered to pay compensatory and exemplary damages.

42.     As part of J&J's liability avoidance/limiting corporate restructuring, all of the productive assets of Old JJCI, including those used to manufacture and market Johnson's Baby Powder, were transferred to a newly minted corporate entity named "Johnson & Johnson Consumer Inc." ("New JJCI"). New JJCI upon receipt of the Old JJCI's operating assets continued to sell J&J Baby Powder, as had Old JJCI previously before when J&J itself directly marketed the product line through an internal division.

43.     Over the objection of tens of thousands of personal injury and wrongful death tort plaintiffs, the Bankruptcy Court presiding over LTL's 2021 bankruptcy case stayed and enjoined prosecution of all litigation against not only the Debtor LTL but all cosmetic talc injury related litigation involving J&J and New JJCI.

44.     During LTL's bankruptcy proceedings, representatives of the affected personal injury and wrongful death tort victims challenged J&J's Texas Two Step scheme before the Bankruptcy Court.  After losing their challenges before the Bankruptcy Court, they were ultimately successful on appeal before the United States Court of Appeals for the Third Circuit, which on

9

January 30, 2023, ruled that the Bankruptcy filing by LTL was not proper and ordered that LTL's 2021 Bankruptcy case be dismissed. *In re: LTL Management, LLC*, No. 22-0007, 2023 WL 2760479 (3d Cir., decided Jan. 30, 2023; opinion entered Mar. 31, 2023).

45.     LTL's efforts to obtain re-argument before the Third Circuit panel hearing its appeal or an *en banc* hearing were denied, and the Appeals Court's mandate to the Bankruptcy Court was issued by the Third Circuit Clerk on March 31, 2023, thereby triggering the lower court's duty to enter an order dismissing the case.

46.     Within hours of the LTL Bankruptcy Court issuing its ensuing dismissal order on April 4, 2023, LTL filed a second Chapter 11 petition for bankruptcy protection in the same court seeking the same relief as in the dismissed case, claiming its funding sources and arrangements had been replaced and reconfigured in such way that purportedly overcomes the Third Circuit's reasons for ordering the earlier bankruptcy case be dismissed.

47.     Unbeknownst to Plaintiffs, during the time the Third Circuit Court of Appeals was considering the propriety of LTL's bankruptcy filing, New JJCI began the process of moving its assets and business to yet another J&J subsidiary, Defendant Kenvue, Inc., by transfers through JJCI's direct parent, Janssen Pharmaceuticals, Inc.

48.     According to the Kim Declaration, as part of J&J's further corporate restructuring, New JJCI changed its name to "Johnson & Johnson Holdco (NA) Inc." ("Holdco"), a New Jersey corporation. His declaration before the Bankruptcy Court additionally revealed that "in early January 2023, [New JJCI] transferred its Consumer Business assets to its parent entity." *See* Kim LTL Decl. at ¶ 26.

49.     While Mr. Kim's declaration does not expressly state who the parent entity is, a careful examination of the affidavit demonstrates that Janssen Pharmaceuticals, Inc, is the parent entity of Defendant New JJCI. *Id.* Figure 1 below is from an Exhibit to Mr. Kim's Declaration and

shows that Janssen is the parent that received all the JJCI assets used to manufacture, market, and sell J&J Baby Powder.

Figure 1



50.    Accordingly, both Holdco and Janssen are successors to Old JJCI and responsible for the contractual undertakings and tortious conduct of Old JJCI.

51.    The information gleaned from Mr. Kim's Declaration and a J&J subsidiary's SEC filings shows that J&J is in the process once again of manipulating assets and responsibilities related to the sale of J&J's Baby Powder.

52.    On January 4, 2023, Defendant Kenvue, another J&J subsidiary, submitted its first filing with the Securities and Exchange Commission ("SEC"), an S-1 registration of securities form. Kenvue Inc. Form S-1 Registration Statement Under the Securities Act of 1933 (Jan. 4, 2023). Figure 2 below reproduces a portion of the filing's cover page.

Figure 2



53.     In its SEC registration filing, Kenvue sets forth the products that it claims to manufacture and sell in the United States. In this regard, Kenvue represented to the SEC and the public: "A number of our products marketed in the United States, including many of our products in our Skin Health and Beauty segment, are considered cosmetics regulated by the FDA through the Federal Food, Drug, and Cosmetic Act and the Fair Packaging and Labeling Act.  Our cosmetic products include Aveeno Restorative Skin Therapy Oat Repairing Cream, Aveeno Restorative Skin Therapy Sulfate-Free Body Wash, Johnson's Baby Powder and certain of our Listerine mouthwash products." *Id.* (emphasis added).

54.     Kenvue acknowledged in its SEC S-1 filing that it may be held accountable for the harm caused by the talc-based products it is responsible for: "It is also possible that various parties will seek to bring and will be successful in bringing claims against us, including by raising allegations that we are liable for the Talc-Related Liabilities." *Id.*

55.     Kenvue further acknowledges itself as the company responsible for the manufacture of Johnson's Baby Powder indicating that it "may be subject to additional claims . . . related to the sale of talc-based Johnson's Baby Powder in markets where we have discontinued this product (such as in the United States and Canada), including potential governmental inquiries, investigations, claims and consumer protection cases from state attorneys general." *Id.* (emphasis added).

12

56.    Kenvue also acknowledges that it is "responsible for all liabilities on account of or relating to harm arising out of, based upon, or resulting from, directly or indirectly, the presence of or exposure to talc or talc-containing products sold outside the United States or Canada." *Id.*

57.    As such, Kenvue is responsible individually and as successor to all predecessor entities involved in the manufacturing, marketing, and sale of the asbestos-containing talc products to which the Decedent was exposed.

58.    On July 18, 2023, LTL's second bankruptcy filing was dismissed. *In re: LTL Management, LLC,* Case No.: 23-12825, United States Bankruptcy Court District of New Jersey. Accordingly, Plaintiff now has rights to assert claims against LTL Management, LLC.

59.    For purposes of clarity and avoidance of doubt, this Complaint is not asserting and does not assert claims against, or seek any relief from, Imerys Talc Vermont, Inc., or any of its affiliates (collectively, "Imerys"), and no relief obtained by Plaintiffs pursuant to the Complaint will be used by the Plaintiff against Imerys in any manner, so long as this lawsuit remains stayed against Imerys only due to its bankruptcy.

## GENERAL ALLEGATIONS

60.    Defendant J&J was incorporated in New Jersey in 1887.

61.    As stated in Defendant J&J's Form 10-K Annual Report Pursuant to Section 13 of the Securities Exchange Act of 1934 for the fiscal year ended January 3, 2016, Defendant J&J's primary focus is on products related to human health and well-being, and Defendant J&J has more than 127,100 employees worldwide.

62.    Defendant J&J's family of companies includes, and at all relevant times has included, more than 250 operating companies conducting business in 60 countries and is organized into three business segments: Consumer, Pharmaceutical, and Medical Devices.

63.    Defendant J&J's family of companies includes, and at all relevant times has included, 121 manufacturing facilities. Within the United States, eight of those facilities are used by the Consumer business segment. In addition to the manufacturing facilities, Defendant J&J maintains numerous offices and warehouses in the United States.

64.    The Consumer segment of Defendant J&J's family of companies includes, and at all relevant times has included, a broad range of over-the-counter products including, but not limited to, the PRODUCTS. These over-the-counter products are marketed to the general public and sold both to retail outlets and distributors all over the world.

65.    At all relevant times, Defendant J&J was conducting business in Florida and engaged in substantial, continuous economic activity in Florida, including the marketing, distribution, and sale of billions of dollars in products to Floridians including, but not limited to, the PRODUCTS; said activity by Defendant J&J is substantially connected to Plaintiff's claims as alleged herein.

66.    The PRODUCTS that are the subject of this action all contain talc, also known as magnesium trisilicate. Talc is an inorganic mineral that is mined from the earth.

67.    Talc is the main ingredient contained in the PRODUCTS.

68.    At all relevant times, upon information and belief, the PRODUCTS contained asbestos and/or asbestiform fibers.

69.    At all relevant times alleged herein, a feasible alternative to the PRODUCTS has existed, such as cornstarch.

70.    Cornstarch is an organic carbohydrate that is quickly broken down by the body with no known health effects.  Cornstarch powders have been sold and marketed for the same uses with nearly the same effectiveness.

71.    At all relevant times alleged herein, Defendant J&J has continually advertised and marketed the PRODUCTS as safe for human use.

14

72.     Historically, the PRODUCTS have been portrayed or otherwise characterized by Defendants as a symbol of freshness, cleanliness, and purity.

73.     At all relevant times, Defendant J&J advertised and-marketed the PRODUCTS as the beacon of "freshness" and "comfort", eliminating friction on the skin, absorbing "excess wetness" helping keep skin feeling dry and comfortable, and "clinically proven gentle and mild." Defendant J&J compelled women through advertisements to dust themselves with this product to mask odors.

74.     The bottle of Defendant J&J's "Baby Powder" specifically targets women. The bottle states "For you, use every day to help feel soft, fresh, and comfortable."

75.     At all relevant times, Defendant J&J advertised and marketed the product "Shower to Shower" as safe for use by women. The "Shower to Shower" product's slogan was "A sprinkle a day keeps odor away," and conveyed, through advertisements, that "Your body perspires in more places than just under your arms. Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day." And "SHOWER to SHOWER can be used all over your body."

76.     Decedent used the PRODUCTS to dust her perineum for feminine hygiene purposes. This was an intended and foreseeable use of the PRODUCTS based on the advertising, marketing, and labeling of the PRODUCTS.

77.     Geologists and mining companies, including the J&J Defendants and Imerys, as well as their suppliers, experts, agents and advisors, have long known that talc deposits and mines around the United States of America, and the world, were and are closely associated with asbestos. In its elemental form talc is nearly identical to certain asbestos fiber types; and depending on the amount of heat, pressure and time applied to asbestos or talc deposits, transitional fibers are found within both. Transitional fibers are fibers that are half talc and half asbestos.

78.     Asbestos is a commercial and legal term, rather than a geological or scientific term, referring to six now-regulated magnesium silicate minerals that occur in fibrous form, including the

serpentine mineral chrysotile, and the amphibole minerals actinolite, anthophyllite, tremolite, amosite and crocidolite.

79.    In 1965, The United States Geological Survey on Commercial Talc production, which the J&J Defendants are well aware, includes surveys dating back to the 1800s, which clearly reveal that tremolite, anthophyllite and chrysotile asbestos are commonly found within, around or as integral part of virtually all talc deposits in the United States. Indeed, talc from some deposits and mines, including some owned by J&J, were identified and advertised as "tremolitic talc" due to its extremely high asbestos content.

80.    The J&J Defendants, which have been and still are the largest talc or talcum powder producers, users, suppliers, distributors, or consumer product manufacturers in the world, admit that they have long employed doctors, scientists, mineralogist, and toxicologists; and that they have long maintained extensive medical and scientific libraries and archives containing or likely to have contained medical and scientific articles, international articles, as well as books, surveys, internally produced reports, and other materials indicating exposures to all grades of talc were and are dangerous and sometimes fatal.

81.    Beginning in the 1930s, medical and scientific literature emerged indicating talc was and is commonly, if not invariably, contaminated with substances known or suspected of being carcinogenic, such as asbestos, asbestiform fibers, non-asbestiform particles, silica, quartz, nickel and arsenic. Within the next several decades an ever-growing body of medical and scientific literature demonstrated that direct and secondary inhalation of, and exposure to, talc or talc contaminated with asbestos, asbestiform fibers, and non-asbestiform particles, and other carcinogens, was hazardous to exposed persons' health in that it could cause lung disease, cancer and even death.

82.    The J&J Defendants and/or their predecessors, affiliates, employees, agents or suppliers were members of the National Safety Council (NSC). In March of 1933, Waldemar C.

Dreesen of the United States Public Health Service reported to the National Safety Council the results of a study conducted of employees at a talc and slate mine and mill. The study indicated that the talc was a hydrous calcium magnesium silicate, being 45 percent talc and 45 percent tremolite, and the National Safety Council stated "[t]he results of the study seemed to indicate a relationship between the amount of dust inhaled and the effect of this dust on the lungs of the workers."

83.     Over the course of the next three years, the NSC continued to publish articles and hold conferences for its members informing them that inhalation of asbestos causes fatal lung disease; that exposures to mineral dust including talc were resulting in successful claims for compensation and injury; and that the best means of combating disease and future claims from exposure to mineral dust is reducing exposures to the same.

84.     During the 1940s, 1950s, and 1960s, the body of medical and scientific literature regarding the hazards of exposure to talc or talc contaminated with asbestos expanded providing experts in the field like the J&J Defendants with increasing evidence that talc, including cosmetic grade talcum powder, caused lung disease, tissue lesions, cancer, and death—including reports of persons contracting fatal lung diseases from regular use of talcum/body powder.

85.     During the 1940s and 1950s, various States' Departments of Labor and Industrial Commissions began recognizing the health hazards of talc and talcum powders and implemented regulations targeting employers, including the J&J Defendants, which mined, milled, or processed talc to ensure employees' exposures to respirable talc were below levels considered to be safe, and economically feasible.

86.     By 1967, the J&J Defendants knew or most certainly should have known asbestos exposure causes mesothelioma. In the same year, doctors and researchers at State University of New York—Buffalo published a paper implicating asbestos as being a cause of ovarian cancer. The authors noted that there had been a thousand-fold increase in the incidence of ovarian cancer since

17

the beginning of the 20th century, which had then grown to the third leading causing of cancer of women in the western world—a rate that was significantly higher than Southern American and Asian women, where use of talcum powder is less prevalent.

87.     In 1968, a scientific study of store-bought, commercially available talcum powders conducted by the Occupational Health Program, National Center for Urban Industrial Health, was published and presented by the American Industrial Hygiene Association revealing that, contrary to popular belief, talcum powders were not entirely pure, but contaminated with various fibrous minerals, including tremolite, anthophyllite, and chrysotile.  This was not unexpected, as the study imparts, as these types of fibers are often present in fibrous talc mineral deposits. Among other things, the authors noted the unknown significant amounts of such materials in products used without precaution may create unsuspected problems.

88.     Available documents indicate that during the same year and in the years following, at least one company began testing store bought talcum powders for asbestos content. Despite tests showing some commercial talcum powders were contaminated with asbestos, there is no evidence showing that positive results or the brand names of contaminated products were communicated to any governmental agency, the media, and the public at large, let alone the customers.

89.     In 1971, the first study was conducted that suggested an association between talc and ovarian cancer.  This study was conducted by Dr. WJ Henderson and others in Cardiff, Wales.

90.     Also in 1971, the New York City of Environmental Protection Administration-Air Resources Board, conducted a study of two "leading" brand of talcum powder using transmission electron microscopy and X-ray diffraction analysis (XRD), and found them to contain 5-25% tremolite and anthophyllite asbestos fibers under 5 microns.

91.     Thereafter, within the same year, a symposium was held in August of 1971 at the FDA to discuss the problem of asbestos contamination in talcum powders with the talc industry,

government officials, and doctors and scientists from Mt. Sinai Hospital—then the epicenter of the medical and scientific study of asbestos. Among other statements, participants and attendees heard: that asbestos should be banned in talcum powders; models should be set up to measure the levels exposure to asbestos experienced by persons using talcum powder containing asbestos at the lowest level of microscopic detection; and that finding asbestos in talc and talcum powder is extremely difficult, and the only truly reliable way to determine the asbestos content of talc and talcum powder is through using a transmission electron microscope and electron diffraction. J&J citing costs, as well as their fear of the public learning talcum powder was contaminated with asbestos, ignored and completely rejected any measures to meaningfully test all their products to make sure they were asbestos-free and free of other cancer causing contaminates.

92.    After this 1971 meeting, Dr. Weissler of the FDA, hired Dr. Seymour Z. Lewin to test commercially available talcum powders and test them for asbestos. Dr. Lewin tested 195 samples and found asbestos of varying amounts in 43 samples. Many of Dr. Lewin's positive results were eventually corroborated by Pfizer, Inc. laboratories—the difference being in percentages of asbestos found. The results however were uncorroborated by two other laboratories, leading the FDA to the conclusion that XRD, optical and electron microscopy and diffraction must be used to find asbestos in talc and talcum powders.

93.    Contemporaneously, evidence began to emerge from testing conducted by various regulatory agencies revealing that asbestos was being found in food, beer, drugs, including intravenously injected medicines. In 1972, and later in 1973, the FDA filed notices of proposed rulemaking requiring talc used in food, food packing, and drugs, to be asbestos-free. These of course were some of the same grades of talc used in talcum and baby powders, including talc mined, milled, supplied, and distributed by J&J.

94.    The talc industry's response, including those of the J&J Defendants, was swift and

well-coordinated through the CTFA (now known as the PCPC), an exclusive lobbying and advocacy group representing companies engaged in the cosmetic products industry, that conspired and worked in concert with the J&J Defendants to: purposely create a flawed, voluntary testing and surveillance methodology for detecting asbestos and other carcinogens in talcum powder; and block efforts to label and warn consumers regarding the dangers associated with the talcum powder products.

95.    Respecting the FDA's proposed 1972 ruling making, the FDA Director of Product Development and Cosmetics, Dr. Schaffner, invited representatives of the talc industry to a meeting in August of 1972 to discuss the results of Dr. Lewin's study of 195 talcum powders and inform them that the FDA was preparing to release a "Proposed Statement of Policy On Asbestos in Cosmetics Containing Talc." Dr. Schaffner explained that he was duty bound and must publicize the brand names of the talcum powders that contained asbestos. The President of the CTFA, Dr. Merritt however strongly objected to the FDA alerting the general public or publishing or publicizing the brand and manufacturers' names of the talcum powders, as it would cause them "economic hardship." The CTFA's President also threatened to sue the FDA to prevent the disclosure of these names. Unsurprisingly, the FDA and J&J never revealed or publicized the brand names of the talcum powders that contained asbestos.

96.    In 1973, the CTFA created a talc subcommittee and the Scientific Advisory Committee to start developing a testing methodology for measuring asbestos in talc. Initially, the CTFA designated a group of its members to tests talc grades used in talcum powder utilizing the methodology proposed by the FDA in its notice of rulemaking. Six samples of talc used in commercially available talcum powders, plus one talc sample purposely spiked with tremolite and chrysotile, were circulated amongst the members, including representatives of J&J. Of the 8 participating members, 4 found asbestos in every sample, 3 did not find asbestos in any sample (including the purposely spiked sample), and 1 found asbestos only in the spiked sample. In

20

conclusion, all members agreed that the best and most reliable method of detecting asbestos in talc is not using optical microscopy, but rather transmission electronic microscopy (TEM) and electron diffraction. The same members, however, dispensed with this analytical method, claiming TEM and electron diffraction equipment was too expensive, despite J&J then owning or having unfettered access to TEM and electron diffraction equipment.

97. From there the difference between what J&J and the CTFA were telling themselves and each other, began to diverge from what they were telling and representing to the FDA. Amongst themselves, J&J and others in the industry knew that there was no such thing as asbestos- free talc mine, mill or powder—only talc in which asbestos could not be detected using the prevailing, most economical analytical methodologies—x-ray diffraction, which at the time could not accurately identify chrysotile asbestos in talc, nor detect tremolite asbestos contamination levels below 2-5%. The dangerousness of this cannot be understated, as 1 milligram of talc with 1% asbestos contains over 80,000,000 asbestos fibers.

98. J&J and the CTFA also did not disclose to the FDA that the vast majority of talcum powder manufacturers and sellers were not testing their products for asbestos, and if they were testing, it was done so superficially—only 4 or so grams per 20 tons of pre-shipment and pre- processed talc. J&J and the CTFA also failed to the tell the FDA that they were not testing off-the- shelf talcum powder products that the public was using, but rather samples that were years old; nor did they tell the FDA that they were limiting their testing of talc to only one type of asbestos fiber to the exclusion of all other fiber types that commonly contaminate talc; and to the extent J&J found asbestos in their samples, these positive results were not reported to the FDA. Instead, on their behalf, the CTFA sent letters to the FDA in March of 1976 falsely claiming that industry testing had shown all their talcum powder products to be completely free of asbestos.

99. Beginning in 1975 and 1976, researchers at New York Air Resources Board, Mt.

21

Sinai School of Medicine, and the FDA became increasingly concerned, if not disgusted, that the CTFA and J&J were dragging their feet on the issue of asbestos in talc and talcum powders. They had not issued any recalls, they provided no consumer warnings, they had not informed the FDA of any effort to ensure that talcum powders on the market did not contain asbestos, and they had yet to create and produce a verifiable methodology or protocol for ensuring that talc and talcum powder did not contain asbestos.

100.    Taking matters into their own hands, Mt. Sinai Hospital researchers published a follow-up article to Dr. Lewin's 1971 study, which showed that some of J&J's talcum powders that were tested contained over 20% asbestos. The researchers concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc . . . We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." The results of the Mount Sinai study were soon picked up and reported by both the New York Times and the Washington Post that same year.

101.    J&J and the CTFA responded to these developments by falsely claiming that industry was doing "everything" they could to solve the problem, and by issuing press releases falsely claiming that chrysotile has never been found in talcum powders and/or completely failing to disclose that tremolite was not only commonly found in talc, but that undisclosed test, after undisclosed test showed that finished talcum powder products contained tremolite asbestos.

102.    With news of asbestos in talc finally making some headlines, the CTFA finally began in earnest to produce a voluntary protocol and methodology that would provide them cover from both lawsuits and regulation. Egregiously, as concerned media members, citizens and regulators began asking more questions about which other brands of talcum powder might contain asbestos, J&J and

CTFA refused to comment or falsely represented that talcum powders have never contained asbestos.

103.    J&J and third parties collectively met with and corresponded with the CTFA, as well as collectively met with the FDA, to individually and collectively advocate for the use of "voluntary" XRD testing of miniscule portions of the tens of thousands of pounds of talc to be used in consumer products. This "voluntary" method that was developed collectively by J&J and advocated to the FDA by J&J in lieu of regulations requiring asbestos labeling or warnings on talcum powder products, knowingly did not work in that levels of asbestos contamination in talc commonly and demonstrably fell below the detection limit of XRD. J&J also knew that asbestos contamination was not uniformly distributed, such that the tiny amounts J&J tested would not reveal the true level of contamination in the talc products sold to their customers.

104.    In support of their voluntary XRD methodology which was finally published in 1977, the CTFA produced letters to the FDA written by their members, including J&J, identifying tests they had conducted showing their talcum powder products did not contain asbestos. The CTFA and J&J, however, never informed the FDA of the hundreds of positive tests showing talc and talcum powders were contaminated with asbestos.

105.    J&J made and published such representations claiming that their testing method was adequate, claiming they were ensuring that talcum powder products were safe, and claiming that their testing of talc reaching consumers was "safe," despite knowing the contrary. J&J intentionally and knowingly did so to avoid FDA regulations that may have required J&J to place warnings regarding the asbestos content of their products, and thereby inform the public, including Decedent, that talcum powder products contained asbestos and other hazardous minerals and were therefore dangerous.

106.    The CTFA then published an article in 1979 stating they conducted over three thousand tests of talcum powders and none of them contained chrysotile. The article and report do not mention whether the talcum powders tested contained tremolite or anthophyllite. This publication

and half-truths conveyed to the FDA and the inquiring public effectively staved off any proposed regulations and seemingly resolved the issue, at least in the FDA and public's eye. Thereafter CTFA's methodology became the standard by which all talc was analyzed by the entire industry, including talc used in personal care and construction products today.

107.    Since 1979 and when the issue of asbestos in talc has arisen thereafter, the CTFA, and representatives of J&J, have represented to various national news media and the public at large that their products are "asbestos-free", when in fact J&J actually meant, they did not "detect" asbestos according to their infrequently used and inadequate testing protocol. "No asbestos detected" means something much different than "no asbestos", but due to J&J's repeated conflation of the terms, the public has been led to erroneously believe the former. Furthermore, since J&J did not have a sufficient testing protocol in place to support their claim that their products were safe or asbestos-free, such statements were recklessly made as they had no reason to believe them.

108.    In 1982, the first epidemiologic study was performed on talc powder use in the female genital area.  This study was conducted by Dr. Daniel Cramer and others.  This study found a 92% increased risk in ovarian cancer with women who reported genital talc use. Shortly after this study was published, Dr. Bruce Semple of Defendant J&J visited Dr. Cramer about his study. Dr. Cramer advised Dr. Semple that Defendant J&J should place a warning on its talcum powder PRODUCTS concerning the ovarian cancer risks so that women can make an informed decision about their health.

109.    Since 1982, there have been at least twenty-two (22) additional epidemiologic studies providing data regarding the association of talc and ovarian cancer. Nearly all of these studies have reported an elevated risk for ovarian cancer associated with genital talc use in women.

110.    In 1993, the United States National Toxicology Program published a study on the toxicity of non-asbestiform talc and found clear evidence of carcinogenic activity.  Talc was found to

be a carcinogen, with or without the presence of asbestos-like fibers.

111.    In response to the United States National Toxicology Program's study, the CTFA, which, as mentioned above, is now known as the PCPC, formed the Talc Interested Party Task Force ("TIPTF"). Defendants J&J and J&J Consumer were members of the CTFA and were the primary actors and contributors of the TIPTF. The stated purpose of the TIPTF was to pool financial resources of these member companies in an effort to collectively defend talc use at all costs and to prevent regulation of any type over this industry. The TIPTF hired scientists to perform biased research regarding the safety of talc, members of the TIPTF edited scientific reports of the scientists hired by this group prior the submission of these scientific reports to governmental agencies, members of the TIPTF knowingly released false information about the safety of talc to the consuming public, and used political and economic influence on regulatory bodies regarding talc. All of these activities have been well coordinated and planned by these companies and organizations over the past four (4) decades in an effort to prevent regulation of talc and to create confusion to the consuming public about the true hazards of talc relative to ovarian cancer.

112.    On November 10, 1994, the Cancer Prevention Coalition mailed a letter to Defendant J&J's then-C.E.O, Ralph Larsen, informing his company that studies as far back as 1960's "show conclusively that the frequent use of talcum powder in the genital area pose a serious health risk of ovarian cancer." The letter cited a recent study from Dr. Harlow of Harvard Medical School confirming this fact and quoted a portion of the study where Dr. Harlow and his colleagues discouraged the use of talc in the female genital area. The letter further stated that 14,000 women per year die from ovarian cancer and that this type of cancer is very difficult to detect and has a low survival rate. The letter concluded by requesting that Defendant J&J withdraw talc products from the market because of readily available alternative corn starch powders, or at a minimum, place warning information on its talc-based products about ovarian cancer risk they pose.

113.    In 1996, the condom industry stopped dusting condoms with talc due to the health concerns of ovarian cancer.

114.    In February 2006, the International Association for the Research of Cancer ("IARC") part of the World Health Organization published a paper whereby they classified perineal use of talc-based body powder as a "Group 2B" human carcinogen. IARC, which is universally accepted as the international authority on cancer issues, concluded that studies from around the world consistently found an increased risk of ovarian cancer in women from perineal use of talc. IARC found that between 16-52% of women in the world were using talc to dust their perineum and found an increased risk of ovarian cancer in women talc users ranging from 30-60%. IARC concluded with this Evaluation: "There is limited evidence in humans for the carcinogenicity of perineal use of talc-based body powder." By definition, "[l]imited evidence of carcinogenicity" means "a positive association has been observed between exposure to the agent and cancer for which a causal interpretation is considered by the Working Group to be credible, but chance, bias or confounding could not be ruled out with reasonable confidence."

115.    In 2006, the Canadian government under The Hazardous Products Act and associated Controlled Products Regulations classified talc as a "D2A", "very toxic", "cancer causing" substance under its Workplace Hazardous Materials Information System ("WHMIS"). Asbestos is also classified as "D2A".

116.    In 2006, Defendant J&J's vendor, Imerys, began placing a warning on its Material Safety Data Sheets ("MSDS") it provided to Defendant J&J regarding the talc it sold to them to be used in the PRODUCTS. These MSDSs not only provided the warning information about the IARC classification but also included warning information regarding "States (including Florida) Rights to Know" and warning information about the Canadian Government's "D2A" classification of talc as well.

117.    In 2008, the Cancer Prevention Coalition submitted a second "Petition Seeking a Cancer Warning on Cosmetic Talc Product" to the FDA. The first Citizen Petition had been filed on November 17, 1994.  The second Petition requested that the FDA immediately require cosmetic talcum powder product to bear labels with a prominent warning that frequent talc application in the female genital area is responsible for major risks of ovarian cancer. The FDA response to the two Citizen Petitions was filed on April 1, 2014.

118.    In 2009, IARC concluded that there is sufficient evidence for a causal association between exposure to asbestos and ovarian cancer.

119.    In 2013, Cancer Prevention Research published a study that showed that women who used talcum powder in their perineal area had a 20 to 30 percent greater risk of developing ovarian cancer than women who did not use talc product in that area.

120.    The Gilda Radner Familial Ovarian Cancer Registry, Roswell Park Center Institute, and the Department of Gynecologic Oncology at University of Vermont published a pamphlet titled, "Myths & Facts about ovarian cancer: What you need to know." In this pamphlet, under "known" risk factors for ovarian cancer, it lists: "Use of Talc (Baby Powder) in the Genital Area."

121.    Between 1970 through the 1990s, tests conducted by the talc industry and J&J continued to show that talc and talcum powder products contained asbestos.  None of these positive tests have ever been produced or made known to any regulatory agency, and knowledge of their existence is only because of litigation against these companies.

122.    J&J and the CTFA failed to disclose these positive results and the inadequacies of their testing protocols continued through the 1980s, 1990s and 2000s, when various government agencies raised the issue of safety of talc, including the issue of asbestos-contamination, and efforts to label talc as a carcinogen.

123.    To this day talc containing products presently on the market contain and/or are

27

contaminated with asbestos; and instead of publicizing this fact, J&J continues to deny all the above purely to protect themselves in litigation, much to the detriment of the entire United States public.

124.    Since at least 1979 the J&J Defendants have conducted a campaign to convince that their products are regulated by the FDA, that their tests are conducted pursuant to FDA regulations, and that talcum powder products are safe as a consequence. Nothing could be further from the truth, the FDA has never been assigned a budget by congress to regulate cosmetics including asbestos in talcum powders. J&J's concerns for the safety of their products have always been voluntary, and under the auspices of the CTFA—a private industry group, who in it 40 years has only banned the use of 11 ingredients in all cosmetics ever sold in the United States.  Indeed, as of today asbestos containing talc in cosmetics has not been banned by the CTFA or FDA.

125.    However, in October 2019, the FDA announced that it found levels of chrysotile asbestos in a bottle of J&J Baby Powder.  As a result of the FDA's finding, J&J recalled a shipment of its Baby Powder and several retailers pulled J&J Baby Powder from their shelves.

126.    J&J continues to fail to place any warning on their talc and talcum powder products or ever disclose the fact that these products contained asbestos at any point, up to and including the present, despite the clear hazard and direct information that their products did and continue to contain asbestos.

127.    J&J through explicit agreement and consciously parallel behavior controlled industry standards regarding the testing, manufacture, sale, distribution and use of asbestos- containing talcum powder products, and controlled the level of knowledge and information available to the public, including Decedent, regarding the hazards of exposure to asbestos dust and fibers from talc and talc-containing products.

128.    J&J failed to report to the FDA tests performed both internally and by an outside laboratory confirming the presence of asbestos in both their finished products as well as talc

28

shipments from J&J and other sources that were used to produce finished products. J&J, and even the outside laboratory McCrone Associates, further sent letters to the CTFA, to be and which were forwarded collectively to the FDA, stating that results of testing of talc used by them after 1972 had not revealed the presence of amphiboles or chrysotile, when in fact all of these entities had received or performed tests indicating the contrary by 1976, when such false representations were made.

129.    J&J intentionally failed to warn potential users, including Decedent, of the serious bodily harm and/or death which may result from the inhalation of, ingestion of and exposure to asbestos fibers and dust emanating from and released by their talc and talc-containing products.

130.    J&J knowingly and intentionally released, published and disseminated invalid, inaccurate, outdated and misleading scientific data, literature and test reports containing misinformation and false statements regarding the risks of asbestosis, cancer, mesothelioma and other illnesses and diseases from the use of talc and talcum powder, and specifically talc and talcum powder used in the production of products to which Decedent was exposed.

131.    J&J, while cognizant of the aforementioned data, deliberately chose to ignore the health and safety issues raised in said data and embarked upon a plan of deception intended to deprive the public at large, including Decedent, of alarming medical and scientific findings, many of which remained in their exclusive possession and under their exclusive control.

132.    Defendants knew of the adverse risks of using talc and talc-based body powders in the perineal area, and other areas of the body, and ovarian cancer and had a duty to warn about the potential hazards associated with the use of the PRODUCTS.

133.    Defendants, though having knowledge of the increased risk of ovarian cancer associated with genital use of talc-based body powder, nevertheless actively marketed the safety of the PRODUCTS to users and failed to inform customers and end users of the PRODUCTS of a known catastrophic health hazard associated with the use of the PRODUCTS, particularly when used by

women in the perineal area.

134.    In addition, Defendants procured and disseminated false, misleading, and biased information regarding the safety of talc, talc-based body powders, and the PRODUCTS to the public, and used influence over federal, state, and local governmental and regulatory bodies regarding talc and talc-based body powder.

<u>**COUNT I: STRICT LIABILITY – FAILURE TO WARN**</u>
<u>**(AGAINST DEFENDANT IMERYS)**</u>

Plaintiff incorporates by reference paragraphs 1-134 as if set forth fully herein.

135.    At all relevant times, Defendant Imerys mined and sold talc to the J&J Defendants with full knowledge that the J&J Defendants were then packaging the talc and selling it to consumers as the PRODUCTS and that consumers of the PRODUCTS were using it to powder their perineal regions.

136.    At all relevant times, by mining refining, screening and testing talc, and supplying that talc to the J&J Defendants for use in the PRODUCTS, Defendant Imerys was knowingly an integral part of the overall manufacture, design, and production of the PRODUCTS, and the PRODUCTS' introduction into the stream of interstate commerce.

137.    At all relevant times, Defendant Imerys knew or should have known of the unreasonably dangerous and carcinogenic nature of the talc it was selling to the J&J Defendants, especially when applied to a woman's perineal regions, and it knew or should have known that the J&J Defendants were not warning consumers of this danger.

138.    At all relevant times, Defendant Imerys knew or should have known that the use of the PRODUCTS significantly increases the risk of ovarian cancer in women based upon scientific knowledge dating back until at least 1971.

139.    At all relevant times, the PRODUCTS were defective and unreasonably dangerous

when used in a reasonably foreseeable manner because, despite Defendant Imerys's knowledge that the PRODUCTS were carcinogenic and could lead to an increased risk of ovarian cancer, Defendant Imerys failed to provide adequate warnings and/or instructions to consumers, including the Decedent, regarding the increased risk of ovarian cancer associated with the use of the PRODUCTS when applied to the perineal area.

140.    Had the Decedent received warning or instruction regarding the increased risk of ovarian cancer associated with the PRODUCTS when applied to the perineal area, the Decedent would not have used the PRODUCTS in this manner.

141.    Due to the absence of any warning or instruction by Defendants as to the significant health and safety risks posed by the PRODUCTS as described herein, the Decedent was unaware that the PRODUCTS created an increased risk of ovarian cancer, as this danger was not known to the general public.

142.    As a direct and proximate result of Defendant Imerys's failure to warn Decedent of the increased risk of ovarian cancer associated with the PRODUCTS when applied to the perineal area, despite its actual knowledge of this material fact, Decedent was injured and died.

143.    As a direct and proximate result of Decedent's injuries and death, her husband, Plaintiff, has sustained the following damages:

a.    Deprivation of past and future support and services;

b.    Loss of companionship and protection, and great mental pain and suffering in the past and future; and

c.    Medical and funeral expenses due to Decedent's injury and death.

144.    As a direct and proximate result of Decedent's injuries and death, her estate has sustained the following damages:

a.    Loss of net accumulations of Decedent; and

b.      Medical and funeral expenses due to Decedent's injury and death.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant Imerys, awarding any and all damages to which Plaintiff, Decedent, the survivors, and the Estate may be entitled under applicable law, together with interest, costs, and, pursuant to applicable law, reasonable attorneys' fees incurred or to be incurred in this action.

## COUNT II: STRICT LIABILITY – FAILURE TO WARN (AGAINST THE J&J DEFENDANTS)

Plaintiff incorporates by reference paragraphs 1-134 as if set forth fully herein.

145.    At all relevant times, the J&J Defendants were engaged in the business of manufacturing, formulating, designing, marketing, testing, promoting, selling, distributing, and otherwise introducing into the stream of interstate commerce the PRODUCTS.

146.    At all relevant times, the J&J Defendants knew or should have known that the use of the PRODUCTS in the female perineal area significantly increased the risk of ovarian cancer in women based upon scientific knowledge dating back until at least 1971.

147.    At all relevant times, the PRODUCTS, manufactured and supplied by the J&J Defendants, were defective and unreasonably dangerous because, despite the J&J Defendants' knowledge that the PRODUCTS were carcinogenic and lead to an increased risk of ovarian cancer when applied to the female perineal area (a reasonably foreseeable use of the PRODUCTS), the J&J Defendants failed to provide adequate warning or instruction to consumers, including Decedent, regarding the increased risk of ovarian cancer when the PRODUCTS are applied to the female perineal area.

148.    At all relevant times, Decedent used the PRODUCTS to powder her perineal area, a use that was reasonably foreseeable and for which the PRODUCTS were sold.

149.    Had Decedent received warning and/or instruction from the J&J Defendants

regarding the increased risk of ovarian cancer associated with the PRODUCTS when applied to the perineal area, Decedent would not have used the PRODUCTS in this manner or used the PRODUCTS at all.

150.    Due to the absence of any warning or instruction by the J&J Defendants as to the significant health and safety risks posed by the PRODUCTS as described herein, Decedent was unaware that the PRODUCTS created an increased risk of ovarian cancer, as this danger was not known to the general public.

151.    As the direct and proximate result of the reasonably foreseeable use of the PRODUCTS as manufactured, formulated, marketed, tested, promoted, sold, distributed and introduced into the stream of commerce by the J&J Defendants, Decedent was injured and died.

152.    As a direct and proximate result of Decedent's injuries and death, her husband, Plaintiff, has sustained the following damages:

a.    Deprivation of past and future support and services;

b.    Loss of companionship and protection, and great mental pain and suffering in the past and future; and

c.    Medical and funeral expenses due to Decedent's injury and death.

153.    As a direct and proximate result of Decedent's injuries and death, her estate has sustained the following damages:

c.    Loss of net accumulations of Decedent; and

d.    Medical and funeral expenses due to Decedent's injury and death.

WHEREFORE, Plaintiff demands judgment in his favor and against the J&J Defendants, awarding any and all damages to which Plaintiff, Decedent, the survivors, and the Estate may be entitled under applicable law, together with interest, costs, and, pursuant to applicable law, reasonable attorneys' fees incurred or to be incurred in this action.

33

## COUNT III: STRICT LIABILITY – DEFECTIVE MANUFACTURE AND DESIGN (AGAINST DEFENDANT IMERYS)

Plaintiff incorporates by reference paragraphs 1-134 as if set forth fully herein.

154.    At all relevant times, Defendant Imerys was engaged in the business of mining and distributing talc to the J&J Defendants for use in the PRODUCTS, and Defendant Imerys was knowingly an integral part of the overall manufacture, design, and production of the PRODUCTS, and their introduction into the stream of interstate commerce.

155.    At all relevant times, the PRODUCTS were expected to and did reach Decedent without a substantial change in their condition.

156.    At all relevant times, the PRODUCTS were defectively and improperly manufactured and designed by Defendant Imerys in that, when Defendant Imerys supplied its talc product to the J&J Defendants with full knowledge that the J&J Defendants would use the talc in formulating the PRODUCTS, and that the talc would be the primary ingredient in the PRODUCTS, the foreseeable risks of the PRODUCTS far outweighed the benefits associated with their design and formulation.

157.    At all relevant times, the PRODUCTS were defectively manufactured and designed by Defendant Imerys in that its design and formulation were more dangerous than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner.

158.    At all relevant times, the PRODUCTS created significant risks to the health and safety of consumers that far outweigh the risks posed by other products on the market used for the same purposes.

159.    As a direct and proximate result of the defective design and manufacture of the PRODUCTS, Decedent was injured and died.

160.    As a direct and proximate result of Decedent's injuries and death, her husband,

34

Plaintiff, has sustained the following damages:

a.      Deprivation of past and future support and services;

b.      Loss of companionship and protection, and great mental pain and suffering in the past and future; and

c.      Medical and funeral expenses due to Decedent's injury and death.

161.    As a direct and proximate result of Decedent's injuries and death, her estate has sustained the following damages:

a.      Loss of net accumulations of Decedent; and

b.      Medical and funeral expenses due to Decedent's injury and death.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant Imerys, awarding any and all damages to which Plaintiff, Decedent, the survivors, and the Estate may be entitled under applicable law, together with interest, costs, and, pursuant to applicable law, reasonable attorneys' fees incurred or to be incurred in this action.

## COUNT IV: STRICT LIABILITY – DEFECTIVE MANUFACTURING AND DESIGN (AGAINST THE J&J DEFENDANTS)

Plaintiff incorporates by reference paragraphs 1-134 as if set forth fully herein.

162.    At all relevant times, the J&J Defendants were engaged in the business of manufacturing, formulating, creating, designing, testing, labeling, packaging, supplying, marketing, promoting, selling, advertising, and otherwise introducing the PRODUCTS into the stream of commerce, which they sold and distributed throughout the United States

163.    At all relevant times, the PRODUCTS were defectively and improperly manufactured and designed by the J&J Defendants in that, when the PRODUCTS left the hands of the J&J Defendants, the foreseeable risks of the PRODUCTS far outweighed the benefits associated with their design and formulation.

35

164.    At all relevant times, the PRODUCTS were defectively manufactured and designed by the J&J Defendants in that their design and formulation were more dangerous than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner.

165.    At all relevant times, the PRODUCTS created significant risks to the health and safety of consumers that far outweigh the risks posed by other products on the market used for the same purpose.

166.    At all relevant times, a reasonable and safer alternative design existed, which could have feasibly been employed by J&J Defendants to manufacture a product with the same purpose as the PRODUCTS. Despite knowledge of this reasonable and safer alternative design, J&J Defendants failed to alter the PRODUCTS' design and formulation. The magnitude of the danger created by the PRODUCTS far outweighs the costs associated with using an alternative, safer design.

167.    As a direct and proximate result of the defective design and manufacture of the PRODUCTS, Decedent was injured and died.

168.    As a direct and proximate result of Decedent's injuries and death, her husband, Plaintiff, has sustained the following damages:

a.    Deprivation of past and future support and services;

b.    Loss of companionship and protection, and great mental pain and suffering in the past and future; and

c.    Medical and funeral expenses due to Decedent's injury and death.

169.    As a direct and proximate result of Decedent's injuries and death, her estate has sustained the following damages:

a.    Loss of net accumulations of Decedent; and

b.    Medical and funeral expenses due to Decedent's injury and death.

WHEREFORE, Plaintiff demands judgment in his favor and against the J&J Defendants, awarding any and all damages to which Plaintiff, Decedent, the survivors, and the Estate may be entitled under applicable law, together with interest, costs, and, pursuant to applicable law, reasonable attorneys' fees incurred or to be incurred in this action.

## COUNT V: BREACH OF EXPRESS WARRANTIES
## (AGAINST THE J&J DEFENDANTS)

Plaintiff incorporates by reference paragraphs 1-134 as though set forth fully herein.

170.    The J&J Defendants, through their advertising and promotional materials, expressly warranted and affirmed that the PRODUCTS were safe for the uses for which they were intended and for uses which were reasonably foreseeable. The J&J Defendants' express warranties extended beyond delivery of the PRODUCTS and expressly warranted the future performance of the PRODUCTS. These express warranties include, but are not limited to, the following:

a.      The J&J Defendants advertised and labeled the PRODUCTS as safe for application all over the body, including the following: "For you, use every day to help feel soft, fresh, and comfortable"; "A sprinkle a day keeps the odor away"; "Your body perspires in more places than just under your arms."

171.    The J&J Defendants, through the advertisements as listed above, made express warranties to Decedent and the public that the PRODUCTS were safe and effective when applied all over the body, including the female perineal area.

172.    At all relevant times, the J&J Defendants breached said express warranties in that the PRODUCTS were unsafe and ineffective for application all over the body, specifically when used in the female perineal area, because the PRODUCTS, when used in this manner for which the J&J Defendants advertised and promoted, significantly increased the risk of developing ovarian cancer among consumers.

37

173.    At all relevant times, the J&J Defendants had knowledge of the hazards and health risks posed by the PRODUCTS when applied to the perineal area.

174.    At all relevant times, the J&J Defendants willfully failed to disclose the defects and health risks of the PRODUCTS to Decedent and the consuming public.

175.    At all relevant times, in reliance upon the express warranties made by the J&J Defendants as set forth above, Decedent purchased and used the PRODUCTS in her perineal area, believing that the PRODUCTS were safe when used in this manner.

176.    As a direct and proximate result of the J&J Defendants' express warranties concerning the PRODUCTS, as described herein, Decedent was injured and died.

177.    As a direct and proximate result of Decedent's injuries and death, her husband, Plaintiff, has sustained the following damages:

a.    Deprivation of past and future support and services

b.    Loss of companionship and protection, and great mental pain and suffering in the past and future; and

c.    Medical and funeral expenses due to Decedent's injury and death.

178.    As a further direct and proximate result of Decedent's injuries and death, her estate has sustained the following damages:

a.    Loss of net accumulations of Decedent; and

b.    Medical and funeral expenses due to Decedent's injury and death.

WHEREFORE, Plaintiff demands judgment in his favor and against the J&J Defendants, awarding any and all damages to which Plaintiff, Decedent, the survivors, and the Estate may be entitled under applicable law, together with interest, costs, and, pursuant to applicable law, reasonable attorneys' fees incurred or to be incurred in this action.

## COUNT VI: BREACH OF IMPLIED WARRANTY OF MERCHANTIBILITY (AGAINST THE J&J DEFENDANTS)

Plaintiff incorporates by reference paragraph 1-134 as if set forth fully herein.

179.     At the time the J&J Defendants manufactured, marketed, labeled, promoted, distributed, and/or sold the PRODUCTS, The J&J Defendants knew of uses for which the PRODUCTS were intended, including use by women in the perineal area, and impliedly warranted the PRODUCTS were merchantable and fit for the ordinary purposes for which they were intended.

180.     Members of the consuming public, including consumers such as Decedent, were intended beneficiaries and/or third-party beneficiaries of the warranty.

181.     The PRODUCTS were not merchantable or fit for their ordinary purposes, because they had a propensity to lead to the serious personal injuries described herein.

182.     Decedent reasonably relied on the J&J Defendants' representations that the PRODUCTS were safe and free of defects.

183.     The J&J Defendants' breach of the implied warranty of merchantability was the direct and proximate cause of Decedent's injuries and death and thus Plaintiff's injuries.

184.     The J&J Defendants' conduct, as described above, was extreme and outrageous. The J&J Defendants risked the lives of the consumers and users of their products, including Decedent, with knowledge of the safety and efficacy problems associated with said products, and suppressed this knowledge from Decedent and the general public. The J&J Defendants made conscious decisions not to redesign, relabel, warn, or inform Decedent or the unsuspecting consuming public.

185.     As a direct and proximate result of the J&J Defendants' implied warranties of merchantability concerning the PRODUCTS, as described herein, Decedent was injured and died.

186.     As a direct and proximate result of Decedent's injuries and death, her husband, Plaintiff, has sustained the following damages:

a.      Deprivation of past and future support and services

b.      Loss of companionship and protection, and great mental pain and suffering in the past and future; and

c.      Medical and funeral expenses due to Decedent's injury and death.

187.    As a further direct and proximate result of Decedent's injuries and death, her estate has sustained the following damages:

a.      Loss of net accumulations of Decedent; and

b.      Medical and funeral expenses due to Decedent's injury and death.

WHEREFORE, Plaintiff demands judgment in his favor and against the J&J Defendants, awarding any and all damages to which Plaintiff, Decedent, the survivors, and the Estate may be entitled under applicable law, together with interest, costs, and, pursuant to applicable law, reasonable attorneys' fees incurred or to be incurred in this action.

## COUNT VII: BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE (AGAINST THE J&J DEFENDANTS)

Plaintiffs incorporate by reference paragraphs 1-134 as though set forth fully herein.

188.    The J&J Defendants manufactured, supplied, and sold the PRODUCTS with an implied warranty that they were fit for the particular purpose for which they were warranted.

189.    Members of the consuming public, including Decedent, were the intended beneficiaries and/or third-party beneficiaries of the warranty.

190.    The PRODUCTS were not fit for the particular purpose for which they were warranted without serious risk of personal injury, which risk is much higher than other products designed to perform the same function, such as cornstarch.

191.    Decedent reasonably relied on the J&J Defendants' representations that the PRODUCTS were safe and effective for use by women in the perineal area.

40

192.    The J&J Defendants' breach of implied warranty of fitness for a particular purpose was the direct and proximate cause of Decedent's injuries and death and thus Plaintiff's injuries.

193.    The J&J Defendants' conduct, as described above, was extreme and outrageous.

The J&J Defendants risked the lives of the consumers and users of their products, including Decedent, by having knowledge of the safety and efficacy problems associated with the PRODUCTS, and by suppressing this knowledge from the general public. The J&J Defendants made conscious decisions not to redesign, relabel, warn, or inform the unsuspecting consuming public.

194.    As a direct and proximate result of the J&J Defendants' implied warranties of fitness concerning the PRODUCTS, as described herein, Decedent was injured and died.

195.    As a direct and proximate result of Decedent's injuries and death, her husband, Plaintiff, has sustained the following damages:

a.    Deprivation of past and future support and services

b.    Loss of companionship and protection, and great mental pain and suffering in the past and future; and

c.    Medical and funeral expenses due to Decedent's injury and death.

196.    As a further direct and proximate result of Decedent's injuries and death, her estate has sustained the following damages:

a.    Loss of net accumulations of Decedent; and

b.    Medical and funeral expenses due to Decedent's injury and death.

WHEREFORE, Plaintiff demands judgment in his favor and against the J&J Defendants, awarding any and all damages to which Plaintiff, Decedent, the survivors, and the Estate may be

entitled under applicable law, together with interest, costs, and, pursuant to applicable law, reasonable attorneys' fees incurred or to be incurred in this action.

<u>**COUNT VIII: NEGLIGENCE (AGAINST DEFENDANT IMERYS)**</u>

Plaintiff incorporates by reference paragraphs 1-134 as if set forth fully herein.

197.     At all relevant times, Defendant Imerys mined, refined, screened, tested and sold talc to the J&J Defendants, which it knew that the J&J Defendants were then packaging and selling to consumers as the PRODUCTS, and that consumers of the PRODUCTS were using it to powder their perineal regions.

198.     At all relevant times, Defendant Imerys had a duty to act with reasonable care in the design, development, marketing, labeling, manufacturing, formulating, testing, monitoring, and sale of its talc.

199.     At all relevant times, Defendant Imerys knew or should have known of the unreasonably dangerous and carcinogenic nature of the talc it was selling to the J&J Defendants, especially when used in a woman's perineal regions, and it knew or should have known that the J&J Defendants did not warn its consumers of that danger.

200.     At all relevant times, Defendant Imerys was negligent in supplying talc to the J&J Defendants, when it knew or should have known that the talc would be used in the PRODUCTS, without adequately taking steps to ensure that consumers of the PRODUCTS, including Decedent, received material information that Defendant Imerys possessed regarding the carcinogenic properties of talc, including its risk of causing ovarian cancer.

201.     At all relevant times, Defendant Imerys breached its duty of reasonable care to Decedent in that it negligently designed, developed, marketed, labeled, manufactured, formulated, tested, monitored, and/or sold talc to the J&J Defendants.

202.     As a direct and proximate result of Defendant Imerys's negligence, Decedent was injured and died.

203.     As a direct and proximate result of Decedent's injuries and death, her husband, Plaintiff, has sustained the following damages:

a.     Deprivation of past and future support and services

b.     Loss of companionship and protection, and great mental pain and suffering in the past and future; and

c.     Medical and funeral expenses due to Decedent's injury and death.

204.     As a further direct and proximate result of Decedent's injuries and death, her estate has sustained the following damages:

a.     Loss of net accumulations of Decedent; and

b.     Medical and funeral expenses due to Decedent's injury and death.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant Imerys, awarding any and all damages to which Plaintiff, Decedent, the survivors, and the Estate may be entitled under applicable law, together with interest, costs, and, pursuant to applicable law, reasonable attorneys' fees incurred or to be incurred in this action.

## COUNT IX: NEGLIGENCE (AGAINST THE J&J DEFENDANTS)

Plaintiff incorporates by reference paragraphs 1-134 as if set forth fully herein.

205.     At all relevant times, the J&J Defendants manufactured, designed, formulated, marketed, tested, promoted, supplied, sold, and/or distributed the PRODUCTS in the regular course of business.

206.     At all relevant times, the J&J Defendants had a duty to act with reasonable care in the design, development, marketing, labeling, manufacturing, formulating, testing, monitoring, distribution, and sale of the PRODUCTS.

207.    At all relevant times, the J&J Defendants had a duty to act with reasonable care and to warn Decedent and the consuming public of the risk, dangers and adverse side effects of the PRODUCTS.

208.    At all relevant times, the J&J Defendants knew or should have known that the PRODUCTS were unreasonably dangerous and defective when used in a reasonably foreseeable manner.

209.    The J&J Defendants breached their duty to Decedent and were otherwise negligent in the design, development, marketing, labeling, manufacturing, formulating, testing, monitoring, distribution, and/or sale of the PRODUCTS utilized by Decedent, which were inherently dangerous and defective, and unfit and unsafe for their intended and reasonably foreseeable uses.

210.    The J&J Defendants were further negligent in failing to accompany the PRODUCTS with proper warnings or adequate labeling regarding the dangerous and potentially fatal health risks associated with the use of the PRODUCTS, particularly when used in the perineal area of women, which was their intended or reasonably foreseeable use.

211.    As a direct and proximate result of the J&J Defendants' negligence, Decedent was injured and died.

212.    As a direct and proximate result of Decedent's injuries and death, her husband, Plaintiff, has sustained the following damages:

a.    Deprivation of past and future support and services

b.    Loss of companionship and protection, and great mental pain and suffering in the past and future; and

c.    Medical and funeral expenses due to Decedent's injury and death.

213.    As a further direct and proximate result of Decedent's injuries and death, her estate has sustained the following damages:

a.      Loss of net accumulations of Decedent; and

b.      Medical and funeral expenses due to Decedent's injury and death.

WHEREFORE, Plaintiff demands judgment in his favor and against the J&J Defendants, awarding any and all damages to which Plaintiff, Decedent, the survivors, and the Estate may be entitled under applicable law, together with interest, costs, and, pursuant to applicable law, reasonable attorneys' fees incurred or to be incurred in this action.

**COUNT X: FRAUDULENT CONCEALMENT (AGAINST DEFENDANT IMERYS)**

Plaintiff incorporates by reference paragraphs 1-134 as if set forth fully herein.

214.    Prior to Decedent's use of the PRODUCTS and during the period in which Decedent actually used the PRODUCTS, Defendant Imerys fraudulently suppressed material information regarding the safety and efficacy of the PRODUCTS and the availability of an alternative feasible safer design, including but not limited to, information regarding a safe use of cornstarch-based products for the same purposes. Furthermore, Defendant Imerys fraudulently concealed the safety information about the use of talc, generally, and on the perineal area, specifically. Upon information and belief, the fraudulent misrepresentations and fraudulent concealment described throughout this Complaint were intentional so as to maintain the sales volume of its talc.

215.    Geologists and mining companies, including Talc Defendants, as well as their suppliers, experts, agents and advisors, have long known that talc deposits and mines around the United States of America, and the world, were and are closely associated with asbestos. In its elemental form talc is nearly identical to certain asbestos fiber types; and depending on the amount of heat, pressure and time applied to asbestos or talc deposits, transitional fibers are found within both. Transitional fibers are fibers that are half talc and half asbestos.

216.    Asbestos is a commercial and legal term, rather than a geological or scientific term, the serpentine mineral chrysotile, and the amphibole minerals actinolite, anthophyllite, tremolite,

amosite and crocidolite.

217.    In 1965, The United States Geological Survey on Commercial Talc production, which Talc Defendants are well aware, includes surveys dating back to the 1800s, which clearly reveal that tremolite, anthophyllite and chrysotile asbestos are commonly found within, around or as integral part of virtually all talc deposits in the United States. Indeed, talc from some deposits and mines, including some owned by Talc Defendants, were identified and advertised as "tremolitic talc" due to its extremely high asbestos content.

218.    Talc Defendants, some which have been and still are the largest talc or talcum powder producers, users, suppliers, distributors, or consumer product manufacturers in the world, admit that they have long employed doctors, scientists, mineralogist, and toxicologists; and that they have long maintained extensive medical and scientific libraries and archives containing or likely to have contained medical and scientific articles, international articles, as well as books, surveys, internally produced reports, and other materials indicating exposures to all grades of talc were and are dangerous and sometimes fatal.

219.    Beginning in the 1930s, medical and scientific literature emerged indicating talc was and is commonly, if not invariably, contaminated with substances known or suspected of being carcinogenic, such as asbestos, asbestiform fibers, non-asbestiform particles, silica, quartz, nickel and arsenic. Within the next several decades an ever-growing body of medical and scientific literature demonstrated that direct and secondary inhalation of, and exposure to, talc or talc contaminated with asbestos, asbestiform fibers, and non-asbestiform particles, and other carcinogens, was hazardous to exposed persons' health in that it could cause lung disease, cancer and even death.

220.    Talc Defendants and/or their predecessors, affiliates, employees, agents or suppliers were members of the National Safety Council (NSC). In March of 1933, Waldemar C. Dreesen of the United States Public Health Service reported to the National Safety Council the results of a study

conducted of employees at a talc and slate mine and mill. The study indicated that the talc was a hydrous calcium magnesium silicate, being 45 percent talc and 45 percent tremolite, and the National Safety Council stated "[t]he results of the study seemed to indicate a relationship between the amount of dust inhaled and the effect of this dust on the lungs of the workers."

221.    Over the course of the next three years, the NSC continued to publish articles and hold conferences for its members informing them that inhalation of asbestos causes fatal lung disease; that exposures to mineral dust including talc were resulting in successful claims for compensation and injury; and that the best means of combating disease and future claims from exposure to mineral dust is reducing exposures to the same.

222.    During the 1940s, 1950s, and 1960s, the body of medical and scientific literature regarding the hazards of exposure to talc or talc contaminated with asbestos expanded providing experts in the field like Talc Defendants with increasing evidence that talc, including cosmetic grade talcum powder, caused lung disease, tissue lesions, cancer, and death—including reports of persons contracting fatal lung diseases from regular use of talcum/body powder.

223.    During the 1940s and 1950s, various States' Departments of Labor and Industrial Commissions began recognizing the health hazards of talc and talcum powders and implemented regulations targeting employers, including Talc Defendants, which mined, milled, or processed talc to ensure employees' exposures to respirable talc were below levels considered to be safe, and economically feasible.

224.    By 1967, Talc Defendants knew or most certainly should have known asbestos exposure causes mesothelioma. In the same year, doctors and researchers at State University of New York—Buffalo published a paper implicating asbestos as being a cause of ovarian cancer. The authors noted that there had been a thousand-fold increase in the incidence of ovarian cancer since the beginning of the 20th century, which had then grown to the third leading causing of cancer of

women in the western world—a rate that was significantly higher than Southern American and Asian women, where use of talcum powder is less prevalent.

225.    In 1968, a scientific study of store-bought, commercially available talcum powders conducted by the Occupational Health Program, National Center for Urban Industrial Health, was published and presented by the American Industrial Hygiene Association revealing that, contrary to popular belief, talcum powders were not entirely pure, but contaminated with various fibrous minerals, including tremolite, anthophyllite, and chrysotile.  This was not unexpected, as the study imparts, as these types of fibers are often present in fibrous talc mineral deposits. Among other things, the authors noted the unknown significant amounts of such materials in products used without precaution may create unsuspected problems.

226.    Available documents indicate that during the same year and in the years following, at least one company began testing store bought talcum powders for asbestos content. Despite tests showing some commercial talcum powders were contaminated with asbestos, there is no evidence showing that positive results or the brand names of contaminated products were communicated to any governmental agency, the media, and the public at large, let alone the customers.

227.    In 1971, the first study was conducted that suggested an association between talc and ovarian cancer. This study was conducted by Dr. WJ Henderson and others in Cardiff, Wales.

228.    Also in 1971, the New York City of Environmental Protection Administration— Air Resources Board, conducted a study of two "leading" brand of talcum powder using transmission electron microscopy and X-ray diffraction analysis (XRD), and found them to contain 5-25% tremolite and anthophyllite asbestos fibers under 5 microns.

229.    Thereafter, within the same year, a symposium was held in August of 1971 at the FDA to discuss the problem of asbestos contamination in talcum powders with the talc industry, government officials, and doctors and scientists from Mt. Sinai Hospital—then the epicenter of the

medical and scientific study of asbestos. Among other statements, participants and attendees heard: that asbestos should be banned in talcum powders; models should be set up to measure the levels exposure to asbestos experienced by persons using talcum powder containing asbestos at the lowest level of microscopic detection; and that finding asbestos in talc and talcum powder is extremely difficult, and the only truly reliable way to determine the asbestos content of talc and talcum powder is through using a transmission electron microscope and electron diffraction. Talc Defendants citing costs, as well as their fear of the public learning talcum powder was contaminated with asbestos, ignored and completely rejected any measures to meaningfully test all their products to make sure they were asbestos-free and free of other cancer causing contaminates.

230.    After this 1971 meeting, Dr. Weissler of the FDA, hired Dr. Seymour Z. Lewin to test commercially available talcum powders and test them for asbestos. Dr. Lewin tested 195 samples and found asbestos of varying amounts in 43 samples. Many of Dr. Lewin's positive results were eventually corroborated by Pfizer, Inc. laboratories—the difference being in percentages of asbestos found. The results however were uncorroborated by two other laboratories, leading the FDA to the conclusion that XRD, optical and electron microscopy and diffraction must be used to find asbestos in talc and talcum powders.

231.    Contemporaneously, evidence began to emerge from testing conducted by various regulatory agencies revealing that asbestos was being found in food, beer, drugs, including intravenously injected medicines. In 1972, and later in 1973, the FDA filed notices of proposed rulemaking requiring talc used in food, food packing, and drugs, to be asbestos-free. These of course were some of the same grades of talc used in talcum and baby powders, including talc mined, milled, supplied, and distributed by Talc Defendants.

232.    The talc industry's response, including those of the Talc Defendants, was swift and well-coordinated through the CTFA (now known as the PCPC), an exclusive lobbying and advocacy

group representing companies engaged in the cosmetic products industry, that conspired and worked in concert with the Talc Defendants to: purposely create a flawed, voluntary testing and surveillance methodology for detecting asbestos and other carcinogens in talcum powder; and block efforts to label and warn consumers regarding the dangers associated with the talcum powder products.

233.    Respecting the FDA's proposed 1972 ruling making, the FDA Director of Product Development and Cosmetics, Dr. Schaffner, invited representatives of the talc industry to a meeting in August of 1972 to discuss the results of Dr. Lewin's study of 195 talcum powders and inform them that the FDA was preparing to release a "Proposed Statement of Policy On Asbestos in Cosmetics Containing Talc." Dr. Schaffner explained that he was duty bound and must publicize the brand names of the talcum powders that contained asbestos. The President of the CTFA, Dr. Merritt however strongly objected to the FDA alerting the general public or publishing or publicizing the brand and manufacturers' names of the talcum powders, as it would cause them "economic hardship." The CTFA's President also threatened to sue the FDA to prevent the disclosure of these names. Unsurprisingly, the FDA and Talc Defendants never revealed or publicized the brand names of the talcum powders that contained asbestos.

234.    In 1973, the CTFA created a talc subcommittee and the Scientific Advisory Committee to start developing a testing methodology for measuring asbestos in talc. Initially, the CTFA designated a group of its members to tests talc grades used in talcum powder utilizing the methodology proposed by the FDA in its notice of rulemaking. Six samples of talc used in commercially available talcum powders, plus one talc sample purposely spiked with tremolite and chrysotile, were circulated amongst the members, including representatives of Talc Defendants. Of the 8 participating members, 4 found asbestos in every sample, 3 did not find asbestos in any sample (including the purposely spiked sample), and 1 found asbestos only in the spiked sample. In conclusion, all members agreed that the best and most reliable method of detecting asbestos in talc is

50

not using optical microscopy, but rather transmission electronic microscopy (TEM) and electron diffraction. The same members, however, dispensed with this analytical method, claiming TEM and electron diffraction equipment was too expensive, despite Talc Defendants then owning or having unfettered access to TEM and electron diffraction equipment.

235. From there the difference between what Talc Defendants and the CTFA were telling themselves and each other, began to diverge from what they were telling and representing to the FDA. Amongst themselves, Talc Defendants and others in the industry knew that there was no such thing as asbestos-free talc mine, mill or powder—only talc in which asbestos could not be detected using the prevailing, most economical analytical methodologies—x-ray diffraction, which at the time could not accurately identify chrysotile asbestos in talc, nor detect tremolite asbestos contamination levels below 2-5%. The dangerousness of this cannot be understated, as 1 milligram of talc with 1% asbestos contains over 80,000,000 asbestos fibers.

236. Talc Defendants and the CTFA also did not disclose to the FDA that the vast majority of talcum powder manufacturers and sellers were not testing their products for asbestos, and if they were testing, it was done so superficially—only 4 or so grams per 20 tons of pre- shipment and pre-processed talc. Talc Defendants and the CTFA also failed to the tell the FDA that they were not testing off-the-shelf talcum powder products that the public was using, but rather samples that were years old; nor did they tell the FDA that they were limiting their testing of talc to only one type of asbestos fiber to the exclusion of all other fiber types that commonly contaminate talc; and to the extent Talc Defendants found asbestos in their samples, these positive results were not reported to the FDA. Instead, on their behalf, the CTFA sent letters to the FDA in March of 1976 falsely claiming that industry testing had shown all their talcum powder products to be completely free of asbestos.

237. Beginning in 1975 and 1976, researchers at New York Air Resources Board, Mt. Sinai School of Medicine, and the FDA became increasingly concerned, if not disgusted, that the

CTFA and Talc Defendants were dragging their feet on the issue of asbestos in talc and talcum powders. They had not issued any recalls, they provided no consumer warnings, they had not informed the FDA of any effort to ensure that talcum powders on the market did not contain asbestos, and they had yet to create and produce a verifiable methodology or protocol for ensuring that talc and talcum powder did not contain asbestos.

238.    Taking matters into their own hands Mt. Sinai Hospital researchers published a follow-up article to Dr. Lewin's 1971 study, which showed that some of Talc Defendants' talcum powders that were tested contained over 20% asbestos. The researchers concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc…We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." The results of the Mount Sinai study were soon picked up and reported by both the New York Times and the Washington Post that same year.

239.    Talc Defendants and the CTFA responded to these developments by falsely claiming that industry was doing "everything" they could to solve the problem, and by issuing press releases falsely claiming that chrysotile has never been found in talcum powders and/or completely failing to disclose that tremolite was not only commonly found in talc, but that undisclosed test, after undisclosed test showed that finished talcum powder products contained tremolite asbestos.

240.    With news of asbestos in talc finally making some headlines, the CTFA finally began in earnest to produce a voluntary protocol and methodology that would provide them cover from both lawsuits and regulation. Egregiously, as concerned media members, citizens and regulators began asking more questions about which other brands of talcum powder might containing asbestos, the Talc Defendants and CTFA refused to comment or falsely represented that talcum powders have never contained asbestos.

52

241.    Talc Defendants named herein and third parties collectively met with and corresponded with the CTFA, as well as collectively met with the FDA, to individually and collectively advocate for the use of "voluntary" XRD testing of miniscule portions of the tens of thousands of pounds of talc to be used in consumer products. Talc Defendants' "voluntary" method that was developed collectively by Talc Defendants and advocated to the FDA by Talc Defendants in lieu of regulations requiring asbestos labeling or warnings on talcum powder products, knowingly did not work in that levels of asbestos contamination in talc commonly and demonstrably fell below the detection limit of XRD. Talc Defendants also knew that asbestos contamination was not uniformly distributed, such that the tiny amounts Talc Defendants tested would not reveal the true level of contamination in the talc products sold to their customers.

242.    In support of their voluntary XRD, methodology which was finally published in 1977, the CTFA produced letters to the FDA written by their members, including Talc Defendants, identifying tests they had conducted showing their talcum powder products did not contain asbestos. The CTFA, Talc Defendants and other talcum product producers, however, never informed the FDA of the hundreds of positive tests showing talc and talcum powders were contaminated with asbestos.

243.    Talc Defendants made and published such representations claiming that their testing method was adequate, claiming they were ensuring that talcum powder products were safe, and claiming that their testing of talc reaching consumers was "safe," despite knowing the contrary. Talc Defendants intentionally and knowingly did so to avoid FDA regulations that may have required the Talc Defendants to place warnings regarding the asbestos content of their products, and thereby inform the public, including Decedent, that talcum powder products contained asbestos and were therefore dangerous.

244.    The CTFA then published an article in 1979 stating they conducted over three thousand tests of talcum powders and none of them contained chrysotile. The article and report do not

mention whether the talcum powders tested contained tremolite or anthophyllite. This publication and half-truths conveyed to the FDA and the inquiring public effectively staved off any proposed regulations and seemingly resolved the issue, at least in the FDA and public's eye. Thereafter CTFA's methodology became the standard by which all talc was analyzed by the entire industry, including talc used in personal care and construction products today.

245. Since 1979 and when the issue of asbestos in talc has arisen thereafter, the CTFA, and representatives of some Talc Defendants, have represented to various national news media and the public at large that their products are "asbestos-free", when in fact Talc Defendants actually meant, they did not "detect" asbestos according to their infrequently used and inadequate testing protocol. "No asbestos detected" means something much different than "no asbestos", but due to Talc Defendants' repeated conflation of the terms, the public has been lead to erroneously believe the former. Furthermore, since Talc Defendants did not have a sufficient testing protocol in place to support their claim that their products were safe or asbestos-free, such statements were recklessly made as they had no reason to believe them.

246. In 1982, the first epidemiologic study was performed on talc powder use in the female genital area. This study was conducted by Dr. Daniel Cramer and others. This study found a 92% increased risk in ovarian cancer with women who reported genital talc use. Shortly after this study was published, Dr. Bruce Semple of Defendant J&J visited Dr. Cramer about his study. Dr. Cramer advised Dr. Semple that Defendant J&J should place a warning on its talcum powder PRODUCTS concerning the ovarian cancer risks so that women can make an informed decision about their health.

247. Since 1982, there have been approximately twenty-two (22) additional epidemiologic studies providing data regarding the association of talc and ovarian cancer. Nearly all of these studies have reported an elevated risk for ovarian cancer associated with genital talc use in

women.

248.      In 1993, the United States National Toxicology Program published a study on the toxicity of non-asbestiform talc and found clear evidence of carcinogenic activity. Talc was found to be a carcinogen, with or without the presence of asbestos-like fibers.

249.      In response to the United States National Toxicology Program's study, the CTFA, which, as mentioned above, is now known as the PCPC, formed the Talc Interested Party Task Force ("TIPTF"). Defendants J&J and J&J Consumer were members of the CTFA and were the primary actors and contributors of the TIPTF. The stated purpose of the TIPTF was to pool financial resources of these member companies in an effort to collectively defend talc use at all costs and to prevent regulation of any type over this industry. The TIPTF hired scientists to perform biased research regarding the safety of talc, members of the TIPTF edited scientific reports of the scientists hired by this group prior the submission of these scientific reports to governmental agencies, members of the TIPTF knowingly released false information about the safety of talc to the consuming public, and used political and economic influence on regulatory bodies regarding talc. All of these activities have been well coordinated and planned by these companies and organizations over the past four (4) decades in an effort to prevent regulation of talc and to create confusion to the consuming public about the true hazards of talc relative to ovarian cancer.

250.      On November 10, 1994, the Cancer Prevention Coalition mailed a letter to Defendant J&J's then-C.E.O, Ralph Larson, informing his company that studies as far back as 1960's "show conclusively that the frequent use of talcum powder in the genital area pose a serious health risk of ovarian cancer." The letter cited a recent study from Dr. Harlow of Harvard Medical School confirming this fact and quoted a portion of the study where Dr. Harlow and his colleagues discouraged the use of talc in the female genital area. The letter further stated that 14,000 women per year die from ovarian cancer and that this type of cancer is very difficult to detect and has a low

survival rate. The letter concluded by requesting that Defendant J&J withdraw talc products from the market because of readily available alternative corn starch powders, or at a minimum, place warning information on its talc-based products about ovarian cancer risk they pose.

251.    In 1996, the condom industry stopped dusting condoms with talc due to the health concerns of ovarian cancer.

252.    In February 2006, the International Association for the Research of Cancer ("IARC") part of the World Health Organization published a paper whereby they classified perineal use of talc-based body powder as a "Group 2B" human carcinogen. IARC, which is universally accepted as the international authority on cancer issues, concluded that studies from around the world consistently found an increased risk of ovarian cancer in women from perineal use of talc. IARC found that between 16-52% of women in the world were using talc to dust their perineum and found an increased risk of ovarian cancer in women talc users ranging from 30-60%. IARC concluded with this Evaluation: "There is limited evidence in humans for the carcinogenicity of perineal use of talc-based body powder." By definition, "[l]imited evidence of carcinogenicity" means "a positive association has been observed between exposure to the agent and cancer for which a causal interpretation is considered by the Working Group to be credible, but chance, bias or confounding could not be ruled out with reasonable confidence."

253.    In 2006, the Canadian government under The Hazardous Products Act and associated Controlled Products Regulations classified talc as a "D2A", "very toxic", "cancer causing" substance under its Workplace Hazardous Materials Information System ("WHMIS"). Asbestos is also classified as "D2A".

254.    In 2006, Defendant J&J's vendor, Imerys, began placing a warning on its Material Safety Data Sheets ("MSDS") it provided to Defendant J&J regarding the talc it sold to them to be used in the PRODUCTS. These MSDSs not only provided the warning information about the IARC

classification but also included warning information regarding "States (including Florida) Rights to Know" and warning information about the Canadian Government's "D2A" classification of talc as well.

255.    In 2008, the Cancer Prevention Coalition submitted a second "Petition Seeking a Cancer Warning on Cosmetic Talc Product" to the FDA. The first Citizen Petition had been filed on November 17, 1994. The second Petition requested that the FDA immediately require cosmetic talcum powder product to bear labels with a prominent warning that frequent talc application in the female genital area is responsible for major risks of ovarian cancer. The FDA response to the two Citizen Petitions was filed on April 1, 2014.

256.    In 2009, IARC concluded that there is sufficient evidence for a causal association between exposure to asbestos and ovarian cancer.

257.    In 2013, Cancer Prevention Research published a study that showed that women who used talcum powder in their perineal area had a 20 to 30 percent greater risk of developing ovarian cancer than women who did not use talc product in that area.

258.    The Gilda Radner Familial Ovarian Cancer Registry, Roswell Park Center Institute, and the Department of Gynecologic Oncology at University of Vermont published a pamphlet titled, "Myths & Facts about ovarian cancer: What you need to know." In this pamphlet, under "known" risk factors for ovarian cancer, it lists: "Use of Talc (Baby Powder) in the Genital Area."

259.    Between 1970 through the 1990s, tests conducted by the talc industry and J&J continued to show that talc and talcum powder products contained asbestos.  None of these positive tests have ever been produced or made known to any regulatory agency, and knowledge of their existence is only because of litigation against these companies.

260.    J&J and the CTFA failed to disclose these positive results and the inadequacies of their testing protocols continued through the 1980s, 1990s and 2000s, when various government

57

agencies raised the issue of safety of talc, including the issue of asbestos-contamination, and efforts to label talc as a carcinogen.

261.    To this day talc containing products presently on the market contain and/or are contaminated with asbestos; and instead of publicizing this fact, J&J continues to deny all the above purely to protect themselves in litigation, much to the detriment of the entire United States public.

262.    Since at least 1979 the J&J Defendants have conducted a campaign to convince that their products are regulated by the FDA, that their tests are conducted pursuant to FDA regulations, and that talcum powder products are safe as a consequence. Nothing could be further from the truth, the FDA has never been assigned a budget by congress to regulate cosmetics including asbestos in talcum powders. J&J's concerns for the safety of their products have always been voluntary, and under the auspices of the CTFA—a private industry group, who in it 40 years has only banned the use of 11 ingredients in all cosmetics ever sold in the United States. Indeed, as of today asbestos containing talc in cosmetics has not been banned by the CTFA or FDA.

263.    However, in October 2019, the FDA announced that it found levels of chrysotile asbestos in a bottle of J&J Baby Powder. As a result of the FDA's finding, J&J recalled a shipment of its Baby Powder and several retailers pulled J&J Baby Powder from their shelves.

264.    J&J continues to fail to place any warning on their talc and talcum powder products or ever disclose the fact that these products contained asbestos at any point, up to and including the present, despite the clear hazard and direct information that their products did and continue to contain asbestos.

265.    J&J through explicit agreement and consciously parallel behavior controlled industry standards regarding the testing, manufacture, sale, distribution and use of asbestos- containing talcum powder products, and controlled the level of knowledge and information available to the public, including Plaintiff, regarding the hazards of exposure to asbestos dust and fibers from talc and talc-

containing products.

266.    J&J failed to report to the FDA tests performed both internally and by an outside laboratory confirming the presence of asbestos in both their finished products as well as talc shipments from J&J and other sources that were used to produce finished products. J&J, and even the outside laboratory McCrone Associates, further sent letters to the CTFA, to be and which were forwarded collectively to the FDA, stating that results of testing of talc used by them after 1972 had not revealed the presence of amphiboles or chrysotile, when in fact all of these entities had received or performed tests indicating the contrary by 1976, when such false representations were made.

267.    J&J intentionally failed to warn potential users, including Plaintiff, of the serious bodily harm and/or death which may result from the inhalation of, ingestion of and exposure to asbestos fibers and dust emanating from and released by their talc and talc-containing products.

268.    J&J knowingly and intentionally released, published and disseminated invalid, inaccurate, outdated and misleading scientific data, literature and test reports containing misinformation and false statements regarding the risks of asbestosis, cancer, mesothelioma and other illnesses and diseases from the use of talc and talcum powder, and specifically talc and talcum powder used in the production of products to which Plaintiff was exposed.

269.    J&J, while cognizant of the aforementioned data, deliberately chose to ignore the health and safety issues raised in said data and embarked upon a plan of deception intended to deprive the public at large, including Plaintiff, of alarming medical and scientific findings, many of which remained in their exclusive possession and under their exclusive control.

270.    Defendants knew of the adverse risks of using talc and talc-based body powders in the perineal area, and other areas of the body, and ovarian cancer and had a duty to warn about the potential hazards associated with the use of the PRODUCTS.

271.    Defendants, though having knowledge of the increased risk of ovarian cancer

associated with genital use of talc-based body powder, nevertheless actively marketed the safety of the PRODUCTS to users and failed to inform customers and end users of the PRODUCTS of a known catastrophic health hazard associated with the use of the PRODUCTS, particularly when used by women in the perineal area.

272.     In addition, Defendants procured and disseminated false, misleading, and biased information regarding the safety of talc, talc-based body powders, and the PRODUCTS to the public, and used influence over federal, state, and local governmental and regulatory bodies regarding talc and talc-based body powder.

273.     Defendant Imerys intentionally concealed safety issues with talc generally in order to induce consumers, including Decedent, to purchase the PRODUCTS.

274.     At the time Defendant Imerys concealed the fact that the PRODUCTS were not safe as designed and marketed by the J&J Defendants, Defendant Imerys was under a duty to communicate this information to the general public in such a manner that the general public would appreciate the risks associated with using the PRODUCTS, generally.

275.     Decedent relied upon Defendants' false and fraudulent misrepresentations and concealments regarding the safety of the PRODUCTS.

276.     As a direct and proximate result of Defendant Imerys's malicious and intentional concealment of material and information, Defendants caused or significantly contributed to Decedent's injuries and death.

277.     Defendant Imerys furthered this fraudulent concealment through a continued and systematic failure to disclose information to Decedent and the public.

278.     Defendant Imerys's conduct, as described in the preceding paragraphs, amounts to conduct purposely committed, which Defendant Imerys must have realized was dangerous, needless, and reckless, without regard to the consequences or the rights and safety of Decedent.

279.    As a direct and proximate result of Defendant Imerys's fraudulent concealment concerning the PRODUCTS, as described herein, Decedent was injured and died.

280.    As a direct and proximate result of Decedent's injuries and death, her husband, Plaintiff, has sustained the following damage:

a.    Deprivation of past and future support and services;

b.    Loss of companionship and protection, and great mental pain and suffering in the past and future; and

c.    Medical and funeral expenses due to Decedent's injury and death,

281.    As a further direct and proximate result of Decedent's injuries and death, her estate has sustained the following damages:

a.    Loss of net accumulations of Decedent; and

b.    Medical and funeral expenses due to Decedent's injury and death.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant Imerys, awarding any and all damages to which Plaintiff, Decedent, the survivors, and the Estate may be entitled under applicable law, together with interest, costs, and, pursuant to applicable law, reasonable attorneys' fees incurred or to be incurred in this action.

### COUNT XI: FRAUDULENT CONCEALMENT
### (AGAINST THE J&J DEFENDANTS)

Plaintiff incorporates by reference paragraphs 1-134 as if set forth fully herein.

282.    Prior to Decedent's use of the PRODUCTS and during the period in which Decedent actually used the PRODUCTS, the J&J Defendants fraudulently suppressed material information regarding the safety and efficacy of the PRODUCTS and the availability of an alternative feasible safer design, including but not limited to, information regarding the safe use of cornstarch-based products for the same purposes. Furthermore, the J&J Defendants fraudulently concealed the safety

information about the use of the PRODUCTS, generally, and on the perineal area, specifically. Upon information and belief, the fraudulent misrepresentations and fraudulent concealment described throughout this Complaint were intentional so as to maintain the sales volume of the PRODUCTS.

283.    Geologists and mining companies, including J&J, as well as their suppliers, experts, agents and advisors, have long known that talc deposits and mines around the United States of America, and the world, were and are closely associated with asbestos. In its elemental form talc is nearly identical to certain asbestos fiber types; and depending on the amount of heat, pressure and time applied to asbestos or talc deposits, transitional fibers are found within both. Transitional fibers are fibers that are half talc and half asbestos.

284.    Asbestos is a commercial and legal term, rather than a geological or scientific term, referring to six now-regulated magnesium silicate minerals that occur in fibrous form, including the serpentine mineral chrysotile, and the amphibole minerals actinolite, anthophyllite, tremolite, amosite and crocidolite.

285.    In 1965, The United States Geological Survey on Commercial Talc production, which the J&J Defendants are well aware, includes surveys dating back to the 1800s, which clearly reveal that tremolite, anthophyllite and chrysotile asbestos are commonly found within, around or as integral part of virtually all talc deposits in the United States. Indeed, talc from some deposits and mines, including some owned by J&J, were identified and advertised as "tremolitic talc" due to its extremely high asbestos content.

286.    The J&J Defendants, which have been and still are the largest talc or talcum powder producers, users, suppliers, distributors, or consumer product manufacturers in the world, admit that they have long employed doctors, scientists, mineralogist, and toxicologists; and that they have long maintained extensive medical and scientific libraries and archives containing or likely to have contained medical and scientific articles, international articles, as well as books, surveys, internally

62

produced reports, and other materials indicating exposures to all grades of talc were and are dangerous and sometimes fatal.

287.    Beginning in the 1930s, medical and scientific literature emerged indicating talc was and is commonly, if not invariably, contaminated with substances known or suspected of being carcinogenic, such as asbestos, asbestiform fibers, non-asbestiform particles, silica, quartz, nickel and arsenic. Within the next several decades an ever-growing body of medical and scientific literature demonstrated that direct and secondary inhalation of, and exposure to, talc or talc contaminated with asbestos, asbestiform fibers, and non-asbestiform particles, and other carcinogens, was hazardous to exposed persons' health in that it could cause lung disease, cancer and even death.

288.    The J&J Defendants and/or their predecessors, affiliates, employees, agents or suppliers were members of the National Safety Council (NSC). In March of 1933, Waldemar C. Dreesen of the United States Public Health Service reported to the National Safety Council the results of a study conducted of employees at a talc and slate mine and mill. The study indicated that the talc was a hydrous calcium magnesium silicate, being 45 percent talc and 45 percent tremolite, and the National Safety Council stated "[t]he results of the study seemed to indicate a relationship between the amount of dust inhaled and the effect of this dust on the lungs of the workers."

289.    Over the course of the next three years, the NSC continued to publish articles and hold conferences for its members informing them that inhalation of asbestos causes fatal lung disease; that exposures to mineral dust including talc were resulting in successful claims for compensation and injury; and that the best means of combating disease and future claims from exposure to mineral dust is reducing exposures to the same.

290.    During the 1940s, 1950s, and 1960s, the body of medical and scientific literature regarding the hazards of exposure to talc or talc contaminated with asbestos expanded providing

experts in the field like the J&J Defendants with increasing evidence that talc, including cosmetic grade talcum powder, caused lung disease, tissue lesions, cancer, and death—including reports of persons contracting fatal lung diseases from regular use of talcum/body powder.

291.    During the 1940s and 1950s, various States' Departments of Labor and Industrial Commissions began recognizing the health hazards of talc and talcum powders and implemented regulations targeting employers, including the J&J Defendants, which mined, milled, or processed talc to ensure employees' exposures to respirable talc were below levels considered to be safe, and economically feasible.

292.    By 1967, the J&J Defendants knew or most certainly should have known asbestos exposure causes mesothelioma. In the same year, doctors and researchers at State University of New York—Buffalo published a paper implicating asbestos as being a cause of ovarian cancer. The authors noted that there had been a thousand-fold increase in the incidence of ovarian cancer since the beginning of the 20th century, which had then grown to the third leading causing of cancer of women in the western world—a rate that was significantly higher than Southern American and Asian women, where use of talcum powder is less prevalent.

293.    In 1968, a scientific study of store-bought, commercially available talcum powders conducted by the Occupational Health Program, National Center for Urban Industrial Health, was published and presented by the American Industrial Hygiene Association revealing that, contrary to popular belief, talcum powders were not entirely pure, but contaminated with various fibrous minerals, including tremolite, anthophyllite, and chrysotile.  This was not unexpected, as the study imparts, as these types of fibers are often present in fibrous talc mineral deposits. Among other things, the authors noted the unknown significant amounts of such materials in products used without precaution may create unsuspected problems.

294.     Available documents indicate that during the same year and in the years following, at least one company began testing store bought talcum powders for asbestos content. Despite tests showing some commercial talcum powders were contaminated with asbestos, there is no evidence showing that positive results or the brand names of contaminated products were communicated to any governmental agency, the media, and the public at large, let alone the customers.

295.     In 1971, the first study was conducted that suggested an association between talc and ovarian cancer. This study was conducted by Dr. WJ Henderson and others in Cardiff, Wales.

296.     Also in 1971, the New York City of Environmental Protection Administration— Air Resources Board, conducted a study of two "leading" brand of talcum powder using transmission electron microscopy and X-ray diffraction analysis (XRD), and found them to contain 5-25% tremolite and anthophyllite asbestos fibers under 5 microns.

297.     Thereafter, within the same year, a symposium was held in August of 1971 at the FDA to discuss the problem of asbestos contamination in talcum powders with the talc industry, government officials, and doctors and scientists from Mt. Sinai Hospital—then the epicenter of the medical and scientific study of asbestos. Among other statements, participants and attendees heard: that asbestos should be banned in talcum powders; models should be set up to measure the levels exposure to asbestos experienced by persons using talcum powder containing asbestos at the lowest level of microscopic detection; and that finding asbestos in talc and talcum powder is extremely difficult, and the only truly reliable way to determine the asbestos content of talc and talcum powder is through using a transmission electron microscope and electron diffraction. J&J citing costs, as well as their fear of the public learning talcum powder was contaminated with asbestos, ignored and completely rejected any measures to meaningfully test all their products to make sure they were asbestos-free and free of other cancer causing contaminates.

65

298.    After this 1971 meeting, Dr. Weissler of the FDA, hired Dr. Seymour Z. Lewin to test commercially available talcum powders and test them for asbestos. Dr. Lewin tested 195 samples and found asbestos of varying amounts in 43 samples. Many of Dr. Lewin's positive results were eventually corroborated by Pfizer, Inc. laboratories—the difference being in percentages of asbestos found. The results however were uncorroborated by two other laboratories, leading the FDA to the conclusion that XRD, optical and electron microscopy and diffraction must be used to find asbestos in talc and talcum powders.

299.    Contemporaneously, evidence began to emerge from testing conducted by various regulatory agencies revealing that asbestos was being found in food, beer, drugs, including intravenously injected medicines. In 1972, and later in 1973, the FDA filed notices of proposed rulemaking requiring talc used in food, food packing, and drugs, to be asbestos-free. These of course were some of the same grades of talc used in talcum and baby powders, including talc mined, milled, supplied, and distributed by J&J.

300.    The talc industry's response, including those of the J&J Defendants, was swift and well-coordinated through the CTFA (now known as the PCPC), an exclusive lobbying and advocacy group representing companies engaged in the cosmetic products industry, that conspired and worked in concert with the J&J Defendants to: purposely create a flawed, voluntary testing and surveillance methodology for detecting asbestos and other carcinogens in talcum powder; and block efforts to label and warn consumers regarding the dangers associated with the talcum powder products.

301.    Respecting the FDA's proposed 1972 ruling making, the FDA Director of Product Development and Cosmetics, Dr. Schaffner, invited representatives of the talc industry to a meeting in August of 1972 to discuss the results of Dr. Lewin's study of 195 talcum powders and

inform them that the FDA was preparing to release a "Proposed Statement of Policy On Asbestos in Cosmetics Containing Talc." Dr. Schaffner explained that he was duty bound and must publicize the brand names of the talcum powders that contained asbestos. The President of the CTFA, Dr. Merritt however strongly objected to the FDA alerting the general public or publishing or publicizing the brand and manufacturers' names of the talcum powders, as it would cause them "economic hardship." The CTFA's President also threatened to sue the FDA to prevent the disclosure of these names. Unsurprisingly, the FDA and the J&J Defendants never revealed or publicized the brand names of the talcum powders that contained asbestos.

302.    In 1973, the CTFA created a talc subcommittee and the Scientific Advisory Committee to start developing a testing methodology for measuring asbestos in talc. Initially, the CTFA designated a group of its members to tests talc grades used in talcum powder utilizing the methodology proposed by the FDA in its notice of rulemaking. Six samples of talc used in commercially available talcum powders, plus one talc sample purposely spiked with tremolite and chrysotile, were circulated amongst the members, including representatives of the J&J Defendants. Of the 8 participating members, 4 found asbestos in every sample, 3 did not find asbestos in any sample (including the purposely spiked sample), and 1 found asbestos only in the spiked sample. In conclusion, all members agreed that the best and most reliable method of detecting asbestos in talc is not using optical microscopy, but rather transmission electronic microscopy (TEM) and electron diffraction.  The same members, however, dispensed with this analytical method, claiming TEM and electron diffraction equipment was too expensive, despite J&J then owning or having unfettered access to TEM and electron diffraction equipment.

303.    From there the difference between what J&J and the CTFA were telling themselves and each other, began to diverge from what they were telling and representing to the FDA.

67

Amongst themselves, J&J and others in the industry knew that there was no such thing as asbestos-free talc mine, mill or powder—only talc in which asbestos could not be detected using the prevailing, most economical analytical methodologies—x-ray diffraction, which at the time could not accurately identify chrysotile asbestos in talc, nor detect tremolite asbestos contamination levels below 2-5%. The dangerousness of this cannot be understated, as 1 milligram of talc with 1% asbestos contains over 80,000,000 asbestos fibers.

304.     J&J and the CTFA also did not disclose to the FDA that the vast majority of talcum powder manufacturers and sellers were not testing their products for asbestos, and if they were testing, it was done so superficially—only 4 or so grams per 20 tons of pre-shipment and pre-processed talc. J&J and the CTFA also failed to the tell the FDA that they were not testing off-the-shelf talcum powder products that the public was using, but rather samples that were years old; nor did they tell the FDA that they were limiting their testing of talc to only one type of asbestos fiber to the exclusion of all other fiber types that commonly contaminate talc; and to the extent the J&J Defendants found asbestos in their samples, these positive results were not reported to the FDA.  Instead, on their behalf, the CTFA sent letters to the FDA in March of 1976 falsely claiming that industry testing had shown all their talcum powder products to be completely free of asbestos.

305.     Beginning in 1975 and 1976, researchers at New York Air Resources Board, Mt. Sinai School of Medicine, and the FDA became increasingly concerned, if not disgusted, that the CTFA and J&J were dragging their feet on the issue of asbestos in talc and talcum powders.  They had not issued any recalls, they provided no consumer warnings, they had not informed the FDA of any effort to ensure that talcum powders on the market did not contain asbestos, and they had yet to create and produce a verifiable methodology or protocol for ensuring that talc and talcum powder did not contain asbestos.

306.     Taking matters into their own hands Mt. Sinai Hospital researchers published a follow-up article to Dr. Lewin's 1971 study, which showed that some of J&J's talcum powders that were tested contained over 20% asbestos. The researchers concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc . . . We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." The results of the Mount Sinai study were soon picked up and reported by both the New York Times and the Washington Post that same year.

307.     J&J and the CTFA responded to these developments by falsely claiming that industry was doing "everything" they could to solve the problem, and by issuing press releases falsely claiming that chrysotile has never been found in talcum powders and/or completely failing to disclose that tremolite was not only commonly found in talc, but that undisclosed test, after undisclosed test showed that finished talcum powder products contained tremolite asbestos.

308.     With news of asbestos in talc finally making some headlines, the CTFA finally began in earnest to produce a voluntary protocol and methodology that would provide them cover from both lawsuits and regulation. Egregiously, as concerned media members, citizens and regulators began asking more questions about which other brands of talcum powder might contain asbestos, J&J and CTFA refused to comment or falsely represented that talcum powders have never contained asbestos.

309.     J&J and third parties collectively met with and corresponded with the CTFA, as well as collectively met with the FDA, to individually and collectively advocate for the use of "voluntary" XRD testing of miniscule portions of the tens of thousands of pounds of talc to be used in consumer products. This "voluntary" method that was developed collectively by J&J and

advocated to the FDA by J&J in lieu of regulations requiring asbestos labeling or warnings on talcum powder products, knowingly did not work in that levels of asbestos contamination in talc commonly and demonstrably fell below the detection limit of XRD. J&J also knew that asbestos contamination was not uniformly distributed, such that the tiny amounts J&J tested would not reveal the true level of contamination in the talc products sold to their customers.

310.     In support of their voluntary XRD, methodology which was finally published in 1977, the CTFA produced letters to the FDA written by their members, including J&J, identifying tests they had conducted showing their talcum powder products did not contain asbestos. The CTFA and J&J, however, never informed the FDA of the hundreds of positive tests showing talc and talcum powders were contaminated with asbestos.

311.     The J&J Defendants made and published such representations claiming that their testing method was adequate, claiming they were ensuring that talcum powder products were safe, and claiming that their testing of talc reaching consumers was "safe," despite knowing the contrary. J&J intentionally and knowingly did so to avoid FDA regulations that may have required J&J to place warnings regarding the asbestos content of their products, and thereby inform the public, including Decedent, that talcum powder products contained asbestos and were therefore dangerous.

312.     The CTFA then published an article in 1979 stating they conducted over three thousand tests of talcum powders and none of them contained chrysotile. The article and report do not mention whether the talcum powders tested contained tremolite or anthophyllite. This publication and half-truths conveyed to the FDA and the inquiring public effectively staved off any proposed regulations and seemingly resolved the issue, at least in the FDA and public's eye. Thereafter CTFA's methodology became the standard by which all talc was analyzed by the entire

70

industry, including talc used in personal care and construction products today.

313.    Since 1979 and when the issue of asbestos in talc has arisen thereafter, the CTFA, and representatives of J&J, have represented to various national news media and the public at large that their products are "asbestos-free", when in fact J&J actually meant, they did not "detect" asbestos according to their infrequently used and inadequate testing protocol. "No asbestos detected" means something much different than "no asbestos", but due to J&J's repeated conflation of the terms, the public has been led to erroneously believe the former. Furthermore, since J&J did not have a sufficient testing protocol in place to support their claim that their products were safe or asbestos-free, such statements were recklessly made as they had no reason to believe them.

314.    In 1982, the first epidemiologic study was performed on talc powder use in the female genital area. This study was conducted by Dr. Daniel Cramer and others. This study found a 92% increased risk in ovarian cancer with women who reported genital talc use. Shortly after this study was published, Dr. Bruce Semple of Defendant J&J visited Dr. Cramer about his study. Dr. Cramer advised Dr. Semple that Defendant J&J should place a warning on its talcum powder PRODUCTS concerning the ovarian cancer risks so that women can make an informed decision about their health.

315.    Since 1982, there have been at least twenty-two (22) additional epidemiologic studies providing data regarding the association of talc and ovarian cancer. Nearly all of these studies have reported an elevated risk for ovarian cancer associated with genital talc use in women.

316.    In 1993, the United States National Toxicology Program published a study on the toxicity of non-asbestiform talc and found clear evidence of carcinogenic activity. Talc was found to be a carcinogen, with or without the presence of asbestos-like fibers.

317.     In response to the United States National Toxicology Program's study, the CTFA, which, as mentioned above, is now known as the PCPC, formed the Talc Interested Party Task Force ("TIPTF"). Defendants J&J and J&J Consumer were members of the CTFA and were the primary actors and contributors of the TIPTF. The stated purpose of the TIPTF was to pool financial resources of these member companies in an effort to collectively defend talc use at all costs and to prevent regulation of any type over this industry. The TIPTF hired scientists to perform biased research regarding the safety of talc, members of the TIPTF edited scientific reports of the scientists hired by this group prior the submission of these scientific reports to governmental agencies, members of the TIPTF knowingly released false information about the safety of talc to the consuming public, and used political and economic influence on regulatory bodies regarding talc. All of these activities have been well coordinated and planned by these companies and organizations over the past four (4) decades in an effort to prevent regulation of talc and to create confusion to the consuming public about the true hazards of talc relative to ovarian cancer.

318.     On November 10, 1994, the Cancer Prevention Coalition mailed a letter to Defendant J&J's then-C.E.O, Ralph Larsen, informing his company that studies as far back as 1960's "show conclusively that the frequent use of talcum powder in the genital area pose a serious health risk of ovarian cancer." The letter cited a recent study from Dr. Harlow of Harvard Medical School confirming this fact and quoted a portion of the study where Dr. Harlow and his colleagues discouraged the use of talc in the female genital area. The letter further stated that 14,000 women per year die from ovarian cancer and that this type of cancer is very difficult to detect and has a low survival rate. The letter concluded by requesting that Defendant J&J withdraw talc products from the market because of readily available alternative corn starch powders, or at a minimum, place warning information on its talc-based products about ovarian cancer risk they pose.

319.    In 1996, the condom industry stopped dusting condoms with talc due to the health concerns of ovarian cancer.

320.    In February 2006, the International Association for the Research of Cancer ("IARC") part of the World Health Organization published a paper whereby they classified perineal use of talc-based body powder as a "Group 2B" human carcinogen. IARC, which is universally accepted as the international authority on cancer issues, concluded that studies from around the world consistently found an increased risk of ovarian cancer in women from perineal use of talc. IARC found that between 16-52% of women in the world were using talc to dust their perineum and found an increased risk of ovarian cancer in women talc users ranging from 30-60%. IARC concluded with this Evaluation: "There is limited evidence in humans for the carcinogenicity of perineal use of talc-based body powder." By definition, "Limited evidence of carcinogenicity" means "a positive association has been observed between exposure to the agent and cancer for which a causal interpretation is considered by the Working Group to be credible, but chance, bias or confounding could not be ruled out with reasonable confidence."

321.    In 2006, the Canadian government under The Hazardous Products Act and associated Controlled Products Regulations classified talc as a "D2A", "very toxic", "cancer causing" substance under its Workplace Hazardous Materials Information System ("WHMIS"). Asbestos is also classified as "D2A."

322.    In 2006, Defendant J&J's vendor, Imerys began placing a warning on its Material Safety Data Sheets ("MSDS") it provided to Defendant J&J regarding the talc it sold to them to be used in the PRODUCTS. These MSDSs not only provided the warning information about the IARC classification but also included warning information regarding "States (including Florida) Rights to Know" and warning information about the Canadian Government's "D2A" classification

of talc as well.

323.    In 2008, the Cancer Prevention Coalition submitted a second "Petition Seeking a Cancer Warning on Cosmetic Talc Product" to the FDA. The first Citizen Petition had been filed on November 17, 1994.  The second Petition requested that the FDA immediately require cosmetic talcum powder product to bear labels with a prominent warning that frequent talc application in the female genital area is responsible for major risks of ovarian cancer. The FDA response to the two Citizen Petitions was filed on April 1, 2014.

324.    In 2009, IARC concluded that there is sufficient evidence for a causal association between exposure to asbestos and ovarian cancer.

325.    In 2013, Cancer Prevention Research published a study that showed that women who used talcum powder in their perineal area had a 20 to 30 percent greater risk of developing ovarian cancer than women who did not use talc product in that area.

326.    The Gilda Radner Familial Ovarian Cancer Registry, Roswell Park Center Institute, and the Department of Gynecologic Oncology at University of Vermont published a pamphlet titled, "Myths & Facts about ovarian cancer: What you need to know." In this pamphlet, under "known" risk factors for ovarian cancer, it lists: "Use of Talc (Baby Powder) in the Genital Area."

327.    Between 1970 through the 1990s, tests conducted by the talc industry and J&J continued to show that talc and talcum powder products contained asbestos.  None of these positive tests have ever been produced or made known to any regulatory agency, and knowledge of their existence is only because of litigation against these companies.

328.    J&J and the CTFA failed to disclose these positive results and the inadequacies of their testing protocols continued through the 1980s, 1990s and 2000s, when various government agencies raised the issue of safety of talc, including the issue of asbestos-contamination, and efforts

to label talc as a carcinogen.

329.    To this day talc containing products presently on the market contain and/or are contaminated with asbestos; and instead of publicizing this fact, J&J continues to deny all the above purely to protect themselves in litigation, much to the detriment of the entire United States public.

330.    Since at least 1979 the J&J Defendants have conducted a campaign to convince that their products are regulated by the FDA, that their tests are conducted pursuant to FDA regulations, and that talcum powder products are safe as a consequence. Nothing could be further from the truth; the FDA has never been assigned a budget by congress to regulate cosmetics including asbestos in talcum powders. J&J's concerns for the safety of their products have always been voluntary, and under the auspices of the CTFA—a private industry group, who in it 40 years has only banned the use of 11 ingredients in all cosmetics ever sold in the United States.  Indeed, as of today asbestos containing talc in cosmetics has not been banned by the CTFA or FDA.

331.    However, in October 2019, the FDA announced that it found levels of chrysotile asbestos in a bottle of J&J Baby Powder. As a result of the FDA's finding, J&J recalled a shipment of its Baby Powder and several retailers pulled J&J Baby Powder from their shelves.

332.    J&J continues to fail to place any warning on their talc and talcum powder products or ever disclose the fact that these products contained asbestos at any point, up to and including the present, despite the clear hazard and direct information that their products did and continue to contain asbestos.

333.    J&J through explicit agreement and consciously parallel behavior controlled industry standards regarding the testing, manufacture, sale, distribution and use of asbestos-containing talcum powder products, and controlled the level of knowledge and information

available to the public, including Decedent, regarding the hazards of exposure to asbestos dust and fibers from talc and talc-containing products.

334.    J&J failed to report to the FDA tests performed both internally and by an outside laboratory confirming the presence of asbestos in both their finished products as well as talc shipments from J&J and other sources that were used to produce finished products.  J&J, and even the outside laboratory McCrone Associates, further sent letters to the CTFA, to be and which were forwarded collectively to the FDA, stating that results of testing of talc used by them after 1972 had not revealed the presence of amphiboles or chrysotile, when in fact all of these entities had received or performed tests indicating the contrary by 1976, when such false representations were made.

335.    J&J intentionally failed to warn potential users, including Decedent, of the serious bodily harm and/or death which may result from the inhalation of, ingestion of and exposure to asbestos fibers and dust emanating from and released by their talc and talc-containing products.

336.    J&J knowingly and intentionally released, published and disseminated invalid, inaccurate, outdated and misleading scientific data, literature and test reports containing misinformation and false statements regarding the risks of asbestosis, cancer, mesothelioma and other illnesses and diseases from the use of talc and talcum powder, and specifically talc and talcum powder used in the production of products to which Decedent was exposed.

337.    J J&J, while cognizant of the aforementioned data, deliberately chose to ignore the health and safety issues raised in said data and embarked upon a plan of deception intended to deprive the public at large, including Decedent, of alarming medical and scientific findings, many of which remained in their exclusive possession and under their exclusive control.

338.    Defendants knew of the adverse risks of using talc and talc-based body powders in the perineal area, and other areas of the body, and ovarian cancer and had a duty to warn about

the potential hazards associated with the use of the PRODUCTS.

339.    Defendants, though having knowledge of the increased risk of ovarian cancer associated with genital use of talc-based body powder, nevertheless actively marketed the safety of the PRODUCTS to users and failed to inform customers and end users of the PRODUCTS of a known catastrophic health hazard associated with the use of the PRODUCTS, particularly when used by women in the perineal area.

340.    In addition, Defendants procured and disseminated false, misleading, and biased information regarding the safety of talc, talc-based body powders, and the PRODUCTS to the public, and used influence over federal, state, and local governmental and regulatory bodies regarding talc and talc-based body powder.

341.    In addition, Defendants procured and disseminated false, misleading, and biased information regarding the safety of talc, talc-based body powders, and the PRODUCTS to the public, and used influence over federal, state, and local governmental and regulatory bodies regarding talc and talc-based body powder.

342.    The J&J Defendants intentionally concealed safety issues with the PRODUCTS in order to induce consumers, including Decedent, to purchase the PRODUCTS.

343.    At the time the J&J Defendants concealed the fact that the PRODUCTS were not safe as designed and marketed, the J&J Defendants were under a duty to communicate this information to the general public in such a manner that the general public could appreciate the risks associated with using the PRODUCTS, generally.

344.    Decedent relied upon Defendants' false and fraudulent misrepresentations and concealments regarding the safety of the PRODUCTS.

345.    As a direct and proximate result of the J&J Defendants' malicious and intentional concealment of material and information, the J&J Defendants caused or significantly contributed

to Decedent's injuries and death.

346.    The J&J Defendants furthered this fraudulent concealment through a continued and systemic failure to disclose information to Decedent and the public.

347.    The J&J Defendants' acts before, during, and/or after the act causing Decedent's injuries prevented Decedent from discovering the injury or cause thereof.

348.    The J&J Defendants' conduct, as described in the preceding paragraphs, amounts to conduct purposely committed, which the J&J Defendants must have realized was dangerous, needless and reckless, without regard to the consequences or the rights and safety of decedent.

349.    As a direct and proximate result of the J&J Defendants' fraudulent concealment concerning the PRODUCTS, as described herein, Decedent was injured and died.

350.    As a direct and proximate result of Decedent's injuries and death, her husband, Plaintiff, has sustained the following damages:

a.    Deprivation of past and future support and services

b.    Loss of companionship and protection, and great mental pain and suffering in the past and future; and

c.    Medical and funeral expenses due to Decedent's injury and death.

351.    As a further direct and proximate result of Decedent's injuries and death, her estate has sustained the following damages:

a.    Loss of net accumulations of Decedent; and

b.    Medical and funeral expenses due to Decedent's injury and death.

WHEREFORE, Plaintiff demands judgment in his favor and against the J&J Defendants, awarding any and all damages to which Plaintiff, Decedent, the survivors, and the Estate may be entitled under applicable law, together with interest, costs, and, pursuant to applicable law,

reasonable attorneys' fees incurred or to be incurred in this action.

## COUNT XII: STRICT LIABILITY (AGAINST DEFENDANT PUBLIX)

Plaintiff incorporates by reference paragraphs 1-134 as though set forth fully herein.

352.    Defendant Publix was engaged in the business of selling and/or placing into the stream of commerce the PRODUCTS, and/or Publix brand asbestos-containing talc products, which Defendant Publix knew would be used or utilized by persons like Decedent.

353.    Defendant Publix marketed, sold, and/or placed into the stream of commerce the PRODUCTS, and/or Publix brand asbestos-containing talc products, involved in this action which were defective and unreasonably dangerous.

354.    Throughout her life, Decedent used the PRODUCTS, and/or Publix brand asbestos-containing talc products, for the purpose for which they were intended and in a manner reasonably foreseeable to Defendant Publix.

355.    Defendant Publix marketed and/or sold the PRODUCTS, and/or Publix brand asbestos-containing talc products, in a manner so as to render them defective and unsafe for their intended use, including, but not limited to:

a.    they were not reasonably fit for the uses intended or reasonably foreseeable by Defendant Publix;

b.    they were in a condition unreasonably dangerous to Decedent in that use there of increased the risk of ovarian cancer;

c.    they were designed, manufactured, and assembled using an unsafe plan or design and with materials, ingredients, and/or components, which would cause increased risk of ovarian cancer with the use of the Products by women;

d.    they lacked reasonable and adequate warnings to users as to their dangerous

79

propensity, including the increased risk of ovarian cancer with use by women;

  e.  they lacked reasonable and adequate warnings to users as to the hazards associated with the use of thereof;

  f.  they lacked reasonable and adequate warnings to users to inform ultimate users, such as Decedent, as to the safe and proper methods of handling and using same;

  g.  they lacked reasonable and adequate warnings to users to inform ultimate users, such as Decedent, as to the safe and proper methods of handling and using same;

  h.  they lacked reasonable and adequate instructions to the ultimate users, such as Decedent, as to the methods for reducing the type of exposure thereto which caused increased risk of ovarian cancer;

  i.  they lacked reasonable and adequate warnings of the known dangers of using same for dusting the perineum; and

  j.  they lacked reasonable and adequate warnings and instruction for users on how to prevent or reduce exposure that caused increased risk for ovarian cancer.

  356. The PRODUCTS, and/or Publix brand asbestos-containing talc products, were defective when they left the possession of Defendant Publix and were expected to, and did, reach the user without substantial change in their condition.

  357. The PRODUCTS, and/or Publix brand asbestos-containing talc products, were defective, as alleged herein, when they were first placed into the stream of commerce.

  358. Defendant Publix's marketing and sale of the PRODUCTS, and/or Publix brand asbestos-containing talc products, which were defective and unsafe as aforementioned and alleged, was the proximate cause of the injuries, and, as a result, Defendant Publix is strictly liable in tort to Plaintiff.

359.     As a direct and proximate result of Defendant Publix's negligence in one or more of the aforementioned ways, Decedent purchased and used, as aforementioned, the PRODUCTS, and/or Publix brand asbestos-containing talc products, that directly and proximately caused Decedent to develop ovarian cancer.

360.     As a direct and proximate result of Defendant Publix's negligence in one or more of the aforementioned ways, Decedent was injured and died.

361.     As a direct and proximate result of Decedent's injuries and death, her husband, Plaintiff, has sustained the following damages:

a.     Deprivation of past and future support and services

b.     Loss of companionship and protection, and great mental pain and suffering in the past and future; and

c.     Medical and funeral expenses due to Decedent's injury and death.

362.     As a further direct and proximate result of Decedent's injuries and death, her estate has sustained the following damages:

a.     Loss of net accumulations of Decedent; and

b.     Medical and funeral expenses due to Decedent's injury and death.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant Publix, awarding any and all damages to which Plaintiff, Decedent, the survivors, and the Estate may be entitled under applicable law, together with interest, costs, and, pursuant to applicable law, reasonable attorneys' fees incurred or to be incurred in this action.

## COUNT XIII: NEGLIGENCE (AGAINST DEFENDANT PUBLIX)

Plaintiff incorporates by reference paragraphs 1-134 as though set forth fully herein.

363.     Defendant Publix was engaged in the business of selling and/or placing into the

stream of commerce the PRODUCTS, and/or Publix brand asbestos-containing talc products, which Defendant Publix knew would be used or utilized by persons like Decedent.

364.    Defendant Publix marketed, sold, and/or placed into the stream of commerce the PRODUCTS, and/or Publix brand asbestos-containing talc products, involved in this action.

365.    Throughout her lifetime, Decedent used the PRODUCTS, and/or Publix brand asbestos-containing talc products, for the purpose for which they were intended and in a manner reasonably foreseeable to Defendant Publix.

366.    Defendant Publix knew, or in the exercise of reasonable care, should have known, that the PRODUCTS, and/or Publix brand asbestos-containing talc products, were not properly designed, manufactured, assembled, tested, inspected, and sold, and knew, or, in the exercise of reasonable care, should have known, that the PRODUCTS, and/or Publix brand asbestos-containing talc products, created an unreasonable risk of harm to persons using the Products, including Decedent.

367.    Defendant Publix owed a duty to convey to consumers and users a fair and adequate warning of the dangerous characteristics of the PRODUCTS, and/or Publix brand asbestos-containing talc products, so that the users, in the exercise of reasonable care, would have fair and adequate notice of the possible consequences of using the PRODUCTS.

368.    Defendant Publix owed a duty to consumer and users to inspect the products it sells, including the PRODUCTS, and/or Publix brand asbestos-containing talc products, at issue here, and to sell products which are reasonably safe for the consumers or users.

369.    Defendant Publix negligently sold the PRODUCTS, and/or Publix brand asbestos-containing talc products, in some and/or all of, but not limited to, the following respects:

a.    Selling the PRODUCTS, and/or Publix brand asbestos-containing talc products,

that it knew, or should have known, through reasonable care diligence, increased the risk of ovarian cancer;

b.        Failing to provide reasonable and adequate warnings as to the dangerous propensities of the PRODUCTS, and/or Publix brand asbestos-containing talc products, including the risk that their use could lead to the development of ovarian cancer;

c.        Failing to adequately and properly inspect the PRODUCTS, and/or Publix brand asbestos-containing talc products, for any and all defects or dangers in the design, manufacture, ingredients, and/or component parts of the same, when it knew or should have known that it was better suited and capable of conducting such inspection than its consumers

370.     As a direct and proximate result of Defendant Publix's negligence in one or more of the aforementioned ways, Decedent purchased and used, as mentioned above, the PRODUCTS, and/or Publix brand asbestos-containing talc products, that directly and proximately caused Decedent to develop ovarian cancer and die.

371.     As a direct and proximate result of Defendant Publix's carelessness and negligence in one or more of the aforementioned ways, Decedent was injured and died.

372.     As a direct and proximate result of Decedent's injuries and death, her husband, Plaintiff, has sustained the following damages:

a.        Deprivation of past and future support and services

b.        Loss of companionship and protection, and great mental pain and suffering in the past and future; and

c.        Medical and funeral expenses due to Decedent's injury and death.

373.     As a further direct and proximate result of Decedent's injuries and death, her estate has sustained the following damages:

a.      Loss of net accumulations of Decedent; and

b.      Medical and funeral expenses due to Decedent's injury and death.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant Publix, awarding any and all damages to which Plaintiff, Decedent, and the Estate may be entitled under applicable law, together with interest, costs, and, pursuant to applicable law, reasonable attorneys' fees incurred or to be incurred in this action.

## DAMAGES

Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully herein and seeks damages for each Count above.

374.    As a direct and proximate result of the negligence, gross negligence, strict liability, intentional misconduct, breach of warranties, misrepresentation, fraud, concealment, conspiracy, and/or willful omissions of Defendants as described herein, Decedent contracted, and died from, ovarian cancer, causing Decedent pain, suffering, and mental anguish, in the past and future.

375.    As a direct and proximate result of the aforesaid, Plaintiff and Decedent were obliged to spend various sums of money to treat Decedent's ovarian cancer, and Plaintiff continues to be obliged for the expenses of same.

376.    As a direct and proximate result of the aforesaid, Decedent suffered a loss of earnings and earnings capacity.

377.    As a direct and proximate result of the aforesaid, Decedent's enjoyment of life was impaired and Decedent's life was severely shortened, which all resulted in Plaintiff's and Decedent's beneficiaries' loss of parental companionship, protection, and great mental pain and suffering in the past and future.

378.    As a direct and proximate result of the aforesaid, and since Plaintiff and

Decedent first learned of Decedent's aforementioned injuries, Plaintiff, Decedent, and/or Decedent's beneficiaries suffered, and will continue to suffer, severe anxiety and ongoing psychological damage, which may require future psychological and/or medical treatment.

379.     As a direct and proximate result of the aforesaid, Plaintiff, Decedent, and/or Decedent's beneficiaries have and will continue to suffer a disintegration and deterioration of the family unit and the relationships existing therein, resulting in enhanced anguish, depression, and other symptoms of psychological stress and disorder.

380.     As a direct and proximate result of the Decedent's injuries, and since the date of her injuries, Plaintiff and Decedent's beneficiaries have lost the support, services, consortium, companionship, care, comfort, and protection of Decedent, and will suffer such losses in the future; and from the date of Decedent's injuries, Decedent's beneficiaries have also sustained severe mental pain, grief and suffering as a result of Decedent's injuries and death and will suffer such losses into the future.

## **RELIEF REQUESTED**

**WHEREFORE**, Plaintiff prays for judgment against Defendants on all of the aforementioned counts, awarding Plaintiff as follows:

381.     Past and future compensatory damages for deprivation of support and services, the exact amount of which has yet to be ascertained, in an amount which will conform to proof at the time of trial;

382.     Past and future compensatory damages for loss of companionship and protection, the exact amount of which has yet to be ascertained, in an amount which will conform to proof at the time of trial;

383.    Past and future compensatory damages for mental pain and suffering, the exact amount of which has yet to be ascertained, in an amount which will conform to proof at the time of trial;

384.    Past and future medical expenses, according to proof at the time of trial;

385.    Funeral expenses, according to proof at the time of trial;

386.    Plaintiff reserves the right to seek leave to amend to add a claim for punitive damages pursuant to § 768.72, Fla. Stat.;

387.    Reasonable attorneys' fees under applicable law;

388.    Costs of suit expended herein;

389.    Interest; and

390.    Such other and further relief both at law and equity to which Plaintiff may be justly entitled.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues so triable as a matter of right.

DATED:  October 2, 2023

Respectfully submitted,

**THE FERRARO LAW FIRM, P.A.**
Attorneys for Plaintiff
600 Brickell Avenue, Suite 3800
Miami, Florida 33131
Telephone (305) 375-0111
Facsimile (305) 379-6222

By:  */s/ Daniel J. DiMatteo*
DANIEL J. DIMATTEO, ESQ.
Florida Bar No.: 114914
Email: ddimatteo@ferrarolaw.com
Secondary Email: lfuentes@ferrarolaw.com

86



**JOSEPH ABRUZZO**

# RECEIPT
5065151

CLERK OF THE CIRCUIT COURT & COMPTROLLER

PALM BEACH COUNTY, FLORIDA

Printed On:
10/04/2023 11:00
Page 1 of 1

| Receipt Number: 5065151 - Date 10/04/2023  Time 11:00AM | | | |
|---|---|---|---|
| **Received of:** | The Ferraro Law Firm<br>600 Brickell Avenue<br>Miami, FL 33131 | | |
| **Cashier Name:** | ADMIN | **Balance Owed:** | 406.00 |
| **Cashier Location:** | E-Filing | **Total Amount Paid:** | 406.00 |
| **Receipt ID:** | 11455480 | **Remaining Balance:** | 0.00 |
| **Division:** | AH: Circuit Civil Central - AH(Civil) | | |

| Case# 50-2023-CA-014349-XXXA-MB -- PLAINTIFF/PETITIONER: PIERS DEVALLE, TIMOTHY | | | |
|---|---|---|---|
| **Item** | **Balance** | **Paid** | **Bal Remaining** |
| Fees | 406.00 | 406.00 | 0.00 |
| **Case Total** | **406.00** | **406.00** | **0.00** |

| Payments | | |
|---|---|---|
| **Type** | **Ref#** | **Amount** |
| EFiling_CREDITCARD | ███ | **406.00** |
| **Total Received** | | **406.00** |
| **Total Paid** | | **406.00** |

**How was your service today?**  Please visit www.mypalmbeachclerk.com/survey or send your feedback to clerkweb@mypalmbeachclerk.com.
**For office locations and information about Clerk & Comptroller services:**
Visit www.mypalmbeachclerk.com or call (561) 355-2996.

NOT A CERTIFIED COPY

IN THE CIRCUIT COURT OF THE FIFTEENTH
JUDICIAL CIRCUIT IN AND
FOR PALM BEACH COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION:"AH"
CASE NO.: 502023CA014349XXXAMB
TIMOTHY PIERS DEVALLE,
TIMOTHY PIERS DEVALLE,
     Plaintiff/Petitioners

vs.

JOHNSON AND JOHNSON,
JOHNSON AND JOHNSON HOLDCO,
JANSSEN PHARMACEUTICAL INC,
et al.,
     Defendant/Respondents.
_____/

## ORDER IMPLEMENTING DIFFERENTIATED CASE MANAGEMENT PLAN, DESIGNATING CASE TO THE GENERAL TRACK, ORDER SETTING CALENDAR CALL AND CASE MANAGEMENT CONFERENCE AND DIRECTING PRETRIAL AND MEDIATION PROCEDURES (DCMGJT)

     **THIS MATTER** is a Circuit Civil case calling for a jury trial. Accordingly, it is

     **ORDERED AND ADJUDGED** that pursuant to Administrative Order 3.110 (as amended), this case is designated to the **GENERAL TRACK**. The deadlines established by this Order are to ensure the case is **disposed of within 18 months from the date of filing.** To that end, the following procedures and deadlines shall be strictly observed:

I.  **SERVICE OF THIS ORDER, ACTIVE CASE MANAGEMENT AND NON-COMPLIANCE**

     **Plaintiff/Petitioner is directed to serve this Order** upon each Defendant/Respondent with the Initial Complaint/Petition and Summons. The deadlines and procedures set forth herein are firm and may be modified only upon a showing of a good faith attempt to comply with the deadlines or demonstration of a significant change of circumstances and through the process established in the 15th Circuit's Administrative Order 3.110 (as amended).

     The parties are expected to actively manage the case and to confer early and often to ensure compliance with this order and timely resolution of the case. The parties and counsel are expected to govern themselves at all times with a spirit of cooperation, professionalism, and civility. They are expected to accommodate each other whenever reasonably possible and eliminate disputes by reasonable agreements.

     **Self-Represented/Pro se litigants** (i.e. those without counsel) are held to the same obligations imposed upon counsel.

     **Motions to extend deadlines** must be filed *prior* to the deadline. Untimely motions will be denied absent compelling circumstances and showing of good cause.

**NONCOMPLIANCE WITH THIS ORDER, ABSENT A SHOWING OF GOOD CAUSE, MAY RESULT IN DISMISSAL OF THE ACTION, THE STRIKING OF PLEADINGS, WITNESSES, OR EXHIBITS, REMOVAL OF THE CASE FROM THE DOCKET, DEFAULT OR ANY OTHER APPROPRIATE SANCTION.**

The failure to act in good faith and comply with this order must be reported, if not resolved through a conference of the parties and good faith conferral, by filing a **"Suggestion of Non-Compliance with Pre-Trial Order"** that must be set for hearing in a timely manner. The Suggestion must name the non-compliant person, describe the act of non-compliance, be served upon all parties and sent to the Court's chambers. Responses may only be submitted upon request of the Court. Failure to correct any non-compliance before the hearing may result in sanctions as described above. The parties will notify the Court immediately if non-compliance is cured; if cured more than 7 days before the hearing, the hearing may be cancelled.

II. <u>**SCHEDULING, CONTINUANCES AND PRETRIAL DEADLINES**</u>

**A CASE MANAGEMENT CONFERENCE and CALENDAR CALL will be held on March 7, 2025**. The parties must be ready to try the case by that day. The specific time of Case Management Conference and procedures for conducting Calendar Call can be found on the Division's webpages at www.15thcircuit.com. The Calendar Call may be conducted in-person or by e-calendar.

The trial period begins the first business day of the immediately following week after the above-listed Case Management Conference and Calendar Call, unless otherwise described in the divisional instructions or by court order.

**TRIAL CONTINUANCES:** If a case cannot be ready for trial by the Calendar Call despite all good faith efforts, a motion to continue trial must be set for a Differentiated Case Management (DCM) Conference as described in the 15th Circuit's Administrative Order 3.110 (as amended) and the next paragraph. Any motion to continue the trial must comply with Fla. R. Civ. P. Rule 1.460, including that they are signed by the client. The Motion must be filed and the DCM Conference set no more than **30 DAYS** from the last defendant being served or as soon as circumstances giving rise to the need for a continuance becomes known and only for good cause. Every motion for a continuance must include a proposed Amended DCMO resetting each pretrial deadline that remains applicable and indicating the month the case can be ready for trial.

**DCM CONFERENCES:** DCM conferences are scheduled through the Circuit's Online Scheduling System under DCM- Case Management Conference Scheduling. No less than ten (10) days in advance of the DCM Conference the parties must file with the Clerk a Joint Status Report that:

1. Concisely updates the Court on the status of the case,
2. Identifies pending motions and other matters the Court needs to address, and
3. If applicable, provides a proposed revised pretrial schedule.

The parties must upload the Joint Status report at least 7 days in advance of a DCM Conference through the e-courtesy feature of the Circuit's Online Scheduling System. The parties are to be prepared at the DCM Conference to address the topics listed in Rule 1.200(a) and for the court, at its discretion, to hear or set for hearing any pending motions.

Case No. 50-2023-CA-014349-XXXA-MB

**The following deadlines (discussed in detail below) apply unless otherwise modified by the Court:**

| | EVENTS | DESCRIPTION | COMPLETION DEADLINE |
|---|---|---|---|
| 1. | Service of Complaint | See Part III.A, infra | January 30, 2024 Service under extension is only by court order. |
| 2. | Pleading Amendments/ Adding parties | See Part III.B, infra | March 30, 2024 |
| 3. | Resolution of all motions/objections directed to the pleadings *(i.e. to dismiss or strike)* and pleadings closed * | See Part III.B, infra | June 8, 2024 |
| 4. | Expert Witnesses and Compulsory Examinations | See Part III.D, infra | November 7, 2024 |
| 5. | Witness & Exhibit Lists | See Part III.C, infra | November 7, 2024 |
| 6. | Rebuttal Witness Lists | See Part III.E, infra | November 27, 2024 |
| 7. | Filing Summary Judgment & *Daubert* Motions | See Part III.J, infra | December 7, 2024 |
| 8. | Discovery Cut-Off | See Part III.H, infra | December 7, 2024 |
| 9. | Pre-Trial Meet & Confer | See Part III.I, infra | February 5, 2025 |
| 10. | Deposition Designations | See Part III.G, infra | February 15, 2025 |
| 11. | Deadline for Mediation | See Part IV, infra | February 25, 2025 |
| 12. | Deadline to hear ALL Motions | See Part III.J, infra | March 2, 2025 |
| 13. | Jury Instructions and Verdict Form | See Part III.O, infra | March 4, 2025 |
| 14. | Trial Ready Date ** | See Part II, supra | March 7, 2025 |

**Fla. R. Gen. Prac. & Jud. Admin. Rule 2.514 governs if any deadlines falls on a weekend or holiday.**

* The parties must expeditiously address any motions directed to the pleadings. Defensive motions under Rule 1.140 of the Fla. R. Civ. P., motions to extend time to file a defensive motion or pleading, and any other motion preventing the matter from being at issue shall be set for hearing within **five (5) days** of filing. The motion should be scheduled for hearing at the earliest date that the Court and parties are available.

** The Court reserves the authority to expedite the trial setting and amend the pretrial deadlines accordingly.

III. **UNIFORM PRETRIAL PROCEDURES**

  A. **Timely Service and Defaults:**

   Parties must make reasonable efforts to ensure speedy service. Each return of service must be separately filed for each defendant. If service is not completed within 90 days, an Order will be issued directing service by the **120 DAY**

Case No. 50-2023-CA-014349-XXXA-MB

**DEADLINE**. Failure to comply will result in dismissal of the case or party for lack of service. Any motions to extend the deadline for service must specify why service could not have been effectuated, what is being done to effectuate service and request only that amount of additional time necessary.

If all defendants become defaulted, a Motion for Default Final Judgment along with supporting documentation must be filed within **30 days** of the last default and set for hearing at the next available hearing time.

B. **Amendment of Pleadings, Motions Directed at Pleadings and Notice for Trial:**

Any Motions to Amend Pleadings to add parties, must be filed no later than the first business day **180 DAYS AFTER THE CASE IS FILED**.

The parties must expeditiously address any other motions directed to the pleadings. Defensive motions under Rule 1.140, Fla. R. Civ. P., motions to extend time to file a defensive motion or pleading, and any other motion preventing the matter from being at issue must be set for hearing within **5 days** of filing to be heard at the earliest date that the Court and parties are available.

If the pleadings are not closed and the case not at issue **250 DAYS AFTER FILING**, the parties must appear for a DCM Conference to be noticed and held in accordance within the 15th Circuit's Administrative Order 3.110 and Divisional Instructions located on the Circuit's website for the Division to which the case is assigned.

C. **Exhibits and Witnesses**. On the last business day no later than **120 DAYS PRIOR TO CALENDAR CALL**, the parties must exchange lists of all trial exhibits, names and addresses of all trial witnesses.

D. **Expert Witnesses and Compulsory Medical Examinations.** If Expert Witnesses or Compulsory Medical Examinations are anticipated, the Parties must confer and establish a schedule for completing related discovery, including deadlines for disclosures, written discovery, depositions and motions directed at Experts or Compulsory Medical Examiners that will result in the completion of Expert/CME Discovery and resolution of Motions directed at them at least **120 DAYS BEFORE TRIAL.**

If agreed, the parties must submit a proposed Expert/CME Scheduling Order for entry by the Court. If not, the parties must appear for a DCM Case Management Conference.

**Expert Disclosures:** In addition to names and addresses of each expert retained to formulate an expert opinion with regard to this cause, both on the initial listing and on rebuttal, the parties must provide:

1. The subject matter about which the expert will testify;
2. The substance of facts and opinions to which the expert will testify;
3. A summary of the grounds for each opinion;
4. A copy of any written reports issued by the expert; and
5. A copy of the expert's curriculum vitae.

**One Expert Per Specialty:** The parties will be limited to one expert witness per

specialty unless they obtain leave of Court to list and call more than one expert witness per specialty, no later than 60 days prior to calendar call.

E. **Rebuttal Witnesses and Exhibits.** On the last business day no later than **100 DAYS PRIOR TO CALENDAR CALL**, the parties must exchange lists of names and addresses of all rebuttal witnesses and list of any rebuttal exhibits.

F. **Additional Exhibits, Witnesses Or Objections.** At trial, the parties will be strictly limited to exhibits and witnesses disclosed and objections reserved on the schedules attached to the Pre-Trial Stipulation prepared in accordance with paragraphs D and E, absent agreement specifically stated in the Pre-Trial Stipulation or order of the Court upon good cause shown. Failure to reserve objections constitutes a waiver. A party desiring to use an exhibit or witness discovered after counsel have conferred pursuant to paragraph D must immediately furnish the Court and other counsel with a description of the exhibit or with the witness' name and address and the expected subject matter of the witness' testimony, together with the reason for the late discovery of the exhibit or witness. Use of the exhibit or witness may be allowed by the Court for good cause shown or to prevent manifest injustice.

G. **Deposition Designations.** No later than **20 DAYS PRIOR TO CALENDAR CALL**, each party must serve designation of depositions, or portions of depositions, each intends to offer as testimony. No later than **10 DAYS PRIOR TO CALENDAR CALL**, each opposing party is to serve any counter (or "fairness") designations to portions of depositions designated, together with objections to the depositions, or portions thereof, originally designated. No later than **5 DAYS BEFORE** calendar call, each party must serve any objections to counter designations served by an opposing party.

H. **Discovery Cutoff.** Unless otherwise agreed in the Pre-Trial Stipulation, all discovery must be completed no later than **90 DAYS PRIOR TO CALENDAR CALL** absent agreement for later discovery specifically stated in the Pre-Trial Stipulation or for other good cause shown. Absent unforeseeable, exigent circumstances, the failure to complete discovery is not grounds for a continuance.

I. **Pre-Trial Meet and Confer.** On the last business day no later than **30 DAYS PRIOR TO CALENDAR CALL**, the parties must confer and:

1. Discuss settlement;
2. Simplify the issues and stipulate, in writing, as to as many facts and issues as possible;
3. Prepare a Pre-Trial Stipulation in accordance with paragraph E; and
4. List all objections to trial exhibits.

J. **Motions:** The Parties must plan for, file and timely set hearings for any motions they expect the Court to address in advance of trial. **No motions will be heard the day of trial**. Few are appropriate after Calendar Call. The parties must confer early in the case and coordinate briefing and discovery schedules, as necessary, to ensure motions are timely heard.

While motion practice is critical to the advancement and streamlining of a case, the Parties are reminded they **DO NOT have an absolute right to most motions being**

**heard**. Failure to timely file and set motions for hearing in advance of Calendar Call will likely result the Court denying a request for hearing. Failure to file and have a motion heard is not grounds for a trial continuance.

**Summary Judgment and *Daubert* Motions** must be filed at least **90 DAYS prior to Calendar Call**. The parties shall confer regarding summary judgment motions to ensure discovery necessary for those motions is completed in advance of their filing.

**ALL MOTIONS** (including dispositive motions to motions in limine), must be heard no less than **5 days before Calendar Call**. Parties must plan and seek hearing time sufficiently in advance to ensure this deadline is met.

K. **Filing of Pre-Trial Stipulation.** It is the duty of counsel for the Plaintiff to see that the Pre-Trial Stipulation is drawn, executed by counsel for all parties, and filed with the Clerk no later than **20 DAYS PRIOR TO CALENDAR CALL**. Unilateral pretrial statements are disallowed, unless approved by the Court, after notice and hearing showing good cause. Counsel for all parties are charged with good faith cooperation in this regard. The Pre-Trial Stipulation must contain in separately numbered paragraphs:

1. A list of all pending motions including Motions *In Limine* and *Daubert* Motions requiring action by the Court and the dates those motions are set for hearing. **Motions not listed are deemed waived**.

2. Stipulated facts requiring no proof at trial which may be read to the trier of fact;

3. A statement of all issues of fact for determination at trial;

4. Lists of exhibits itemized as follows:

   a. Exhibits to be admitted by Plaintiff without objection;
   b. Exhibits to be admitted by Defendant without objection;
   c. Objected to Exhibits, with the specific basis for the objection stated.

   Note: Reasonably specific description of each exhibit is required. Non-specific descriptions like "all documents produced in discovery" will be stricken. Moreover, Objections may not be "reserved." Failure to specify an objection constitutes its waiver.

5. Each party's numbered list of trial witnesses with addresses (including all known rebuttal witnesses); the list of witnesses must be on separate schedules attached to the Stipulation;

6. A statement of total estimated time for trial, including the time needed per side for (1) jury selection, (2) opening arguments, (3) each case in chief, and (4) closing arguments.

7. Names of attorneys to try case and their contact information; and

8. The number of peremptory challenges per party.

Failure to file the Pre-Trial Stipulation or a Court Approved Unilateral Stipulation as provided above may result in the case being stricken from the Court's calendar or

other sanctions, including dismissal or default.

L. **Pre-Trial Conference pursuant to Fla. R. Civ. P. 1.200** If a pre-trial conference is set upon motion of a party or by the Court, counsel must meet and prepare a stipulation pursuant to paragraph K, infra, and file the stipulation no later than **5 DAYS BEFORE THE CONFERENCE**. Failure to request a pre-trial conference in a timely fashion constitutes a waiver of the notice of requirement of Rule 1.200. Absent prior approval, Motions for Summary Judgment will not be heard at any pre-trial conference.

M. **Pre-Marking Exhibits.** Prior to trial, each party is to mark for identification all exhibits, as directed by the clerk. (instructions and templates found at www.mypalmbeachclerk.com/departments/courts/evidence-guidelines/civil-evidence)

N. **Enlarged Jury Panels:** Local Rules require advance approval of the Chief Judge and Jury Office for jury panels exceeding 31 jurors. To ensure enough jurors are available, requests for enlarged jury panels must be resolved at least 6 months before calendar call.

O. **Jury Instructions and Verdict Form:** A joint set of proposed jury instructions and a proposed verdict form must be provided to the court no less than **3 days BEFORE TRIAL** in a printed form appropriate for submission to the jury and in Microsoft Word format.

If there is an objection to a proposed instruction, the instruction should be followed by the specific objection, a brief explanation, and a citation to legal authority. If an alternative or modified instruction is proposed, it should follow the instruction it is intended to replace.

P. **Unique Questions Of Law.** Prior to calendar call, counsel for the parties are directed to exchange and simultaneously submit to the Court appropriate memoranda with citations to legal authority in support of any unique legal questions that may reasonably be anticipated to arise during the trial.

IV. **MEDIATION**

A. All parties are required to participate in mediation as follows:

1. The attendance of counsel who will try the case and representatives of each party with full authority to enter into a complete compromise and settlement is mandatory. If insurance is involved, an adjuster with authority up to the policy limits must attend.

2. At least one week prior to a scheduled mediation conference, all parties are to file with the mediator a brief, written summary of the case containing a list of issues as to each party.

3. All communications at the mediation conference are privileged consistent with Florida Statutes sections 44.102 and 90.408.

4. The mediator has no power to compel or enforce a settlement agreement. If a settlement is reached, it is a responsibility of the attorneys or parties to reduce the agreement to writing and to comply with Florida Rule of Civil Procedure

Case No. 50-2023-CA-014349-XXXA-MB

1.730(b), unless waived.

B. The Plaintiff's attorney is responsible for scheduling mediation. The parties should agree on a mediator. If they are unable to agree, any party may apply to the Court for appointment of a mediator in conformity with Rule 1.720 (j), Fla. R. Civ. P. The lead attorney or party must file and serve on all parties and the mediator a Notice of Mediation giving the time, place, and date of the mediation and the mediator's name.

C. **Completion of mediation prior to calendar call is a prerequisite to trial and must be completed no later than 10 DAYS PRIOR TO CALENDAR CALL.** If mediation is not conducted, or if a party fails to participate in mediation, the case, at the Court's discretion, may be stricken from the trial calendar, pleadings may be stricken, and other sanctions may be imposed.

D. Any party opposing mediation may proceed under Florida Rule of Civil Procedure 1.700(b).

**DONE AND ORDERED** in West Palm Beach, Palm Beach County, Florida.



50-2023-CA-014349-XXXA-MB     10/05/2023
Reid P. Scott
Judge

A copy of this Order has been furnished to the Plaintiff. The Plaintiff shall serve this Order to the Defendant(s) in compliance with Administrative Order 3.110 (amended).

This notice is provided pursuant to Administrative Order No. 2.207

**"If you are a <u>person with a disability</u> who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact William Hutchings, Jr., Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."**

**"Si usted es una <u>persona minusválida</u> que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N.**

Case No. 50-2023-CA-014349-XXXA-MB

Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711."

"Si ou se yon <u>moun ki enfim</u> ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon pou jwen kèk èd. Tanpri kontakte William Hutchings, Jr., kòòdonatè pwogram Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711."

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT, IN AND
FOR PALM BEACH COUNTY, FLORIDA

Timothy Piers DeValle, et al.

_____
                    Plaintiff,

vs.

Johnson & Johnson, et al.

_____
                    Defendant.

CASE NO. _____
          50-2023-CA-014349-XXXA-MB

## SUMMONS
### (PERSONAL SERVICE ON A NATURAL PERSON)

TO DEFENDANT(S):

Johnson & Johnson

**ALTERNATE ADDRESS:**

1 Johnson & Johnson Plaza, New Brunswick, NJ
08993

_____

### IMPORTANT

A LAWSUIT HAS BEEN FILED AGAINST YOU. YOU HAVE 20 CALENDAR DAYS AFTER
THIS SUMMONS IS SERVED ON YOU TO FILE A WRITTEN RESPONSE TO THE
ATTACHED COMPLAINT WITH THE CLERK OF THIS COURT. A PHONE CALL WILL NOT
PROTECT YOU. YOUR WRITTEN RESPONSE, INCLUDING THE CASE NUMBER GIVEN
ABOVE AND THE NAMES OF THE PARTIES, MUST BE FILED IF YOU WANT THE COURT
TO HEAR YOUR SIDE OF THE CASE. IF YOU DO NOT FILE YOUR RESPONSE ON TIME,
YOU MAY LOSE THE CASE, AND YOUR WAGES, MONEY, AND PROPERTY MAY
THEREAFTER BE TAKEN WITHOUT FURTHER WARNING FROM THE COURT. THERE
ARE OTHER LEGAL REQUIREMENTS. YOU MAY WANT TO CALL AN ATTORNEY
RIGHT AWAY. IF YOU DO NOT KNOW AN ATTORNEY, YOU MAY CALL AN ATTORNEY
REFERRAL SERVICE OR A LEGAL AID OFFICE (LISTED IN THE PHONE BOOK).

IF YOU CHOOSE TO FILE A WRITTEN RESPONSE YOURSELF, AT THE SAME TIME YOU
FILE YOUR WRITTEN RESPONSE TO THE COURT YOU MUST ALSO MAIL OR TAKE A
COPY OF YOUR WRITTEN RESPONSE TO THE APLAINTIFF OR PLAINTIFF(S) ATTORNEY
NAMED BELOW.

Daniel J. DiMatteo, Esq. - The Ferraro Law Firm
600 Brickell Ave., Suite 3800, Miami, FL 33131

THE STATE OF FLORIDA:
TO EACH SHERIFF OF THE STATE: YOU ARE COMMANDED TO SERVE THIS SUMMONS
AND A COPY OF THE COMPLAINT IN THIS LAWSUIT ON THE ABOVE NAMED
DEFENDANT(S).

DATED: **Oct 18 2023**

Joseph Abruzzo, Clerk & Comptroller

By: _____
DEPUTY CLERK **JOSIE LUCCE**

SEE REVERSE SIDE - VEASE AL REVES - VOIR DE L=AUTRE COTE DE

FILED: PALM BEACH COUNTY, FL, JOSEPH ABRUZZO, CLERK, 10/11/2023 03:44:17 PM

## IMPORTANTE

Usted ha sido demandado legalmente. Tiene 20 dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales.  Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

## IMPORTANT

Des poursuites judiciares ont ete entreprises contre vous. Vous avez 20 jours consecu-tifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egale-ment, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

SEE REVERSE SIDE - VEASE AL REVES - VOIR DE L=AUTRE COTE DE

This notice is provided pursuant to Administrative Order No. 2.207-1/15

**"If you are a <u>person with a disability</u> who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact William Hutchings, Jr., Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway, West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."**

**"Si usted es una <u>persona minusválida</u> que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N. Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711."**

**"Si ou se yon <u>moun ki enfim</u> ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon pou jwen kèk èd. Tanpri kontakte William Hutchings, Jr., kòòdonatè pwogram Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711."**

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT, IN AND
FOR PALM BEACH COUNTY, FLORIDA

Timothy Piers DeValle, et al.

CASE NO. _____ 50-2023-CA-014349-XXXA-MB

_____
                    Plaintiff,

vs.

Johnson & Johnson, et al.

_____
                    Defendant.

**SUMMONS**
**(PERSONAL SERVICE ON A NATURAL PERSON)**

TO DEFENDANT(S):                          **ALTERNATE ADDRESS:**

Johnson & Johnson Holdco (NA), Inc.       1200 South Pine Island Road, Plantation, FL 33324

_____              _____

IMPORTANT

A LAWSUIT HAS BEEN FILED AGAINST YOU. YOU HAVE 20 CALENDAR DAYS AFTER
THIS SUMMONS IS SERVED ON YOU TO FILE A WRITTEN RESPONSE TO THE
ATTACHED COMPLAINT WITH THE CLERK OF THIS COURT. A PHONE CALL WILL NOT
PROTECT YOU. YOUR WRITTEN RESPONSE, INCLUDING THE CASE NUMBER GIVEN
ABOVE AND THE NAMES OF THE PARTIES, MUST BE FILED IF YOU WANT THE COURT
TO HEAR YOUR SIDE OF THE CASE. IF YOU DO NOT FILE YOUR RESPONSE ON TIME,
YOU MAY LOSE THE CASE, AND YOUR WAGES, MONEY, AND PROPERTY MAY
THEREAFTER BE TAKEN WITHOUT FURTHER WARNING FROM THE COURT. THERE
ARE OTHER LEGAL REQUIREMENTS. YOU MAY WANT TO CALL AN ATTORNEY
RIGHT AWAY. IF YOU DO NOT KNOW AN ATTORNEY, YOU MAY CALL AN ATTORNEY
REFERRAL SERVICE OR A LEGAL AID OFFICE (LISTED IN THE PHONE BOOK).

IF YOU CHOOSE TO FILE A WRITTEN RESPONSE YOURSELF, AT THE SAME TIME YOU
FILE YOUR WRITTEN RESPONSE TO THE COURT YOU MUST ALSO MAIL OR TAKE A
COPY OF YOUR WRITTEN RESPONSE TO THE ᴀPLAINTIFF OR PLAINTIFF(S) ATTORNEY
NAMED BELOW.

Daniel J. DiMatteo, Esq. - The Ferraro Law Firm
600 Brickell Ave., Suite 3800, Miami, FL 33131

THE STATE OF FLORIDA:
TO EACH SHERIFF OF THE STATE: YOU ARE COMMANDED TO SERVE THIS SUMMONS
AND A COPY OF THE COMPLAINT IN THIS LAWSUIT ON THE ABOVE NAMED
DEFENDANT(S).

DATED: **Oct 18 2023**                Joseph Abruzzo, Clerk & Comptroller

                                      By: _____
                                      DEPUTY CLERK **JOSIE LUCCE**

SEE REVERSE SIDE - VEASE AL REVES - VOIR DE L=AUTRE COTE DE

## IMPORTANTE

Usted ha sido demandado legalmente. Tiene 20 dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales.  Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

## IMPORTANT

Des poursuites judiciares ont ete entreprises contre vous. Vous avez 20 jours consecu-tifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egale-ment, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

SEE REVERSE SIDE - VEASE AL REVES - VOIR DE L=AUTRE COTE DE

This notice is provided pursuant to Administrative Order No. 2.207-1/15

**"If you are a <u>person with a disability</u> who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact William Hutchings, Jr., Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway, West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."**

**"Si usted es una <u>persona minusválida</u> que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N. Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711."**

**"Si ou se yon <u>moun ki enfim</u> ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon pou jwen kèk èd. Tanpri kontakte William Hutchings, Jr., kòòdonatè pwogram Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711."**

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT, IN AND
FOR PALM BEACH COUNTY, FLORIDA

Timothy Piers DeValle, et al.

_____
                    Plaintiff,

vs.

Johnson & Johnson, et al.

_____
                    Defendant.

CASE NO. _____
50-2023-CA-014349-XXXA-MB

## SUMMONS
### (PERSONAL SERVICE ON A NATURAL PERSON)

TO DEFENDANT(S):

Janssen Pharmaceuticals, Inc.

_____    _____

ALTERNATE ADDRESS:

1200 South Pine Island Road, Plantation, FL 33324

## IMPORTANT

A LAWSUIT HAS BEEN FILED AGAINST YOU.  YOU HAVE 20 CALENDAR DAYS AFTER
THIS SUMMONS IS SERVED ON YOU TO FILE A WRITTEN RESPONSE TO THE
ATTACHED COMPLAINT WITH THE CLERK OF THIS COURT.  A PHONE CALL WILL NOT
PROTECT YOU.  YOUR WRITTEN RESPONSE, INCLUDING THE CASE NUMBER GIVEN
ABOVE AND THE NAMES OF THE PARTIES, MUST BE FILED IF YOU WANT THE COURT
TO HEAR YOUR SIDE OF THE CASE.  IF YOU DO NOT FILE YOUR RESPONSE ON TIME,
YOU MAY LOSE THE CASE, AND YOUR WAGES, MONEY, AND PROPERTY MAY
THEREAFTER BE TAKEN WITHOUT FURTHER WARNING FROM THE COURT.  THERE
ARE OTHER LEGAL REQUIREMENTS.  YOU MAY WANT TO CALL AN ATTORNEY
RIGHT AWAY.  IF YOU DO NOT KNOW AN ATTORNEY, YOU MAY CALL AN ATTORNEY
REFERRAL SERVICE OR A LEGAL AID OFFICE (LISTED IN THE PHONE BOOK).

IF YOU CHOOSE TO FILE A WRITTEN RESPONSE YOURSELF, AT THE SAME TIME YOU
FILE YOUR WRITTEN RESPONSE TO THE COURT YOU MUST ALSO MAIL OR TAKE A
COPY OF YOUR WRITTEN RESPONSE TO THE ΑPLAINTIFF OR PLAINTIFF(S) ATTORNEY
NAMED BELOW.

Daniel J. DiMatteo, Esq. - The Ferraro Law Firm
600 Brickell Ave., Suite 3800, Miami, FL 33131

THE STATE OF FLORIDA:
TO EACH SHERIFF OF THE STATE: YOU ARE COMMANDED TO SERVE THIS SUMMONS
AND A COPY OF THE COMPLAINT IN THIS LAWSUIT ON THE ABOVE NAMED
DEFENDANT(S).

DATED: **Oct 18 2023**

Joseph Abruzzo, Clerk & Comptroller

By: _____

DEPUTY CLERK **JOSIE LUCCE**

SEE REVERSE SIDE - VEASE AL REVES - VOIR DE L=AUTRE COTE DE

## IMPORTANTE

Usted ha sido demandado legalmente. Tiene 20 dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales.  Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

## IMPORTANT

Des poursuites judiciares ont ete entreprises contre vous. Vous avez 20 jours consecu-tifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egale-ment, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

SEE REVERSE SIDE - VEASE AL REVES - VOIR DE L=AUTRE COTE DE

This notice is provided pursuant to Administrative Order No. 2.207-1/15

**"If you are a <u>person with a disability</u> who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact William Hutchings, Jr., Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway, West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."**

**"Si usted es una <u>persona minusválida</u> que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N. Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711."**

**"Si ou se yon <u>moun ki enfim</u> ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon pou jwen kèk èd. Tanpri kontakte William Hutchings, Jr., kòòdonatè pwogram Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711."**

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT, IN AND
FOR PALM BEACH COUNTY, FLORIDA

Timothy Piers DeValle, et al.

_____

CASE NO. 50-2023-CA-014349-XXXA-MB
_____

Plaintiff,

vs.

Johnson & Johnson, et al.

_____

Defendant.

## SUMMONS
## (PERSONAL SERVICE ON A NATURAL PERSON)

TO DEFENDANT(S):                                    **ALTERNATE ADDRESS:**

LTL Management, LLC                                 160 Mine Lake Ct. Ste 200, Raleigh, NC 27615

_____                       _____

## IMPORTANT

A LAWSUIT HAS BEEN FILED AGAINST YOU. YOU HAVE 20 CALENDAR DAYS AFTER THIS SUMMONS IS SERVED ON YOU TO FILE A WRITTEN RESPONSE TO THE ATTACHED COMPLAINT WITH THE CLERK OF THIS COURT. A PHONE CALL WILL NOT PROTECT YOU. YOUR WRITTEN RESPONSE, INCLUDING THE CASE NUMBER GIVEN ABOVE AND THE NAMES OF THE PARTIES, MUST BE FILED IF YOU WANT THE COURT TO HEAR YOUR SIDE OF THE CASE. IF YOU DO NOT FILE YOUR RESPONSE ON TIME, YOU MAY LOSE THE CASE, AND YOUR WAGES, MONEY, AND PROPERTY MAY THEREAFTER BE TAKEN WITHOUT FURTHER WARNING FROM THE COURT. THERE ARE OTHER LEGAL REQUIREMENTS. YOU MAY WANT TO CALL AN ATTORNEY RIGHT AWAY. IF YOU DO NOT KNOW AN ATTORNEY, YOU MAY CALL AN ATTORNEY REFERRAL SERVICE OR A LEGAL AID OFFICE (LISTED IN THE PHONE BOOK).

IF YOU CHOOSE TO FILE A WRITTEN RESPONSE YOURSELF, AT THE SAME TIME YOU FILE YOUR WRITTEN RESPONSE TO THE COURT YOU MUST ALSO MAIL OR TAKE A COPY OF YOUR WRITTEN RESPONSE TO THE ᴀPLAINTIFF OR PLAINTIFF(S) ATTORNEY NAMED BELOW.

Daniel J. DiMatteo, Esq. - The Ferraro Law Firm
600 Brickell Ave., Suite 3800, Miami, FL 33131

THE STATE OF FLORIDA:
TO EACH SHERIFF OF THE STATE: YOU ARE COMMANDED TO SERVE THIS SUMMONS AND A COPY OF THE COMPLAINT IN THIS LAWSUIT ON THE ABOVE NAMED DEFENDANT(S).

DATED: **Oct 18 2023**

Joseph Abruzzo, Clerk & Comptroller

By: _____

DEPUTY CLERK **JOSIE LUCCE**

SEE REVERSE SIDE - VEASE AL REVES - VOIR DE L=AUTRE COTE DE

<u>IMPORTANTE</u>

Usted ha sido demandado legalmente. Tiene 20 dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales.  Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

<u>IMPORTANT</u>

Des poursuites judiciares ont ete entreprises contre vous. Vous avez 20 jours consecu-tifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egale-ment, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

SEE REVERSE SIDE - VEASE AL REVES - VOIR DE L=AUTRE COTE DE

This notice is provided pursuant to Administrative Order No. 2.207-1/15

**"If you are a <u>person with a disability</u> who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact William Hutchings, Jr., Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway, West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."**

**"Si usted es una <u>persona minusválida</u> que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N. Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711."**

**"Si ou se yon <u>moun ki enfim</u> ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon pou jwen kèk èd. Tanpri kontakte William Hutchings, Jr., kòòdonatè pwogram Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711."**

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT, IN AND
FOR PALM BEACH COUNTY, FLORIDA

Timothy Piers DeValle, et al.

_____
                    Plaintiff,

vs.

Johnson & Johnson, et al.

_____
                    Defendant.

CASE NO. 50-2023-CA-014349-XXXA-MB
_____

## SUMMONS
### (PERSONAL SERVICE ON A NATURAL PERSON)

TO DEFENDANT(S):

Kenvue, Inc.

**ALTERNATE ADDRESS:**

1209 Orange Street, Wilmington, DE 19801

_____ _____

## IMPORTANT

A LAWSUIT HAS BEEN FILED AGAINST YOU. YOU HAVE 20 CALENDAR DAYS AFTER THIS SUMMONS IS SERVED ON YOU TO FILE A WRITTEN RESPONSE TO THE ATTACHED COMPLAINT WITH THE CLERK OF THIS COURT. A PHONE CALL WILL NOT PROTECT YOU. YOUR WRITTEN RESPONSE, INCLUDING THE CASE NUMBER GIVEN ABOVE AND THE NAMES OF THE PARTIES, MUST BE FILED IF YOU WANT THE COURT TO HEAR YOUR SIDE OF THE CASE. IF YOU DO NOT FILE YOUR RESPONSE ON TIME, YOU MAY LOSE THE CASE, AND YOUR WAGES, MONEY, AND PROPERTY MAY THEREAFTER BE TAKEN WITHOUT FURTHER WARNING FROM THE COURT. THERE ARE OTHER LEGAL REQUIREMENTS. YOU MAY WANT TO CALL AN ATTORNEY RIGHT AWAY. IF YOU DO NOT KNOW AN ATTORNEY, YOU MAY CALL AN ATTORNEY REFERRAL SERVICE OR A LEGAL AID OFFICE (LISTED IN THE PHONE BOOK).

IF YOU CHOOSE TO FILE A WRITTEN RESPONSE YOURSELF, AT THE SAME TIME YOU FILE YOUR WRITTEN RESPONSE TO THE COURT YOU MUST ALSO MAIL OR TAKE A COPY OF YOUR WRITTEN RESPONSE TO THE ᴀPLAINTIFF OR PLAINTIFF(S) ATTORNEY NAMED BELOW.

Daniel J. DiMatteo, Esq. - The Ferraro Law Firm
600 Brickell Ave., Suite 3800, Miami, FL 33131

THE STATE OF FLORIDA:
TO EACH SHERIFF OF THE STATE: YOU ARE COMMANDED TO SERVE THIS SUMMONS AND A COPY OF THE COMPLAINT IN THIS LAWSUIT ON THE ABOVE NAMED DEFENDANT(S).

DATED: **Oct 18 2023**

Joseph Abruzzo, Clerk & Comptroller

By:_____
DEPUTY CLERK **JOSIE LUCCE**

SEE REVERSE SIDE - VEASE AL REVES - VOIR DE L=AUTRE COTE DE

IMPORTANTE

Usted ha sido demandado legalmente. Tiene 20 dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales.  Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

IMPORTANT

Des poursuites judiciares ont ete entreprises contre vous. Vous avez 20 jours consecu-tifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egale-ment, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

SEE REVERSE SIDE - VEASE AL REVES - VOIR DE L=AUTRE COTE DE

This notice is provided pursuant to Administrative Order No. 2.207-1/15

**"If you are a <u>person with a disability</u> who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact William Hutchings, Jr., Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway, West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."**

**"Si usted es una <u>persona minusválida</u> que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N. Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711."**

**"Si ou se yon <u>moun ki enfim</u> ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon pou jwen kèk èd. Tanpri kontakte William Hutchings, Jr., kòòdonatè pwogram Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711."**

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT, IN AND
FOR PALM BEACH COUNTY, FLORIDA

Timothy Piers DeValle, et al.

_____
                        Plaintiff,

CASE NO. _____

50-2023-CA-014349-XXXA-MB

vs.

Johnson & Johnson, et al.

_____
                        Defendant.

## SUMMONS
## (PERSONAL SERVICE ON A NATURAL PERSON)

TO DEFENDANT(S):

Imerys Talc America, Inc., f/k/a Luzenac America,
Inc., f/k/a Rio Tinto Minerals, Inc.

ALTERNATE ADDRESS:

251 Little Falls Drive, Wilmington, DE 19808

_____         _____

## IMPORTANT

A LAWSUIT HAS BEEN FILED AGAINST YOU.  YOU HAVE 20 CALENDAR DAYS AFTER
THIS SUMMONS IS SERVED ON YOU TO FILE A WRITTEN RESPONSE TO THE
ATTACHED COMPLAINT WITH THE CLERK OF THIS COURT.  A PHONE CALL WILL NOT
PROTECT YOU.  YOUR WRITTEN RESPONSE, INCLUDING THE CASE NUMBER GIVEN
ABOVE AND THE NAMES OF THE PARTIES, MUST BE FILED IF YOU WANT THE COURT
TO HEAR YOUR SIDE OF THE CASE.  IF YOU DO NOT FILE YOUR RESPONSE ON TIME,
YOU MAY LOSE THE CASE, AND YOUR WAGES, MONEY, AND PROPERTY MAY
THEREAFTER BE TAKEN WITHOUT FURTHER WARNING FROM THE COURT.  THERE
ARE OTHER LEGAL REQUIREMENTS.  YOU MAY WANT TO CALL AN ATTORNEY
RIGHT AWAY.  IF YOU DO NOT KNOW AN ATTORNEY, YOU MAY CALL AN ATTORNEY
REFERRAL SERVICE OR A LEGAL AID OFFICE (LISTED IN THE PHONE BOOK).

IF YOU CHOOSE TO FILE A WRITTEN RESPONSE YOURSELF, AT THE SAME TIME YOU
FILE YOUR WRITTEN RESPONSE TO THE COURT YOU MUST ALSO MAIL OR TAKE A
COPY OF YOUR WRITTEN RESPONSE TO THE APLAINTIFF OR PLAINTIFF(S) ATTORNEY
NAMED BELOW.

Daniel J. DiMatteo, Esq. - The Ferraro Law Firm
600 Brickell Ave., Suite 3800, Miami, FL 33131

THE STATE OF FLORIDA:
TO EACH SHERIFF OF THE STATE: YOU ARE COMMANDED TO SERVE THIS SUMMONS
AND A COPY OF THE COMPLAINT IN THIS LAWSUIT ON THE ABOVE NAMED
DEFENDANT(S).

DATED: **Oct 18 2023**

Joseph Abruzzo, Clerk & Comptroller

By: _____
DEPUTY CLERK  **JOSIE LUCCE**

SEE REVERSE SIDE - VEASE AL REVES - VOIR DE L=AUTRE COTE DE

NOT A CERTIFIED COPY

IMPORTANTE

Usted ha sido demandado legalmente. Tiene 20 dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales.  Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

IMPORTANT

Des poursuites judiciares ont ete entreprises contre vous. Vous avez 20 jours consecu-tifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egale-ment, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

SEE REVERSE SIDE - VEASE AL REVES - VOIR DE L=AUTRE COTE DE

This notice is provided pursuant to Administrative Order No. 2.207-1/15

**"If you are a <u>person with a disability</u> who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact William Hutchings, Jr., Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway, West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."**

**"Si usted es una <u>persona minusválida</u> que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N. Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711."**

**"Si ou se yon <u>moun ki enfim</u> ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon pou jwen kèk èd. Tanpri kontakte William Hutchings, Jr., kòòdonatè pwogram Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711."**

Case 3:26-cv-00094-MAS-RLS    Document 1-2    Filed 12/11/25    Page 118 of 516
PageID: 127

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT, IN AND
FOR PALM BEACH COUNTY, FLORIDA

Timothy Piers DeValle, et al.

_____
                    Plaintiff,

vs.

Johnson & Johnson, et al.

_____
                    Defendant.

CASE NO.  50-2023-CA-014349-XXXA-MB

                              _____

## SUMMONS
### (PERSONAL SERVICE ON A NATURAL PERSON)

TO DEFENDANT(S):                    **ALTERNATE ADDRESS:**

Publix Supermarkets, Inc.            801 US Highway 1, North Palm Beach, FL 33408

_____            _____

### IMPORTANT

A LAWSUIT HAS BEEN FILED AGAINST YOU. YOU HAVE 20 CALENDAR DAYS AFTER
THIS SUMMONS IS SERVED ON YOU TO FILE A WRITTEN RESPONSE TO THE
ATTACHED COMPLAINT WITH THE CLERK OF THIS COURT. A PHONE CALL WILL NOT
PROTECT YOU. YOUR WRITTEN RESPONSE, INCLUDING THE CASE NUMBER GIVEN
ABOVE AND THE NAMES OF THE PARTIES, MUST BE FILED IF YOU WANT THE COURT
TO HEAR YOUR SIDE OF THE CASE. IF YOU DO NOT FILE YOUR RESPONSE ON TIME,
YOU MAY LOSE THE CASE, AND YOUR WAGES, MONEY, AND PROPERTY MAY
THEREAFTER BE TAKEN WITHOUT FURTHER WARNING FROM THE COURT. THERE
ARE OTHER LEGAL REQUIREMENTS. YOU MAY WANT TO CALL AN ATTORNEY
RIGHT AWAY. IF YOU DO NOT KNOW AN ATTORNEY, YOU MAY CALL AN ATTORNEY
REFERRAL SERVICE OR A LEGAL AID OFFICE (LISTED IN THE PHONE BOOK).

IF YOU CHOOSE TO FILE A WRITTEN RESPONSE YOURSELF, AT THE SAME TIME YOU
FILE YOUR WRITTEN RESPONSE TO THE COURT YOU MUST ALSO MAIL OR TAKE A
COPY OF YOUR WRITTEN RESPONSE TO THE ΑPLAINTIFF OR PLAINTIFF(S) ATTORNEY
NAMED BELOW.

Daniel J. DiMatteo, Esq. - The Ferraro Law Firm
600 Brickell Ave., Suite 3800, Miami, FL 33131

THE STATE OF FLORIDA:
TO EACH SHERIFF OF THE STATE: YOU ARE COMMANDED TO SERVE THIS SUMMONS
AND A COPY OF THE COMPLAINT IN THIS LAWSUIT ON THE ABOVE NAMED
DEFENDANT(S).

DATED: **Oct 18 2023**                    Joseph Abruzzo, Clerk & Comptroller

                                          By:_____
                                          DEPUTY CLERK **JOSIE LUCCE**

SEE REVERSE SIDE - VEASE AL REVES - VOIR DE L=AUTRE COTE DE

<u>IMPORTANTE</u>

Usted ha sido demandado legalmente. Tiene 20 dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales.  Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

<u>IMPORTANT</u>

Des poursuites judiciares ont ete entreprises contre vous. Vous avez 20 jours consecu-tifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egale-ment, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

SEE REVERSE SIDE - VEASE AL REVES - VOIR DE L=AUTRE COTE DE

This notice is provided pursuant to Administrative Order No. 2.207-1/15

**"If you are a <u>person with a disability</u> who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact William Hutchings, Jr., Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway, West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."**

**"Si usted es una <u>persona minusválida</u> que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N. Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711."**

**"Si ou se yon <u>moun ki enfim</u> ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon pou jwen kèk èd. Tanpri kontakte William Hutchings, Jr., kòòdonatè pwogram Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711."**



**JOSEPH ABRUZZO**

# RECEIPT
5082036

CLERK OF THE CIRCUIT COURT & COMPTROLLER

PALM BEACH COUNTY, FLORIDA

Printed On:
10/18/2023 03:52
Page 1 of 1

| Receipt Number: 5082036 - Date 10/18/2023  Time 3:52PM | | | |
|---|---|---|---|
| **Received of:** | The Ferraro Law Firm<br>600 Brickell Avenue<br>Miami, FL 33131 | | |
| **Cashier Name:** | ADMIN | **Balance Owed:** | 70.00 |
| **Cashier Location:** | E-Filing | **Total Amount Paid:** | 70.00 |
| **Receipt ID:** | 11473302 | **Remaining Balance:** | 0.00 |
| **Division:** | AH: Circuit Civil Central - AH(Civil) | | |

| Case# 50-2023-CA-014349-XXXA-MB -- PLAINTIFF/PETITIONER: PIERS DEVALLE, TIMOTHY | | | |
|---|---|---|---|
| **Item** | **Balance** | **Paid** | **Bal Remaining** |
| Fees | 70.00 | 70.00 | 0.00 |
| **Case Total** | **70.00** | **70.00** | **0.00** |

| Payments | | |
|---|---|---|
| **Type** | **Ref#** | **Amount** |
| EFiling_CREColorDITCARD | ▬▬▬ | **70.00** |
| **Total Received** | | **70.00** |
| **Total Paid** | | **70.00** |

**How was your service today?**  Please visit www.mypalmbeachclerk.com/survey or send your feedback to clerkweb@mypalmbeachclerk.com.

**For office locations and information about Clerk & Comptroller services:**
Visit www.mypalmbeachclerk.com or call (561) 355-2996.

NOT A CERTIFIED COPY

## RETURN OF SERVICE

| State of Florida | County of Palm Beach | Circuit Court |
|---|---|---|

Case Number: 50-2023-CA-014349-XXXA-MB

Plaintiff: **TIMOTHY PIERS DeValle, and et al.,**
vs.
Defendant: **JOHNSON & JOHNSON, and et al,**

For:
DANIEL J. DIMATTEO
THE FERRARO LAW FIRM, P.A.
600 BRICKELL AVENUE
SUITE 3800
MIAMI, FL 33131

Received by Caplan, Caplan & Caplan Process Servers on the 24th day of October, 2023 at 1:22 pm to be served on **PUBLIX SUPERMARKETS, INC. BY SERVING ITS REGISTERED AGENT: CORPORATE CREATIONS NETWORK, INC, 801 US HIGHWAY 1, NORTH PALM BEACH, FL 33408**

I, NIXON FLEURIMOND, do hereby affirm that on the **25th day of October, 2023** at **1:25 pm, I:**

served a **CORPORATION, REGISTERED AGENT** by delivering a true copy of the **SUMMONS, ORDER IMPLEMENTING DIFFERENTIATED CASE MANAGEMENT PLAN, DESIGNATING CASE TO THE GENERAL TRACK, ORDER SETTING CALENDAR CALL AND CASE MANAGEMENT CONFERENCE AND DIRECTING PRETRIAL AND MEDIATION PROCEDURES (DCMGJT), CIVIL COVER SHEET, PLAINTIFF'S WRONGFUL DEATH COMPLAINT AND DEMAND FOR JURY TRIAL,** with the date and hour of service endorsed thereon by me, to: **CORPORATE CREATIONS NETWORK, INC** as **REGISTERED AGENT** at the address of: **801 US HIGHWAY 1, NORTH PALM BEACH, FL 33408** on behalf of **PUBLIX SUPERMARKETS, INC. BY SERVING ITS REGISTERED AGENT: CORPORATE CREATIONS NETWORK, INC,** and informed said person of the contents therein, in compliance with Florida State Statute 48.091.

**Additional Information pertaining to this Service:**
BY SERVING ALICIA YBARRA AS EMPLOYEE OF THE REGISTERED AGENT

**Description** of Person Served: Age: 27, Sex: F, Race/Skin Color: HISPANIC, Height: 5'3, Weight: 230, Hair: BLACK, Glasses: U

I certify that I am over the age of 18, have no interest in the above action, Under penalty of perjury, I declare that I have read the foregoing and that the facts stated in it are true, that I am a Certified Process Server in good standing in the judicial circuit in which the process was served in the county in which this defendant/witness was served. Pursuant to FS 92.525(2) and 28 USC Section 1746, no notary is required.

**NIXON FLEURIMOND**
1316

**Caplan, Caplan & Caplan Process Servers**
**12505 Orange Drive**
**Suite 907**
**Davie, FL 33330**
**(305) 374-3426**

Our Job Serial Number: CPN-2023040279
Service Fee: _____



Filing # 183763480 E-Filed 10/11/2023 03:44:17 PM



IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT, IN AND
FOR PALM BEACH COUNTY, FLORIDA

Timothy Piers DeValle, et al.

_____
                        Plaintiff,

vs.

Johnson & Johnson, et al.

_____
                        Defendant.

CASE NO. 50-2023-CA-014349-XXXA-MB
_____

OCT 2 4 2023

## SUMMONS
### (PERSONAL SERVICE ON A NATURAL PERSON)

TO DEFENDANT(S):

Publix Supermarkets, Inc.

**ALTERNATE ADDRESS:**

801 US Highway 1, North Palm Beach, FL 33408

DELIVERED 10/25/2023 1:25 PM
SERVER NF
LICENSE 1316

## IMPORTANT

A LAWSUIT HAS BEEN FILED AGAINST YOU. YOU HAVE 20 CALENDAR DAYS AFTER
THIS SUMMONS IS SERVED ON YOU TO FILE A WRITTEN RESPONSE TO THE
ATTACHED COMPLAINT WITH THE CLERK OF THIS COURT. A PHONE CALL WILL NOT
PROTECT YOU. YOUR WRITTEN RESPONSE, INCLUDING THE CASE NUMBER GIVEN
ABOVE AND THE NAMES OF THE PARTIES, MUST BE FILED IF YOU WANT THE COURT
TO HEAR YOUR SIDE OF THE CASE. IF YOU DO NOT FILE YOUR RESPONSE ON TIME,
YOU MAY LOSE THE CASE, AND YOUR WAGES, MONEY, AND PROPERTY MAY
THEREAFTER BE TAKEN WITHOUT FURTHER WARNING FROM THE COURT. THERE
ARE OTHER LEGAL REQUIREMENTS. YOU MAY WANT TO CALL AN ATTORNEY
RIGHT AWAY. IF YOU DO NOT KNOW AN ATTORNEY, YOU MAY CALL AN ATTORNEY
REFERRAL SERVICE OR A LEGAL AID OFFICE (LISTED IN THE PHONE BOOK).

IF YOU CHOOSE TO FILE A WRITTEN RESPONSE YOURSELF, AT THE SAME TIME YOU
FILE YOUR WRITTEN RESPONSE TO THE COURT YOU MUST ALSO MAIL OR TAKE A
COPY OF YOUR WRITTEN RESPONSE TO THE APLAINTIFF OR PLAINTIFF(S) ATTORNEY
NAMED BELOW.

Daniel J. DiMatteo, Esq. - The Ferraro Law Firm
600 Brickell Ave., Suite 3800, Miami, FL 33131

THE STATE OF FLORIDA:
TO EACH SHERIFF OF THE STATE: YOU ARE COMMANDED TO SERVE THIS SUMMONS
AND A COPY OF THE COMPLAINT IN THIS LAWSUIT ON THE ABOVE NAMED
DEFENDANT(S).

MUST PROVIDE FOLLOWING INFORMATION:
M/F: _____ RACE: _____ WEIGHT: _____
AGE: _____ HEIGHT: _____ HAIR: _____

DATED: **Oct 18 2023**

Joseph Abruzzo, Clerk & Comptroller

By: _____
DEPUTY CLERK **JOSIE LUCCE**

SEE REVERSE SIDE - VEASE AL REVES - VOIR DE L=AUTRE COTE DE

Summons (Personal Service on a Natural Person) Page 2 of 6

40279

NOT A CERTIFIED COPY

## IMPORTANTE

Usted ha sido demandado legalmente. Tiene 20 dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales.  Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

## IMPORTANT

Des poursuites judiciaires ont ete entreprises contre vous. Vous avez 20 jours consecu-tifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egale-ment, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

## SEE REVERSE SIDE - VEASE AL REVES - VOIR DE L=AUTRE COTE DE

Summons (Personal Service on a Natural Person) Page 3 of 6

This notice is provided pursuant to Administrative Order No. 2.207-1/15

"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact William Hutchings, Jr., Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway, West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."

"Si usted es una persona minusválida que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N. Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711."

"Si ou se yon moun ki enfim ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon pou jwen kèk èd. Tanpri kontakte William Hutchings, Jr., kòòdonatè pwogram Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711."

IN THE CIRCUIT COURT OF THE FIFTEENTH
JUDICIAL CIRCUIT IN AND
FOR PALM BEACH COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION: "AH"
CASE NO.: 502023CA014349XXXAMB

TIMOTHY PIERS DEVALLE,
TIMOTHY PIERS DEVALLE,

     Plaintiff/Petitioners

vs.

JOHNSON AND JOHNSON,
JOHNSON AND JOHNSON HOLDCO,
JANSSEN PHARMACEUTICAL INC,
et al.,

     Defendant/Respondents.

_____/

## ORDER IMPLEMENTING DIFFERENTIATED CASE MANAGEMENT PLAN, DESIGNATING CASE TO THE GENERAL TRACK, ORDER SETTING CALENDAR CALL AND CASE MANAGEMENT CONFERENCE AND DIRECTING PRETRIAL AND MEDIATION PROCEDURES (DCMGJT)

     **THIS MATTER** is a Circuit Civil case calling for a jury trial. Accordingly, it is

     **ORDERED AND ADJUDGED** that pursuant to Administrative Order 3.110 (as amended), this case is designated to the **GENERAL TRACK**. The deadlines established by this Order are to ensure the case is **disposed of within 18 months from the date of filing.** To that end, the following procedures and deadlines shall be strictly observed:

I. **SERVICE OF THIS ORDER, ACTIVE CASE MANAGEMENT AND NON-COMPLIANCE**

     **Plaintiff/Petitioner is directed to serve this Order** upon each Defendant/Respondent with the Initial Complaint/Petition and Summons. The deadlines and procedures set forth herein are firm and may be modified only upon a showing of a good faith attempt to comply with the deadlines or demonstration of a significant change of circumstances and through the process established in the 15th Circuit's Administrative Order 3.110 (as amended).

     The parties are expected to actively manage the case and to confer early and often to ensure compliance with this order and timely resolution of the case. The parties and counsel are expected to govern themselves at all times with a spirit of cooperation, professionalism, and civility. They are expected to accommodate each other whenever reasonably possible and eliminate disputes by reasonable agreements.

     **Self-Represented/Pro se litigants** (i.e. those without counsel) are held to the same obligations imposed upon counsel.

     **Motions to extend deadlines** must be filed *prior* to the deadline. Untimely motions will be denied absent compelling circumstances and showing of good cause.

Case No. 50-2023-CA-014349-XXXA-MB

**NONCOMPLIANCE WITH THIS ORDER, ABSENT A SHOWING OF GOOD CAUSE, MAY RESULT IN DISMISSAL OF THE ACTION, THE STRIKING OF PLEADINGS, WITNESSES, OR EXHIBITS, REMOVAL OF THE CASE FROM THE DOCKET, DEFAULT OR ANY OTHER APPROPRIATE SANCTION.**

The failure to act in good faith and comply with this order must be reported, if not resolved through a conference of the parties and good faith conferral, by filing a **"Suggestion of Non-Compliance with Pre-Trial Order"** that must be set for hearing in a timely manner. The Suggestion must name the non-compliant person, describe the act of non-compliance, be served upon all parties and sent to the Court's chambers. Responses may only be submitted upon request of the Court. Failure to correct any non-compliance before the hearing may result in sanctions as described above. The parties will notify the Court immediately if non-compliance is cured; if cured more than 7 days before the hearing, the hearing may be cancelled.

II. <u>SCHEDULING, CONTINUANCES AND PRETRIAL DEADLINES</u>

**A CASE MANAGEMENT CONFERENCE and CALENDAR CALL will be held on March 7, 2025.** The parties must be ready to try the case by that day. The specific time of Case Management Conference and procedures for conducting Calendar Call can be found on the Division's webpages at www.15thcircuit.com. The Calendar Call may be conducted in-person or by e-calendar.

The trial period begins the first business day of the immediately following week after the above-listed Case Management Conference and Calendar Call, unless otherwise described in the divisional instructions or by court order.

**TRIAL CONTINUANCES:** If a case cannot be ready for trial by the Calendar Call despite all good faith efforts, a motion to continue trial must be set for a Differentiated Case Management (DCM) Conference as described in the 15th Circuit's Administrative Order 3.110 (as amended) and the next paragraph. Any motion to continue the trial must comply with Fla. R. Civ. P. Rule 1.460, including that they are signed by the client. The Motion must be filed and the DCM Conference set no more than **30 DAYS** from the last defendant being served or as soon as circumstances giving rise to the need for a continuance becomes known and only for good cause. Every motion for a continuance must include a proposed Amended DCMO resetting each pretrial deadline that remains applicable and indicating the month the case can be ready for trial.

**DCM CONFERENCES:** DCM conferences are scheduled through the Circuit's Online Scheduling System under DCM- Case Management Conference Scheduling. No less than ten (10) days in advance of the DCM Conference the parties must file with the Clerk a Joint Status Report that:

1. Concisely updates the Court on the status of the case,

2. Identifies pending motions and other matters the Court needs to address, and

3. If applicable, provides a proposed revised pretrial schedule.

The parties must upload the Joint Status report at least 7 days in advance of a DCM Conference through the e-courtesy feature of the Circuit's Online Scheduling System. The parties are to be prepared at the DCM Conference to address the topics listed in Rule 1.200(a) and for the court, at its discretion, to hear or set for hearing any pending motions.

Case No. 50-2023-CA-014349-XXXA-MB

**The following deadlines (discussed in detail below) apply unless otherwise modified by the Court:**

| | EVENTS | DESCRIPTION | COMPLETION DEADLINE |
|---|---|---|---|
| 1. | Service of Complaint | See Part III.A, infra | January 30, 2024 Service under extension is only by court order. |
| 2. | Pleading Amendments/ Adding parties | See Part III.B, infra | March 30, 2024 |
| 3. | Resolution of all motions/objections directed to the pleadings *(i.e. to dismiss or strike)* and pleadings closed * | See Part III.B, infra | June 8, 2024 |
| 4. | Expert Witnesses and Compulsory Examinations | See Part III.D, infra | November 7, 2024 |
| 5. | Witness & Exhibit Lists | See Part III.C, infra | November 7, 2024 |
| 6. | Rebuttal Witness Lists | See Part III.E, infra | November 27, 2024 |
| 7. | Filing Summary Judgment & *Daubert* Motions | See Part III.J, infra | December 7, 2024 |
| 8. | Discovery Cut-Off | See Part III.H, infra | December 7, 2024 |
| 9. | Pre-Trial Meet & Confer | See Part III.I, infra | February 5, 2025 |
| 10. | Deposition Designations | See Part III.G, infra | February 15, 2025 |
| 11. | Deadline for Mediation | See Part IV, infra | February 25, 2025 |
| 12. | Deadline to hear ALL Motions | See Part III.J, infra | March 2, 2025 |
| 13. | Jury Instructions and Verdict Form | See Part III.O, infra | March 4, 2025 |
| 14. | Trial Ready Date ** | See Part II, supra | March 7, 2025 |

**Fla. R. Gen. Prac. & Jud. Admin. Rule 2.514 governs if any deadlines falls on a weekend or holiday.**

\* The parties must expeditiously address any motions directed to the pleadings. Defensive motions under Rule 1.140 of the Fla. R. Civ. P., motions to extend time to file a defensive motion or pleading, and any other motion preventing the matter from being at issue shall be set for hearing within **five (5) days** of filing. The motion should be scheduled for hearing at the earliest date that the Court and parties are available.

\*\* The Court reserves the authority to expedite the trial setting and amend the pretrial deadlines accordingly.

III. **UNIFORM PRETRIAL PROCEDURES**

   A. **Timely Service and Defaults:**

   Parties must make reasonable efforts to ensure speedy service. Each return of service must be separately filed for each defendant. If service is not completed within 90 days, an Order will be issued directing service by the **120 DAY**

NOT A CERTIFIED COPY

Case No. 50-2023-CA-014349-XXXA-MB

**DEADLINE.** Failure to comply will result in dismissal of the case or party for lack of service. Any motions to extend the deadline for service must specify why service could not have been effectuated, what is being done to effectuate service and request only that amount of additional time necessary.

If all defendants become defaulted, a Motion for Default Final Judgment along with supporting documentation must be filed within **30 days** of the last default and set for hearing at the next available hearing time.

B. **Amendment of Pleadings, Motions Directed at Pleadings and Notice for Trial:**

Any Motions to Amend Pleadings to add parties, must be filed no later than the first business day **180 DAYS AFTER THE CASE IS FILED**.

The parties must expeditiously address any other motions directed to the pleadings. Defensive motions under Rule 1.140, Fla. R. Civ. P., motions to extend time to file a defensive motion or pleading, and any other motion preventing the matter from being at issue must be set for hearing within **5 days** of filing to be heard at the earliest date that the Court and parties are available.

If the pleadings are not closed and the case not at issue **250 DAYS AFTER FILING**, the parties must appear for a DCM Conference to be noticed and held in accordance within the 15th Circuit's Administrative Order 3.110 and Divisional Instructions located on the Circuit's website for the Division to which the case is assigned.

C. **Exhibits and Witnesses.** On the last business day no later than **120 DAYS PRIOR TO CALENDAR CALL**, the parties must exchange lists of all trial exhibits, names and addresses of all trial witnesses.

D. **Expert Witnesses and Compulsory Medical Examinations.** If Expert Witnesses or Compulsory Medical Examinations are anticipated, the Parties must confer and establish a schedule for completing related discovery, including deadlines for disclosures, written discovery, depositions and motions directed at Experts or Compulsory Medical Examiners that will result in the completion of Expert/CME Discovery and resolution of Motions directed at them at least **120 DAYS BEFORE TRIAL.**

If agreed, the parties must submit a proposed Expert/CME Scheduling Order for entry by the Court. If not, the parties must appear for a DCM Case Management Conference.

**Expert Disclosures:** In addition to names and addresses of each expert retained to formulate an expert opinion with regard to this cause, both on the initial listing and on rebuttal, the parties must provide:

1. The subject matter about which the expert will testify;

2. The substance of facts and opinions to which the expert will testify;

3. A summary of the grounds for each opinion;

4. A copy of any written reports issued by the expert; and

5. A copy of the expert's curriculum vitae.

**One Expert Per Specialty:** The parties will be limited to one expert witness per

Case No. 50-2023-CA-014349-XXXA-MB

specialty unless they obtain leave of Court to list and call more than one expert witness per specialty, no later than 60 days prior to calendar call.

E. **Rebuttal Witnesses and Exhibits.** On the last business day no later than **100 DAYS PRIOR TO CALENDAR CALL,** the parties must exchange lists of names and addresses of all rebuttal witnesses and list of any rebuttal exhibits.

F. **Additional Exhibits, Witnesses Or Objections.** At trial, the parties will be strictly limited to exhibits and witnesses disclosed and objections reserved on the schedules attached to the Pre-Trial Stipulation prepared in accordance with paragraphs D and E, absent agreement specifically stated in the Pre-Trial Stipulation or order of the Court upon good cause shown. Failure to reserve objections constitutes a waiver. A party desiring to use an exhibit or witness discovered after counsel have conferred pursuant to paragraph D must immediately furnish the Court and other counsel with a description of the exhibit or with the witness' name and address and the expected subject matter of the witness' testimony, together with the reason for the late discovery of the exhibit or witness. Use of the exhibit or witness may be allowed by the Court for good cause shown or to prevent manifest injustice.

G. **Deposition Designations.** No later than **20 DAYS PRIOR TO CALENDAR CALL,** each party must serve designation of depositions, or portions of depositions, each intends to offer as testimony. No later than **10 DAYS PRIOR TO CALENDAR CALL,** each opposing party is to serve any counter (or "fairness") designations to portions of depositions designated, together with objections to the depositions, or portions thereof, originally designated. No later than **5 DAYS BEFORE** calendar call, each party must serve any objections to counter designations served by an opposing party.

H. **Discovery Cutoff.** Unless otherwise agreed in the Pre-Trial Stipulation, all discovery must be completed no later than **90 DAYS PRIOR TO CALENDAR CALL** absent agreement for later discovery specifically stated in the Pre-Trial Stipulation or for other good cause shown. Absent unforeseeable, exigent circumstances, the failure to complete discovery is not grounds for a continuance.

I. **Pre-Trial Meet and Confer.** On the last business day no later than **30 DAYS PRIOR TO CALENDAR CALL,** the parties must confer and:

   1. Discuss settlement;
   2. Simplify the issues and stipulate, in writing, as to as many facts and issues as possible;
   3. Prepare a Pre-Trial Stipulation in accordance with paragraph E; and
   4. List all objections to trial exhibits.

J. **Motions:** The Parties must plan for, file and timely set hearings for any motions they expect the Court to address in advance of trial. **No motions will be heard the day of trial.** Few are appropriate after Calendar Call. The parties must confer early in the case and coordinate briefing and discovery schedules, as necessary, to ensure motions are timely heard.

While motion practice is critical to the advancement and streamlining of a case, the Parties are reminded they **DO NOT have an absolute right to most motions being**

Case No. 50-2023-CA-014349-XXXA-MB

**heard.** Failure to timely file and set motions for hearing in advance of Calendar Call
will likely result the Court denying a request for hearing. Failure to file and have a
motion heard is not grounds for a trial continuance.

**Summary Judgment and *Daubert* Motions** must be filed at least **90 DAYS prior
to Calendar Call**. The parties shall confer regarding summary judgment motions to
ensure discovery necessary for those motions is completed in advance of their
filing.

**ALL MOTIONS** (including dispositive motions to motions in limine), must be heard
no less than **5 days before Calendar Call**. Parties must plan and seek hearing time
sufficiently in advance to ensure this deadline is met.

K.  **Filing of Pre-Trial Stipulation.** It is the duty of counsel for the Plaintiff to see that
the Pre-Trial Stipulation is drawn, executed by counsel for all parties, and filed with
the Clerk no later than **20 DAYS PRIOR TO CALENDAR CALL**. Unilateral
pretrial statements are disallowed, unless approved by the Court, after notice and
hearing showing good cause. Counsel for all parties are charged with good faith
cooperation in this regard. The Pre-Trial Stipulation must contain in separately
numbered paragraphs:

1.  A list of all pending motions including Motions *In Limine* and *Daubert*
    Motions requiring action by the Court and the dates those motions are set for
    hearing. **Motions not listed are deemed waived.**

2.  Stipulated facts requiring no proof at trial which may be read to the trier of
    fact;

3.  A statement of all issues of fact for determination at trial;

4.  Lists of exhibits itemized as follows:

    a.  Exhibits to be admitted by Plaintiff without objection;

    b.  Exhibits to be admitted by Defendant without objection;

    c.  Objected to Exhibits, with the specific basis for the objection stated.

    Note: Reasonably specific description of each exhibit is required. Non-
    specific descriptions like "all documents produced in discovery" will be
    stricken. Moreover, Objections may not be "reserved." Failure to specify an
    objection constitutes its waiver.

5.  Each party's numbered list of trial witnesses with addresses (including all
    known rebuttal witnesses); the list of witnesses must be on separate schedules
    attached to the Stipulation;

6.  A statement of total estimated time for trial, including the time needed per side
    for (1) jury selection, (2) opening arguments, (3) each case in chief, and (4)
    closing arguments.

7.  Names of attorneys to try case and their contact information; and

8.  The number of peremptory challenges per party.

Failure to file the Pre-Trial Stipulation or a Court Approved Unilateral Stipulation as
provided above may result in the case being stricken from the Court's calendar or

Case No. 50-2023-CA-014349-XXXA-MB

other sanctions, including dismissal or default.

L. **Pre-Trial Conference pursuant to Fla. R. Civ. P. 1.200** If a pre-trial conference is set upon motion of a party or by the Court, counsel must meet and prepare a stipulation pursuant to paragraph K, infra, and file the stipulation no later than 5 **DAYS BEFORE THE CONFERENCE**. Failure to request a pre-trial conference in a timely fashion constitutes a waiver of the notice of requirement of Rule 1.200. Absent prior approval, Motions for Summary Judgment will not be heard at any pre-trial conference.

M. **Pre-Marking Exhibits.** Prior to trial, each party is to mark for identification all exhibits, as directed by the clerk. (instructions and templates found at www.mypalmbeachclerk.com/departments/courts/evidence-guidelines/civil-evidence)

N. **Enlarged Jury Panels:** Local Rules require advance approval of the Chief Judge and Jury Office for jury panels exceeding 31 jurors. To ensure enough jurors are available, requests for enlarged jury panels must be resolved at least 6 months before calendar call.

O. **Jury Instructions and Verdict Form:** A joint set of proposed jury instructions and a proposed verdict form must be provided to the court no less than **3 days BEFORE TRIAL** in a printed form appropriate for submission to the jury and in Microsoft Word format.

If there is an objection to a proposed instruction, the instruction should be followed by the specific objection, a brief explanation, and a citation to legal authority. If an alternative or modified instruction is proposed, it should follow the instruction it is intended to replace.

P. **Unique Questions Of Law.** Prior to calendar call, counsel for the parties are directed to exchange and simultaneously submit to the Court appropriate memoranda with citations to legal authority in support of any unique legal questions that may reasonably be anticipated to arise during the trial.

IV. **MEDIATION**

A. All parties are required to participate in mediation as follows:

1. The attendance of counsel who will try the case and representatives of each party with full authority to enter into a complete compromise and settlement is mandatory. If insurance is involved, an adjuster with authority up to the policy limits must attend.

2. At least one week prior to a scheduled mediation conference, all parties are to file with the mediator a brief, written summary of the case containing a list of issues as to each party.

3. All communications at the mediation conference are privileged consistent with Florida Statutes sections 44.102 and 90.408.

4. The mediator has no power to compel or enforce a settlement agreement. If a settlement is reached, it is a responsibility of the attorneys or parties to reduce the agreement to writing and to comply with Florida Rule of Civil Procedure

Case No. 50-2023-CA-014349-XXXA-MB

1.730(b), unless waived.

B. The Plaintiff's attorney is responsible for scheduling mediation. The parties should agree on a mediator. If they are unable to agree, any party may apply to the Court for appointment of a mediator in conformity with Rule 1.720 (j), Fla. R. Civ. P. The lead attorney or party must file and serve on all parties the mediator a Notice of Mediation giving the time, place, and date of the mediation and the mediator's name.

C. **Completion of mediation prior to calendar call is a prerequisite to trial and must be completed no later than 10 DAYS PRIOR TO CALENDAR CALL.** If mediation is not conducted, or if a party fails to participate in mediation, the case, at the Court's discretion, may be stricken from the trial calendar, pleadings may be stricken, and other sanctions may be imposed.

D. Any party opposing mediation may proceed under Florida Rule of Civil Procedure 1.700(b).

**DONE AND ORDERED** in West Palm Beach, Palm Beach County, Florida.



50-2023-CA-014349-XXXA-MB    10/05/2023
Reid P. Scott
Judge

A copy of this Order has been furnished to the Plaintiff. The Plaintiff shall serve this Order to the Defendant(s) in compliance with Administrative Order 3.110 (amended).

This notice is provided pursuant to Administrative Order No. 2.207

**"If you are a <u>person with a disability</u> who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact William Hutchings, Jr., Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."**

**"Si usted es una <u>persona minusválida</u> que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N.**

Case No. 50-2023-CA-014349-XXXA-MB

Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711."

"Si ou se yon <u>moun ki enfim</u> ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon pou jwen kèk èd. Tanpri kontakte William Hutchings, Jr., kòòdonatè pwogram Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711."

## AFFIDAVIT OF SERVICE

State of Florida                    County of Palm Beach                    Circuit Court

Case Number: 50-2023-CA-014349-XXXA-MB

Plaintiff: **TIMOTHY PIERS DeValle, and et al.,**
vs.
Defendant: **JOHNSON & JOHNSON, and et al,**

For: DANIEL J. DIMATTEO
THE FERRARO LAW FIRM, P.A.

Received by Caplan, Caplan & Caplan Process Servers on the 24th day of October, 2023 at 1:22 pm to be served on **IMERYS TALC AMERICA, INC. f/k/a LUZENAC AMERICA, INC f/k/a RIO TINTO MINERALS, INC. C/O CORPORATION SERVICE COMPANY, 251 LITTLE FALLS DRIVE, WILMINGTON, DE 19808.** I, _____ Nancy Butler _____, being duly sworn, depose and say that on the __31st__ day of __October__, 2023 at __11:38__ a.m., executed service by delivering a true copy of the **SUMMONS, ORDER IMPLEMENTING DIFFERENTIATED CASE MANAGEMENT PLAN, DESIGNATING CASE TO THE GENERAL TRACK, ORDER SETTING CALENDAR CALL AND CASE MANAGEMENT CONFERENCE AND DIRECTING PRETRIAL AND MEDIATION PROCEDURES (DCMGJT), CIVIL COVER SHEET, PLAINTIFF'S WRONGFUL DEATH COMPLAINT AND DEMAND FOR JURY TRIAL,**
in accordance with state statutes in the manner marked below:

( )PUBLIC AGENCY:By serving_____ as _____ Served the named agency by delivering a true copy of pleadings and informed said person of the contents therein, with date,hour,intials of service endorsed thereon by me in compliance with State Statute
( )CORPORATE SERVICE/CORPORATE LLC:By serving _____ as _____, Served the named person by delivering a true copy of pleadings and informed said person of the contents therein,with the date, hour andintials of service endorsed thereon by me in compliance with State Statute
(X)CORPORATE REGISTERED AGENT:By serving Corporation Service Company as Registered Agent. Served the named person by delivering a true copy of pleadings and informed said person of the contents therein,with date,hour,intials of service endorsed by me in compliance with State Statute
( )CORPORATE REGISTERED AGENT EMPLOYEE:By serving _____ as Employee of Registered agent. Served the named person by delivering a true copy of pleadings and informed person of the contents therein,with date,hour,intials of service endorsed thereon by me in compliance with F.S.48.081(3)(a) and 48.091, the registered agent failed to comply by not being available for service between the hours of 10am and 12pm
( )CORPORATE SUBSTITUTE RESIDENTIAL :By serving _____ as _____ Served the named person at a residence by delivering true copy of pleadings and informed person of the contents therein,withthe date,hour and intials of service endorsed thereon by me in compliance with F.S. 48.081(3)(b) and 48.031(1)(a) as the registered agent failed to comply by not being available for service between10am and 12pm
( )SERVED:Served a Authorized person by delivering a true copy with date and hour of service endorsed to _____ as _____ who stated they are authorize to accept service for deponent and informed said person of the contents
( )NO SERVICE:Reason stated in comments

COMMENTS: by serving Service Of Process Bin - specifically designate as such and located at the front reception desk in the main lobby (the service documents were placed in this service of process bin in compliance with the registered agent's service of process policy/procedure) - as registered agent for the named defendant

Under penalties of perjury, I declare that I have read the foregoing Affidavit of Service / Return of Service and that the facts stated in it are true. I certify that I have no interest in the above action, am of legal age and service was made within this state by an officer authorized to serve process where the person was served.

Subscribed and Sworn to before me on the __31st__ day of __October__ 2023 by the affiant who is personally known to me.

NOTARY PUBLIC

JEFFREY L. BUTLER
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires August 14, 2026

Nancy Butler - process server
PROCESS SERVER # __n/a__
Appointed in accordance with State Statutes

**Caplan, Caplan & Caplan Process Servers**
**12505 Orange Drive**
**Suite 907**
**Davie, FL 33330**
**(305) 374-3426**

Our Job Serial Number: 2023040284

Filing # 183763480 E-Filed 10/11/2023 03:44:17 PM

*10*

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT, IN AND
FOR PALM BEACH COUNTY, FLORIDA

Timothy Piers DeValle, et al.                                    50-2023-CA-014349-XXXA-MB

_____          CASE NO. _____
                    Plaintiff,

vs.

Johnson & Johnson, et al.                    OCT 2 4 2023

_____
                    Defendant.

## SUMMONS
### (PERSONAL SERVICE ON A NATURAL PERSON)

TO DEFENDANT(S):                              ALTERNATE ADDRESS:

Imerys Talc America, Inc., f/k/a Luzenac America,     261 Little Falls Drive, Wilmington, DE 19808
Inc., f/k/a Rio Tinto Minerals, Inc.

### IMPORTANT

A LAWSUIT HAS BEEN FILED AGAINST YOU. YOU HAVE 20 CALENDAR DAYS AFTER
THIS SUMMONS IS SERVED ON YOU TO FILE A WRITTEN RESPONSE TO THE
ATTACHED COMPLAINT WITH THE CLERK OF THIS COURT. A PHONE CALL WILL NOT
PROTECT YOU. YOUR WRITTEN RESPONSE, INCLUDING THE CASE NUMBER GIVEN
ABOVE AND THE NAMES OF THE PARTIES, MUST BE FILED IF YOU WANT THE COURT
TO HEAR YOUR SIDE OF THE CASE. IF YOU DO NOT FILE YOUR RESPONSE ON TIME,
YOU MAY LOSE THE CASE, AND YOUR WAGES, MONEY, AND PROPERTY MAY
THEREAFTER BE TAKEN WITHOUT FURTHER WARNING FROM THE COURT. THERE
ARE OTHER LEGAL REQUIREMENTS. YOU MAY WANT TO CALL AN ATTORNEY
RIGHT AWAY. IF YOU DO NOT KNOW AN ATTORNEY, YOU MAY CALL AN ATTORNEY
REFERRAL SERVICE OR A LEGAL AID OFFICE (LISTED IN THE PHONE BOOK).

IF YOU CHOOSE TO FILE A WRITTEN RESPONSE YOURSELF, AT THE SAME TIME YOU
FILE YOUR WRITTEN RESPONSE TO THE COURT YOU MUST ALSO MAIL OR TAKE A
COPY OF YOUR WRITTEN RESPONSE TO THE APLAINTIFF OR PLAINTIFF(S) ATTORNEY
NAMED BELOW.

Daniel J. DiMatteo, Esq. - The Ferraro Law Firm        MUST PROVIDE FOLLOWING INFOPMATION:
600 Brickell Ave., Suite 3800, Miami, FL 33131
                                             M/F: _____ RACE: _____ WEIGHT: _____
                                             AGE: _____ HEIGHT: _____ HAIR: _____
THE STATE OF FLORIDA:
TO EACH SHERIFF OF THE STATE: YOU ARE COMMANDED TO SERVE THIS SUMMONS
AND A COPY OF THE COMPLAINT IN THIS LAWSUIT ON THE ABOVE NAMED
DEFENDANT(S).

DATED: **Oct 18 2023**                    Joseph Abruzzo, Clerk & Comptroller

                                             By: _____
                                             DEPUTY CLERK **JOSIE LUCCE**

SEE REVERSE SIDE - VEASE AL REVES - VOIR DE L=AUTRE COTE DE

Summons (Personal Service on a Natural Person) Page 2 of 6

*Legal Beagles*                                           40284

## IMPORTANTE

Usted ha sido demandado legalmente. Tiene 20 dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales.  Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

## IMPORTANT

Des poursuites judiciares ont ete entreprises contre vous. Vous avez 20 jours consecu-tifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egale-ment, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

SEE REVERSE SIDE - VEASE AL REVES - VOIR DE L=AUTRE COTE DE

Summons (Personal Service on a Natural Person) Page 3 of 6

This notice is provided pursuant to Administrative Order No. 2.207-1/15

"If you are a <u>person with a disability</u> who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact William Hutchings, Jr., Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway, West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."

"Si usted es una <u>persona minusválida</u> que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N. Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711."

"Si ou se yon <u>moun ki enfim</u> ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon pou jwen kèk èd. Tanpri kontakte William Hutchings, Jr., kòòdonatè pwogram Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711."

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

CASE NO. 50-2023-CA-014349-XXXA-MB (AH)

TIMOTHY PIERS DEVALLE, Individually
and as Personal Representative of the
Estate of DONNA MARIE DEVALLE,

                              Plaintiff,

v.

JOHNSON & JOHNSON;
JOHNSON & JOHNSON HOLDCO (NA) INC., f/k/a
      Johnson & Johnson Consumer Inc.,
      Individually and as successor-in-interest to
      Johnson & Johnson subsidiary "Old JJCI"
JANSSEN PHARMACEUTICALS, INC., individually
      and as successor in interest to Johnson & Johnson
      subsidiaries named Johnson & Johnson Consumer
      Inc., both prior to and after its 2021 restructurings
      and colloquially known as "Old JJCI and New JJCI";
KENVUE INC., individually and as successor-in-interest
      to Johnson & Johnson Consumer Inc.;
LTL MANAGEMENT, LLC;
IMERYS TALC AMERICA, INC. f/k/a
      LUZENAC AMERICA, INC. f/k/a
      RIO TINTO MINERALS, INC.;
PUBLIX SUPER MARKETS, INC.,

                        Defendants.

## NOTICE OF APPEARANCE AND DESIGNATION
## OF E-MAIL ADDRESSES

     PLEASE TAKE NOTICE that, without waiver of any defenses including as to personal

jurisdiction, Jennifer A. McLoone of the law firm of SHOOK, HARDY & BACON L.L.P. hereby

enters her appearance as counsel for Defendants JOHNSON & JOHNSON; LTL

MANAGEMENT LLC; JOHNSON & JOHNSON HOLDCO (NA) INC.; KENVUE, INC.; and

JANSSEN PHARMACEUTICALS in the above-captioned matter and hereby requests copies of all pleadings, motions, notices and any other matters that are filed herein.

FURTHER, pursuant to Florida Rule of Judicial Administration Rule 2.516(b)(1)(A), the undersigned counsel for the above Defendants designates the following e-mail addresses for service of court documents in this action:

**Jennifer A. McLoone, Esq.**
Primary E-Mail Address:  jmcloone@shb.com
Secondary E-Mail Address:  bizquierdo@shb.com
Tertiary E-Mail Address:  cmjordan@shb.com

Dated: November 13, 2023

Respectfully submitted,

**SHOOK, HARDY & BACON L.L.P.**
Citigroup Center, Suite 3200
201 South Biscayne Blvd.
Miami, Florida 33131-4332
T: (305) 358-5171 | F: (305) 358-7470

By: _s/ Jennifer A. McLoone_____
JENNIFER A. McLOONE
Fla. Bar. No. 029234
jmcloone@shb.com

***Counsel for Defendants, Johnson & Johnson; LTL Management, LLC; Johnson & Johnson Holdco (NA) Inc.; Janssen Pharmaceuticals, Inc. and Kenvue, Inc.***

2

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 13, 2023 I electronically filed the foregoing with

the Clerk of Court by using the Florida Courts E-Filing Portal, which will send an electronic notice

to counsel of record listed on the below Service List.


_s/ Jennifer A. McLoone_


## SERVICE LIST

**_Attorneys for Plaintiff_**

Daniel J. DiMatteo, Esq.
**THE FERRARO LAW FIRM, P.A.**
600 Brickell Avenue, Suite 3800
Miami, FL 33131
T: (305) 375-0111
F: (305) 379-6222
ddimatteo@ferrarolaw.com
lfuentes@ferrarolaw.com

**IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA**

**TIMOTHY PIERS DEVALLE**,
Individually and as Personal Representative
Of the Estate of **DONNA MARIE DEVALLE**,

        Plaintiff,                         CASE NO.: 2023-CA-014349

v.

**JOHNSON & JOHNSON;
JOHNSON & JOHNSON HOLDCO (NA) INC.**,
f/k/a Johnson & Johnson Consumer Inc., individually
and as successor-in-interest to Johnson & Johnson
subsidiary "Old JJCI"; **JANSSEN PHAMACEUTICALS,
INC.**, individually and as successor-in-interest to
Johnson & Johnson subsidiaries named Johnson &
Johnson Consumer Inc., both prior to and after its
2021 restructurings and colloquially known as "Old
JJCI and New JJCI"; **KENVUE INC.**, individually and
as successor-in-interest to Johnson & Johnson Consumer Inc.;
**LTL MANAGEMENT, LLC; IMERYS TALC AMERICA, INC.,
f/k/a LUZENAC AMERICA, INC., f/k/a RIO TINTO
MINERALS, INC.**; and **PUBLIX SUPER MARKETS, INC.**,

        Defendants.
_____/

**NOTICE OF SUGGESTION OF PENDENCY OF BANKRUPTCY
AND AUTOMATIC STAY OF PROCEEDINGS**

       PLEASE BE ADVISED that on February 13, 2019, Imerys Talc America, Inc., Imerys

Talc Vermont, Inc., and Imerys Talc Canada, Inc. (collectively, the "**Debtor**s") commenced

bankruptcy cases in the United States Bankruptcy Court for the District of Delaware (the

"**Bankruptcy Court**") by filing voluntary petitions for relief under chapter 11 of title 11 of the

United States Code, 11 U.S.C. §§ 101-1532, *et seq.* (the "**Bankruptcy Code**"). The Debtors'

chapter 11 cases are now pending before the Honorable Laurie Selber Silverstein, United States

Bankruptcy Judge, and are being jointly administered for procedural purposes only under the caption *In re Imerys Talc America, Inc., et al.,* Chapter 11 Case No. 19-10289-LSS.

PLEASE BE FURTHER ADVISED that pursuant to Section 362 of the Bankruptcy Code, as of the commencement of the Debtors' chapter 11 cases, the above-captioned action has been automatically stayed as against the Debtor-defendant(s).  Section 362 of the Bankruptcy Code provides, in part, that the filing of a petition to commence a chapter 11 case operates as a stay of "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under [chapter 11], or to recover a claim against the debtor that arose before the commencement of the case under [chapter 11]" and "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the [bankruptcy] case. . ."  11 U.S.C. §§ 362(a)(1) & (6).

PLEASE BE FURTHER ADVISED that additional information regarding the status of the Debtors' chapter 11 cases may be obtained by reviewing the docket of the chapter 11 cases, available electronically at http://ecf.deb.uscourts.gov (PACER login and password required) or free of charge via the website maintained by the Debtors' proposed Claims and Noticing Agent, Prime Clerk, LLC, at https://cases.primeclerk.com/imerystalc, or by contacting counsel for the Debtors: (a) Richards, Layton & Finger, P.A., One Rodney Square, 920 N. King Street, Wilmington, Delaware 19801, (302) 651-7700 (Attn: Mark D. Collins, Esq., Michael J. Merchant,

Esq., and Amanda R. Steele, Esq.) and (b) Latham & Watkins LLP, 355 South Grand Avenue,

Suite 100, Los Angeles, California 90071 (Attn: Jeffrey E. Bjork, Esq. and Helena Tseregounis,

Esq.), Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611

(Attn: Richard A. Levy, Esq.), and Latham & Watkins LLP, 885 Third Avenue, New York, New

York 10022 (Attn: George A. Davis, Esq. and Keith A. Simon, Esq.).

Respectfully submitted this 10th day of November 2023.

By: */s/ Joseph A. Sacher*
**Joseph A. Sacher, Esq.**
Florida Bar No. 174920
**GORDON REES SCULLY
MANSUKHANI, LLP**
Miami Tower, Suite 3900
100 SE Second Street
Suite 3900
Miami, Florida 33131
Telephone: (305) 428-5339
Email: jsacher@grsm.com
*Counsel for Imerys Talc America,
Inc. (named as "Imerys Talc
America, Inc., f/k/a Luzenac
America, Inc., f/k/a Rio Tinto
Minerals, Inc.")*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 10, 2023, a true and correct copy of the foregoing

Notice of Suggestion of Pendency of Bankruptcy and Automatic Stay of Proceedings to be served

by electronic service to all counsel of record through the Court's E-Filing System.

*/s/ Joseph A. Sacher*
Joseph A. Sacher

3

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

CASE NO. 50-2023-CA-014349-XXXA-MB (AH)

TIMOTHY PIERS DEVALLE, Individually
and as Personal Representative of the
Estate of DONNA MARIE DEVALLE,

                        Plaintiff,

v.

JOHNSON & JOHNSON;
JOHNSON & JOHNSON HOLDCO (NA) INC., f/k/a
     Johnson & Johnson Consumer Inc.,
     Individually and as successor-in-interest to
     Johnson & Johnson subsidiary "Old JJCI"
JANSSEN PHARMACEUTICALS, INC., individually
     and as successor in interest to Johnson & Johnson
     subsidiaries named Johnson & Johnson Consumer
     Inc., both prior to and after its 2021 restructurings
     and colloquially known as "Old JJCI and New
     JJCI";
KENVUE INC., individually and as successor-in-
interest      to Johnson & Johnson Consumer Inc.;
LTL MANAGEMENT, LLC;
IMERYS TALC AMERICA, INC. f/k/a
     LUZENAC AMERICA, INC. f/k/a
     RIO TINTO MINERALS, INC.;
PUBLIX SUPER MARKETS, INC.,

                        Defendants.

## DEFENDANTS, JOHNSON & JOHNSON HOLDCO (NA) INC., JANSSEN PHARMACEUTICALS, INC., AND KENVUE INC.'S JOINT MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Defendants Johnson & Johnson Holdco (NA) Inc. ("Holdco"); Janssen Pharmaceuticals,

Inc. ("Janssen"); and Kenvue, Inc. ("Kenvue") (together, "Moving Defendants") should be

dismissed from this lawsuit. First, this Court lacks personal jurisdiction over these foreign entities

4871-2625-0384 v2

who have no involvement in the design, manufacture, distribution, marketing or sale of the Johnson's Baby Powder® or Shower to Shower® products at issue in this lawsuit. Moreover, Plaintiff fails to state a claim against these Moving Defendants as a matter of law.

### Factual Background

1. This is a products liability action in which Plaintiff Timothy Piers DeValle alleges that the decedent, Donna Marie DeValle, developed ovarian cancer as a result of her use of Johnson's Baby Powder® and Shower to Shower® ("Products"). Compl. ¶ 6.

2. Before Plaintiff filed this litigation, Johnson & Johnson Consumer Inc. ("Old JJCI") transferred its talc liabilities to a newly created entity LTL Management LLC ("LTL"). LTL then declared bankruptcy. Following the dismissal of LTL's bankruptcy petition, this litigation commenced.

3. In addition to suing Moving Defendants, Plaintiff is suing Johnson & Johnson ("J&J"), Old JJCI, and LTL as well as Imerys Talc America, Inc. and Publix Supermarkets, Inc.

4. Plaintiff's Complaint asserts seven claims against Moving Defendants (each of which is also asserted against J&J and LTL) – Strict Liability Failure to Warn (Count II), Strict Liability Defective Manufacture and Design (Count IV), Breach of Express Warranties (Count V), Breach of Implied Warranty of Merchantability (Count VI), Breach of Implied Warranty of Fitness for a Particular Purpose (Count VII), Negligence (Count IX), and Fraudulent Concealment (Count XI).

5. Plaintiff's Complaint makes clear that Holdco, Janssen and Kenvue are foreign companies that were not incorporated in Florida and do not have their principal place of business in Florida. Compl. ¶¶ 11, 14, 17. Moreover, Holdco, Janssen and Kenvue had no involvement in

2

the design, manufacture, distribution, marketing or sale of talc-based Johnson's Baby Powder® or

Shower to Shower® – in Florida or elsewhere in the United States.

      6.      In fact, LTL is the sole entity with talcum powder liabilities.

      7.      As Plaintiff fails to establish Moving Defendants are successors in interest to Old

JJCI, Plaintiff's claims against Holdco, Janssen and Kenvue fail as a matter of law.

<div align="center">

**ARGUMENT**

</div>

I.      **<u>This Court Lack's Personal Jurisdiction over Holdco, Janssen and Kenvue.</u>**

      A Florida court may exercise personal jurisdiction over a non-resident defendant only if a

plaintiff satisfies the two-part test of *Venetian Salami Co. v. Parthenais*, 554 So. 2d 499 (Fla.

1989). First, a plaintiff must show that the defendant's conduct falls within the reach of Florida's

Long-Arm Statute. Florida's Long-Arm statute provides two ways in which a defendant may be

subject to the personal jurisdiction of the state's courts. *E.g.*, *Waite v. All Acquisition Corp.,* 901

F.3d 1307, 1312 (11th Cir. 2018). A defendant is either subject to "general personal jurisdiction—

that is, jurisdiction over any claims against a defendant, whether or not they involve the

defendant's activities in Florida—if the defendant engages in 'substantial and not isolated activity'

in Florida." *Id.* (quoting Fla. Stat. § 48.193(2)); or a defendant is subject to "specific personal

jurisdiction—that is, jurisdiction over suits that arise out of or relate to a defendant's contacts with

Florida"—for conduct specifically enumerated in the statute. *Id.* (citing Fla. Stat. § 48.193(1)(a)).

Florida's Long-Arm statute is strictly construed, and Plaintiff has the burden of proving facts

sufficient to satisfy the statutory criteria. *Insight Instruments, Inc. v. Advanced Visual Instruments,*

*Inc.*, 44 F. Supp. 2d 1269, 1271 (M.D. Fla. 1999); *see also Shefer v. Shefer*, 440 So. 2d 1319 (Fla.

3d DCA 1983).

<div align="center">

3

</div>

If the criteria of the Long-Arm statute are met, then a plaintiff must demonstrate that a defendant possesses sufficient minimum contacts with Florida to satisfy the due process requirements of the Constitution and not offend "traditional notions of fair play and substantial justice." *Venetian Salami Co.*, 554 So. 2d at 500.  This is the second prong of the *Venetian Salami* test.  The touchstone of this analysis is whether the defendant has "certain minimum contacts with [the state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Waite*, 901 F.3d at 1312.  (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  The minimum contacts inquiry focuses on "the relationship among the defendant, the forum, and the litigation." *Id.* (citing *Walden v. Fiore*, 571 U.S. 277, 284 (2014)).  This inquiry ensures that a defendant is haled into court in a forum state based on the defendant's own affiliation with the state, rather than the "random, fortuitous, or attenuated" contacts it makes by interacting with other persons affiliated with the state.  *Id.*  It is the plaintiff's burden to allege sufficient facts to satisfy both prongs of *Venetian Salami's* test.  Only after the plaintiff has met its burden, must a defendant rebut those jurisdictional allegations with affidavits or other evidence.  *Venetian Salami*, 554 So. 2d at 502.  The burden then shifts back to the plaintiff to conclusively prove jurisdiction.  *See Rollet v. de Bizemont*, 159 So. 3d 351, 356 (Fla. 3d DCA 2015) (plaintiff's "failure to file an affidavit or other evidence to rebut [defendant's] affidavit, filed in support of his motion to dismiss, required dismissal of the complaint); *Underwood v. Univ. of Kentucky*, 390 So. 2d 433, 434–35 (Fla. 3d DCA 1980) ("(t)he obligation of the plaintiff is not simply to raise a possibility of jurisdiction, but rather to establish jurisdiction with affidavits, testimony or documents") (quotations omitted).  Conclusory allegations are insufficient to satisfy Plaintiff's pleading burden.  *Parisi v. Kingston*, 314 So. 3d 656, 661–65 (Fla. 3d DCA 2021) (holding

4

conclusory allegations insufficient to establish personal jurisdiction under Florida's long-arm statute); *Kingland Estates, Ltd. v. Davis*, 170 So. 3d 825, 831 (Fla. 3d DCA 2015) (same).

### A. General Jurisdiction is Lacking.

With regard to general jurisdiction, the United States Supreme Court has made clear that "only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there." *Daimler AG v. Bauman*, 571 U.S. 117, 136 (2014). The "paradigm all-purpose forums for general jurisdiction are a corporation's place of incorporation and principal place of business." *Id.* at 137; *see also Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 432 (5th Cir. 2014) (affirming that after *Daimler*, it is "incredibly difficult to establish general jurisdiction in a forum other than the place of incorporation or principal place of business"). Plaintiff alleges that Holdco is a New Jersey corporation with a principal place of business in New Jersey. Compl. ¶ 11. Plaintiff alleges that Janssen is a New Jersey corporation with its principal place of business in New Jersey. *Id.* ¶ 14. In reality, Janssen is a Pennsylvania corporation with a principal place of business in New Jersey. Kenvue is a Delaware corporation with its principal place of business in New Jersey. *Id.* ¶ 17. Since Holdco, Janssen, and Kenvue do not have their principal place of business nor place of incorporation in Florida, these Moving Defendants are not subject to general jurisdiction in Florida.

In Paragraph 29, Plaintiff attempts to invoke "general jurisdiction" over Kenvue by referring to sections 48.193(1)(a)(1) and 48.193(1)(a)(2) of the Florida Statutes; however, those sections confer only specific personal jurisdiction – and Plaintiff's attempt to rely on those sections fails as set forth below. Moreover, to the extent Plaintiff attempts to invoke general jurisdiction via section 48.193(2), such an attempt likewise falls short because Plaintiff utterly fails to allege any facts in support of systemic, substantial, and not isolated contacts with Florida. *See Ash v.*

*Royal Caribbean Cruises, Ltd.*, 991 F. Supp. 2d 1241 (S.D. Fla. 2013) (dismissing case for lack of personal jurisdiction where "Plaintiffs have not alleged, nor plead sufficient factual allegations supporting personal jurisdiction under Fla. Stat. 48.193(2)").

### B. Specific Jurisdiction Is Lacking.

Unable to establish general jurisdiction, Plaintiff also fails to establish specific personal jurisdiction in Florida over the Moving Defendants with respect to the alleged conduct giving rise to the lawsuit, *i.e.,* the research, development, formulation, manufacture, design, testing, licensing, sale, distribution and marketing or introducing into interstate commerce of Johnson's Baby Powder® and Shower to Shower®. Compl. ¶ 21. Plaintiff relies on section 48.193(1)(a)(6) to invoke specific personal jurisdiction.[1] *Id*. ¶¶ 12, 13, 15, 16, 18, 19, 29. However, specific personal jurisdiction relates to a defendant's activities with regard to the conduct that gave rise to the lawsuit. Here, Holdco has no involvement with the design, manufacture, testing, packaging, labeling, distribution, sale, marketing or promotion of Johnson's Baby Powder® or Shower to Shower® and did not design, manufacture, test, package, distribute, sell, market or promote Johnson's Baby Powder® or Shower to Shower®. Holdco was not even formed until a time at or after the Decedent's ovarian cancer diagnosis in October 2021 – and therefore could not have been involved in the actions related to the product Decedent used prior to her diagnosis. *See id*. ¶ 39. Like Holdco, Janssen did not design, manufacture, test, package, distribute, sell, market or promote the product at issue in this lawsuit anywhere, much less in Florida. Further, Janssen's relationship with Holdco did not exist during Decedent's alleged use of the product before her diagnosis, *see*

---

[1] Moving Defendants note that this allegation is specific to Kenvue, not Janssen or Holdco which can be read as an admission that there is no such personal jurisdiction over Janssen or Holdco. Nonetheless for purposes of completeness address, Moving Defendant address Kenvue, Janssen and Holdco in this section.

*id*. ¶¶ 6, 39 and as a result Janssen could not have been involved in actions directly or indirectly causing or relating to product the Decedent used before her diagnosis.

The same reasoning applies to Kenvue, which was not formed until well after Decedent's alleged use of the Product at issue. *See id.* ¶ 52 (citing Kenvue Inc. Form S-1 Registration Statement Under the Securities Act of 1933 (Jan. 4, 2023)) ("Kenvue S-1").[2]  Thus, Holdco, Janssen, and Kenvue engaged in no conduct in Florida related to the product at issue, they have not committed torts or tortious acts in Florida related to the product at issue, they did not solicit in Florida, and they have not placed the product at issue into the state in the ordinary course of commerce.  As such, Holdco, Janssen and Kenvue can have no direct liability for talc-related claims and there is no specific personal jurisdiction over them in Florida.

No authority supports the notion that specific personal jurisdiction exists over an entity where it otherwise does not, simply because that entity has successor liability for an entity over whom there would be personal jurisdiction (i.e., Johnson & Johnson Consumer, Inc. – Old JJCI). But even if there was, such a theory would fail to confer jurisdiction here as Holdco, Janssen, and Kenvue have no successor liability.  Texas, Pennsylvania, and Delaware law govern the questions of successor liability for Holdco, Janssen, and Kenvue, respectively, *see infra* Part II, and Plaintiff has not stated any plausible claims for successor talc-liability under these applicable laws.

---

[2] Plaintiff quotes from and cites to Kenvue Inc.'s Form S-1 Registration Statement multiple times throughout his Complaint.  *See* Compl. ¶¶ 52-56.  Since Kenvue's registration filing is incorporated by reference, this Court is entitled to and should consider the contents of the entire Form S-1 when ruling on this Motion to Dismiss.  *See One Call Prop. Servs. Inc. v. Sec. First Ins. Co.*, 165 So. 3d 749, 752 (Fla. 4th DCA 2015) ("In ruling on a motion to dismiss, a trial court is limited to the four corners of the complaint and its incorporated attachments . . . [b]ut where the terms of a legal document are impliedly incorporated by reference into the complaint, the trial court may consider the contents of the document in ruling on a motion to dismiss).  Since Plaintiff did not attach Kenvue Inc.'s Form S-1 Registration Statement Under the Securities Act of 1933 (Jan. 4, 2023) to his complaint, Moving Defendants provide the link here for the Court's convenience and for purposes of completeness: https://www.sec.gov/Archives/edgar/data/1944048/000162828023000234/kenvues-1.htm.

7

Therefore, the contacts alleged are wholly insufficient for this Court to find specific personal jurisdiction over the Moving Defendants under a successor liability theory.

Nor would due process allow the exercise of specific personal jurisdiction over Holdco, Janssen or Kenvue in Florida, as these entities would have no reason to expect to be sued in a Florida over a product with which they have no involvement. *See Pellerito Foods, Inc. v. Am. Conveyors Corp.*, 542 So. 2d 426, 427 (Fla. 3d DCA 1989) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985); *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 631 (11th Cir. 1996)). In short, this Court lacks personal jurisdiction over Moving Defendants.

## II.    MOVING DEFENDANTS HAVE NO SUCCESSOR LIABILITY AS A MATTER OF LAW

A defendant's liability as a successor is governed by the law of the state in which the defendant is incorporated. *Action Nissan, Inc. v. Hyundai Motor Am.*, No. 6:18-cv-380-Orl-78EJK, 2020 WL 7419669, at *6 (M.D. Fla. Nov. 5, 2020) (Florida choice-of-law: "the question of successor liability involves their internal affairs" and is "subject to the laws of the state of incorporation"); *see also Chatlos Found., Inc. v. D'Arata*, 882 So. 2d 1021, 1023 (Fla. 5th DCA 2004) (applying federal case law interpretation of "internal affairs," finding law of foreign state of incorporation applies in Florida cause of action). Holdco is a New Jersey corporation, Compl. ¶ 11, Janssen is a Pennsylvania corporation, and Kenvue is a Delaware corporation, *id.* ¶ 17. Thus, claims against Holdco are governed by Texas law, claims against Janssen are governed by Pennsylvania law, and claims against Kenvue are governed by Delaware law. Under each applicable law, Plaintiff has failed to state a claim on the basis of successor liability.

*Holdco.* Plaintiff cannot seriously dispute that LTL acquired all talc-related liabilities from Old JJCI. Plaintiff cites LTL's bankruptcy proceeding and a related declaration, both of which explain LTL's liability. *See e.g.,* Compl. ¶¶ 35, 48. The Third Circuit has also confirmed LTL's

8

talc-related liabilities.  *In re LTL Mgmt., LLC*, 64 F.4th at 96-97, 105 (3d Cir. 2023).  Nonetheless, Plaintiff alleges that Holdco has successor liability because the productive assets of Old JJCI, including those used to manufacture and market the Products at issue, were transferred to Holdco, which Plaintiff alleges continued to sell baby powder.[3]  Compl. ¶ 42.  Even if Plaintiff was correct as a factual matter, under Texas law, Holdco has no liability related to the Products at issue in this case.

In October 2021, Old JJCI. underwent a "divisional merger" following which it ceased to exist, and two new entities were created: (1) LTL, which became solely responsible for all of Old JJCI's liabilities arising from talc-related claims against it., and (2) a new entity which changed its name to Johnson & Johnson Consumer Inc. ("New JJCI") and then changed its name again to Johnson & Johnson Holdco (NA) Inc. ("Holdco").  *Id.* ¶¶ 42, 48.

New JJCI/Holdco therefore came into existence with no talc-related liabilities.  In fact, Holdco, (as well as Janssen and Kenvue) has not agreed to assume liabilities of JJCI – to the contrary, it is undisputed that LTL did.  *In re LTL Mgmt., LLC*, 64 F.4th at 96-97, 105 (3d Cir. 2023); Order ¶ 17, *LaSalle v. Am. Int'l Indus.*, No. 23-2-08165-0 SEA (Wash. Super. Ct. Sept. 12, 2023).

Texas law expressly permitted Old JJCI to exclusively transfer its talc liabilities to LTL while transferring other productive assets to Holdco, which is exactly what Old JJCI did.  *See E-Quest Mgmt., LLC v. Shaw*, 433 S.W. 3d, 18, 24 (Tex. App. 2013) ("Texas law authorizes a successor to acquire the assets of a corporation without incurring any of the grantor corporation's liabilities unless the successor expressly assumes those liabilities.").

---

[3] Notably, talc-based Johnson's Baby Powder® was discontinued in the US market in 2020, well prior to the formation of Holdco as described in Plaintiff's Complaint.

9

Under Texas law, "liabilities and obligations" of a party undergoing a divisional merger can be "allocated to one or more of the surviving or new organizations in the manner provided by the plan of merger," and "except as otherwise provided by the plan or merger or by law or contract, . . . no other new . . . entity . . . created under the plan of merger is liable for the debt." Tex. Bus. Orgs. Code Ann. § 10.008(a)(3)-(4); *see, e.g.*, *Alta Mesa Holdings, L.P. v. Ives*, 488 S.W.3d 438, 449-50 & n.13 (Tex. App. 2016) (applying this rule).  Moreover, Texas courts allow successor liability only when "the successor expressly assume[s]" it or in the case of a fraudulent transfer.  *See, e.g.*, *United States v. Americus Mortg. Corp.*, No. 4:12-cv-02676, 2013 WL 4829284, at *4 (S.D. Tex. Sept. 10, 2013).  Not only does Plaintiff fail to allege that Holdco expressly assumed the talc-related liabilities of Old JJCI, Holdco did not assume talc-related liabilities as a matter of law.

Likewise, Plaintiff does not allege a fraudulent transfer, nor is there any support for such an allegation.  Indeed, both the bankruptcy court and the Third Circuit found that LTL, the entity with talc-related liabilities, is amply funded, and unlikely to even need "to exhaust its funding rights to pay talc liabilities," much less to fall short of those liabilities.  *LTL II*, 652 B.R. at 448 (quoting *LTL I*, 64 F.4th at 108); *see also LaSalle*, ¶ 17 (granting motion to dismiss Holdco and Kenvue in part because "the purpose of the divisional merger . . . was expressly to anticipate creditor claims, not to evade them").

Successor liability based on the product-line exception or the mere continuity exception, to the extent pled, is likewise unavailable because neither exception is recognized under Texas law.  *See Ford Bacon & Davis, L.L.C. v. Travelers Ins. Co.*, 635 F.3d 734 735 (5th Cir. 2011) ("Texas law explicitly rejects the product-line successor liability rule.").  Since Plaintiff does not

allege successor liability under one of the recognized exceptions under Texas law, the general rule of no liability applies.

*Janssen.*   With regard to Janssen, Plaintiff alleges that Janssen is a parent company to Holdco and that Holdco transferred the assets used to manufacture, market and sell the Products at issue to Janssen in connection with LTL's second attempt at bankruptcy.[4]   Compl. ¶¶ 47-49. Pennsylvania law governs any successor liability as to Janssen.   Under Pennsylvania law, a purchaser does not become liable for the debts, liabilities, or torts of the transferor unless one of five exceptions is met:

> (1) the successor corporation either expressly or implicitly agreed to assume liability; (2) the transaction amounted to a consolidation or merger, (3) the purchasing corporation was merely a continuation of the selling corporation, (4) the transaction was fraudulently entered into to escape liability, or (5) the transfer was without adequate consideration and had no provisions [] made for creditors of the selling corporation.

*Continental Ins. Co. v. Schneider, Inc.*, 873 A.2d 1286, 1291 (Pa. 2005).   Pennsylvania has also adopted the product-line exception under certain circumstances discussed below.

Plaintiff has not alleged express or implied successor liability.   Nor has Plaintiff alleged that Janssen transacted fraudulently or acted without adequate consideration.   To the extent Plaintiff alleges the product line, de facto merger, or mere continuation exceptions, he fails to sufficiently do so. In Pennsylvania, the product-line exception may only be invoked when plaintiff has no recourse against the original manufacturer.   *See Keselyak v. Reach All, Inc.*, 660 A.2d 1350, 1353 (Pa. Super. Ct. 1995).   The exception may be invoked if the successor "corporation acquires all or substantially all the manufacturing assets of another corporation . . . and undertakes essentially the same manufacturing operation as the selling corporation."   *McLaud v. Indus. Ress.,*

---

[4] Yet again, it bears noting that talc-based baby powder sales were discontinued in the United States in 2020, whereas the alleged asset transfers allegedly occurred in "early January 2023."  Compl. ¶ 48.

11

715 F. App'x 115, 118 (3d Cir. 2017) (quoting *Keselyak v. Reach All, Inc.*, 660 A.2d 1350, 1353

(Pa. Super. Ct. 1995)).  To determine the applicability of the product-line exception, Pennsylvania

courts weigh three factors:

> (1) the virtual destruction of the plaintiff's remedies against the original manufacturer
> caused by the successor's acquisition of the business, (2) the successor's ability to assume
> the original manufacturer's risk-spreading rule, and (3) the fairness of requiring the
> successor to assume a responsibility for defective products that was a burden necessarily
> attached to the original manufacturer's good will being enjoyed by the successor in the
> continued operation of the business.

*McLaud*, 715 F. App'x at 118-19 (quoting *Dawejko v. Jorgensen Steel Co.*, 290 Pa. Super. 15, 434

A.2d 106, 109 (Pa. Super. Ct. 1981).  Since plaintiff failed to address any of these factors and has

talc-related liability recourse through LTL, the product-line exception is inapplicable.

Plaintiff likewise fails to state a claim under the de facto merger exception or mere

continuity exception, which are to be treated similarly.  *See e.g., Luxliner P.L. Exp. Co. v.

RDI/Luxliner, Inc.,* 13 F.3d 69, 73 (3d Cir. 1993) ("Much the same evidence is relevant to each

determination"); *Ruiz v. Blentech Corp.*, 89 F.3d 320, 325 (7th Cir. 1996) ("In effect, the *de

facto* merger and continuation exceptions are identical").  Under Pennsylvania law, a court must

consider four factors to determine whether a transaction is a de facto merger or continuation, falling

into a successor liability exception: (1) continuity of the enterprise including continuity of

management, personnel, physical location, assets, and general business operations; (2) continuity

of shareholders or ownership; (3) cessation of ordinary business and dissolution of the acquired

corporation as soon as possible; and (4) assumption by the successor of liabilities ordinarily

necessary for the uninterrupted continuation of business.  *Philadelphia Elec. Co. v. Hercules, Inc.*,

762 F.2d 303, 310 (3d Cir. 1985).  And, as with the product-line exception, the mere continuity

exception is intended for a plaintiff without ordinary recourse, so that a successor will not be held

liable where its predecessor operating independently.

12

Considering these exceptions, Plaintiff has not pled the necessary elements of either the product-line, de facto merger, or mere continuity exception so as to state a claim against Janssen for talc-related liabilities. Plaintiff's relevant allegations are mere conclusions, without ultimate facts stated. Moreover, and most fatal, Plaintiff has not and cannot plead that he has no recourse – it is beyond dispute that LTL holds talc-related liabilities, and LTL has been named in this lawsuit and is subject to the Court's jurisdiction. This dooms Plaintiff's successor liability theory against Janssen as a matter of law.

***Kenvue.*** With regard to Kenvue, Plaintiff alleges that Janssen transferred Holdco assets to Kenvue, and that Kenvue's public filings concede liability for talc-related claims. Compl. ¶¶ 52-57. Delaware law governs the question of whether Kenvue has successor liability. In Delaware, the purchaser of a company does not become liable for the debts, liabilities, and torts of the transferor unless one of four exceptions is met: "(1) the purchaser expressly or impliedly assumes such obligations; (2) the transaction amounts to a consolidation or merger of the seller into the purchaser; (3) the purchaser is merely a continuation of the seller; or (4) the transaction has been entered fraudulently." *Elmer v. Tenneco Resins, Inc.*, 698 F. Supp. 535, 540 (D. Del. 1988). Delaware has not adopted the product-line exception to successor liability. *Dickens v. A-1 Auto Parts & Repair Inc.*, No. 1:18CV162-LG-JCG, 2020 WL 6265078, at *3 (S.D. Miss. Oct. 23, 2020) ("There is no indication that Delaware has adopted the product[-]line exception to the general rule against successor liability. . . . Indeed, recent Delaware decisions list no more than the traditional exceptions to the general rule against successor liability.") (footnote omitted); *In re G-I Holdings, Inc.*, No. 02-3626 (SRC), 2008 WL 11513187, at *14 n.12 (D.N.J. May 30, 2008) ("Delaware and most other states do not" "recognize[] . . . the product[-]line exception . . . .").

13

Here, there is no allegation that Kenvue expressly or impliedly was assigned talc-liabilities. Plaintiff has not alleged that any of the other three exceptions applies to Kenvue either.

In Delaware, the mere-continuity exception exists, but it is narrowly construed and requires the successor to be the same legal person under a new name. *See In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2017 WL 3382071, at \*17-18 & n.8 (S.D.N.Y. Aug. 3, 2017) ("continuity of ownership or control" cuts in favor of liability while "an arm's-length, cash transaction" cuts against it); *Simple Glob., Inc. v. Brathwait Watches, Inc.*, No. N21C-01-086 FWW, 2022 WL 100363, at \*2 (Del. Super. Ct. Jan. 10, 2022) (whether "the officers, directors, or stockholders" remain the same). Further, Delaware courts have specified that a court must consider whether the "corporate entity" continues, not whether its "business operations" do. *See Elmer*, 698 F. Supp. at 542. Since the purpose of the exception is to allow for recovery where it would otherwise be impossible, a court must consider "whether the transferor corporation [continued to] exist[] after the sale." *GM Ignition Switch*, 2017 WL 3382071, at \*18; *Simple Global*, 2022 WL 100363, at \*2 (similar); *see also GM Ignition Switch*, 2017 WL 3382071, at \*17 n.8 (related de facto merger exception requires, among other things, transfer of "all [predecessor's] assets").

To the extent that Plaintiff alleges Kenvue's successor liability based on a product-line, mere continuation, or de facto merger theories, they too fail as a matter of law because Plaintiff merely alleges conclusory statements. Kenvue, as an independent and publicly traded company, is not a mere continuation or de facto merger of Holdco. First, Holdco survived the Kenvue spin-off as a productive company and transferred only a portion of its assets to Kenvue. This alone forecloses any effort to treat Kenvue as its mere continuation. Second, Plaintiff fails to allege continuity in management between Kenvue and Holdco, much less between Holdco and Old JJCI.

14

Plaintiff does not identify any officer or director of Kenvue who previously served at any of the alleged predecessor companies.  Plaintiff failed to allege any substantial continuity of ownership and thereby fails to establish that this exception applies to Kenvue.

Plaintiff makes much of the fact that Kenvue's Registration Statement, which must address material risks, mentioned the possibility that the parties might "seek to bring" and "be successful in bringing claims" related to talc liability.  Compl. ¶ 54.  But the fact that the Registration Statement foresaw the possibility that some people, like Plaintiff, would misguidedly seek to impose liability on Kenvue does not concede the legitimacy or legality of those arguments.  In fact, the Statement takes the position that LTL "assumed sole responsibility for all liabilities of Old JJCI related in any way to injury or damage, or alleged injury or damage, sustained or incurred in the purchase or use of, or exposure to, talc, including talc contained in any product sold in the United States or Canada."  Kenvue S-1 at 40.[5]

Plaintiff's reliance on Kenvue's Form S-1 Registration Statement to assert that Kenvue has liability for talc-related claims is likewise misplaced.  For example, Plaintiff quoted, cited, and excerpted from Kenvue's Form S-1 Registration Statement, which stated Kenvue "sets forth the products that it claims to manufacture and sell in the United States."  Compl. ¶ 53 (quoting Kenvue S-1 at 154).  However, Plaintiff cherry-picked its bolded and underlined quotation from Kenvue's "Cosmetics" subsection of the "Government Regulations" section of the S-1 Form, which does not specify whether it is the talc-based baby powder or cornstarch-based baby powder.  Kenvue S-1 at 154.  When examining Kenvue's cosmetic statement in the context of other sections of its S-1 Form, it is clear that Kenvue was not marketing the talc-based baby powder in the United States,

---

[5] The fact that Kenvue was able to continue selling product lines previously sold by Holdco (and originally by Old JJCI) is inherent in any successful spin-off, but at most it shows a continuation of the "business operation," which is insufficient.  *Elmer*, 698 F. Supp. at 542.

but rather had transitioned to an all *cornstarch*-based baby powder, *id.* at 96, which Plaintiff himself admits is safe.  Compl. ¶¶ 69-70.

Since Holdco, Janssen, and Kenvue do not fall into any successor liability exceptions under the applicable laws, they cannot be liable for talc-related liabilities as a matter of law.  Further, in the Declaration of Mr. Kim in Support of First Day Pleadings in LTL's second Bankruptcy filing on April 4, 2023 ("Kim Decl.") that Plaintiff quotes and cites multiple times in his Complaint, *see e.g., id.* ¶¶ 35, 48, Mr. Kim confirmed that LTL is solely responsible for all talc-related liabilities. Kim Decl. ¶¶ 24, 25.[6]  The explicit assumption of all talc-related liabilities by LTL precludes the court from exercising personal jurisdiction based on successor liability contacts in Florida and the plausibility of Plaintiff's liability allegations against Holdco, Janssen, and Kenvue.

## CONCLUSION

For the foregoing reasons, Defendants Holdco, Janssen, and Kenvue respectfully request that this Honorable Court enter an order dismissing them as Defendants for lack of personal jurisdiction and for failure to state a claim upon which relief can be granted.

---

[6] Since the declaration is incorporated by reference in Plaintiff's Complaint, this Court is entitled to and should consider the contents of the entire declaration when ruling on this motion to dismiss. *See One Call Prop. Servs. Inc.*, 165 So. 3d at 752. *See* Def.'s Exhibit A – 2023 Kim Declaration.

CASE NO. 50-2023-CA-014349-XXXA-MB (AH)

Dated: November 13, 2023

Respectfully submitted,

*s/ Jennifer A. McLoone*
JENNIFER A. McLOONE
Fla. Bar. No. 029234
jmcloone@shb.com
DANIELLE A. GREENBERG
Fla. Bar No. 1038864
dgreenberg@shb.com
DARIA J. PIETROPAOLO
Fla. Bar No. 1049460
dpietropaolo@shb.com
**SHOOK, HARDY & BACON L.L.P.**
Citigroup Center, Suite 3200
201 South Biscayne Blvd.
Miami, Florida 33131-4332
T: (305) 358-5171 | F: (305) 358-7470

***Counsel for Defendants Johnson & Johnson
Holdco (NA) Inc.; Janssen Pharmaceuticals,
Inc.; and Kenvue, Inc.***

17

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 13, 2023 I electronically filed the foregoing with the Clerk of Court by using the Florida Courts E-Filing Portal, which will send an electronic notice to counsel of record listed on the below Service List.

By: *s/ Jennifer A. McLoone*
    Jennifer A. McLoone

Daniel J. DiMatteo, Esquire
**The Ferraro Law Firm, P.A.**
600 Brickell Avenue, Suite 3800
Miami, Florida 33131
T: 305.375.0111
E: ddimatteo@ferrarolaw.com
    lfuentes@ferrarolaw.com

*Attorneys for Plaintiff*

18

# EXHIBIT A

NOT A CERTIFIED COPY

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admissions *pro hac vice* pending)

*PROPOSED ATTORNEYS FOR DEBTOR*

| | |
|---|---|
| In re: | Chapter 11 |
| LTL MANAGEMENT LLC,[1] | Case No.:  23-12825 (MBK) |
| Debtor. | Judge:  Michael B. Kaplan |

**DECLARATION OF JOHN K. KIM**
**IN SUPPORT OF FIRST DAY PLEADINGS**

John K. Kim, being first duly sworn, deposes and states as follows:

1.       I am the Chief Legal Officer of LTL Management LLC, a North Carolina

limited liability company (the "Debtor") and the debtor in the above-captioned chapter 11 case.  I

have held this position with the Debtor since its formation on October 12, 2021.

---

[1]        The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is
501 George Street, New Brunswick, New Jersey 08933.

2. I am employed by Johnson & Johnson Services, Inc. ("J&J Services"), a non-debtor affiliate of the Debtor and a subsidiary of the Debtor's ultimate non-debtor parent company, Johnson & Johnson ("J&J").

3. Prior to my role as the Chief Legal Officer of the Debtor, I was J&J's Assistant General Counsel, Practice Group Lead for the Product Liability Litigation Group. In that role, I was responsible for product liability litigation globally. I began my employment with J&J and its affiliates in 2001 as a Senior Counsel in the Litigation Group, handling a variety of cases ranging from commercial disputes and international arbitrations to product liability litigation.

4. Prior to my employment with J&J and its affiliates, I was associated with the law firm of Simpson Thacher & Bartlett in its Litigation Group from 1989 to 2001. There, I handled a number of complex litigation engagements, including bankruptcy proceedings, anti-trust disputes, insurance coverage arbitrations and securities actions.

5. I earned a Juris Doctor degree from Fordham University School of Law in 1989 and a Bachelor of Arts degree from Tufts University in 1985.

6. On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code, as well as certain motions and other pleadings (collectively, the "First Day Pleadings"). As discussed in more detail below, on October 14, 2021, the Debtor previously commenced a chapter 11 case, No. 21-30589 (Bankr. D.N.J.) (the "2021 Chapter 11 Case"), which was dismissed on April 4, 2023. In connection with the 2021 Chapter 11 Case, I submitted various declarations in support of relief requested by the Debtor, including the *Declaration of John K. Kim in Support of First Day Pleadings* [No. 21-30589, Dkt. 5] (the "2021 First Day Declaration"). I incorporate by

NOT A CERTIFIED COPY

reference the statements I made in my 2021 First Day Declaration and affirm that they remain true and correct.

7.　　　The Debtor continues to believe that the talc products manufactured and sold by its predecessors were safe and did not cause any of the harms plaintiffs have alleged. Nonetheless, the costs of litigating those claims together with the risk of extraordinarily large plaintiff verdicts and the long latency periods of the cancers alleged to be caused by the products, made the continued defense of this litigation in the tort system untenable.

8.　　　The Debtor is filing for bankruptcy a second time to effectuate the intent of its initial bankruptcy filing:  to fully, equitably and efficiently resolve all current and future talc-related claims.  This filing is supported by law firms on behalf of more than 60,000 thousands claimants and includes ovarian cancer and mesothelioma claims.[2]  The Debtor, J&J, the Debtor's direct parent company, and these claimants have entered into Plan Support Agreements pursuant to which the parties have agreed to work together to finalize and seek confirmation of a plan of reorganization that would fund $8.9 billion net present value to a trust for the benefit of all talc-related claims.  This amount represents an increase of $6.9 billion over the $2 billion J&J previously agreed to advance to the Debtor to establish a qualified settlement fund in the 2021 Chapter 11 Case.  Based on the breadth of claimant support, the Debtor believes it is well positioned to achieve a prompt resolution of this case.

9.　　　The 2021 Chapter 11 Case was dismissed on April 4, 2023 at the direction of the United States Court of Appeals for the Third Circuit (the "Third Circuit").  The Third Circuit found that the Debtor was not in financial distress due to its prior financing arrangements

---

[2]　　　These claimants include individuals who did not have filed claims as of the commencement of the 2021 Chapter 11 Case.

and, therefore, ruled that the filing was not in good faith. Since that decision, the Debtor has

entered into new financing arrangements that, among other things, contain commitments for

funding consistent with the agreed plan terms reflected in the Plan Support Agreements, but also

follow the guidance provided by the Third Circuit in its dismissal opinion. As a result of these

new arrangements, the Debtor believes that this filing satisfies the good faith filing standard

articulated by the Third Circuit in its dismissal opinion.

10.      I submit this Declaration to support the First Day Pleadings and provide

certain information about the Debtor, its decision to commence this chapter 11 case and its

objectives for this case. I have reviewed each of the First Day Pleadings, and it is my belief that

the relief sought therein is necessary to (a) avoid immediate and irreparable harm to the Debtor,

(b) maximize and preserve the value of the Debtor's chapter 11 estate, (c) assist in the smooth

transition of the Debtor into chapter 11 and/or (d) promote the efficient administration of this

case.

11.      As the Chief Legal Officer, I am familiar with the Debtor's day-to-day

operations, assets, financial condition, business affairs and books and records. Except as

otherwise indicated, all facts and statements set forth in this Declaration are based upon: (a) my

personal knowledge; (b) information supplied to me by other members of the Debtor's

management, professionals or employees; (c) my review of relevant documents; and/or (d) my

opinion based upon my experience and knowledge of the Debtor's assets, liabilities and financial

condition. If called upon to testify, I could and would testify to the facts and opinions set forth

herein.

12.      Section I of this Declaration provides an overview of the Debtor's history

and corporate structure. Section II describes the circumstances surrounding the commencement

of this case, as well as the Debtor's objectives for this case.  Section III sets forth relevant facts
in support of the First Day Pleadings as well as in support of the Adversary Proceeding (as
defined below) filed by the Debtor.

## I.  THE DEBTOR'S HISTORY AND CORPORATE STRUCTURE

### A.  The Debtor's Predecessors and Related Restructurings

13.     The Debtor traces its roots back to Johnson & Johnson Baby Products
Company ("J&J Baby Products"), a New Jersey company incorporated in 1970 as a wholly
owned subsidiary of J&J.

14.     J&J, a New Jersey company incorporated in 1887, first began selling
JOHNSON'S® Baby Powder in 1894, launching its baby care line of products.  In 1972, J&J
established a formal operating division for its baby products business, which included
JOHNSON'S® Baby Powder.

15.     In 1978, consistent with J&J's policy of decentralizing its business, J&J
transferred all its assets and liabilities associated with the baby products division to J&J Baby
Products.  This was part of a larger restructuring of J&J that included the transfer of assets and
liabilities of seven principal operating divisions to wholly owned subsidiaries.  To effectuate the
transaction, J&J and J&J Baby Products entered into an *Agreement for Transfer of Assets and
Bill of Sale*, effective January 1, 1979 (the "1979 Agreement"),[3] pursuant to which J&J
transferred all assets and liabilities associated with the baby products division to J&J Baby
Products.  As part of the transfer, J&J Baby Products agreed to indemnify J&J for all claims
relating to the baby products business, including the talc powder products.  Following the

---

[3]      A copy of the 1979 Agreement is attached hereto as Annex A.

1979 Agreement, J&J no longer manufactured or sold baby products, including JOHNSON'S®️ Baby Powder.

16. In 1981, J&J Baby Products transferred all its assets, except those assets allocated to its diaper programs, to Omni Education Corporation ("Omni"), a wholly owned subsidiary of J&J Baby Products. In turn, Omni assumed all liabilities of J&J Baby Products except those liabilities related to its diaper program. Immediately following the transaction, J&J Baby Products merged into another subsidiary of J&J and was renamed Personal Products Company, and Omni changed its name to Johnson & Johnson Baby Products Company.[4]

17. In 1988, Johnson & Johnson Baby Products Company transferred all its assets in respect of its baby products business to Johnson & Johnson Dental Products Company, which assumed all of its liabilities and was renamed Johnson & Johnson Consumer Products, Inc.

18. In 1997, Johnson & Johnson Consumer Products, Inc. changed its name to Johnson and Johnson Consumer Companies, Inc. ("J&J Consumer Companies").

19. In 2015, J&J Consumer Companies merged with and into an affiliate, which then merged into McNeil-PPC, Inc. The resulting entity was renamed Johnson & Johnson Consumer Inc. (including all former names and historical forms, "Old JJCI").

20. Following these intercompany transactions, Old JJCI became responsible for all claims alleging that JOHNSON'S®️ Baby Powder and other talc-containing products cause cancer or other diseases. Old JJCI also was obligated to indemnify J&J for all claims relating to the talc products.

---

[4] In 1989, Personal Products Company changed its name to McNeil-PPC, Inc.

NOT A CERTIFIED COPY

21.     Old JJCI also became responsible for all claims alleging that Shower to Shower products, which contained talc, cause cancer or other diseases.  Before J&J's decentralization, Shower to Shower products were marketed by a division of J&J, the Johnson & Johnson Domestic Operating Company division.  Consistent with J&J's decentralization efforts and its transition to a holding company, effective January 1, 1978, J&J transferred all assets and liabilities related to Shower to Shower products to Personal Products Company, a wholly owned subsidiary of J&J, and Personal Products Company thereafter assumed operational responsibility for the Shower to Shower products.

22.     The operational responsibilities, liabilities and assets related to Shower to Shower products were transferred from Personal Products Company to Johnson & Johnson Baby Products Company by early 1987.

23.     In 2012, Old JJCI sold the assets and liabilities related to certain products, including the Shower to Shower products, to Valeant Pharmaceuticals International, Inc. ("Valeant").  Thereafter, in 2019, Old JJCI and Valeant (now known as Bausch Health Companies Inc. ("Bausch")) entered into an indemnification agreement.  Pursuant to that indemnification agreement, Old JJCI agreed to indemnify Valeant for any liability arising from Shower to Shower products and for certain other regulatory actions arising out of the manufacture, use or sale of Shower to Shower products, as set forth more fully in the agreement.

24.     In 2021, Old JJCI implemented a corporate restructuring (the "2021 Corporate Restructuring"), which was completed on October 12, 2021.  As a result of that restructuring:  Old JJCI ceased to exist and two new entities were created:  (a) the Debtor, which was initially formed as a Texas limited liability company and then converted into a North Carolina limited liability company; and (b) another entity, which was initially formed as a Texas

limited liability company and then merged into a New Jersey corporation that was its direct

parent (as well as the direct parent of the Debtor), whereupon this entity changed its name to

Johnson & Johnson Consumer Inc. ("New JJCI").  In the 2021 Corporate Restructuring, the

Debtor was allocated certain of Old JJCI's assets and became solely responsible for the

talc-related liabilities of Old JJCI, and New JJCI was allocated all other assets of Old JJCI and

became solely responsible for all other liabilities of Old JJCI.

        25.      Old JJCI implemented the 2021 Corporate Restructuring to facilitate a

chapter 11 filing by the Debtor that would permit the Debtor to fully resolve current and future

talc-related claims through a plan of reorganization without subjecting the entire Old JJCI

enterprise to a bankruptcy proceeding.  As I will discuss in more detail below, the Debtor in fact

filed for chapter 11 relief in the Western District of North Carolina on October 14, 2021, two

days after the completion of the 2021 Corporate Restructuring.

**B.**    **New JJCI/Holdco**

        26.      New JJCI operated its business following the 2021 Corporate

Restructuring.  This included the manufacture and sale of a broad range of products used in the

baby care, beauty, oral care, wound care and women's health care fields, as well as over-the-

counter pharmaceutical products (collectively, the "Consumer Business").  In December 2022,

New JJCI changed its name to Johnson & Johnson Holdco (NA) Inc., a New Jersey Corporation

("Holdco"), and in early January 2023, Holdco transferred its Consumer Business assets to its

parent entity.

        27.      Holdco is the direct parent of the Debtor, and the Debtor is the direct

parent of Royalty A&M LLC ("Royalty A&M"), a North Carolina limited liability company.

Holdco is a holding company with ownership interests in various subsidiaries.  The most

substantial of Holdco's ownership interests are held through its wholly owned subsidiary Apsis

SAS (France) ("Apsis").  Apsis owns (through its wholly owned subsidiary Johnson & Johnson

Holding GmbH (Germany)) a 36.1% ownership interest in GH Biotech Holdings Limited

(Ireland) ("GH Biotech").  GH Biotech holds ownership interests, either directly or through

wholly owned subsidiaries, in four entities, Janssen Sciences Ireland Unlimited Company,

Janssen Irish Finance Unlimited Company, C Consumer Products Denmark ApS, and Impulse

Dynamics (71% interest).  Apsis also owns, either directly or indirectly, interests in various

limited risk distributors (which distribute J&J products in foreign countries), a German-based

subsidiary that manufactures 3D-printed titanium interbody implants for spinal fusion surgery,

and various other subsidiaries.  A chart depicting the Debtor's corporate structure is attached

hereto as Annex B.

        28.     As of the date of this declaration, Holdco has access to approximately

$400 million in cash through J&J's cash management system.

**C.**    **The Debtor**

        29.     The Debtor was formed to manage and defend thousands of talc-related

claims and to oversee the operations of its subsidiary, Royalty A&M.  Royalty A&M owns a

portfolio of royalty revenue streams, including royalty revenue streams based on third-party sales

of CLOROX®, ECOLAB®, ESSITY®, LACTAID®, MYLANTA® / MYLICON®,

ROGAINE®, SPARTAN® and TENA® products.  It reviews royalty monetization opportunities

in the healthcare industry and seeks to grow its business by financing and/or reinvesting the

income from the existing royalty revenue streams into both the acquisition of additional external

royalty revenue streams as well as financings to third parties secured by similar royalty streams.

In June 2022, Royalty A&M entered into a royalty purchase agreement whereby it acquired

rights to certain royalty streams from a third-party.

30.     The Debtor also has cash, interests as payee under a funding agreement, which I describe in more detail below, and certain insurance coverage rights.

**D.     J&J**

31.     The Debtor's ultimate parent company, J&J, is a holding company that through its operating subsidiaries conducts business in virtually all countries in the world, focused primarily on products related to human health and well-being.  J&J is a global innovator and leader in public health and has been at the forefront of healthcare innovation for over 130 years.  That innovation includes novel oncology, immunology and vaccine products, including its COVID-19 vaccine that it developed and supplied at non-profit pricing.

**E.     Previous Financing Arrangements**

32.     As described above, Old JJCI and its affiliates engaged in multiple restructurings through the years, including the 2021 Corporate Restructuring.  The 2021 Corporate Restructuring was effectuated through a series of steps, which I described in detail in my 2021 First Day Declaration.  See 2021 First Day Decl. ¶¶ 22-27.  A key component of the 2021 Corporate Restructuring was a funding agreement between the Debtor, on the one hand, and J&J and New JJCI on the other (the "2021 Funding Agreement").  The primary purpose of the 2021 Funding Agreement was to facilitate the resolution of talc-related claims through a chapter 11 filing by the Debtor.  The 2021 Funding Agreement obligated New JJCI and J&J, on a joint and several basis, to provide funding, up to the full value of New JJCI, for, among other things, (a) the administrative costs of the Debtor's chapter 11 case and (b) a trust that would satisfy current and future talc claims, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M were insufficient to pay such costs and further, in the case of the funding of a trust, the Debtor's other assets are insufficient to provide that funding.

-10-

33.  In connection with the 2021 Funding Agreement, New JJCI and J&J entered into a commitment and loan agreement, dated October 12, 2021 (the "2021 Commitment and Loan Agreement"), pursuant to which New JJCI and J&J agreed that (a) New JJCI would be the primary obligor under the 2021 Funding Agreement, (b) upon the request of New JJCI, J&J would make revolving credit loans to New JJCI, with the proceeds of the loans to be used by New JJCI solely to satisfy its obligations under the 2021 Funding Agreement, and (c) if New JJCI failed to make any payment to the Debtor required by the 2021 Funding Agreement and instead J&J made such payment under the 2021 Funding Agreement, New JJCI would reimburse J&J for that payment and, if it failed to do so, the amount New JJCI owed would be deemed to be financed with a loan from J&J.

**F.    Other Agreements**

34.  To ensure that the Debtor had access to services it needs to effectively operate its business, in connection with the 2021 Corporate Restructuring, the Debtor entered into a services agreement and a secondment agreement with J&J Services, which agreements I described in my 2021 First Day Declaration. Id. ¶¶ 29-30. Likewise, I described similar agreements that Royalty A&M entered into with J&J Services and the Debtor, respectively, and an intercompany loan facility agreement with J&J. Id. ¶ 30. As a result of these agreements, the Debtor and Royalty A&M have been able to operate their respective businesses efficiently and effectively.

-11-

## II.    EVENTS LEADING TO THE COMMENCEMENT OF THIS CASE AND THE DEBTOR'S OBJECTIVES FOR ITS CHAPTER 11 REORGANIZATION

### A.    Cosmetic Talc Litigation and Its Associated Costs and Burdens

35.    I described the history of the cosmetic talc litigation and the significant costs and burdens associated with it in my 2021 First Day Declaration, which I incorporate herein by reference.  See 2021 First Day Decl. ¶¶ 31-45.

36.    At the time of the filing of the 2021 Chapter 11 Case, the Debtor was besieged by talc claims premised largely on the false allegation that Johnson's Baby Powder contained asbestos and caused cancer.  Notwithstanding that these claims have no valid scientific basis, a few blockbuster plaintiff verdicts in plaintiff-friendly jurisdictions fueled a boom in talc claims, causing Old JJCI to incur astronomical costs:  nearly $1 billion in defense costs on account of cosmetic talc litigation, most of which has been spent in only the five years immediately before the filing of the 2021 Chapter 11 Case; and over $3.5 billion in indemnity payments, primarily over the same time period.

37.    Although Old JJCI prevailed in most of the claims brought, including securing unanimous defense verdicts in six of the eight claims tried to verdict during the 12 months prior to the 2021 Chapter 11 Case, the costs of this litigation and the intermittent extreme plaintiff verdicts made the litigation of these cases in the tort system for the next 50 years or more (as claimants seek to do) untenable, unsustainable and inequitable.

38.    In addition to the thousands of talc claims pending in the United States as of the 2021 Chapter 11 Case, Old JJCI, J&J, Johnson & Johnson Inc. ("J&J Canada"), a federal corporation incorporated under the laws of Canada, and Bausch are named defendants in one certified class action, three proposed class actions and one individual action in four Canadian provinces (Alberta, British Columbia, Ontario and Quebec).  The certified class action and the

proposed class actions commenced in Alberta, British Columbia, Ontario and Quebec are

brought on behalf of classes (or proposed classes) of Canadian individuals who allege injury or

damages arising from the use or purchase of talc-containing products manufactured, marketed

and/or sold by Old JJCI, J&J, J&J Canada or Bausch. The individual action was commenced in

British Columbia by an individual who likewise alleges injury arising from the use of

talc-containing products manufactured or sold by Old JJCI, J&J or J&J Canada. Although

subject to a stay of proceedings arising from the recognition of the 2021 Chapter 11 Case in

Canada in December 2021, 12 additional Ontario-based Canadian claims were served in March

2022 and 26 additional British Columbia-based claims were filed in January and February 2023.

      39.     Furthermore, the States of Mississippi[5] and New Mexico[6] filed actions

against Old JJCI, J&J and certain other parties alleging that Old JJCI and J&J are liable for

claims in connection with the sale, promotion and marketing of talc-containing products,

including making misrepresentations about the safety of the talc products sold by Old JJCI. The

attorneys general of other states had initiated investigations in their respective states against

Old JJCI and J&J related to the marketing, promotion and sale of the talc products, all based on

allegations of unfair business practices and consumer protection violations similar to those at

issue in the New Mexico and Mississippi actions. Specifically, the attorneys general for the

states of Arizona, North Carolina, Texas and Washington issued civil investigative demands, and

the Maryland attorney general has issued an Administrative Subpoena for Consumer Protection.

---

[5]     See State of Mississippi ex rel. Hood v. Johnson & Johnson, et al., No. G2014-0001207, in the First
Judicial District Court for the County of Hinds, Mississippi.

[6]     See State of New Mexico ex rel. Balderas v. Johnson & Johnson, et al., No. D-101-CV-2020-00013, in the
First Judicial District Court for the County of Santa Fe, New Mexico.

40. In the 2021 Chapter 11 Case, forty member states and one district formed an ad hoc committee of states holding consumer protection claims against the Debtor. The ad hoc committee alleged that its members "hold consumer protection claims that are significant, encompassing civil penalties that, based on the statutory maximum per violation, could in principle run into the trillions of dollars." See *Motion of the Ad Hoc Committee of States Holding Consumer Protection Claims Seeking Relief With Respect to the Order Establishing Mediation Protocol*, No. 21-30589, Dkt. 1939 ¶ 1. The Debtor disputes these claims.

41. On February 8, 2018, a securities action was filed in the United States District Court for the District of New Jersey against certain non-debtor individuals and affiliates of the Debtor.[7] The central issue in the Securities Action is whether the defendants knew of, concealed and made false or misleading statements regarding the allegation that Old JJCI's talc products contained asbestos or caused cancer. The defendants in the Securities Action maintain (as does the Debtor) that the talc products were safe and free from asbestos. Although the Debtor is not a defendant, there is substantial overlap between the claims in the Securities Action and the talc-related claims against the Debtor.

42. Due to the long alleged latency periods for mesothelioma and ovarian cancer, cosmetic talc litigation against the Debtor is anticipated to continue for decades more, as are the extraordinary costs of defending and resolving the tens of thousands of expected claims. Plaintiff experts estimate that the latency period for mesothelioma can run as long as 60 years and have begun to allege extended latency periods for ovarian cancer allegedly caused by asbestos exposure. As a result, even though Old JJCI stopped selling its talc-based JOHNSON'S® Baby Powder in North America in 2020, individuals who develop mesothelioma

---

[7]     See Hall v. Johnson & Johnson, No. 3:18-cv-01833 (D.N.J) (the "Securities Action").

in 2080 and beyond could sue the Debtor, potentially drawing out the litigation to the end of this century.

43.     As of the filing of the 2021 Chapter 11 Case, there were almost 40,000 plaintiffs asserting ovarian cancer claims against the Debtor, including almost 36,000 plaintiffs with claims pending in a federal multi-district litigation in New Jersey, and more than 3,800 plaintiffs with claims in multiple state court jurisdictions across the country. These claims were all stayed during the pendency of the 2021 Chapter 11 Case.

44.     In addition to the ovarian cancer claims, approximately 470 mesothelioma cases were pending against the Debtor as of the filing of the 2021 Chapter 11 Case. These claims, like the ovarian cancer claims, spanned the U.S. with cases pending in New Jersey, California, Illinois, Missouri, New York and Ohio, and were stayed during the pendency of the 2021 Chapter 11 Case.

45.     The Debtor believes that, absent the 2021 Chapter 11 Case, thousands of additional ovarian cancer and mesothelioma cases would have been filed against it. Moreover, absent this case, the Debtor expects thousands of additional cases would have been filed for decades to come.

**B.      The Debtor's Insurance Coverage and Related Litigation**

46.     The Debtor believes it has insurance coverage for its talc-related liability. In particular, the Debtor has access to certain primary and excess liability insurance policies that cover, among other things, defense and/or indemnity costs related to talc bodily injury claims, subject to the terms of the policies.[8]

---

[8]     The policies that cover the Debtor were issued to J&J as the Named Insured. Those policies cover the period when Old JJCI was operated as a business unit of J&J, as well as during the period when Old JJCI was a subsidiary of J&J.

47. I provided a general overview of the Debtor's insurance coverage in my 2021 First Day Declaration, which I incorporate herein by reference. See 2021 First Day Decl. ¶¶ 46-52. In total, the limits of solvent primary and excess insurance policies issued to J&J by third-party insurers that potentially cover talc-related liabilities are in excess of $1.95 billion.

48. Prior to the 2021 Chapter 11 Case, J&J and Old JJCI tendered talc-related claims to the third-party insurers. Since then, none of those insurers has acknowledged its coverage obligations, defended Old JJCI or J&J, paid any costs of defense, or indemnified J&J or Old JJCI for settlements or judgments. Instead, the third-party insurers have asserted coverage defenses.

49. In May 2019, certain of the Debtor's third party insurers filed a lawsuit against Old JJCI and J&J, and their captive insurance affiliate, Middlesex Insurance Company ("Middlesex"), in the Superior Court of Middlesex County (Docket No. MID-L-003563-19) (the "NJ Coverage Action"), seeking a declaratory judgment regarding the parties' respective obligations under the plaintiff insurers' policies including, in particular, the plaintiff insurers' duties to pay defense and indemnity costs to, among other things, Old JJCI. The insurer plaintiffs filed a Second Amended Complaint on June 22, 2020. J&J, Old JJCI and Middlesex filed answers to the Second Amended Complaint on July 31, 2020, and asserted counterclaims, as well as cross-claims against certain defendants. Aetna Casualty and Surety Company ("Travelers")[9] and certain other insurers filed cross-claims against J&J, Old JJCI and Middlesex, to which J&J, Old JJCI and Middlesex responded later in 2020.

---

[9]      Aetna Casualty and Surety Company is now part of Travelers Insurance Company.

50.     In the 2021 Chapter 11 Case, certain insurers filed motions to lift the automatic stay to permit the NJ Coverage Action to proceed.  This Court denied those motions but permitted certain third-party discovery to occur.  The NJ Coverage Action remains pending.

### C.     Retailers and Third Party Indemnities

51.     Old JJCI had relationships with various retailers who sold Old JJCI's talc-containing products (collectively, the "Retailers").  Old JJCI agreed to indemnify the Retailers for claims related to the sale of Old JJCI's talc-containing products, and these contractual indemnities were allocated to the Debtor in the 2021 Corporate Restructuring.  In addition, to the extent a Retailer is held liable for a claim arising out of the products manufactured and/or sold by Old JJCI, and not by independent actions of the Retailers, certain state laws could require the Debtor to indemnify the Retailers for these liabilities.

52.     Claims asserted against the Retailers for their sale of Old JJCI products are virtually identical to the claims asserted against Old JJCI.  I believe these claims against Retailers are generally brought to defeat removal to federal court based on diversity jurisdiction and the Retailers are often dismissed before trial without payment.

53.     Old JJCI would periodically accept from Retailers tenders of talc-related claims related to the sale of its products.  When a Retailer was sued on a claim related to Old JJCI's talc-containing products, the Retailer would notify Old JJCI by submitting a tender request.  Old JJCI would then determine whether to accept the Retailer's tender of its defense and indemnify the Retailer pursuant to a tender agreement (each, a "Tender Agreement").  Since the commencement of the talc-related litigation, Old JJCI has agreed to indemnify and assume the defense of nearly 790 talc-related claims against the Retailers pursuant to Tender Agreements.

-17-

54.     In addition, Old JJCI agreed to indemnify certain other transaction counterparties for liability arising from talc-containing products sold by Old JJCI.  For example, in 2005, Old JJCI entered into an asset purchase agreement with Pharma Tech Industries, Inc. ("PTI" and subsequently PTI Royston, LLC) pursuant to which Old JJCI sold a manufacturing plant (where various products, including certain talc-containing products, were bottled) to PTI, which continued to operate the facility and manufacture certain talc products until early 2020.  In connection with the asset sale, Old JJCI and PTI entered into a manufacturing and supply agreement, which was subsequently amended and restated.  Under the manufacturing and supply agreement, Old JJCI agreed to indemnify, and has indemnified, PTI and its affiliates for certain claims related to talc products.  The claims against PTI are generally identical to and based on the claims against Old JJCI.

55.     Further, pursuant to an indemnification agreement, Old JJCI agreed to indemnify Valeant (now Bausch) and its affiliates (including Bausch Health Americas, Inc. f/k/a Valeant Pharmaceuticals International and Bausch Health US, LLC f/k/a Valeant Pharmaceuticals North America LLC f/k/a Valeant Pharmaceuticals North America) for personal injury and products liability actions arising from alleged exposure to "Shower to Shower" products and for certain other regulatory actions arising out of the manufacture, use or sale of "Shower to Shower" products, as set forth more fully in the agreement.[10]  The claims against Valeant (now Bausch) are generally identical to the claims asserted against Old JJCI.

---

[10]     It is my understanding that "Shower to Shower" products sold in the U.S. and Canada no longer include talc.  Like Johnson's Baby Powder, Johnson's Medicated Powder sold in the U.S. and Canada no longer contains talc as of 2020.

D. **Chapter 11 Cases of Talc Suppliers**

56.     In February 2019, Old JJCI's talc supplier, Imerys Talc America, Inc. and

two of its affiliates, Imerys Talc Vermont, Inc. and Imerys Talc Canada, Inc.

(collectively, "Imerys") filed voluntary petitions under chapter 11 of the Bankruptcy Code in the

United States Bankruptcy Court for the District of Delaware (the "Imerys Bankruptcy").  Imerys

has potential liability for personal injury claims arising from exposure to talc it sold to

customers, including Old JJCI.  In its bankruptcy case, Imerys has contended that it has claims

against Old JJCI and J&J for indemnification and joint insurance proceeds, claims alleged to be

in the billions of dollars.  Old JJCI and J&J had settlement discussions with Imerys and other

parties to permanently resolve talc claims against them.  Those discussions ended in May 2021

with no resolution.

57.     In July 2021, Imerys Talc America, Inc. and Imerys Talc Vermont, Inc.

filed an adversary proceeding against Old JJCI and J&J in the Imerys Bankruptcy seeking

declaratory judgments with respect to certain indemnification obligations allegedly owed by

Old JJCI and J&J to Imerys.  The Debtor and J&J thereafter filed a motion to dismiss the

adversary proceeding.  In October 2021, the Debtor filed a notice of bankruptcy filing and stay of

proceedings clarifying that the automatic stay arising upon the filing of the 2021 Chapter 11

Case applied to this adversary proceeding.  No further activity has taken place in this adversary

proceeding since the filing of the 2021 Chapter 11 Case.

58.     In May 2020, Imerys, its parent Imerys S.A., the tort claimants' committee

and the future claimants' representative (collectively, the "Imerys Plan Proponents") filed a plan

of reorganization and a related disclosure statement. The Plan Proponents subsequently filed

numerous amendments to the plan and disclosure statement.  A hearing on the Plan Proponent's

disclosure statement was held in January 2021, and the court entered an order approving the disclosure statement, permitting Imerys to proceed with soliciting votes on the plan.

59.     In March 2021, Old JJCI and J&J voted to reject the plan and opted out of the consensual releases in the plan.  In April 2021, the Plan Proponents announced that the plan had received the requisite number of accepting votes to confirm the plan.  Old JJCI and J&J challenged certain portions of the vote based on improprieties that had been discovered and sought to disqualify those votes.  In October 2021, the Imerys bankruptcy court issued a ruling deeming thousands of votes as withdrawn.  In October 2021, Imerys cancelled the confirmation hearing on the plan. The Imerys Bankruptcy remains pending.

60.     Cyprus Mines Corporation and its parent company (together, "Cyprus"), which had owned certain Imerys talc mines, filed in the Imerys Bankruptcy an adversary proceeding against Old JJCI, J&J, Imerys Talc America, Inc. and Imerys Talc Vermont, Inc. seeking a declaration of indemnity rights under certain contractual agreements.  Old JJCI and J&J denied that any indemnification was owed, and filed a motion to dismiss the adversary complaint.  In February 2021, Cyprus Mines Corporation filed its own voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware and filed a disclosure statement and plan of reorganization.  The Cyprus plan contemplates a settlement with Imerys and talc claimants where Cyprus would make a monetary contribution to a trust established under the Imerys plan in exchange for an injunction against talc claims asserted against it and certain protected parties.  Cyprus has not yet sought approval of its disclosure statement and plan.  In October 2021, the Debtor filed a notice of bankruptcy filing and stay of proceedings clarifying that the automatic stay arising upon the filing of the 2021 Chapter 11 Case applies to the Cyprus adversary proceeding.  The Cyprus

chapter 11 case remains pending and no further activity has taken place in the Cyprus adversary

proceeding since the filing of the 2021 Chapter 11 Case.

**E.      The 2021 Chapter 11 Case**

> 61.      The Debtor commenced the 2021 Chapter 11 Case on October 14, 2021 by

filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States

Bankruptcy Court for the Western District of North Carolina (the "NC Bankruptcy Court").  The

Debtor also commenced an adversary proceeding against talc claimants seeking (a) a declaration

that the automatic stay applied to and (b) a preliminary injunction enjoining claims against the

Debtor's affiliates, including J&J and New JJCI, as well as the Debtor's insurers and third-party

retailers and other indemnified parties, a group referred to as the "Protected Parties."  After

discovery and a two-day evidentiary hearing, on November 15, 2021, the NC Bankruptcy Court

entered an order determining that the automatic stay applied to, and also preliminarily enjoining,

the commencement or continuation of talc claims against the Protected Parties for 60 days

(i.e., until January 14, 2022), subject to modification or extension by this Court.

> 62.      On November 16, 2021, the NC Bankruptcy Court entered an order

transferring the 2021 Chapter 11 Case to the District of New Jersey, which referred the case to

this Court.

> 63.      After transfer, the official committee of talc claimants (the "TCC") and

two plaintiff law firms [No. 21-30589, Dkts. 632, 766, 1003] moved to dismiss the 2021

Chapter 11 Case as a bad-faith filing.  On February 25, 2022, following months of discovery and

a five-day trial to address the motions to dismiss and the Debtor's adversary proceeding to enjoin

the talc claims, this Court issued an opinion denying the motions to dismiss [No. 21-30589,

Dkt. 1572] (the "<u>Dismissal Opinion</u>")[11] and a separate opinion granting the stay and injunctive

relief requested by the Debtor (the "<u>PI Opinion</u>") [Adv. Pro. No. 21-3032, Adv. Dkt. 184].[12]

       64.     Following the completion of the dismissal and stay litigation in this Court,

the Court entered orders establishing a process to mediate the terms of a plan of reorganization.[13]

Pursuant to the Mediation Order, the Debtor and J&J engaged in a series of negotiations with the

Debtor's key constituencies, including the TCC, the Future Claimants' Representative

(the "<u>FCR</u>"), state attorneys general and the Debtor's insurers.  In support of those efforts, the

Debtor obtained Court approval to enter into an expense reimbursement agreement with an ad

hoc committee of state attorneys general to facilitate their participation in the mediation.  Despite

the efforts of the mediators and the various constituents, at the time of the Third Circuit's ruling,

no agreement had yet been reached on the terms of a plan to consensually resolve the 2021

Chapter 11 Case.

       65.     During this same time period and primarily for the purpose of facilitating

the parties' mediation efforts, the Debtor proposed a process to estimate the aggregate value of

the talc claims asserted against it.  The Court later authorized an estimation, ruling that "the need

for transparency and to preserve the integrity of the bankruptcy process and the system requires a

---

[11]    On March 2, 2022, the Court entered an order denying the motions to dismiss [No. 21-30589, Dkt. 1603] (the "<u>Dismissal Order</u>").

[12]    On March 4, 2022, the Court entered an *Order (I) Declaring That Automatic Stay Applies to Certain Actions Against Non-Debtors and (II) Preliminarily Enjoining Certain Actions* [Adv. Pro. No. 21-3032, Adv. Dkt. 187] (the "<u>PI Order</u>").

[13]    On March 18, 2022, the Court entered an Order Establishing Mediation Protocol [No. 21-30589, Dkt. 1780] and on May 16, 2022, it entered an Amended Order Establishing Mediation Protocol No. 21-3058, Dkt. 2300] (as amended, the "<u>Mediation Order</u>").  Pursuant to the Mediation Order, the Court appointed the Honorable Joel Schneider and Gary Russo as co-mediators.  On May 27, 2022, the Court entered an order [No. 21-30589, Dkt. 2370] appointing Judge Donald Steckroth as a third mediator.

NOT A CERTIFIED COPY

reasonable effort to estimate the debtor's aggregate liability for both present and future claims for both ovarian and meso diseases." See July 28, 2022 Hr'g Tr., 4:13-17.

66. The Court also indicated that it would appoint an expert (the "Court Expert") under Rule 706 of the Federal Rules of Evidence to prepare and file a report containing his or her opinions on the estimation of the current and future talc claims. See id. at 7:6-10. On August 15, 2022, the Court entered an order appointing Kenneth R. Feinberg, Esq. as the Court Expert [No. 21-30589, Dkt. 2881].

67. Following his appointment, the Court Expert gathered information from claimants, the Debtor and J&J, engaged in discussions with the TCC, the FCR and the Debtor and J&J, and retained counsel and an economic consulting firm. At the time of the Third Circuit decision, no report had been filed by the Court Expert.

68. The TCC and two plaintiff law firms, on behalf of talc claimants they represented, filed notices of appeal from the Dismissal Opinion, the Dismissal Order, the PI Opinion and the PI Order. They also filed motions requesting that this Court certify its orders for direct appeal to the Third Circuit. On April 4, 2022, this Court granted the motions for direct appeal [No. 21-30589, Dkt. 1955; Adv. Pro. No. 21-3032, Dkt. 231]. Thereafter, the Third Circuit accepted the direct appeal, and granted the appellants' motion to consolidate their appeals and to expedite the case. The parties briefed the issues and argued the matters before the Third Circuit on September 19, 2022.

**F.**     **Third Circuit Panel Opinion Dismissing the 2021 Chapter 11 Case**

69. On January 30, 2023, a panel of the Third Circuit issued an opinion directing this Court to dismiss the 2021 Chapter 11 Case on the basis that it was not filed in good faith. See In re LTL Mgmt., LLC, 58 F.4th 738 (3d Cir. 2023) as amended by 2023 WL 2726441 (3d Cir. Mar. 31, 2023) (the "Third Circuit Panel Opinion"). Although the Third

Circuit panel recognized that the Debtor "inherited massive liabilities" and faced "thousands" of

future claims, it concluded that the Debtor was not in financial distress before the filing.  Third

Cir. Panel Op., 762-63.

70.     On February 13, 2023, the Debtor filed a petition for rehearing and

rehearing en banc with the Third Circuit.  See In re LTL Mgmt. LLC, No. 22-2003 (3d Cir.

Feb. 13, 2023), Dkt. 153.  On March 22, 2023, the Third Circuit entered an order denying the

Debtor's petition for rehearing.  That same day, the Debtor filed a motion seeking a stay of the

Third Circuit's mandate pending appeal to the United States Supreme Court.  The Third Circuit

entered an order denying the stay motion on March 31, 2023, and, on the dame day, issued its

mandate directing this Court to dismiss the 2021 Chapter 11 Case.  This Court subsequently

entered an order dismissing the 2021 Chapter 11 Case on April 4, 2023.  See No. 21-30589,

Dkt. 3938.

G.     **Plan Support Agreements**

71.     Throughout the 2021 Chapter 11 Case, the Debtor participated in court

ordered mediation with the Debtor's key constituencies to negotiate a potential consensual

resolution of the case.  Despite a multitude of discussions with various parties and the efforts of

the mediators, no agreement was reached prior to the Third Circuit's decision to dismiss the 2021

Chapter 11 Case.

72.     Following that ruling, however, and with the assistance of the mediators

and the encouragement of this Court, negotiations continued between the Debtor and J&J, and

various plaintiff law firms.  Those negotiations ultimately culminated in an agreement with

thousands of claimants on a broad outline of terms for a plan of reorganization, including

financial terms, that, if confirmed and consummated, would fully resolve all the Debtor's

liability for talc-related claims.  That agreement has been memorialized in a series of plan

-24-

support agreements (collectively, the "<u>Plan Support Agreements</u>") that have been executed and

delivered by counsel on behalf of over 60,000 claimants and signed by the Debtor, Holdco and

J&J.[14]

73.     The Plan Support Agreements provide, among other things, that the

Debtor, J&J, Holdco and the claimants will work together to finalize, file and seek confirmation

of a plan of reorganization that provides for the establishment of a trust funded in the amount of

$8.9 billion on a net present value basis.  The Plan Support Agreements further provide that a

plan containing the terms to which the parties have agreed must be filed by May 14, 2023, or as

soon thereafter as is feasible.

74.     While there are additional issues that the parties will need to address, the

Plan Support Agreements represent significant progress towards a consensual resolution of the

Debtor's current and future talc claims.  The Debtor believes the terms of the plan contemplated

by the Plan Support Agreements are equitable and in the best interests of all parties, including

current and future talc claimants.  Indeed, I understand that the proposed settlement amount of

$8.9 billion by the Debtor and J&J would be the largest settlement amount in any asbestos

bankruptcy case and one of the largest settlements of personal injury claims in history.

H.     <u>The Decision to File This Case</u>

75.     The filing of this second chapter 11 case has the support of thousands of

claimants.  That support is evidenced by their entry into the Plan Support Agreements.

76.     This filing also has the continuing support of Holdco and J&J, who have

agreed to enter into new financing arrangements with the Debtor that facilitate the confirmation

---

[14]     A copy of a form Plan Support Agreement (without exhibits) is attached hereto as <u>Annex C</u>.

and consummation of a plan of reorganization containing the terms described in the Plan Support Agreements.

77.     In view of the substantial support of talc claimants, Holdco and J&J for both the filing of this case and the material terms of a plan, and taking into account the excessive cost, burden, uncertainty and anticipated decades-long duration of the cosmetic talc litigation, the Debtor determined that the filing of a second chapter 11 case in this Court was prudent, necessary and in the best interests of all constituents. The Debtor continues to believe, as do Holdco and J&J, that chapter 11 proceedings are the only method through which the Debtor and talc claimants can fully, equitably and permanently resolve all current and future talc-related claims.

### Termination of 2021 Funding Agreement and Entry Into New Agreements

78.     The Third Circuit found that the Debtor was not in financial distress as a result of its rights under the 2021 Funding Agreement. That determination defeated the fundamental purpose of that agreement, which purpose was to facilitate the Debtor's goal of resolving all current and future talc claims pursuant to section 524(g) of the Bankruptcy Code. The Third Circuit determined it had the exact opposite effect; i.e., that it required dismissal of the 2021 Chapter 11 Case. As a result, the Debtor believes there was a material risk that the 2021 Funding Agreement was no longer enforceable because it had become void or voidable. To eliminate that risk and secure funding terms consistent with the terms set forth in the Plan Support Agreements, the Debtor, J&J and Holdco have entered into new financing arrangements. These new arrangements, among other things, (a) address the guidance provided by the Third Circuit in its dismissal opinion, (b) facilitate confirmation and consummation of a plan of reorganization containing the terms supported by thousands of claimants whose counsel have

executed and delivered the Plan Support Agreements and (c) do not adversely affect the interests

of talc claimants.

79.    The Debtor, J&J and Holdco effectuated these new financing

arrangements by entering into three new agreements.  The Debtor, J&J and Holdco entered into a

termination and substitution agreement (the "T&S Agreement") by which the 2021 Funding

Agreement and a related intercompany loan were terminated and the parties, in substitution

therefor, agreed to enter into two new agreements.[15]  Simultaneously with their entry into the

T&S Agreement, the Debtor, J&J and Holdco then entered into these two new agreements:

Holdco and the Debtor entered into a new funding agreement (the "2023 Funding Agreement")

and the Debtor, Holdco and J&J entered into a separate support agreement (the "J&J Support

Agreement").[16]

80.    The 2023 Funding Agreement is similar to the 2021 Funding Agreement.

It imposes no repayment obligation on the Debtor and is not a loan.  It obligates Holdco to

provide funding to the Debtor to pay for costs and expenses of the Debtor incurred in the normal

course of its business (a) at any time when there is no bankruptcy case and (b) during the

pendency of any chapter 11 case filed by the Debtor, including the costs of administering the

chapter 11 case, in both situations to the extent that any cash distributions received by the Debtor

from Royalty A&M are insufficient to pay those costs and expenses.  In addition, the 2023

Funding Agreement requires Holdco to fund amounts necessary (a) to satisfy the Debtor's talc-

related liabilities at any time when there is no bankruptcy case and (b) in the event of a

---

[15]    A copy of the T&S Agreement is attached hereto as Annex D.

[16]    A copy of the 2023 Funding Agreement (without its Schedule 2 that includes confidential bank account
information) is attached as Annex E and a copy of the J&J Support Agreement is attached hereto as
Annex F. The summaries of the terms of the T&S Agreement, the 2023 Funding Agreement and the J&J
Support Agreement in this Declaration are provided for the convenience of the Court and parties in interest
and are qualified in all respects by the more detailed terms contained in those agreements.

chapter 11 filing by the Debtor, to provide the funding for a trust created pursuant to a plan of

reorganization for the Debtor that contains the terms agreed to in the Plan Support Agreement, as

such terms may be amended or supplemented with the consent of the parties, in both situations to

the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient

to pay such costs and expenses and further, in the case of the funding of a trust, the Debtor's

other assets are insufficient to provide that funding.

81.     The J&J Support Agreement is subject to the approval of the Court and is

operative only in the chapter 11 case.  It obligates J&J to provide the trust funding Holdco is

required to provide under the 2023 Funding Agreement but only if Holdco fails to provide the

funding.  In return, Holdco is obligated to reimburse J&J for any amounts it pays to the trust on

Holdco's behalf, and any amounts that are not reimbursed by Holdco will be deemed to be

financed with a loan from J&J to Holdco.  The Debtor is obligated to use commercially

reasonable efforts to obtain final Court approval of the J&J Support Agreement and to cause a

plan of reorganization containing the terms reflected in the Plan Support Agreements to become

effective, in both cases as soon as reasonably practicable.  The Debtor has the right to enforce

J&J's obligation under the J&J Support Agreement.

82.     The Debtor believes that these new financing arrangements resolve the

concerns that led the Third Circuit to conclude that the 2021 Chapter 11 Case should be

dismissed.  J&J's support is only available in bankruptcy and only if approved by this Court.

Holdco is the sole obligor under the 2023 Funding Agreement.  As I noted above, Holdco

transferred its consumer health business, which represented a substantial portion of its assets, in

early January 2023.  This Court previously found that Old JJCI was in financial distress, and that

was at a time when it was operating its consumer health business.  The performance of J&J's

-28-

Consumer Health division, of which Old JJCI was a primary part, had swung from a profit to a

loss due to the costs of the talc litigation.

83.    Since then, Holdco has transferred its consumer health business.  As a

result, not only was J&J's balance sheet not available to the Debtor prior to this filing, but

Holdco's assets, which were prior to this filing (and are) available through the 2023 Funding

Agreement, no longer include the consumer health business.  The Debtor believes that its pre-

filing financial condition is sufficiently distressed to satisfy the standard established by the Third

Circuit.

84.    Nonetheless, the Debtor's new financing arrangements do not harm talc

claimants for at least two reasons.  First, the 2023 Funding Agreement and the J&J Support

Agreement (subject to Court approval) are available in this case to ensure that the Debtor has the

capability to fund a trust consistent with the terms of the Plan Support Agreements.  Second, the

2023 Funding Agreement is also available to fund the Debtor's talc liabilities and related costs

outside bankruptcy.  The Debtor has the financial support it needs to implement the plan outlined

in the Plan Support Agreements.

85.    Bankruptcy is the only forum where the Debtor and the claimants can

fully, equitably and permanently resolve all talc-related claims.  This second chapter 11 filing

and the proposed plan are in the best interests of all parties, including the Debtor and all current

and future talc claimants.

### The Debtor's Objectives for this Case

86.    The Debtor's goal in this chapter 11 case is to finalize, obtain

confirmation of and ultimately consummate a plan of reorganization containing the terms agreed

to in the Plan Support Agreements.  This plan would, among other things, (a) establish and fund

a trust with $8.9 billion on a net present value basis to resolve and pay all current and future talc-

related claims, including all ovarian cancer claims and all mesothelioma claims, and (b) provide

for the issuance of an injunction that will permanently protect the Debtor, its affiliates and

certain other parties from further talc-related claims arising from products manufactured and/or

sold by Old JJCI, or for which Old JJCI may otherwise have had legal responsibility, pursuant to

sections 524(g) and/or 105(a) of the Bankruptcy Code.

       87.    The Debtor is prepared to immediately engage in good faith negotiations

to finalize the terms of a plan of reorganization consistent with the terms set forth in the Plan

Support Agreements and file a plan by May 14, 2023, as required by the Plan Support

Agreements.  The Debtor will also continue to seek the support of other claimants and

constituents, including the FCR, state attorneys general and the Debtor's insurers, in an effort to

achieve a fully consensual plan.  Given the unprecedented monetary contribution the Debtor and

J&J are prepared to make to resolve the Debtor's liability for all talc-related claims, the Debtor is

confident that a consensual resolution of this chapter 11 case is achievable and in the best

interests of all parties.

**III.    <u>FIRST DAY PLEADINGS AND ADVERSARY PROCEEDING</u>**

       88.    Concurrently with the filing of this chapter 11 case, the Debtor filed First

Day Pleadings requesting various forms of relief.  In addition, the Debtor has filed an adversary

proceeding seeking injunctive and declaratory relief, as well as an <u>ex parte</u> temporary restraining

order (the "Adversary Proceeding").

       89.    The Debtor will move for entry of orders scheduling expedited hearings

on the First Day Pleadings and the Adversary Proceeding.[17]  The Debtor requests that the Court

---

[17]    Capitalized terms used below in the descriptions of the First Day Pleadings and the Adversary Proceeding
and not otherwise defined herein have the meanings given to them in the applicable First Day Pleadings
and the Adversary Proceeding filings.

conduct an administrative hearing (the "First Day Hearing") as soon after the commencement of its chapter 11 case as the Court's schedule will permit, at which the Court will hear and consider the First Day Pleadings.  The Debtor also anticipates that the Court will consider the relief requested in the Adversary Proceeding at a later time.  The First Day Pleadings that the Debtor anticipates will be heard at the First Day Hearing are described in Sections III.A-III.C.  The Adversary Proceeding is described in Section III.D.

90.     Generally, the purposes of the First Day Pleadings and the Adversary Proceeding are to:  (a) obtain authorization for the continued use of the Debtor's bank account; (b) establish procedures for the smooth and efficient administration of this chapter 11 case; and (c) protect the Debtor's ability to negotiate and ultimately effectuate a section 524(g) reorganization under chapter 11.  I have reviewed each of the First Day Pleadings and the Adversary Proceeding filings, including the exhibits thereto, and I believe that the relief sought in each of the First Day Pleadings and the Adversary Proceeding is tailored to meet the goals described above and, ultimately, will be critical to the Debtor's ability to achieve a successful reorganization.

A.     **The Case Administration Motions**

*Appointment of Claims and Noticing Agent*

91.     The Debtor will seek the entry of an order appointing Epiq Corporate Restructuring, LLC ("Epiq") as claims and noticing agent in this chapter 11 case.  I understand that Epiq may, among other things:  (a) prepare and serve all notices required in the Debtor's chapter 11 case, including the notice of the commencement of this case and the meeting of creditors pursuant to section 341 of the Bankruptcy Code; and (b) maintain the official claims register.  Epiq previously served as the Debtor's claims, noticing and ballot agent in the 2021 Chapter 11 Case.  The Debtor submits, based on, among other things, Epiq's prior work in the

-31-

2021 Chapter 11 Case, that Epiq's rates are competitive and reasonable given Epiq's quality of

services and knowledge regarding the Debtor's creditors and the Court's processes.

### *List of the Top Law Firms With Talc Claims Against the Debtor in Lieu of the List of the 20 Largest Unsecured Creditors and Notice Procedures for Talc Claimants*

92.     I understand that the Top 20 List primarily would be used by the United

States Trustee to understand the types and amounts of unsecured claims against the debtor and

thus evaluate prospective candidates to serve on an official committee in the debtor's case.  I

further understand that an official committee of talc claimants is expected to be appointed.

Because committees in mass tort chapter 11 cases typically consists of plaintiff law firms acting

on behalf of individual talc claimants, the Debtor will seek authority to file and provide

the United States Trustee with a list of the 18 law firms with the most significant representations

of parties with talc claims against the Debtor based on the volume of claims or other related

factors (a "Top Talc Counsel List"), in lieu of listing the individual talc claimants with the

largest unsecured claims against the Debtor on a "Top 20" list of unsecured creditors.

The Debtor believes that providing the United States Trustee with a Top Talc Counsel List

would better facilitate the United States Trustee's evaluation of members of an official

committee of talc claimants.

93.     The Debtor also will seek Court approval for certain notice procedures

relating to individuals (collectively, the "Talc Claimants") who are claimants in talc-related

personal injury lawsuits or other proceedings involving the Debtor, including to (a) serve all

notices, mailings, filed documents and other communications relating to its chapter 11 case,

including, without limitation, pleadings, in any contested matter or otherwise, seeking relief that

could directly impact Talc Claimants' rights and obligations in this chapter 11 case, on Talc

Claimants in care of their counsel (collectively, the "Talc Firms") at such counsel's address, as

further described in the Motion; and (b) list the names, addresses and other contact information,

as applicable, of the Talc Firms in any creditor or service lists, including the creditor matrix

provided to the Court or filed in this case, in lieu of listing the contact information of individual

Talc Claimants.  To date, the Debtor has communicated solely with the Talc Firms regarding the

talc-related claims against the Debtor.  The Debtor in many cases cannot be sure that it has the

current addresses (or any addresses) for the Talc Claimants.  Further, consistent with the rules of

professional conduct, communicating with an adversary in litigation generally is conducted

through counsel.  The Debtor therefore believes that providing notice to Talc Claimants through

the Talc Firms, in accordance with past practice, is much more reliable and consistent with the

rules of professional conduct.

94.     The notice procedures proposed in the Motion provide for an effective and

appropriate noticing process for the Talc Claimants.  Further, implementing the proposed Notice

Procedures would alleviate the administrative burden and expense of gathering current contact

information for each of the Talc Claimants, which, in many cases, is not readily available or is

difficult to verify.  The Debtor has access to the names and addresses of the counsel for the Talc

Claimants (including counsel of record in pending lawsuits), but the names and addresses of a

significant number of individual Talc Claimants themselves are not readily available.  It would

be extremely burdensome, costly and time-consuming for the Debtor to attempt to obtain this

information.  In addition, any contact information for the individual Talc Claimants the Debtor

has or is able to obtain may be outdated and unreliable.  Consequently, providing notice in this

chapter 11 case in accordance with the Notice Procedures will be more efficient and reliable than

providing notice to the individual Talc Claimants directly.

*Extension of Time to File Schedules*

95.     The Debtor believes it will need a brief period of additional time, beyond the time period allotted under the Bankruptcy Code, to assemble all of the information necessary to complete and file the required schedules of assets and liabilities and statement of financial affairs (collectively, the "Schedules").  The Debtor will need the additional time because of (a) the size and complexity of this chapter 11 case and (b) the volume of materials that must be compiled and reviewed to complete the Schedules.  Although the Debtor previously submitted Schedules in the 2021 Chapter 11 Case, the Debtor must update those schedules to reflect the most current information given the passage of time and new developments since October 14, 2021.  Like the 2021 Chapter 11 Case, this chapter 11 case will involve tens of thousands of claimants and other parties in interest, and it is my understanding that the Debtor would need to collect, review and assemble a substantial amount of information to complete the Schedules.

96.     Given (a) the large number of claimants and (b) the critical matters that the Debtor and its professionals were required to address prior to the commencement of this chapter 11 case, the Debtor was not in a position to complete the Schedules by the Petition Date, even with the assistance of professionals.  The Debtor further estimates that, with the many critical matters to be addressed in the early days of this case, the Debtor will require more than 14 days after the Petition Date to complete the Schedules.

97.     The additional time requested is important to help ensure that the Schedules are as accurate as possible.  Given the volume of information that is provided in the Schedules, and the fact that the information must be accurate as of the Petition Date, additional time to complete the Schedules will help ensure that the relevant information is fully collected and evaluated and can be incorporated into the relevant filings.  Rushing to complete the Schedules soon after the Petition Date, on the other hand, could compromise their

completeness.  Accordingly, the Debtor will seek to extend the deadline by which it must file its

Schedules by an additional 30 days, through and including May 18, 2023, without prejudice to

the Debtor's right to seek a further extension for cause.

**B.**  **Request to Continue Using Bank Account and Related Relief**

98.  The Debtor will seek approval of the continued use of its prepetition bank

account, as well as authority to open and close bank accounts during the chapter 11 case,

as necessary or appropriate.  In the ordinary course of business, the Debtor maintains a bank

account at Bank of America in Charlotte, North Carolina (the "Bank Account").  All payments

and other funds that are received by the Debtor are deposited into that account, including cash

payments from Holdco under the 2023 Funding Agreement.  The Bank Account also serves as a

disbursement account and is used to pay all of the Debtor's costs and expenses, including

professional fees.

99.  In addition, the Debtor will request authority for Bank of America and any

other bank to charge, and the Debtor to pay or honor, both prepetition and postpetition service

and other fees, costs, charges and expenses to which a bank may be entitled under the terms of

and in accordance with its contractual arrangements with the Debtor.  Further, the Debtor will

request that the Court authorize Bank of America and any other bank to charge back returned

items to the Bank Account in the ordinary course of business.  The Debtor requires this relief to

minimize disruption to its Bank Account and to assist in accomplishing a smooth transition to,

and operation in, chapter 11.

100.  The Bank Account is insured by the United States through the Federal

Deposit Insurance Corporation (the "FDIC") and is maintained at Bank of America, a large,

well-known and well-capitalized institution, which is also a depository approved by the United

States Trustee.

101.    To protect against the possible inadvertent payment of prepetition claims,

the Debtor will advise Bank of America not to honor checks issued prior to the Petition Date,

except as otherwise expressly permitted by an order of the Court and directed by the Debtor.

The Debtor has the capacity to draw the necessary distinctions between prepetition and

postpetition obligations and payments without closing the Bank Account and opening a new one.

C.    **Request to be Appointed Foreign Representative**

102.    The Debtor will seek entry of an order authorizing it to act as the foreign

representative on behalf of the Debtor's estate in any judicial or other proceedings in Canada to

provide an effective mechanism to protect and maximize the value of the Debtor's assets and

estate.

103.    The Debtor, as the proposed Foreign Representative (as defined below),

will shortly seek ancillary relief in Canada on behalf of behalf of the Debtor's estate pursuant to

the Companies' Creditors Arrangement Act (Canada), R.S.C. 1985, c. C-36 as amended

(the "CCAA") in the Ontario Superior Court of Justice (Commercial List) (the "Canadian

Court").  In the ancillary proceeding (the "Canadian Proceeding"), the Debtor (as Foreign

Representative) would request that the Canadian Court recognize the chapter 11 case as a

"foreign main proceeding" under the applicable provisions of the CCAA in order to, among

other things, ensure that the protections of the automatic stay are enforced with respect to the

Canadian Actions and so that such ancillary relief that the Canadian Court may otherwise

consider appropriate can be obtained.

104.    To commence the Canadian Proceeding, the Debtor or another third party

needs authority to act as the "foreign representative" on behalf of the Debtor's estate

(the "Foreign Representative").  I understand that for the Debtor to be recognized as the Foreign

Representative of the Debtor's estate in the Canadian Proceeding, and thereby apply to have the

chapter 11 case recognized by the Canadian Court, this Court must enter the Order authorizing the Debtor to act as the Foreign Representative in the Canadian Proceeding. I understand that if the Order is granted, the Debtor will be able to file the Order with the Canadian Court as the instrument authorizing the Debtor to act as the Foreign Representative pursuant to section 46 of the CCAA.

### D.    Adversary Proceedings

***Motion for an Order (I) Declaring That the Automatic Stay Applies or Extends to Certain Actions Against Non-Debtors, (II) Preliminarily Enjoining Such Actions and (III) Granting a Temporary Restraining Order Ex Parte Pending a Hearing on a Preliminary Injunction***

105.    Contemporaneously herewith, the Debtor has filed a complaint and related motion, which seek a declaration that section 362(a) of the Bankruptcy Code prohibits, or is extended to prohibit, the commencement or continuation of talc-related actions against the Protected Parties[18] while the chapter 11 case remains pending. The Debtor also requests a preliminary injunction under section 105(a) of the Bankruptcy Code. The injunction will enjoin the prosecution of actions outside of the chapter 11 case on account of the same talc claims that exist against the Debtor in the chapter 11 case. Finally, the Debtor also seeks a temporary restraining order, entered ex parte, to immediately effectuate the requested declaratory or injunctive relief pending a final hearing on the motion. I have read the complaint, and I declare under penalty of perjury that the factual allegations therein are true and correct.

106.    The defendants sought to be enjoined in the Adversary Proceeding (collectively, the "Defendants") are all named plaintiffs in talc-related lawsuits against the

---

[18]    As defined in the Debtor's motion, the Protected Parties are: (a) Old JJCI; (b) certain of the Debtor's non-debtor affiliates set forth on Appendix B to the complaint, including J&J and Holdco; and (c) third party retailers who sold Old JJCI's talc-containing products and other third parties whom the Debtor has indemnified contractually, as listed on Appendix B to the complaint.

NOT A CERTIFIED COPY

Debtor or for which the Debtor is responsible or alleged to be responsible, and John and Jane Does 1 to 1000. The Defendants, who are listed on Appendix A to the complaint, would be enjoined from prosecuting actions outside of the chapter 11 case seeking to hold a Protected Party liable on account of any "Debtor Talc Claim" while the chapter 11 case remains pending. "Debtor Talc Claims" means, collectively, any talc-related claim against the Debtor, including all claims relating in any way to talc or talc-containing materials that formerly were asserted against (or that could have been asserted against) Old JJCI[19] on any theory of liability (whether direct, derivative, joint and several, successor liability, vicarious liability, fraudulent or voidable transfer or conveyance, alter ego or otherwise).

107. As I discussed above, the Debtor commenced the chapter 11 case to equitably and permanently resolve all current and future talc-related claims against it through the consummation of a plan of reorganization containing the terms reflected in the Plan Support Agreements. The relief sought by this Adversary Proceeding is critical to the Debtor's ability to achieve that purpose. Without the requested declaration or injunction, claimants would be permitted to commence or restart litigation in other forums asserting the exact same talc claims the Debtor is seeking to resolve in this chapter 11 case. As further explained in the motion, permitting the Defendants to litigate the Debtor Talc Claims against the Protected Parties elsewhere while the Debtor simultaneously works to reorganize by resolving the same claims in its chapter 11 case pursuant to the Bankruptcy Code would (a) defeat the purpose of the Debtor's bankruptcy case, (b) result in irreparable harm to the Debtor's estate, (c) undermine and circumvent the purposes and spirit of the automatic stay and (d) divert the

---

[19] For the avoidance of doubt, Debtor Talc Claims include all talc personal injury claims and other talc-related claims allocated to the Debtor from Old JJCI in the documents implementing the 2021 Corporate Restructuring. The Debtor Talc Claims do not include talc-related claims for which the exclusive remedy is provided under workers' compensation statutes and similar laws.

Debtor from its reorganization efforts.  Such litigation would undermine a central aim of the plan

terms that have been agreed to by thousands of claimants, which is to treat all similarly situated

claimants in an equivalent manner.

108.    The commencement or continued prosecution of the Debtor Talc Claims

against the Protected Parties risks significant, immediate and irreversible harm to the Debtor and

its estate.  It would create chaos across mass-tort proceedings nationwide, as litigation over tens

of thousands of talc claims resumes, all of which may come grinding to a halt if this Court grants

the Debtor's motion.  Approximately 1,000 individually set ovarian cancer claims (not subject to

docket-wide coordination procedures) are pending in various state courts outside of the federal

MDL and consolidated state proceedings in California and New Jersey.  An additional 470

mesothelioma claims are pending in state courts across the country—in 44 courts, across 25

different states.  None of those cases is coordinated, and many are filed on specialized,

asbestos-specific accelerated dockets.  Each is in the process of suddenly springing back into

activity and proceeding towards trial absent extension of the stay or issuance of a preliminary

injunction.   Many of the cases have proceeded in the interim against other defendants and

without the Debtor's involvement, but suddenly, the Debtor would be thrown into the mix—

potentially significantly impacting the progress, scope and nature of the cases.

109.    There are also at least 20 mesothelioma cases now on the eve of trial or

that could be set for trial imminently (in the next 60 days), all of which would demand

significant investment in expedited, catch-up discovery, expert witness engagement, trial lawyer

time, and other resources.  And this machinery does not run itself.  Addressing these matters will

require the time and attention of key Debtor personnel, diverting estate resources away from

reorganization efforts. These negative effects on the Debtor's estate will only compound as new
Debtor Talc Claims are filed against the Protected Parties.

110. <u>Hernandez-Valadez v. Johnson & Johnson, et.al</u>, Case No. 22CV012759
(the "<u>Valadez Case</u>"), a mesothelioma case venued in the Superior Court of the State of
California, Alameda County, should be stayed for all the same reasons that every individual,
talcum powder personal injury matter pending across the country should be stayed. But in light
of recent, unequivocal statements by counsel to Valadez that leave no doubt he intends to put the
2021 Chapter 11 Case—and indeed the bankruptcy system itself—on trial during the Valadez
Case, the risk of permitting the Valadez Case to proceed in the tort system at the very same time
that the Debtor and thousands of claimants work towards a consensual resolution of this
Chapter 11 Case in this Court are acute.

111. The Debtor is a defendant in the Valadez Case, which was therefore
automatically stayed as to the Debtor by the filing of this chapter 11 case. But it is critical to the
Debtor's restructuring efforts that the Valadez Case also be stayed as to the Debtor's
co-defendant, J&J. In the next two weeks, the parties are scheduled to undertake 24 depositions
of fact witnesses, persons most knowledgeable and experts. These depositions include the
continued deposition of the Debtor's person most knowledgeable on a number of topics, some of
which indicate that counsel to Valadez will press for irrelevant and, in some instances, privileged
information regarding a wide range of topics related to the 2021 Chapter 11 Case and the
involvement of both specific members of the J&J legal department and various executive-level
personnel to address the same. Beyond these depositions, the parties are embroiled in significant
evidentiary disputes over the possible spoliation of key testing materials by the plaintiff's testing

expert and whether or not to proceed with genetic testing of the plaintiff (as advocated by certain

of his own expert witnesses).

112. These activities have served as a distraction to some of the very same

counsel and witnesses involved in this chapter 11 case over the past two months and, if allowed

to proceed as to J&J, will continue to do so and drain the Debtor's resources during this

chapter 11 case. More significantly, findings in the Valadez Case could jeopardize the success

of this chapter 11 case by undermining the terms of the plan set forth in the Plan Support

Agreements, contradicting findings by this Court, and threatening the delicate balance now in

place as both the Debtor and claimants work to resolve all talc claims on an equitable and

permanent basis. Permitting one talc claimant to proceed to an accelerated trial on the merits of

his talc claim, while thousands of other talc claimants work towards a full, equitable and final

resolution of all talc claims, risks undermining the Debtor's reorganizational efforts.

113. These concerns are heightened because counsel to Valadez has

unabashedly made clear his intention to put the 2021 Chapter 11 Case on trial during the course

of the trial. According to a March 6 letter to the Alameda County court,[20] Trailblazer Studios, "a

production company based in Raleigh, NC, which focuses on documentary filmmaking and post-

production services for premium platforms like Netflix, Hulu, National Geographic, Disney +

and ESPN," contacted the trial judge in the Valadez Case seeking permission to film the trial.

Trailblazers, and its counsel in a letter dated March 21,[21] clarified that Trailblazers intends to

produce a for-profit documentary "focused on the ongoing talc bankruptcy saga," and hopes to

---

[20]     A copy of the March 6, 2023 letter from Trailblazers is attached hereto as <u>Annex G</u>.

[21]     A copy of the March 21, 2023 letter from Trailblazers' counsel is attached hereto as <u>Annex H</u>.

include an "unknown" amount of Valadez Case trial footage, to be released at an "unknown" time, to "unknown" media outlets, in that documentary.

114.    Given the inevitable distraction of allowing a production company into the courtroom, let alone the well-known and documented prejudicial impact of such activities, defendants promptly opposed Trailblazers' request.  In response, counsel to Valadez stated that "Defendants' **bad-faith bankruptcy** and infliction of **further harm** upon mesothelioma victims . . . is a 'matter of public interest'" such that the Court should permit the trial to be recorded by a production company.  See Pl.'s Resp. to Defs.' Opp. to Trailblazer Studios' Req. to Record T. Proceedings, at 2-3 (Mar. 23, 2023) (emphasis added).[22]  I believe that counsel to Valadez has every intention of turning the Valadez trial into a referendum on the 2021 Chapter 11 Case and the Debtor's reorganization efforts generally.  Permitting such a "trial within a trial" to proceed about the propriety of the 2021 Chapter 11 Case, including the rulings by this Court and the Third Circuit, at the exact same time and on a parallel track to the efforts underway in this Court, at the same time that the Debtor pursues confirmation of a plan that contains the terms in the Plan Support Agreements, will harm the Debtor and its estate, including the talc claimants.

115.    The Valadez Case highlights the critical need for an immediate, ex parte temporary restraining order to avoid exacerbating the very rush to the courthouse that the motion seeks to prevent.

116.    Without immediate injunctive relief, the Debtor will be compelled to pull key estate resources away from its reorganization efforts to focus on the Valadez Case and all other ongoing litigation, hampering the Debtor's reorganization efforts from the outset.  Absent immediate and specific relief, I believe developments in the Valadez Case risk undermining

---

[22]    A copy of the plaintiff's response is attached hereto as Annex I.

support for a plan in this Chapter 11 Case.  For example, an extreme verdict (i) could make it more difficult for the Debtor to obtain additional support for the proposed plan, and (ii) would potentially result in substantially different treatment of Valadez's claim than all other talc claims under a plan with the terms contained in the Plan Support Agreements.  I further believe that litigants will immediately take all measures available to them to circumvent the protections of the automatic stay through coordinated efforts in proceedings against the Protected Parties with the goal of defeating the purpose of this chapter 11 case and a potential fair and equitable resolution for the benefit of thousands of talc claimants.  A denial of the Debtor's request for a temporary restraining order pending a final hearing on the Debtor's request for declaratory and/or injunctive relief would thus cause the very harm that the Debtor seeks to prevent by the motion and the complaint.

## CONCLUSION

117.    For all the reasons described herein, in the First Day Pleadings and in the filings in the Adversary Proceeding, I respectfully request that the Court grant the relief requested in each of the First Day Pleadings and enter the temporary restraining order requested in the Adversary Proceeding.

Dated:  April 4, 2023                     */s/ John K. Kim*
                                          John K. Kim

NAI-1535638438

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

CASE NO. 50-2023-CA-014349-XXXA-MB (AH)

TIMOTHY PIERS DEVALLE, Individually
and as Personal Representative of the
Estate of DONNA MARIE DEVALLE,

                              Plaintiff,

v.

JOHNSON & JOHNSON;
JOHNSON & JOHNSON HOLDCO (NA) INC., f/k/a
      Johnson & Johnson Consumer Inc.,
      Individually and as successor-in-interest to
      Johnson & Johnson subsidiary "Old JJCI"
JANSSEN PHARMACEUTICALS, INC., individually
      and as successor in interest to Johnson & Johnson
      subsidiaries named Johnson & Johnson Consumer
      Inc., both prior to and after its 2021 restructurings
      and colloquially known as "Old JJCI and New
      JJCI";
KENVUE INC., individually and as successor-in-
interest      to Johnson & Johnson Consumer Inc.;
LTL MANAGEMENT, LLC;
IMERYS TALC AMERICA, INC. f/k/a
      LUZENAC AMERICA, INC. f/k/a
      RIO TINTO MINERALS, INC.;
PUBLIX SUPER MARKETS, INC.,

                              Defendants.

NOT A CERTIFIED COPY

**JOHNSON & JOHNSON AND LTL MANAGEMENT, LLC'S
ANSWER AND DEFENSES TO PLAINTIFF'S COMPLAINT**

      Defendants Johnson & Johnson, Inc. ("J&J") and LTL Management, LLC ("LTL")

(collectively, "Answering Defendants") respond to Plaintiff's Complaint as follows.  Answering

Defendants deny each and every allegation, statement, matter and thing contained in Plaintiff's

Complaint except as is hereinafter expressly admitted or alleged.

4869-9382-8495

The repetition of some of the Complaint's subheadings is done solely for organizational purposes and is not an admission as to their truth.

## ANSWER TO COMPLAINT

With respect to the allegations in the Paragraph preceding "Parties, Jurisdiction, & Venue," Answering Defendants admit that Plaintiff purports to sue the Defendants listed and refers to all the listed Defendants collectively as "Defendants." Answering Defendants also admit that Plaintiff purports to collectively refer to J&J, LTL, Johnson & Johnson Holdco (NA) Inc. ("Holdco"), Janssen Pharmaceuticals, Inc. ("Janssen"), Kenvue Inc. ("Kenvue"), and Imerys Talc America, Inc. ("Imerys") as "J&J" or "J&J Defendants" but denies that this is proper or accurate. Answering Defendants further state that Imerys is and has always existed as a separate corporate entity from J&J, LTL, Holdco, Janssen, and/or Kenvue. Answering Defendants deny any remaining allegations in the Paragraph preceding "Parties, Jurisdiction, & Venue."

## PARTIES, JURISDICTION & VENUE

1.    Answering Defendants admit that Plaintiff purports to bring an action for damages in excess of $50,000 but deny that Plaintiff is entitled to any relief.

2.    Answering Defendants admit that Plaintiff purports to bring an action pursuant to Florida's Wrongful Death Statute on behalf of the Estate of Donna Marie DeValle (the "Decedent") and himself as the surviving spouse, but are without sufficient knowledge or information to form a belief as to the accuracy or sufficiency of Plaintiff's purported legal basis for this present suit, and therefore deny the allegations in Paragraph 2 of Plaintiff's Complaint. Answering Defendants further deny that Plaintiff has standing to bring a claim as a surviving spouse individually.

3.     Answering Defendants are without sufficient knowledge or information sufficient to form a belief as to the allegations in Paragraph 3 of Plaintiff's Complaint and therefore deny the same.

4.     Answering Defendants are without knowledge or information sufficient to form a belief as to the allegations in Paragraph 4 of Plaintiff's Complaint and, therefore, deny the same.

5.     Answering Defendants are without knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 5 of Plaintiff's Complaint and, therefore, deny the same.

6.     Answering Defendants are without knowledge or information as to Decedent's diagnosis and, therefore, deny allegations related thereto. Answering Defendants deny the remaining allegations in Paragraph 6 and also specifically deny that cosmetic grade talc causes ovarian cancer.

7.     Answering Defendants are without knowledge or information sufficient to form a belief as to the allegations in Paragraph 7 of Plaintiff's Complaint and, therefore, deny the same.

8.     Answering Defendants admit that Johnson & Johnson is a New Jersey corporation with its principal place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933. Answering Defendants state that the allegations in Paragraph 8 of Plaintiff's Complaint pertaining to service of process call for a legal conclusion to which no response is necessary but responding further, Answering Defendants deny these and all remaining allegations in Paragraph 8.

9.     Answering Defendants deny the allegations in Paragraph 9 of Plaintiff's Complaint.

10.    The allegations in Paragraph 10 are legal conclusions to which no response is required. To the extent a response is required, Answering Defendants deny the allegations in Paragraph 10 of Plaintiff's Complaint.

11.    Answering Defendants admit that Holdco is a New Jersey corporation with its principal place in New Jersey.  Answering Defendants state that the allegations in Paragraph 11 of Plaintiff's Complaint pertaining to service of process call for a legal conclusion to which no response is necessary but responding further, Answering Defendants deny these and all other remaining allegations set forth in Paragraph 11.

12.    Answering Defendants deny that, at all times relevant to the Complaint, Holdco was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling, and/or distributing JOHNSON'S® Baby Powder and/or SHOWER TO SHOWER® and specifically deny the characterization of the Products as asbestos-containing products.  Answering Defendants deny all remaining allegations in Paragraph 12.

13.    The allegations in Paragraph 13 are legal conclusions to which no response is required. To the extent a response is required, Answering Defendants deny the allegations in Paragraph 13 of Plaintiff's Complaint.

14.    Answering Defendants admit the Janssen has its principal place of business in New Jersey but state that Janssen is a Pennsylvania corporation. Answering Defendants state that the allegations in Paragraph 14 of Plaintiff's Complaint pertaining to service of process call for a legal conclusion to which no response is necessary but responding further, Answering Defendants deny these and all other remaining allegations set forth in Paragraph 14.

15.    Answering Defendants deny that, at all times relevant to the Complaint, Janssen was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling,

4

and/or distributing JOHNSON'S® Baby Powder and/or SHOWER TO SHOWER® and specifically deny the characterization of the Products as asbestos-containing products. Answering Defendants deny all remaining allegations in Paragraph 15.

16.    The allegations in Paragraph 16 are legal conclusions to which no response is required. To the extent a response is required, Answering Defendants deny the allegations in Paragraph 16 of Plaintiff's Complaint.

17.    Answering Defendants admit that Kenvue is a Delaware corporation with its principal place of business in New Jersey.  Answering Defendants state that the allegations in Paragraph 17 of Plaintiff's Complaint pertaining to service of process call for a legal conclusion to which no response is necessary but responding further, Answering Defendants deny these and all other remaining allegations set forth in Paragraph 17.

18.    Answering Defendants deny that, at all times relevant to the Complaint, Kenvue was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling, and/or distributing JOHNSON'S® Baby Powder and/or SHOWER TO SHOWER® and specifically deny the characterization of the Products as asbestos-containing products.  Answering Defendants deny all remaining allegations in Paragraph 18.

19.    The allegations in Paragraph 19 are legal conclusions to which no response is required. To the extent a response is required, Answering Defendants deny the allegations in Paragraph 19 of Plaintiff's Complaint.

20.    Answering Defendants admit the LTL has its principal place of business in New Jersey but state that LTL is a North Carolina limited liability corporation. Answering Defendants state that the allegations in Paragraph 20 of Plaintiff's Complaint pertaining to service of process or relating to LTL's "affiliations with the State of Florida" call for a legal conclusion to which no

5

response is necessary but responding further, Answering Defendants deny these and all other remaining allegations set forth in Paragraph 20 and specifically deny the characterization of the products as asbestos-containing products.

21.    Answering Defendants deny that, at all times relevant to the Complaint, Defendants J&J, Holdco, Kenvue, Janssen, and LTL have engaged in the research, development, formulation, manufacture, design, testing, licensing, sale, distribution, marketing and/or introduction in interstate commerce, either directly or indirectly through this parties of related entities, either JOHNSON'S® Baby Powder or SHOWER TO SHOWER®. Answering Defendants further state that, at all times relevant to the Complaint, Johnson & Johnson Consumer Inc. ("Old JJCI") was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling, and/or distributing JOHNSON'S® Baby Powder and SHOWER TO SHOWER®; that Old JJCI transacted business in all fifty states; and that LTL is the sole successor-in-interest to Old JJCI with regard to talc-related liabilities.

22.    Answering Defendants are without knowledge or information sufficient to respond to the allegations in Paragraph 22 and therefore deny same.

23.    Answering Defendants are without knowledge or information sufficient to respond to the allegations in Paragraph 23 and therefore deny same.

24.    Answering Defendants are without knowledge or information sufficient to respond to the allegations in Paragraph 24 and therefore deny same.

25.    The allegations in Paragraph 25 are legal conclusions to which no response is required. To the extent a response is required, Answering Defendants deny the allegations in Paragraph 25 of Plaintiff's Complaint.

26.     Answering Defendants are without knowledge or information sufficient to form a belief as to the allegations in Paragraph 26 of Plaintiff's Complaint and, therefore, deny the same. Answering Defendants further state that the allegations in Paragraph 26 regarding legal responsibility call for legal conclusions to which no response is required. To the extent a response is required, Answering Defendants deny the allegations in Paragraph 26 of Plaintiff's Complaint.

27.     Answering Defendants state that PCPC is a trade association representing the cosmetics industry.   Answering Defendants deny the remaining allegations in Paragraph 27 of Plaintiff's Complaint.

28.     Answering Defendants deny the allegations as stated but admit that at various times various J&J entities have been involved with the PCPC.

29.     The allegations set forth in Paragraph 29 are legal conclusions to which no response is required. To the extent a response is required, Answering Defendants do not challenge this Court's exercise of specific personal jurisdiction over them.   Answering Defendants deny that this Court has personal jurisdiction over Kenvue, Holdco, or Janssen as it relates to this lawsuit. Answering Defendants further deny all remaining allegations in Paragraph 29 which have not been expressly admitted.

30.     Answering Defendants are without knowledge or information sufficient to respond to the allegations in Paragraph 30 and therefore deny same.

31.     Answering Defendants are without knowledge or information sufficient to respond to the allegations in Paragraph 31 and therefore deny same.

32.     Answering Defendants are without sufficient knowledge or information to form a belief as to the accuracy of the allegations in Paragraph 32 of Plaintiff's Complaint and therefore deny the same.

33.    The allegations in Paragraph 33 are legal conclusions to which no response is required. To the extent a response is required, Answering Defendants deny the allegations in Paragraph 33 of Plaintiff's Complaint.

34.    The allegations in Paragraph 34 are legal conclusions to which no response is required. To the extent a response is required, Answering Defendants deny the allegations in Paragraph 34 of Plaintiff's Complaint.  Nonetheless, Answering Defendants have not challenged venue.

**FACTS RELATING TO CERTAIN DEFENDANTS' SUCCESSOR LIABILITY STATUS**

35.    To the extent that the allegations in Paragraph 35 quote from the referenced Declaration, Answering Defendants admit those allegations but state that the Declaration speaks for itself.

36.    Answering Defendants state that the allegations in Paragraph 36 of Plaintiff's Complaint call for a legal conclusion to which no response is necessary but responding further, Answering Defendants further deny the allegations in Paragraph 36 of Plaintiff's Complaint as stated.

37.    Denied.

38.    Answering Defendants admit that Old JJCI manufactured and marketed JOHNSON'S® Baby Powder and SHOWER TO SHOWER® during relevant time periods. Answering Defendants deny the characterization of those products as asbestos-containing products and deny the remaining allegations in Paragraph 38 of Plaintiff's Complaint.

39.    Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 39 of Plaintiff's Complaint is misleading and taken out of context.  Answering Defendants deny the allegations in Paragraph 39 of Plaintiff's Complaint as stated.

40.     Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 40 of Plaintiff's Complaint is misleading and taken out of context.  Answering Defendants deny the allegations in Paragraph 40 of Plaintiff's Complaint as stated.  Answering Defendants admit only that LTL is the sole successor-in-interest to Old JJCI's talc-related liabilities.

41.     Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 41 of Plaintiff's Complaint is misleading and taken out of context.   Answering Defendants deny the allegations in Paragraph 41 of Plaintiff's Complaint as stated.

42.     Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 42 of Plaintiff's Complaint is misleading and taken out of context.  Answering Defendants deny the allegations in Paragraph 42 of Plaintiff's Complaint as stated.

43.     Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 43 of Plaintiff's Complaint is misleading and taken out of context.  Answering Defendants deny the allegations in Paragraph 43 of Plaintiff's Complaint as stated.

44.     Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 44 of Plaintiff's Complaint is misleading and taken out of context.  Answering Defendants deny the allegations in Paragraph 44 of Plaintiff's Complaint as stated.

45.     Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 45 of Plaintiff's Complaint is misleading and taken out of context.  Answering Defendants deny the allegations in Paragraph 45 of Plaintiff's Complaint as stated.

46.     Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 46 of Plaintiff's Complaint is misleading and taken out of context.  Answering Defendants deny the allegations in Paragraph 46 of Plaintiff's Complaint as stated.

47.     Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 47 of Plaintiff's Complaint is misleading and taken out of context.  Answering Defendants deny the allegations in Paragraph 47 of Plaintiff's Complaint as stated.

48.     Answering Defendants state that the declaration cited in Paragraph 48 of Plaintiff's Complaint speaks for itself.  Answering Defendants further state that Plaintiff's interpretation of the events described in Paragraph 48 of Plaintiff's Complaint is misleading and taken out of context.  Answering Defendants deny the allegations in Paragraph 48 of Plaintiff's Complaint as stated.

49.     Answering Defendants state that Plaintiff's interpretation of the Declaration described in Paragraph 49 of Plaintiff's Complaint is misleading and taken out of context. Answering Defendants deny the allegations in Paragraph 49 of Plaintiff's Complaint as stated.

50.     Answering Defendants deny the allegations in Paragraph 50 of Plaintiff's Complaint and further state that LTL is the sole successor-in-interest to Old JJCI's talc-related liabilities.

51.     Answering Defendants deny the allegations in Paragraph 51 of Plaintiff's Complaint.

52.     Answering Defendants state that Plaintiff's interpretation of the events described and document cited in Paragraph 52 of Plaintiff's Complaint is misleading and taken out of context. Answering Defendants deny the allegations in Paragraph 52 of Plaintiff's Complaint as stated.

53.     The Kenvue S-1 speaks for itself; Answering Defendants admit the content of the document but deny that the Kenvue S-1 relates in any way to talc-based JOHNSON'S® Baby Powder or SHOWER TO SHOWER®, the products purportedly at issue in this lawsuit, which were

10

discontinued in the United States prior to the formation of Kenvue. Answering Defendants deny the allegations in Paragraph 53 of Plaintiff's Complaint as stated.

54.    Answering Defendants state that Plaintiff's interpretation of the document cited in Paragraph 54 of Plaintiff's Complaint is misleading and taken out of context.  Answering Defendants deny the allegations in Paragraph 54 of Plaintiff's Complaint as stated.

55.    Answering Defendants state that Plaintiff's interpretation of the document cited in Paragraph 55 of Plaintiff's Complaint is misleading and taken out of context.  Answering Defendants deny the allegations in Paragraph 55 of Plaintiff's Complaint as stated.

56.    Answering Defendants state that Plaintiff's interpretation of the document cited in Paragraph 56 of Plaintiff's Complaint is misleading and taken out of context.  Answering Defendants deny the allegations in Paragraph 56 of Plaintiff's Complaint as stated.

57.    Answering Defendants deny the allegations in Paragraph 57 and further state that LTL is the sole successor-in-interest to Old JJCI's talc-related liabilities.

58.    Answering Defendants admit that LTL's second bankruptcy has been dismissed. The remaining allegations in Paragraph 58 are legal conclusions to which no response is required. To the extent a response is required, Answering Defendants deny the remaining allegations in Paragraph 58.

59.    Answering Defendants are without sufficient knowledge or information to form a belief as to the accuracy of the allegations in Paragraph 59 of Plaintiff's Complaint and therefore deny the same.

## GENERAL ALLEGATIONS

60.    Admitted.

CASE NO. 50-2023-CA-014349-XXXA-MB (AH)

61.     Answering Defendants state that the Report referenced in Paragraph 61 of Plaintiff's Complaint speaks for itself.  Answering Defendants deny the remaining allegations in Paragraph 61 of Plaintiff's Complaint.

62.     Answering Defendants deny the allegations in Paragraph 62 of Plaintiff's Complaint as phrased.

63.     Answering Defendants deny the allegations in Paragraph 63 of Plaintiff's Complaint as phrased.

64.     Answering Defendants deny that J&J, LTL, Holdco, Kenvue, and/or Janssen manufactured or marketed the products at issue in this case during relevant time period. Answering Defendants state that Old JJCI manufactured and marketed JOHNSON'S® Baby Powder and SHOWER TO SHOWER® during relevant time periods and further state that Old JJCI's products, including the products at issue in this suit, were retailed and sold nationwide. Answering Defendants deny the remaining allegations in Paragraph 64 of Plaintiff's Complaint.

65.     The allegations in Paragraph 65 contain legal conclusions to which no response is required. To the extent a response is required, Answering Defendants deny the allegations in Paragraph 65.

66.     Answering Defendants admit that JOHNSON'S® Baby Powder and SHOWER TO SHOWER® contained talc and state that talc is a powdered, selected, natural, hydrated magnesium silicate that is mined from the earth.

67.     Answering Defendants state that talcum powders are comprised mainly of talc. Answering Defendants further state that JOHNSON'S® Baby Powder and SHOWER TO SHOWER® contained talc.

68.     Denied.

12

69.     Answering Defendants deny the allegations in Paragraph 69 of Plaintiff's Complaint.

70.     Answering Defendants deny the allegations in Paragraph 70 of Plaintiff's Complaint.

71.     Answering Defendants deny the allegations in Paragraph 71 of Plaintiff's Complaint.

72.     Answering Defendants state Old JJCI marketed JOHNSON'S® Baby Powder and SHOWER TO SHOWER® for use in accordance with the manufacturer-provided labeling accompanying the product during relevant time periods.  Answering Defendants further state that the marketing for JOHNSON'S® Baby Powder and SHOWER TO SHOWER®, referenced in Paragraph 72 of Plaintiff's Complaint, speaks for itself and that Plaintiff's allegations interpreting this marketing are misleading and taken out of context.   Answering Defendants deny the allegations in Paragraph 72 of Plaintiff's Complaint as stated.

73.     Answering Defendants deny that they marketed JOHNSON'S® Baby Powder and SHOWER TO SHOWER®, but state Old JJCI marketed JOHNSON'S® Baby Powder for use in accordance with the manufacturer-provided labeling accompanying the product during relevant time periods.  Answering Defendants further state that the marketing and advertisements quoted in Paragraph 73 of Plaintiff's Complaint speak for themselves and that Plaintiff's allegations regarding these advertisements or marketing are misleading and taken out of context.  Answering Defendants deny the allegations in Paragraph 73 of Plaintiff's Complaint as stated.

74.     Answering Defendants state Old JJCI marketed JOHNSON'S® Baby Powder for use in accordance with the manufacturer-provided labeling accompanying the product during relevant time periods.  Answering Defendants further state that the statements on the bottle of

13

JOHNSON'S® Baby Powder cited in Paragraph 74 of Plaintiff's Complaint speak for themselves and that Plaintiff's allegations regarding these statements are misleading and taken out of context. Answering Defendants deny the allegations in Paragraph 74 of Plaintiff's Complaint as stated.

75.     Answering Defendants deny that they marketed SHOWER TO SHOWER®, but state Old JJCI marketed SHOWER TO SHOWER® for use in accordance with the manufacturer-provided labeling accompanying the product during relevant time periods.  Answering Defendants further state that the marketing and advertisements quoted in Paragraph 75 of Plaintiff's Complaint speak for themselves and that Plaintiff's allegations regarding these advertisements and marketing are misleading and taken out of context.  Answering Defendants deny the allegations in Paragraph 75 of Plaintiff's Complaint as stated.

76.     Answering Defendants are without sufficient knowledge or information to form a belief as to the accuracy of the allegations in Paragraph 76 of Plaintiff's Complaint regarding the Decedent's use of the product and therefore deny the same. The remaining allegations in Paragraph 76 are legal conclusions to which no response is required. To the extent a response is required, the Answering Defendants deny the remaining allegations in Paragraph 76.

77.     Answering Defendants deny that allegations in Paragraph 77 of Plaintiff's Complaint.

78.     Answering Defendants state that the allegations in Paragraph 78 of Plaintiff's Complaint are legal conclusions to which no response is required, but, responding further, Answering Defendants deny the allegations in Paragraph 78 of Plaintiff's Complaint.

79.     Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 79 of Plaintiff's Complaint is erroneous and/or taken out of context.  As such,

Answering Defendants deny the allegations pertaining to the events described in Paragraph 79 of Plaintiff's Complaint and deny the remaining allegations in Paragraph 79 of Plaintiff's Complaint.

80.    Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 80 of Plaintiff's Complaint is erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations pertaining to the events described in Paragraph 80 of Plaintiff's Complaint and deny the remaining allegations in Paragraph 80 of Plaintiff's Complaint.

81.    Answering Defendants state that Plaintiff's interpretations of and conclusions drawn by the studies cited in Paragraph 81 of Plaintiff's Complaint are erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations pertaining to the studies cited in Paragraph 81 of Plaintiff's Complaint and deny the remaining allegations in Paragraph 81 of Plaintiff's Complaint.

82.    Answering Defendants state that Plaintiff's interpretations of the events described in Paragraph 82 of Plaintiff's Complaint are erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations pertaining to the events described in Paragraph 82 of Plaintiff's Complaint.

83.    Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 83 of Plaintiff's Complaint is erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations pertaining to the events described in Paragraph 83 of Plaintiff's Complaint.

84.    Answering Defendants deny the allegations in Paragraph 84 of Plaintiff's Complaint.

85.    Answering Defendants deny the allegations in Paragraph 85 of Plaintiff's Complaint.

86.     Answering Defendants state that Plaintiff's interpretations of and conclusions drawn by the study referenced in Paragraph 86 of Plaintiff's Complaint are erroneous and/or taken out of context.  Answering Defendants deny the allegations pertaining to the cited study and all remaining allegations in Paragraph 86 of Plaintiff's Complaint.

87.     Answering Defendants state that Plaintiff's interpretations of and conclusions drawn by the study cited in Paragraph 87 of Plaintiff's Complaint are erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations in Paragraph 87 of Plaintiff's Complaint.

88.     Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 88 of Plaintiff's Complaint is erroneous and/or taken out of context.  Further, Answering Defendants state that Plaintiff's interpretations of and conclusions drawn by the documents cited in Paragraph 88 of Plaintiff's Complaint are erroneous and/or taken out of context. As such, Answering Defendants deny the allegations in Paragraph 88 of Plaintiff's Complaint.

89.     Answering Defendants state that Plaintiff's interpretation of and conclusions drawn by the study cited in Paragraph 89 of Plaintiff's Complaint are erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations in Paragraph 89 of Plaintiff's Complaint.

90.     Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 90 of Plaintiff's Complaint are erroneous and/or taken out of context.  Further, Answering Defendants state that Plaintiff's interpretations of and conclusions drawn by the study cited in Paragraph 90 of Plaintiff's Complaint are erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations in Paragraph 90 of Plaintiff's Complaint.

91.     Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 91 of Plaintiff's Complaint is erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations in Paragraph 91 of Plaintiff's Complaint.

92.     Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 92 of Plaintiff's Complaint is erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations in Paragraph 92 of Plaintiff's Complaint.

93.     Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 93 of Plaintiff's Complaint is erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations in Paragraph 93 of Plaintiff's Complaint.

94.     Answering Defendants deny the allegations in Paragraph 94 of Plaintiff's Complaint.

95.     Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 95 of Plaintiff's Complaint is erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations in Paragraph 95 of Plaintiff's Complaint.

96.     Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 96 of Plaintiff's Complaint is erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations pertaining to the events described in Paragraph 96 of Plaintiff's Complaint and deny the remaining allegations in Paragraph 96 of Plaintiff's Complaint.

97.     Answering Defendants deny the allegations in Paragraph 97 of Plaintiff's Complaint.

98.     Answering Defendants deny the allegations in Paragraph 98 of Plaintiff's Complaint.

4869-9382-8495

99.     Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 99 of Plaintiff's Complaint is erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations in Paragraph 99 of Plaintiff's Complaint.

100.     Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 100 of Plaintiff's Complaint is erroneous and/or taken out of context.  Answering Defendants state that Plaintiff's interpretation of and conclusions drawn by the study cited in Paragraph 100 of Plaintiff's Complaint are erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations in Paragraph 100 of Plaintiff's Complaint.

101.     Answering Defendants deny the allegations in Paragraph 101 of Plaintiff's Complaint.

102.     Answering Defendants deny the allegations in Paragraph 102 of Plaintiff's Complaint.

103.     Answering Defendants state that Plaintiff's interpretations of the events described in Paragraph 103 of Plaintiff's Complaint are erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations pertaining to the events described in Paragraph 103 of Plaintiff's Complaint. Answering Defendants deny the remaining allegations in Paragraph 103 of Plaintiff's Complaint.

104.     Answering Defendants deny the allegations in Paragraph 104 of Plaintiff's Complaint.

105.     Answering Defendants deny the allegations in Paragraph 105 of Plaintiff's Complaint.

106.     Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 106 of Plaintiff's Complaint is erroneous and/or taken out of context.  As such,

Answering Defendants deny the allegations pertaining to the events described in Paragraph 106 of Plaintiff's Complaint and deny the remaining allegations in Paragraph 106 of Plaintiff's Complaint.

107.     Answering Defendants deny the allegations in Paragraph 107 of Plaintiff's Complaint.

108.     Answering Defendants state that Plaintiff's interpretation of the paper referenced in Paragraph 108 of Plaintiff's Complaint is taken out of context; the paper speaks for itself. Further, Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 108 of Plaintiff's Complaint is misleading and taken out of context.  Answering Defendants deny the allegations in Paragraph 108 of Plaintiff's Complaint as stated.

109.     Answering Defendants state that Plaintiff's interpretation of and conclusions drawn by the studies referenced in Paragraph 109 of Plaintiff's Complaint is erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations in Paragraph 109 of Plaintiff's Complaint.

110.     Answering Defendants state that Plaintiff's interpretation of and conclusions drawn by the paper referenced in Paragraph 110 of Plaintiff's Complaint are taken out of context and erroneous. As such, Answering Defendants deny the allegations in Paragraph 110 of Plaintiff's Complaint.

111.     Answering Defendants deny the allegations in Paragraph 111 of Plaintiff's Complaint.

112.     Answering Defendants state that Plaintiff's interpretation of and conclusions drawn by the letter and study referenced in Paragraph 112 of Plaintiff's Complaint are taken out of

context; the referenced letter and study speak for themselves. Answering Defendants deny the allegations in Paragraph 112 of Plaintiff's Complaint as stated.

113.    Paragraph 113 does not contain any allegations directed to Answering Defendants, and therefore no response is required.  Further, Answering Defendants state that Plaintiff's interpretations of and conclusions drawn by events in the condom industry referenced in Paragraph 113 of Plaintiff's Complaint are misleading and taken out of context. To the extent a response is required, Answering Defendants deny the allegations set forth in Paragraph 113 as stated.

114.    Answering Defendants state that Plaintiff's interpretation of the paper referenced in Paragraph 114 of Plaintiff's Complaint is taken out of context; the paper speaks for itself. Answering Defendants deny the allegations in Paragraph 114 of Plaintiff's Complaint as stated.

115.    Answering Defendants state that Plaintiff's allegations regarding the Act and regulations cited in Paragraph 115 of Plaintiff's Complaint are misleading and taken out of context. Answering Defendants deny the allegations in Paragraph 115 of Plaintiff's Complaint as stated.

116.    Answering Defendants state that Plaintiff's interpretations of the events described in Paragraph 116 of Plaintiff's Complaint are erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations in Paragraph 116 of Plaintiff's Complaint.

117.    Answering Defendants admit that the Cancer Prevention Coalition filed two Citizen Petitions with the Food and Drug Administration ("FDA") regarding talc products and further state that the interpretations of and conclusions drawn in the Citizen Petitions, as referenced by Plaintiff, are misleading and taken out of context.  Additionally, Answering Defendants admit that the FDA denied these two Citizen Petitions on April 1, 2014. Answering Defendants deny the remaining allegations in Paragraph 117 of Plaintiff's Complaint.

CASE NO. 50-2023-CA-014349-XXXA-MB (AH)

118.    Answering Defendants state that Plaintiff's interpretations of the events described in Paragraph 118 of Plaintiff's Complaint are erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations in Paragraph 118 of Plaintiff's Complaint.

119.    Answering Defendants state that Plaintiff's interpretation of and conclusions drawn by the study cited in Paragraph 119 of Plaintiff's Complaint is erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations in Paragraph 119 of Plaintiff's Complaint.

120.    Answering Defendants state that Plaintiff's interpretation of the pamphlet cited in Paragraph 120 of Plaintiff's Complaint is taken out of context; the pamphlet speaks for itself. Answering Defendants deny the allegations in Paragraph 120 of Plaintiff's Complaint as stated.

121.    Answering Defendants deny the allegations in Paragraph 121 of Plaintiff's Complaint.

122.    Answering Defendants deny the allegations in Paragraph 122 of Plaintiff's Complaint.

123.    Answering Defendants deny the allegations in Paragraph 123 of Plaintiff's Complaint.

124.    Answering Defendants deny the allegations in Paragraph 124 of Plaintiff's Complaint.

125.    Answering Defendants state that Plaintiff's interpretation of the FDA findings referenced in Paragraph 125 of Plaintiff's Complaint is taken out of context; the FDA findings speak for themselves. Answering Defendants admit that Old JJCI recalled a specific lot of JOHNSON'S® Baby Powder in October 2019. Answering Defendants deny all remaining allegations in Paragraph 125.

4869-9382-8495

126.    Answering Defendants deny the allegations in Paragraph 126 of Plaintiff's Complaint.

127.    Answering Defendants deny the allegations in Paragraph 127 of Plaintiff's Complaint.

128.    Answering Defendants deny the allegations in Paragraph 128 of Plaintiff's Complaint.

129.    Answering Defendants deny the allegations in Paragraph 129 of Plaintiff's Complaint.

130.    Answering Defendants deny the allegations in Paragraph 130 of Plaintiff's Complaint.

131.    Answering Defendants deny the allegations in Paragraph 131 of Plaintiff's Complaint.

132.    Answering Defendants deny the allegations in Paragraph 132 of Plaintiff's Complaint, and Answering Defendants specifically deny that cosmetic grade talc causes ovarian cancer.

133.    Answering Defendants deny the allegations in Paragraph 133 of Plaintiff's Complaint, and Answering Defendants specifically deny that cosmetic grade talc causes ovarian cancer.

134.    Answering Defendants deny the allegations in Paragraph 134 of Plaintiff's Complaint.

### Count I: Strict Liability-Failure to Warn
### (Against Defendant Imerys)

Count I is not alleged against the Answering Defendants and, therefore, no response is required. To the extent a response is required, Answering Defendants deny the allegations in Count

CASE NO. 50-2023-CA-014349-XXXA-MB (AH)

I, including those in Paragraphs 135 to 144. Answering Defendants further deny the allegations in the "Wherefore" clause immediately following Paragraph 144.  Answering Defendants further deny that Plaintiff is entitled to any relief.

### Count II: Strict Liability-Failure to Warn
**(Against The J&J Defendants)**

Answering Defendants incorporate by reference as if fully set forth herein their responses to the allegations contained in Paragraphs 1 through 134 of Plaintiff's Complaint.

145.    Answering Defendants admit that Old JJCI manufactured, designed, and marketed JOHNSON'S® Baby Powder and SHOWER TO SHOWER® during relevant time periods and retailed and sold the products nationwide. Answering Defendants deny the remaining allegations in Paragraph 145 of Plaintiff's Complaint.

146.    Answering Defendants deny the allegations in Paragraph 146 of Plaintiff's Complaint, and Answering Defendants specifically deny that cosmetic grade talc causes ovarian cancer.

147.    Answering Defendants deny the allegations in Paragraph 147 of Plaintiff's Complaint, and Answering Defendants specifically deny that cosmetic grade talc causes ovarian cancer.

148.    Answering Defendants are without knowledge or information sufficient to form a belief as to the allegations in Paragraph 148 of Plaintiff's Complaint concerning Decedent's alleged use of the products at issue and, therefore, Answering Defendants deny the same. Answering Defendants state that Old JJCI marketed JOHNSON'S® Baby Powder and SHOWER TO SHOWER® for use in accordance with the manufacturer-provided labeling accompanying the products during relevant time periods.  Answering Defendants deny the remaining allegations in Paragraph 148 of Plaintiff's Complaint.

23

149.    Answering Defendants deny the allegations in Paragraph 149 of Plaintiff's Complaint, and Answering Defendants specifically deny that cosmetic grade talc causes ovarian cancer.

150.    Answering Defendants deny the allegations in Paragraph 150 of Plaintiff's Complaint, and Answering Defendants specifically deny that cosmetic grade talc causes ovarian cancer.

151.    Answering Defendants deny the allegations in Paragraph 151 of Plaintiff's Complaint, and Answering Defendants specifically deny that cosmetic grade talc causes ovarian cancer.

152.    Answering Defendants deny the allegations in Paragraph 152 of Plaintiff's Complaint, including its subparts.

153.    Answering Defendants deny the allegations in Paragraph 153 of Plaintiff's Complaint, including its subparts.

Answering Defendants further deny the allegations in the "Wherefore" clause immediately following Paragraph 153and deny that Plaintiff is entitled to any relief.

### Count III: Strict Liability-Defective Manufacture and Design
**(Against Defendant Imerys)**

Count III is not alleged against the Answering Defendants and, therefore, no response is required. To the extent a response is required, Answering Defendants deny the allegations in Count III, including those in Paragraphs 154 to 161. Answering Defendants further deny the allegations in the "Wherefore" clause immediately following Paragraph 161.  Answering Defendants further deny that Plaintiff is entitled to any relief.

## Count IV: Strict Liability- Defective Manufacture and Design
### (Against The J&J Defendants)

Answering Defendants incorporate by reference as if fully set forth herein their responses to the allegations contained in Paragraphs 1 through 134 of Plaintiff's Complaint.

162.    Answering Defendants admit that Old JJCI manufactured, designed, and marketed JOHNSON'S® Baby Powder and SHOWER TO SHOWER® during relevant time periods, and retailed and sold the products nationwide.  Answering Defendants deny the remaining allegations in Paragraph 162 of Plaintiff's Complaint.

163.    Answering Defendants deny the allegations in Paragraph 163 of Plaintiff's Complaint.

164.    Answering Defendants deny the allegations in Paragraph 164 of Plaintiff's Complaint.

165.    Answering Defendants deny the allegations in Paragraph 165 of Plaintiff's Complaint.

166.    Answering Defendants deny the allegations in Paragraph 166 of Plaintiff's Complaint.

167.    Answering Defendants deny the allegations in Paragraph 167 of Plaintiff's Complaint, and Answering Defendants specifically deny that cosmetic grade talc causes ovarian cancer.

168.    Answering Defendants deny the allegations in Paragraph 168 of Plaintiff's Complaint, including its subparts.

169.    Answering Defendants deny the allegations in Paragraph 169 of Plaintiff's Complaint, including its subparts.

CASE NO. 50-2023-CA-014349-XXXA-MB (AH)

Answering Defendants further deny the allegations in the "Wherefore" clause immediately following Paragraph 169.  Answering Defendants further deny that Plaintiff is entitled to any relief.

### Count V: Breach of Express Warranties
### (Against The J&J Defendants)

Answering Defendants incorporate by reference as if fully set forth herein their responses to the allegations contained in Paragraphs 1 through 134 of Plaintiff's Complaint.

170.    Answering Defendants state that Old JJCI marketed JOHNSON'S® Baby Powder and SHOWER TO SHOWER® for use in accordance with the manufacturer-provided labeling accompanying the products during relevant time periods.  Answering Defendants further state that the statements on the bottles of JOHNSON'S® Baby Powder and SHOWER TO SHOWER® and advertisements for JOHNSON'S® Baby Powder and SHOWER TO SHOWER® speak for themselves.  Answering Defendants deny the remaining allegations in Paragraph 170 of Plaintiff's Complaint, including its subpart.

171.    Answering Defendants state that Old JJCI marketed JOHNSON'S® Baby Powder and SHOWER TO SHOWER® for use in accordance with the manufacturer-provided labeling accompanying the products during relevant time periods.  Answering Defendants further state that the statements on the bottles of JOHNSON'S® Baby Powder and SHOWER TO SHOWER® and advertisements for JOHNSON'S® Baby Powder and SHOWER TO SHOWER® speak for themselves.  Answering Defendants deny the remaining allegations in Paragraph 171 of Plaintiff's Complaint.

172.    Answering Defendants deny the allegations in Paragraph 172 of Plaintiff's Complaint, and Answering Defendants specifically deny that cosmetic grade talc causes ovarian cancer.

4869-9382-8495

173.    Answering Defendants deny the allegations in Paragraph 173 of Plaintiff's Complaint.

174.    Answering Defendants deny the allegations in Paragraph 174 of Plaintiff's Complaint.

175.    Answering Defendants deny the allegations in Paragraph 175 of Plaintiff's Complaint.

176.    Answering Defendants deny the allegations in Paragraph 176 of Plaintiff's Complaint, and Answering Defendants specifically deny that cosmetic grade talc causes ovarian cancer.

177.    Answering Defendants deny the allegations in Paragraph 177 of Plaintiff's Complaint, including its subparts.

178.    Answering Defendants deny the allegations in Paragraph 178 of Plaintiff's Complaint, including its subparts.

Answering Defendants further deny the allegations in the "Wherefore" clause immediately following Paragraph 178.  Answering Defendants further deny that Plaintiff is entitled to any relief.

### Count VI: Breach of Implied Warranty of Merchantability
**(Against The J&J Defendants)**

Answering Defendants incorporate by reference as if fully set forth herein their responses to the allegations contained in Paragraphs 1 through 134 of Plaintiff's Complaint.

179.    Answering Defendants deny the allegations in Paragraph 179 of Plaintiff's Complaint.

180.    Answering Defendants deny the allegations in Paragraph 180 of Plaintiff's Complaint.

4869-9382-8495

181.    Answering Defendants deny the allegations in Paragraph 181 of Plaintiff's Complaint, and Answering Defendants specifically deny that cosmetic grade talc causes ovarian cancer.

182.    Answering Defendants deny the allegations in Paragraph 182 of Plaintiff's Complaint.

183.    Answering Defendants deny the allegations in Paragraph 183 of Plaintiff's Complaint, and Answering Defendants specifically deny that cosmetic grade talc causes ovarian cancer.

184.    Answering Defendants deny the allegations in Paragraph 184 of Plaintiff's Complaint.

185.    Answering Defendants deny the allegations in Paragraph 185 of Plaintiff's Complaint, and Answering Defendants specifically deny that cosmetic grade talc causes ovarian cancer.

186.    Answering Defendants deny the allegations in Paragraph 186 of Plaintiff's Complaint, including its subparts.

187.    Answering Defendants deny the allegations in Paragraph 187 of Plaintiff's Complaint, including its subparts.

Answering Defendants further deny the allegations in the "Wherefore" clause immediately following Paragraph 187 and deny that Plaintiff is entitled to any relief.

**Count VII: Breach of Implied Warranty of Fitness for a Particular Purpose**
**(Against The J&J Defendants)**

Answering Defendants incorporate by reference as if fully set forth herein their responses to the allegations contained in Paragraphs 1 through 134 of Plaintiff's Complaint.

188.    Answering Defendants deny the allegations in Paragraph 188 of Plaintiff's Complaint.

189.    Answering Defendants deny the allegations in Paragraph 189 of Plaintiff's Complaint.

190.    Answering Defendants deny the allegations in Paragraph 190 of Plaintiff's Complaint.

191.    Answering Defendants deny the allegations in Paragraph 191 of Plaintiff's Complaint.

192.    Answering Defendants deny the allegations in Paragraph 192 of Plaintiff's Complaint, and Answering Defendants specifically deny that cosmetic grade talc causes ovarian cancer.

193.    Answering Defendants deny the allegations in Paragraph 193 of Plaintiff's Complaint.

194.    Answering Defendants deny the allegations in Paragraph 194 of Plaintiff's Complaint, and Answering Defendants specifically deny that cosmetic grade talc causes ovarian cancer.

195.    Answering Defendants deny the allegations in Paragraph 195 of Plaintiff's Complaint, including its subparts.

196.    Answering Defendants deny the allegations in Paragraph 196 of Plaintiff's Complaint, including its subparts

Answering Defendants further deny the allegations in the "Wherefore" clause immediately following Paragraph 196 and deny that Plaintiff is entitled to any relief.

### Count VIII: Negligence
### (Against Defendant Imerys)

Count VIII is not alleged against the Answering Defendants and, therefore, no response is required. To the extent a response is required, Answering Defendants deny the allegations in Count VIII, including those in Paragraphs 197 to 204. Answering Defendants further deny the allegations in the "Wherefore" clause immediately following Paragraph 204.  Answering Defendants further deny that Plaintiff is entitled to any relief.

### Count IX: Negligence
### (Against The J&J Defendants)

Answering Defendants incorporate by reference as if fully set forth herein their responses to the allegations contained in Paragraphs 1 through 134 of Plaintiff's Complaint.

205.    Answering Defendants state that Old JJCI manufactured, designed, and marketed JOHNSON'S® Baby Powder and SHOWER TO SHOWER® during relevant time periods. Answering Defendants deny the remaining allegations in Paragraph 205 of Plaintiff's Complaint.

206.    Answering Defendants state that the allegations in Paragraph 206 of Plaintiff's Complaint pertaining to "duty" are legal conclusions to which no response is necessary but, responding further, Answering Defendants deny those allegations to the extent they seek to impose obligations on Answering Defendants beyond those required by law.  Answering Defendants deny the remaining allegations in Paragraph 206 of Plaintiff's Complaint.

207.    Answering Defendants state that the allegations in Paragraph 207 of Plaintiff's Complaint pertaining to "duty" are legal conclusions to which no response is necessary but, responding further, Answering Defendants deny those allegations to the extent they seek to impose obligations on Answering Defendants beyond those required by law.  Answering Defendants deny the remaining allegations in Paragraph 207 of Plaintiff's Complaint.

208.     Answering Defendants deny the allegations in Paragraph 208 of Plaintiff's Complaint.

209.     Answering Defendants deny the allegations in Paragraph 209 of Plaintiff's Complaint.

210.     Answering Defendants deny the allegations in Paragraph 210 of Plaintiff's Complaint, and Answering Defendants specifically deny that cosmetic grade talc causes ovarian cancer.

211.     Answering Defendants deny the allegations in Paragraph 211 of Plaintiff's Complaint, and Answering Defendants specifically deny that cosmetic grade talc causes ovarian cancer.

212.     Answering Defendants deny the allegations in Paragraph 212 of Plaintiff's Complaint, and Answering Defendants specifically deny that cosmetic grade talc causes ovarian cancer.

213.     Answering Defendants deny the allegations in Paragraph 213 of Plaintiff's Complaint, including its subparts.

Answering Defendants further deny the allegations in the "Wherefore" clause immediately following Paragraph 213 and further deny that Plaintiff is entitled to any relief.

### Count X: Fraudulent Concealment
### (Against Defendant Imerys)

Count X is not alleged against the Answering Defendants and, therefore, no response is required. To the extent a response is required, Answering Defendants deny the allegations in Count X, including those in Paragraphs 214 to 281. Answering Defendants further deny the allegations in the "Wherefore" clause immediately following Paragraph 281.  Answering Defendants further deny that Plaintiff is entitled to any relief.

### Count XI: Fraudulent Concealment
**(Against The J&J Defendants)**

Answering Defendants incorporate by reference as if fully set forth herein their responses to the allegations contained in Paragraphs 1 through 134 of Plaintiff's Complaint.

282.    Answering Defendants deny the allegations in Paragraph 282 of Plaintiff's Complaint.

283.    Answering Defendants deny the allegations in Paragraph 283 of Plaintiff's Complaint.

284.    Answering Defendants state that the allegations in Paragraph 284 of Plaintiff's Complaint are legal conclusions to which no response is required, but, responding further, Answering Defendants deny the allegations in Paragraph 284 of Plaintiff's Complaint.

285.    Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 285 of Plaintiff's Complaint is erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations pertaining to the events described in Paragraph 285 of Plaintiff's Complaint and deny the remaining allegations in Paragraph 285 of Plaintiff's Complaint.

286.    Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 286 of Plaintiff's Complaint are erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations pertaining to the events described in Paragraph 286 of Plaintiff's Complaint and further deny the remaining allegations in Paragraph 286 of Plaintiff's Complaint.

287.    Answering Defendants state that Plaintiff's interpretation of and conclusions drawn by the studies cited in Paragraph 287 of Plaintiff's Complaint are erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations pertaining to the studies cited in

32

Paragraph 287 of Plaintiff's Complaint and deny the remaining allegations in Paragraph 287 of Plaintiff's Complaint.

288.    Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 288 of Plaintiff's Complaint is erroneous and/or taken out of context. Answering Defendants state that Plaintiff's interpretation of and conclusions drawn by the study cited in Paragraph 288 of Plaintiff's Complaint are erroneous and/or taken out of context. As such, Answering Defendants deny the allegations in Paragraph 288 of Plaintiff's Complaint.

289.    Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 289 of Plaintiff's Complaint is erroneous and/or taken out of context. Answering Defendants state that Plaintiff's interpretation of and conclusions drawn by the studies referenced in Paragraph 289 of Plaintiff's Complaint are erroneous and/or taken out of context. As such, Answering Defendants deny the allegations in Paragraph 289 of Plaintiff's Complaint.

290.    Answering Defendants deny the allegations in Paragraph 290 of Plaintiff's Complaint.

291.    Answering Defendants state that Plaintiff's interpretations of the events described in Paragraph 291 of Plaintiff's Complaint are erroneous and/or taken out of context. As such, Answering Defendants deny the allegations in Paragraph 291 of Plaintiff's Complaint.

292.    Answering Defendants state that Plaintiff's interpretations of and conclusions drawn by the study referenced in Paragraph 292 of Plaintiff's Complaint are erroneous and/or taken out of context. As such, Answering Defendants deny the allegations pertaining to the cited study and all remaining allegations in Paragraph 292 of Plaintiff's Complaint.

293.    Answering Defendants state that Plaintiff's interpretation of and conclusions drawn by the study cited in Paragraph 293 of Plaintiff's Complaint are erroneous and/or taken out of

context.  As such, Answering Defendants deny the allegations in Paragraph 293 of Plaintiff's Complaint.

294.    Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 294 of Plaintiff's Complaint are erroneous and/or taken out of context.  Further, Answering Defendants state that Plaintiff's interpretation of and conclusions drawn by the documents cited in Paragraph 294 of Plaintiff's Complaint are erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations in Paragraph 294 of Plaintiff's Complaint.

295.    Answering Defendants state that Plaintiff's interpretation of the study cited in Paragraph 295 of Plaintiff's Complaint is erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations in Paragraph 295 of Plaintiff's Complaint.

296.    Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 296 of Plaintiff's Complaint are erroneous and/or taken out of context.  Further, Answering Defendants state that Plaintiff's interpretation of and conclusions drawn by the study cited in Paragraph 296 of Plaintiff's Complaint are erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations in Paragraph 296 of Plaintiff's Complaint.

297.    Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 297 of Plaintiff's Complaint is erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations in Paragraph 297 of Plaintiff's Complaint.

298.    Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 298 of Plaintiff's Complaint is erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations in Paragraph 298 of Plaintiff's Complaint.

299.    Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 299 of Plaintiff's Complaint is erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations in Paragraph 299 of Plaintiff's Complaint.

300.    Answering Defendants deny the allegations in Paragraph 300 of Plaintiff's Complaint.

301.    Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 301 of Plaintiff's Complaint is erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations in Paragraph 301 of Plaintiff's Complaint.

302.    Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 302 of Plaintiff's Complaint is erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations in Paragraph 302 of Plaintiff's Complaint.

303.    Answering Defendants deny the allegations in Paragraph 303 of Plaintiff's Complaint.

304.    Answering Defendants deny the allegations in Paragraph 304 of Plaintiff's Complaint.

305.    Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 305 of Plaintiff's Complaint is erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations in Paragraph 305 of Plaintiff's Complaint.

306.    Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 306 of Plaintiff's Complaint are erroneous and/or taken out of context.  Further, Answering Defendants state that Plaintiff's interpretation of and conclusions drawn by the study cited in Paragraph 306 of Plaintiff's Complaint are erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations in Paragraph 306 of Plaintiff's Complaint.

35

307.     Answering Defendants deny the allegations in Paragraph 307 of Plaintiff's Complaint.

308.     Answering Defendants deny the allegations in Paragraph 308 of Plaintiff's Complaint.

309.     Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 309 of Plaintiff's Complaint is erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations pertaining to the events described in Paragraph 309 of Plaintiff's Complaint and deny the remaining allegations in Paragraph 309 of Plaintiff's Complaint.

310.     Answering Defendants deny the allegations in Paragraph 310 of Plaintiff's Complaint.

311.     Answering Defendants deny the allegations in Paragraph 311 of Plaintiff's Complaint.

312.     Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 312 of Plaintiff's Complaint is erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations pertaining to the events described in Paragraph 312 of Plaintiff's Complaint and deny the remaining allegations in Paragraph 312 of Plaintiff's Complaint.

313.     Answering Defendants deny the allegations in Paragraph 313 of Plaintiff's Complaint.

314.     Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 314 of Plaintiff's Complaint is erroneous and/or taken out of context.  Answering Defendants state that Plaintiff's interpretation of and conclusions drawn by the study cited in

36

Paragraph 314 of Plaintiff's Complaint are erroneous and/or taken out of context. As such, Answering Defendants deny the allegations in Paragraph 314 of Plaintiff's Complaint.

315. Answering Defendants state that Plaintiff's interpretation of and conclusions drawn by the studies referenced in Paragraph 315 of Plaintiff's Complaint are erroneous and/or taken out of context. As such, Answering Defendants deny the allegations in Paragraph 315 of Plaintiff's Complaint.

316. Answering Defendants state that Plaintiff's interpretation of and conclusions drawn by the study cited in Paragraph 316 of Plaintiff's Complaint are erroneous and/or taken out of context. As such, Answering Defendants deny the allegations in Paragraph 316 of Plaintiff's Complaint.

317. Answering Defendants deny the allegations in Paragraph 317 of Plaintiff's Complaint.

318. Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 318 of Plaintiff's Complaint is erroneous and/or taken out of context. Answering Defendants state that Plaintiff's interpretation of and conclusions drawn by the letter and study cited in Paragraph 318 of Plaintiff's Complaint are erroneous and/or taken out of context. As such, Answering Defendants deny the allegations in Paragraph 318 of Plaintiff's Complaint.

319. Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 319 of Plaintiff's Complaint is erroneous and/or taken out of context. As such, Answering Defendants deny the allegations in Paragraph 319 of Plaintiff's Complaint.

320. Answering Defendants state that Plaintiff's interpretation of and conclusions drawn by the paper cited in Paragraph 320 of Plaintiff's Complaint is erroneous and/or taken out of

context.  As such, Answering Defendants deny the allegations in Paragraph 320 of Plaintiff's Complaint.

321.    Answering Defendants state that Plaintiff's interpretation of the events described and the Act referenced in Paragraph 321 of Plaintiff's Complaint is erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations in Paragraph 321 of Plaintiff's Complaint.

322.    Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 322 of Plaintiff's Complaint is erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations in Paragraph 322 of Plaintiff's Complaint.

323.    Answering Defendants admit that the Cancer Prevention Coalition filed a Citizen Petitions with the Food and Drug Administration ("FDA") regarding talc products and further state that the interpretations of and conclusions drawn in the Citizen Petitions, as cited by Plaintiff, are erroneous and/or taken out of context.  Answering Defendants specifically deny that cosmetic grade talc causes ovarian cancer, and Answering Defendants deny all remaining allegations in Paragraph 323 of Plaintiff's Complaint.

324.    Answering Defendants state that Plaintiff's interpretation of the events described in Paragraph 324 of Plaintiff's Complaint is erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations in Paragraph 324 of Plaintiff's Complaint.

325.    Answering Defendants state that Plaintiff's interpretation of and conclusions drawn by the study cited in Paragraph 325 of Plaintiff's Complaint are erroneous and/or taken out of context.  As such, Answering Defendants deny the allegations in Paragraph 325 of Plaintiff's Complaint.

326.    Answering Defendants state that Plaintiff's interpretation of and conclusions drawn by the pamphlet cited in Paragraph 326 of Plaintiff's Complaint are erroneous and/or taken out of context.    As such, Answering Defendants deny the allegations in Paragraph 326 of Plaintiff's Complaint.

327.    Answering Defendants deny the allegations in Paragraph 327 of Plaintiff's Complaint.

328.    Answering Defendants deny the allegations in Paragraph 328 of Plaintiff's Complaint.

329.    Answering Defendants deny the allegations in Paragraph 329 of Plaintiff's Complaint.

330.    Answering Defendants deny the allegations in Paragraph 330 of Plaintiff's Complaint.

331.    Answering Defendants deny the allegations in Paragraph 331 of Plaintiff's Complaint.

332.    Answering Defendants deny the allegations in Paragraph 332 of Plaintiff's Complaint.

333.    Answering Defendants deny the allegations in Paragraph 333 of Plaintiff's Complaint.

334.    Answering Defendants deny the allegations in Paragraph 334 of Plaintiff's Complaint.

335.    Answering Defendants deny the allegations in Paragraph 335 of Plaintiff's Complaint.

CASE NO. 50-2023-CA-014349-XXXA-MB (AH)

336.    Answering Defendants deny the allegations in Paragraph 336 of Plaintiff's Complaint.

337.    Answering Defendants deny the allegations in Paragraph 337 of Plaintiff's Complaint.

338.    Answering Defendants deny the allegations in Paragraph 338 of Plaintiff's Complaint, and Answering Defendants specifically deny that cosmetic grade talc causes ovarian cancer.

339.    Answering Defendants deny the allegations in Paragraph 339 of Plaintiff's Complaint, and Answering Defendants specifically deny that cosmetic grade talc causes ovarian cancer.

340.    Answering Defendants deny the allegations in Paragraph 340 of Plaintiff's Complaint.

341.    Answering Defendants deny the allegations in Paragraph 341 of Plaintiff's Complaint.

342.    Answering Defendants deny the allegations in Paragraph 342 of Plaintiff's Complaint.

343.    Answering Defendants deny the allegations in Paragraph 343 of Plaintiff's Complaint.

344.    Answering Defendants deny the allegations in Paragraph 344 of Plaintiff's Complaint.

345.    Answering Defendants deny the allegations in Paragraph 345 of Plaintiff's Complaint, and Answering Defendants specifically deny that cosmetic grade talc causes ovarian cancer.

4869-9382-8495

346.     Answering Defendants deny the allegations in Paragraph 346 of Plaintiff's Complaint.

347.     Answering Defendants deny the allegations in Paragraph 347 of Plaintiff's Complaint.

348.     Answering Defendants deny the allegations in Paragraph 348 of Plaintiff's Complaint.

349.     Answering Defendants deny the allegations in Paragraph 349 of Plaintiff's Complaint, and Answering Defendants specifically deny that cosmetic grade talc causes ovarian cancer.

350.     Answering Defendants deny the allegations in Paragraph 350 of Plaintiff's Complaint, including its subparts.

351.     Answering Defendants deny the allegations in Paragraph 351 of Plaintiff's Complaint, including its subparts.

Answering Defendants further deny the allegations in the "Wherefore" clause immediately following Paragraph 351 and further deny that Plaintiff is entitled to any relief.

## Count XII: Strict Liability
### (Against Defendant Publix)

Count XII is not alleged against the Answering Defendants and, therefore, no response is required. To the extent a response is required, Answering Defendants deny the allegations in Count XII, including those in Paragraphs 352 to 362. Answering Defendants further deny the allegations in the "Wherefore" clause immediately following Paragraph 362. Answering Defendants further deny that Plaintiff is entitled to any relief.

## Count XIII: Negligence
### (Against Defendant Publix)

Count XIII is not alleged against the Answering Defendants and, therefore, no response is required. To the extent a response is required, Answering Defendants deny the allegations in Count XIII, including those in Paragraphs 363 to 373. Answering Defendants further deny the allegations in the "Wherefore" clause immediately following Paragraph 373. Answering Defendants further deny that Plaintiff is entitled to any relief.

### Damages

Answering Defendants incorporate by reference as if fully set forth herein their responses to the allegations contained in Paragraphs 1 to 373 of Plaintiff's Complaint.

374.    Answering Defendants deny the allegations in Paragraph 374 of Plaintiff's Complaint and specifically deny that cosmetic grade talc causes ovarian cancer.

375.    Answering Defendants deny the allegations in Paragraph 375 of Plaintiff's Complaint and specifically deny that cosmetic grade talc causes ovarian cancer.

376.    Answering Defendants deny the allegations in Paragraph 376 of Plaintiff's Complaint.

377.    Answering Defendants deny the allegations in Paragraph 377 of Plaintiff's Complaint.

378.    Answering Defendants deny the allegations in Paragraph 378 of Plaintiff's Complaint.

379.    Answering Defendants deny the allegations in Paragraph 379 of Plaintiff's Complaint.

380.    Answering Defendants deny the allegations in Paragraph 380 of Plaintiff's Complaint.

4869-9382-8495

## Relief Requested

Answering Defendants deny the allegations in the "Relief Requested" section at the conclusion of the Complaint, including the allegations in Paragraphs 381 to 390, in which Plaintiff includes a prayer for relief against Defendants.

## DEFENSES AND AFFIRMATIVE DEFENSES

Having answered the allegations in Plaintiff's Complaint and having denied any liability whatsoever, Answering Defendants further deny any allegations that have not been expressly admitted and assert the following defenses and affirmative defenses. By asserting the matters set forth below, Answering Defendants do not allege or admit that they have the burden of proof and/or the burden of persuasion with respect to any of these matters. Answering Defendants assert as follows:

### FIRST DEFENSE

The Complaint and each claim contained therein fails to states a claim upon which relief can be granted.

### SECOND DEFENSE

Answering Defendants preserve all defenses relating to lack of personal jurisdiction and improper venue, including forum non conveniens.

### THIRD DEFENSE

The claims asserted in the Complaint are barred, in whole or in part, because the Food and Drug Administration (FDA) has exclusive or primary jurisdiction over the matters asserted in Plaintiff's Complaint.

### FOURTH DEFENSE

The claims asserted in the Complaint are preempted by federal law, including (without limitation) the Federal Food, Drug, and Cosmetic Act (FDCA).

4869-9382-8495

## FIFTH DEFENSE

To the extent Plaintiff asserts claims that depend solely on violations of federal law, including any claims of a "fraud on the FDA" with respect to Defendant disclosure of information related to the safety of the products, such claims are barred and should be dismissed. *See Buckman v. Plaintiff's Legal Comm.*, 531 U.S. 341 (2001).

## SIXTH DEFENSE

The activities of the Answering Defendants alleged in Plaintiff's Complaint conformed with all state and federal statutes, regulations, and industry standards, including the FDA and the FDCA, based upon the states of knowledge existing at the relevant time(s) alleged in Plaintiff's Complaint. Answering Defendants fully assert the benefits of Fla. Stat. § 768.1256 and state that the product(s) at issue complied with mandatory safety standards or regulations adopted and promulgated by the federal government that were applicable to the product at the time of manufacture and that governed the product risk that allegedly caused harm.

## SEVENTH DEFENSE

Plaintiff may not recover from Answering Defendants because the methods, standards, or techniques of designing, manufacturing, and labeling of the product at issue complied with and were in conformity with the generally recognized states of the art at the time the product was designed, manufactured, and labeled. Answering Defendants invoke Fla. Stat. § 768.1257 and all states of the art defenses applicable to Plaintiff's claims.

## EIGHTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by the applicable statute of limitations, including Florida's two year statute of limitations for wrongful death actions, Fla. Stat. § 95.11, and the applicable statutes of repose.

## NINTH DEFENSE

Should Answering Defendants be held liable to Plaintiff, which liability is specifically denied, Answering Defendants would be entitled to a set-off for all sums of money received or available from or on behalf of any tortfeasor(s) for the same injuries alleged in Plaintiff's Complaint. Answering Defendants further plead the benefits of Fla. Stat. § 768.76.

## TENTH DEFENSE

To the extent that Plaintiff's claims have been settled or Plaintiff will in the future settle with any person or entity with respect to the injuries asserted in Plaintiff's Complaint, any liability of Answering Defendants, if any, should be reduced accordingly.

## ELEVENTH DEFENSE

Any verdict or judgment that might be recovered by Plaintiff must be reduced by those amounts that have already or will in the future, with reasonable certainty, indemnify Plaintiff in whole or in part for any past or future claimed economic loss from any collateral source such as insurance, social security, workers' compensation, or employee benefit program. To the extent that Plaintiff is seeking recovery for any benefits from any other source for injuries and damages alleged, such benefits are not recoverable in this action under applicable law.

## TWELFTH DEFENSE

Plaintiff's injuries and damages, if any, are barred in whole or in part by the actions, omissions, and/or conduct of third parties over whom Defendants had no control or authority and, thus, any recovery should be reduced or barred by such parties' proportionate fault.

## THIRTEENTH DEFENSE

Plaintiff's claims are barred and/or reduced by Decedent's contributory or comparative fault.

4869-9382-8495

## FOURTEENTH DEFENSE

Should Answering Defendants be held liable to Plaintiff, which liability is specifically denied, such liability is several, rather than joint, and should be prorated. Answering Defendants further plead the benefits of Fla. Stat. §§ 768.31 and 768.81.

## FIFTEENTH DEFENSE

Pursuant to *Fabre v. Marin,* 623 So. 2d 1182 (Fla. 1993), *Allied-Signal, Inc. v. Fox,* 623 So. 2d 1180 (Fla. 1993), and *Messmer v. Teachers' Ins. Co.,* 588 So. 2d 610 (Fla. 5th DCA 1991), any damages awarded to Plaintiff are subject to apportionment by the jury of the total fault of all participants, including Plaintiff, Decedent, and any additional entities or persons revealed through discovery. Answering Defendants specifically reserve the right to amend this Answer to identify any such parties or non-parties to have such parties or non-parties included on the verdict form pursuant to *Nash v. Wells Fargo Guard Servs., Inc.,* 678 So. 2d 1262 (Fla. 1996).

## SIXTEENTH DEFENSE

Plaintiff's claims are barred by the assumption of the risks alleged in Plaintiff's Complaint.

## SEVENTEENTH DEFENSE

Plaintiff's claims are barred because the risks, if any, associated with the use of the product at issue are outweighed by their utility.

## EIGHTEENTH DEFENSE

Plaintiff's claims are barred, reduced and/or limited pursuant to applicable statutory and common law regarding limitations of awards, caps on recovery, and setoffs.

## NINETEENTH DEFENSE

If Plaintiff has sustained any injuries or damages, such were the result of intervening or superseding events, factors, occurrences or conditions, which were in no way caused by Answering Defendants and for which Answering Defendants are not liable.

4869-9382-8495

### TWENTIETH DEFENSE

Plaintiff's claims are barred, in whole or in part, by doctrines of laches, waiver, unclean hands, estoppel and/or ratification.

### TWENTY-FIRST DEFENSE

To the extent that Plaintiff's claims relate to Answering Defendants' advertising, public statements, lobbying, or other activities protected by the First Amendment to the Constitution of the United States or by the Constitution of the States of Florida or that of any other states whose laws may apply, such claims are barred. Plaintiff's claims are also barred in whole or in part by the *Noerr-Pennington* Doctrine.

### TWENTY-SECOND DEFENSE

Plaintiff's claims are barred, in whole or in part, by Plaintiff's failure to mitigate any damages allegedly sustained.

### TWENTY-THIRD DEFENSE

Decedent's injuries and damages, if any, were the direct result of Decedent's pre-existing medical conditions, idiosyncratic reaction to the product at issue, and/or occurred by operation of nature or as a result of circumstances over which Defendants had and continue to have no control.

### TWENTY-FOURTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by the alteration, modification, misuse or unforeseeable use by Plaintiff or third parties of the product at issue.

### TWENTY-FIFTH DEFENSE

Plaintiff's claims are barred by the doctrine described in Section 4 of the Restatement (Third) of Torts: Products Liability because the product(s) at issue complied with applicable product safety statutes and administrative regulations.

## TWENTY-SIXTH DEFENSE

Plaintiff's warranty-based claims are barred by Plaintiff's failure to give proper or timely notice of any alleged defect or breach of warranty.

## TWENTY-SEVENTH DEFENSE

To the extent Plaintiff seeks punitive or exemplary damages, such claims are barred or reduced by applicable law or statute including Florida's Asbestos and Silica Compensation Fairness Act, §§ 774.201-209, Fla. Stat., or, in the alternative, are unconstitutional insofar as they violate the due process protections afforded by the United States Constitution, the excessive fines clause of the Eighth Amendment of the United States Constitution, the Full Faith and Credit Clause of the United States Constitution, and applicable provisions of the Constitution of the States of Florida or that of any other states whose laws may apply. Any law, statute or other authority purporting to permit the recovery of punitive damages in this case is unconstitutional, facially and as applied, to the extent that, without limitation, it: (1) lacks constitutionally sufficient standards to guide and restrain the jury's discretion in determining whether to award punitive damages and/or the amount, if any; (2) is void for vagueness in that it fails to provide adequate advance notice as to what conduct will result in punitive damages; (3) unconstitutionally may permit recovery of punitive damages based on harms to third parties, out-of-states conduct, conduct that complied with applicable law, or conduct that was not directed, or did not proximately cause harm, to Plaintiff; (4) unconstitutionally may permit recovery of punitive damages in an amount that is not both reasonable and proportionate to the amount of harm, if any, to Plaintiff and to the amount of compensatory damages, if any; (5) unconstitutionally may permit jury consideration of net worth or other financial information relating to Defendants; (6) lacks constitutionally sufficient standards to be applied by the trial court in post-verdict review of any punitive damages award; (7) lacks constitutionally sufficient standards for appellate review of punitive damages awards; (8) would

48

unconstitutionally impose a penalty, criminal in nature, without according to Answering Defendants the same procedural protections that are accorded to criminal defendants under the constitutions of the United States, Florida, and any other states whose laws may apply; and (9) otherwise fails to satisfy Supreme Court precedent, including, without limitation, *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1 (1991); *TXO Production Corp. v. Alliance Resources, Inc.*, 509 U.S. 443 (1993); *BMW of N. Am. v. Gore*, 517 U.S. 559 (1996); *States Farm Ins. Co. v. Campbell*, 538 U.S. 408 (2003); and *Philip Morris USA v. Williams*, 549 U.S. 346 (2007).

## TWENTY-EIGHTH DEFENSE

Plaintiff's warranty-based claims are barred because Decedent was not in privity with Answering Defendants, and are further barred and/or limited by any and all express conditions or disclaimers given by Answering Defendants, and by Decedent's lack of reliance upon such warranties.

## TWENTY-NINTH DEFENSE

Plaintiff's alleged injuries and damages, if any, were caused by the acts or omissions of Plaintiff or Decedent, and/or by the fault of Plaintiff or Decedent, and thus any recovery might be reduced accordingly or eliminated altogether in accord with applicable statutes and common law, including the law of Florida, and/or the law of any states whose law may apply.

## THIRTIETH DEFENSE

Answering Defendants are entitled to the protections and limitations from the imposition of punitive damages afforded under the United States Constitution and any applicable States Constitution. To the extent Plaintiff asserts claims for punitive damages or allegations pertaining to punitive damages, they are governed by the law of New Jersey. Alternatively, to the extent Plaintiff's claims are governed by Florida law or any other states whose law may apply and to the extent Plaintiff seeks punitive or aggravating circumstances damages, any award of such damages

is limited by the applicable law, including the law of Florida and/or the law of any other States whose law may apply.

### THIRTY-FIRST DEFENSE

Plaintiff's claims may be barred, in whole or in part, because the Decedent did not rely to her detriment upon any statement by Answering Defendants in determining to use the product at issue.

### THIRTY-SECOND DEFENSE

Plaintiff's claims are barred, in whole or in part, by the deference that common law gives to discretionary actions by the FDA under the FDCA.

### THIRTY-THIRD DEFENSE

Answering Defendants provided adequate and complete warnings for the product.

### THIRTY-FOURTH DEFENSE

If it is determined that any product of Answering Defendants was substantially and materially changed in condition, misused or abused, or was used in any unintentional or unforeseeable manner, the claims against Answering Defendants must be barred.

### THIRTY-FIFTH DEFENSE

To the extent that Plaintiff is alleging fraud, conspiracy, deceit, or other similar conduct, Plaintiff has failed to plead these claims with sufficient particularity.

### THIRTY-SIXTH DEFENSE

The Complaint fails to states a claim on which relief can be granted as to costs and disbursements, attorney's fees, expert fees, expenses, pre-judgment interest, post-judgment interest, refund, unjust enrichment, disgorgement, restitution, or treble damages.

### THIRTY-SEVENTH DEFENSE

Plaintiff lacks standing to bring the claims set forth herein, in his individual capacity.

4869-9382-8495

CASE NO. 50-2023-CA-014349-XXXA-MB (AH)

### THIRTY-EIGHTH DEFENSE

No act or omission of Answering Defendants was intentional, fraudulent, malicious, reckless, in any way morally culpable, or made with conscious, malicious, or intentional disregard for the health and well-being of Decedent or others.

### THIRTY-NINTH DEFENSE

Answering Defendants request application of the Collateral Source Rule for medical expenses to the amounts actually paid to a healthcare provider. Plaintiff's alleged damages, if any, are subject to any applicable credit or set-off allowance for any medical costs that were credited, written off, forgiven, or otherwise extinguished.

### DEFENSES RESERVED

Answering Defendants hereby give notice that they intend to rely upon any other defenses that may become available or apparent during the discovery proceedings in this matter, and hereby reserve their right to amend their Answer to assert any such defenses.

### JURY DEMAND

Answering Defendants request a trial by jury on all issues so triable.

WHEREFORE, Answering Defendants request that Plaintiff's Complaint, and all claims alleged therein, be dismissed with prejudice, that Answering Defendants be awarded the costs, disbursements, and attorneys' fees incurred in the defense of this action, and that Answering Defendants be granted any other relief to which it may be entitled.

4869-9382-8495

CASE NO. 50-2023-CA-014349-XXXA-MB (AH)

Dated: November 13, 2023

Respectfully submitted,

*/s/ Jennifer A. McLoone*
JENNIFER A. McLOONE (FBN 029234)
E-Mail:  jmcloone@shb.com
**SHOOK, HARDY & BACON L.L.P.**
Citigroup Center, Suite 3200
201 South Biscayne Blvd.
Miami, Florida 33131-4332
T: (305) 358-5171 | F: (305) 358-7470

***Counsel for Defendants Johnson & Johnson and
LTL Management, LLC.***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 13, 2023 I electronically filed the foregoing with

the Clerk of Court by using the Florida Courts E-Filing Portal, which will send an electronic notice

to counsel of record listed on the below Service List.

By: */s/ Jennifer A. McLoone*
Jennifer A. McLoone

Daniel J. DiMatteo, Esquire
The Ferraro Law Firm, P.A.
600 Brickell Avenue, Suite 3800
Miami, Florida 33131
T: 305.375.0111
E: ddimatteo@ferrarolaw.com
    lfuentes@ferrarolaw.com

*Attorneys for Plaintiff*

4869-9382-8495

IN THE CIRCUIT COURT OF THE 15TH
JUDICIAL CIRCUIT IN AND FOR
PALM BEACH COUNTY, FLORIDA

CASE NO. 50-2023-CA014349-XXXAMB

TIMOTHY PIERS DEVALLE,
Individually and as Personal Representative
of the Estate of DONNA MARIE DEVALLE,

      Plaintiff,

v.

JOHNSON & JOHNSON, et al.,

      Defendants.

_____/

## NOTICE OF APPEARANCE AND DESIGNATION OF E-MAIL ADDRESSES

      PLEASE TAKE NOTICE that Julia Stepanova of Barnes & Thornburg LLP enters her

appearance as counsel for Defendant Publix Super Markets, Inc. In accordance with Florida Rule

of Civil Procedure 1.080, the undersigned counsel hereby designates the primary and secondary e-

mail addresses and requests that copies of all pleadings, notices, orders, and other documents filed

in this matter be served on her at the email addresses listed below:

Primary Electronic Mail Address:       Julia.Stepanova@btlaw.com

Secondary Electronic Mail Addresses:       Monica.Brownewell@btlaw.com
                            Hope.Hayes@btlaw.com

Dated: November 14, 2023       Respectfully submitted,

                      By: */s/ Julia Stepanova*
                      Julia Stepanova (FBN 1021185)
                      BARNES & THORNBURG LLP
                      4540 PGA Boulevard, Suite 208
                      Palm Beach Gardens, FL 33418
                      Telephone:     (561) 473-7560
                      Facsimile:     (561) 473-7561
                      E-Mail:         Julia.Stepanova@btlaw.com

                      *Counsel for Publix Super Markets, Inc.*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the forgoing was served via automatic email generated by the Florida Courts E-Filing Portal this 14th day of November, 2023, to all counsel of record.

By:   */s/ Julia Stepanova*
      JULIA STEPANOVA

IN THE CIRCUIT COURT OF THE 15TH
JUDICIAL CIRCUIT IN AND FOR
PALM BEACH COUNTY, FLORIDA

CASE NO. 50-2023-CA014349-XXXAMB

TIMOTHY PIERS DEVALLE,
Individually and as Personal Representative
of the Estate of DONNA MARIE DEVALLE,

     Plaintiff,

v.

JOHNSON & JOHNSON, et al.,

     Defendants.

_____/

## DEFENDANT PUBLIX SUPER MARKETS, INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S WRONGFUL DEATH COMPLAINT AND <u>DEMAND FOR JURY TRIAL</u>

Defendant Publix Super Markets, Inc. ("Publix"), by and through undersigned counsel, hereby submits its Answer and Affirmative Defenses to Timothy Piers Devalle's, Individually and as Personal Representative of the Estate of Donna Marie Devalle ("Plaintiff") Wrongful Death Complaint and Demand for Jury Trial (the "Complaint").

Publix denies each and every allegation, statement, matter and thing contained in the Complaint except as is hereinafter expressly admitted or alleged. The repetition of some of the Complaint's subheadings below is done solely for organizational purposes and is not an admission as to their truth.

The allegations in the unnumbered paragraph preceding paragraph 1 of the Complaint state legal conclusions, which do not require a response. To the extent a response is required, Publix denies that Plaintiff is entitled to relief of any type or nature from Publix.

## <u>PARTIES, JURISDICTION AND VENUE</u>

1.    The allegations in paragraph 1 of the Complaint state legal conclusions of the type of action Plaintiff is bringing, which do not require a response. To the extent a response is required, Publix denies same, and specifically denies that Plaintiff is entitled to relief of any type or nature from Publix.

2.    The allegations in paragraph 2 of the Complaint state legal conclusions of the type of action Plaintiff is bringing, which do not require a response. To the extent a response is required, Publix denies same, and specifically denies that Plaintiff is entitled to relief of any type or nature from Publix.

3.    Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegation in paragraph 3 of the Complaint, and therefore denies the same.

4.    Publix lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 4 of the Complaint, and therefore denies the same.

5.    Publix lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 5 of the Complaint, and therefore denies the same.

6.    Publix denies the allegations in paragraph 6 of the Complaint.

7.    Publix lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 7 of the Complaint, and therefore denies the same.

8.    The allegations contained in paragraph 8 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 8 of the Complaint, and therefore denies the same.

NOT A CERTIFIED COPY

9.      The allegations contained in paragraph 9 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9 of the Complaint, and therefore denies the same.

10.     The allegations contained in paragraph 10 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 10 of the Complaint, and therefore denies the same.

11.     The allegations contained in paragraph 11 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 11 of the Complaint, and therefore denies the same.

12.     The allegations contained in paragraph 12 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 12 of the Complaint, and therefore denies the same.

13.     The allegations contained in paragraph 13 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13 of the Complaint, and therefore denies the same.

14.     The allegations contained in paragraph 14 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks

knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 14 of the Complaint, and therefore denies the same.

15.     The allegations contained in paragraph 15 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 15 of the Complaint, and therefore denies the same.

16.     The allegations contained in paragraph 16 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 16 of the Complaint, and therefore denies the same.

17.     The allegations contained in paragraph 17 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 17 of the Complaint, and therefore denies the same.

18.     The allegations contained in paragraph 18 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 18 of the Complaint, and therefore denies the same.

19.     The allegations contained in paragraph 19 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 19 of the Complaint, and therefore denies the same.

20.     The allegations contained in paragraph 20 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 20 of the Complaint, and therefore denies the same.

21.     The allegations contained in paragraph 15 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 21 of the Complaint, and therefore denies the same.

22.     The allegations contained in paragraph 22 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 22 of the Complaint, and therefore denies the same.

23.     The allegations contained in paragraph 23 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 23 of the Complaint, and therefore denies the same.

24.     The allegations contained in paragraph 24 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 24 of the Complaint, and therefore denies the same.

25.     The allegations contained in paragraph 25 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks

knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 25 of the Complaint, and therefore denies the same.

26.     The allegations contained in paragraph 26 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 26 of the Complaint, and therefore denies the same.

27.     The allegations contained in paragraph 27 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 27 of the Complaint, and therefore denies the same.

28.     The allegations contained in paragraph 28 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 28 of the Complaint, and therefore denies the same.

29.     The allegations contained in paragraph 29 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 29 of the Complaint, and therefore denies the same.

30.     Publix admits that it is a Florida corporation with a principal place of business in Florida. Publix further admits it has stores in Palm Beach County, Florida. Publix denies the remaining allegations in paragraph 30 of the Complaint.

31.    Publix admits it has stores in Palm Beach County, Florida. Publix is without knowledge or information with respect to the meaning of "all material times." Publix denies the remaining allegations in paragraph 31 of the Complaint.

32.    Publix is without knowledge or information with respect to the meaning of "all material times." Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 32 of the Complaint, and therefore denies the same.

33.    Paragraph 33 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, Publix admits that it is a Florida corporation. Publix denies the remaining allegations in paragraph 33 of the Complaint.

34.    Paragraph 34 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, Publix denies the allegations in paragraph 34 of the Complaint.

**FACTS RELATING TO CERTAIN DEFENDANTS' SUCCESSOR LIABILITY STATUS**

35.    The allegations contained in paragraph 35 of the Complaint, including the subparts (a) through (g), are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 35 of the Complaint, and therefore denies the same.

36.    The allegations contained in paragraph 36 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 36 of the Complaint, and therefore denies the same.

37.    The allegations contained in paragraph 37 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks

knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 37 of the Complaint, and therefore denies the same.

38.     The allegations contained in paragraph 38 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 38 of the Complaint, and therefore denies the same.

39.     The allegations contained in paragraph 39 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 39 of the Complaint, and therefore denies the same.

40.     The allegations contained in paragraph 40 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 40 of the Complaint, and therefore denies the same.

41.     The allegations contained in paragraph 41 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 41 of the Complaint, and therefore denies the same.

42.     The allegations contained in paragraph 42 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 42 of the Complaint, and therefore denies the same.

43.     The allegations contained in paragraph 43 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 43 of the Complaint, and therefore denies the same.

44.     The allegations contained in paragraph 44 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 44 of the Complaint, and therefore denies the same.

45.     The allegations contained in paragraph 45 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 45 of the Complaint, and therefore denies the same.

46.     The allegations contained in paragraph 46 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 46 of the Complaint, and therefore denies the same.

47.     The allegations contained in paragraph 47 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 47 of the Complaint, and therefore denies the same.

48.     The allegations contained in paragraph 48 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks

knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 48 of the Complaint, and therefore denies the same.

49.    The allegations contained in paragraph 49 of the Complaint, including Figure 1, are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 49 of the Complaint, and therefore denies the same.

50.    The allegations contained in paragraph 50 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 50 of the Complaint, and therefore denies the same.

51.    The allegations contained in paragraph 51 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 51 of the Complaint, and therefore denies the same.

52.    The allegations contained in paragraph 52 of the Complaint, including Figure 2, are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 52 of the Complaint, and therefore denies the same.

53.    The allegations contained in paragraph 53 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 53 of the Complaint, and therefore denies the same.

54.     The allegations contained in paragraph 54 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 54 of the Complaint, and therefore denies the same.

55.     The allegations contained in paragraph 55 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 55 of the Complaint, and therefore denies the same.

56.     The allegations contained in paragraph 56 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 56 of the Complaint, and therefore denies the same.

57.     The allegations contained in paragraph 57 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 57 of the Complaint, and therefore denies the same.

58.     The allegations contained in paragraph 58 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 58 of the Complaint, and therefore denies the same.

59.     Paragraph 59 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to

form a belief as to the truth of the allegations in paragraph 59 of the Complaint, and therefore denies the same.

## **GENERAL ALLEGATIONS**

60. The allegations contained in paragraph 60 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 60 of the Complaint, and therefore denies the same.

61. The allegations contained in paragraph 61 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 61 of the Complaint, and therefore denies the same. To the extent Paragraph 61 purports to quote from other materials, Publix states that the cited materials speak for themselves.

62. The allegations contained in paragraph 62 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 62 of the Complaint, and therefore denies the same.

63. The allegations contained in paragraph 63 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 63 of the Complaint, and therefore denies the same.

64. The allegations contained in paragraph 64 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks

knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 64 of the Complaint, and therefore denies the same.

65.    The allegations contained in paragraph 65 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 65 of the Complaint, and therefore denies the same.

66.    Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 66 of the Complaint, and therefore denies the same.

67.    Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 67 of the Complaint, and therefore denies the same.

68.    Publix denies the allegations in paragraph 68 of the Complaint.

69.    Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 69 of the Complaint, and therefore denies the same.

70.    Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 70 of the Complaint, and therefore denies the same.

71.    Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 71 of the Complaint, and therefore denies the same.

72.    Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 72 of the Complaint, and therefore denies the same.

73.    The allegations contained in paragraph 73 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph

73 of the Complaint, and therefore denies the same. To the extent Paragraph 73 purports to quote from other materials, Publix states that the cited materials speak for themselves.

74.    Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 74 of the Complaint, and therefore denies the same. To the extent Paragraph 74 purports to quote from other materials, Publix states that the cited materials speak for themselves.

75.    The allegations contained in paragraph 75 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 75 of the Complaint, and therefore denies the same. To the extent Paragraph 75 purports to quote from other materials, Publix states that the cited materials speak for themselves.

76.    Paragraph 76 of the Complaint contains legal conclusions, to which no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 76 of the Complaint, and therefore denies the same.

77.    Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 77 of the Complaint, and therefore denies the same.

78.    Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 78 of the Complaint, and therefore denies the same.

79.    The allegations contained in paragraph 79 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 79 of the Complaint, and therefore denies the same.

80.     The allegations contained in paragraph 80 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 80 of the Complaint, and therefore denies the same.

81.     Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 81 of the Complaint, and therefore denies the same.

82.     The allegations contained in paragraph 82 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 82 of the Complaint, and therefore denies the same.

83.     Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 83 of the Complaint, and therefore denies the same.

84.     Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 84 of the Complaint, and therefore denies the same.

85.     Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 85 of the Complaint, and therefore denies the same.

86.     The allegations contained in paragraph 86 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 86 of the Complaint, and therefore denies the same.

87.     Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 87 of the Complaint, and therefore denies the same.

88.     Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 88 of the Complaint, and therefore denies the same.

89.     Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 89 of the Complaint, and therefore denies the same.

90.     Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 90 of the Complaint, and therefore denies the same. To the extent Paragraph 90 purports to quote from other materials, Publix states that the cited materials speak for themselves.

91.     Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 91 of the Complaint, and therefore denies the same.

92.     Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 92 of the Complaint, and therefore denies the same.

93.     Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 93 of the Complaint, and therefore denies the same.

94.     Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 94 of the Complaint, and therefore denies the same.

95.     The allegations contained in paragraph 95 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 95 of the Complaint, and therefore denies the same.  To the extent paragraph 95 purports to quote from other materials, Publix states that the cited materials speak for themselves.

96.     Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 96 of the Complaint, and therefore denies the same.

97.     The allegations contained in paragraph 97 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 97 of the Complaint, and therefore denies the same.

98.     The allegations contained in paragraph 98 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 98 of the Complaint, and therefore denies the same.  To the extent paragraph 98 purports to quote from other materials, Publix states that the cited materials speak for themselves.

99.     The allegations contained in paragraph 99 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 99 of the Complaint, and therefore denies the same.

100.     Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 100 of the Complaint, and therefore denies the same. To the extent paragraph 100 purports to quote from other materials, Publix states that the cited materials speak for themselves.

101.     The allegations contained in paragraph 101 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 101 of the Complaint, and therefore denies the same. To the extent paragraph 101 purports to quote from other materials, Publix states that the cited materials speak for themselves.

102.    The allegations contained in paragraph 102 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 102 of the Complaint, and therefore denies the same.

103.    The allegations contained in paragraph 103 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 103 of the Complaint, and therefore denies the same.

104.    The allegations contained in paragraph 104 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 104 of the Complaint, and therefore denies the same.

105.    The allegations contained in paragraph 105 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 105 of the Complaint, and therefore denies the same. To the extent paragraph 105 purports to quote from other materials, Publix states that the cited materials speak for themselves.

106.    Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 106 of the Complaint, and therefore denies the same. To the extent paragraph 106 purports to quote from other materials, Publix states that the cited materials speak for themselves.

107.    The allegations contained in paragraph 107 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix

18

lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 107 of the Complaint, and therefore denies the same. To the extent paragraph 107 purports to quote from other materials, Publix states that the cited materials speak for themselves.

108.    The allegations contained in paragraph 108 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 108 of the Complaint, and therefore denies the same.

109.    Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 109 of the Complaint, and therefore denies the same.

110.    Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 110 of the Complaint, and therefore denies the same.

111.    The allegations contained in paragraph 111 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 111 of the Complaint, and therefore denies the same.

112.    The allegations contained in paragraph 112 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 112 of the Complaint, and therefore denies the same. To the extent paragraph 112 purports to quote from other materials, Publix states that the cited materials speak for themselves.

113.    Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 113 of the Complaint, and therefore denies the same.

114.    Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 114 of the Complaint, and therefore denies the same. To the extent paragraph 114 purports to quote from other materials, Publix states that the cited materials speak for themselves.

115.    Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 115 of the Complaint, and therefore denies the same. To the extent paragraph 115 purports to quote from other materials, Publix states that the cited materials speak for themselves.

116.    The allegations contained in paragraph 116 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 116 of the Complaint, and therefore denies the same. To the extent paragraph 116 purports to quote from other materials, Publix states that the cited materials speak for themselves.

117.    Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 117 of the Complaint, and therefore denies the same.

118.    Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 118 of the Complaint, and therefore denies the same.

119.    Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 119 of the Complaint, and therefore denies the same.

120.    Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 120 of the Complaint, and therefore denies the same. To the extent paragraph 120 purports to quote from other materials, Publix states that the cited materials speak for themselves.

121.   The allegations contained in paragraph 121 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 121 of the Complaint, and therefore denies the same.

122.   The allegations contained in paragraph 122 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 122 of the Complaint, and therefore denies the same.

123.   Publix denies the allegations in paragraph 123 of the Complaint.

124.   The allegations contained in paragraph 124 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 124 of the Complaint, and therefore denies the same.

125.   In responding to paragraph 125 of the Complaint, Publix admits that in 2019 Johnson & Johnson instituted a voluntary recall in the United States of a single lot of its Johnson's Baby Powder in response to a U.S. Food and Drug Administration test.  Publix further states that Publix did not receive any shipments of Johnson's Baby Powder from the recalled lot.

126.   The allegations contained in paragraph 126 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 126 of the Complaint, and therefore denies the same.

127.   The allegations contained in paragraph 127 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix

lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 127 of the Complaint, and therefore denies the same.

128.    The allegations contained in paragraph 128 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 128 of the Complaint, and therefore denies the same.

129.    The allegations contained in paragraph 129 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 129 of the Complaint, and therefore denies the same.

130.    The allegations contained in paragraph 130 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 130 of the Complaint, and therefore denies the same.

131.    The allegations contained in paragraph 131 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 131 of the Complaint, and therefore denies the same.

132.    Paragraph 132 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, Publix denies the allegations in paragraph 132 of the Complaint directed at it. Publix lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 132 of the Complaint, and therefore denies the same.

133.    Paragraph 133 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, Publix denies the allegations in paragraph 133 of the Complaint directed at it. Publix lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 133 of the Complaint, and therefore denies the same.

134.    Publix denies the allegations in paragraph 134 of the Complaint directed at it. Publix lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 134 of the Complaint, and therefore denies the same.

## COUNT I: STRICT LIABILITY – FAILURE TO WARN
## (AGAINST DEFENDANT IMERYS)

In response to the unnumbered paragraph preceding paragraph 135 of the Complaint, Publix incorporates by reference each and every response contained in paragraphs 1 through 134 as if set forth fully herein.

135.    The allegations contained in paragraph 135 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 135 of the Complaint, and therefore denies the same.

136.    The allegations contained in paragraph 136 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 136 of the Complaint, and therefore denies the same.

137.    The allegations contained in paragraph 137 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix

23

lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 137 of the Complaint, and therefore denies the same.

138.    The allegations contained in paragraph 138 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 138 of the Complaint, and therefore denies the same.

139.    The allegations contained in paragraph 139 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 139 of the Complaint, and therefore denies the same.

140.    The allegations contained in paragraph 140 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 140 of the Complaint, and therefore denies the same.

141.    The allegations contained in paragraph 141 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 141 of the Complaint, and therefore denies the same.

142.    The allegations contained in paragraph 142 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 142 of the Complaint, and therefore denies the same.

143.    The allegations contained in paragraph 143 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 143 of the Complaint, and therefore denies the same.

144.    The allegations contained in paragraph 144 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 144 of the Complaint, and therefore denies the same.

The allegations set forth in the unnumbered "WHEREFORE" clause following paragraph 144 of the Complaint contain conclusions of law to which no response is required. To the extent that a response is required, Publix denies the allegations in this clause.

### COUNT II: STRICT LIABILITY – FAILURE TO WARN
### (AGAINST THE J&J DEFENDANTS)

In response to the unnumbered paragraph preceding paragraph 145 of the Complaint, Publix incorporates by reference each and every response contained in paragraphs 1 through 144 as if set forth fully herein.

145.    The allegations contained in paragraph 145 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 145 of the Complaint, and therefore denies the same.

146.    The allegations contained in paragraph 146 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 146 of the Complaint, and therefore denies the same.

147.    The allegations contained in paragraph 147 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 147 of the Complaint, and therefore denies the same.

148.    The allegations contained in paragraph 148 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 148 of the Complaint, and therefore denies the same.

149.    The allegations contained in paragraph 149 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 149 of the Complaint, and therefore denies the same.

150.    The allegations contained in paragraph 150 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 150 of the Complaint, and therefore denies the same.

151.    The allegations contained in paragraph 151 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 151 of the Complaint, and therefore denies the same.

152.    The allegations contained in paragraph 152 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix

lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 152 of the Complaint, and therefore denies the same.

153.    The allegations contained in paragraph 153 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 153 of the Complaint, and therefore denies the same.

The allegations set forth in the unnumbered "WHEREFORE" clause following paragraph 153 of the Complaint contain conclusions of law to which no response is required. To the extent that a response is required, Publix denies the allegations in this clause.

### COUNT III: STRICT LIABILITY – DEFECTIVE MANUFACTURING AND DESIGN (AGAINST DEFENDANT IMERYS)

In response to the unnumbered paragraph preceding paragraph 154 of the Complaint, Publix incorporates by reference each and every response contained in paragraphs 1 through 153 as if set forth fully herein.

154.    The allegations contained in paragraph 154 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 154 of the Complaint, and therefore denies the same.

155.    The allegations contained in paragraph 155 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 155 of the Complaint, and therefore denies the same.

156.    The allegations contained in paragraph 156 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix

27

lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 156 of the Complaint, and therefore denies the same.

157.    The allegations contained in paragraph 157 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 157 of the Complaint, and therefore denies the same.

158.    The allegations contained in paragraph 158 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 158 of the Complaint, and therefore denies the same.

159.    The allegations contained in paragraph 159 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 159 of the Complaint, and therefore denies the same.

160.    The allegations contained in paragraph 160 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 160 of the Complaint, and therefore denies the same.

161.    The allegations contained in paragraph 161 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 161 of the Complaint, and therefore denies the same.

The allegations set forth in the unnumbered "WHEREFORE" clause following paragraph 161 of the Complaint contain conclusions of law to which no response is required. To the extent that a response is required, Publix denies the allegations in this clause.

### COUNT IV: STRICT LIABILITY – DEFECTIVE MANUFACTURING AND DESIGN (AGAINST THE J&J DEFENDANTS)

In response to the unnumbered paragraph preceding paragraph 162 of the Complaint, Publix incorporates by reference each and every response contained in paragraphs 1 through 161 as if set forth fully herein.

162.     The allegations contained in paragraph 162 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 162 of the Complaint, and therefore denies the same.

163.     The allegations contained in paragraph 163 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 163 of the Complaint, and therefore denies the same.

164.     The allegations contained in paragraph 164 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 164 of the Complaint, and therefore denies the same.

165.     The allegations contained in paragraph 165 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 165 of the Complaint, and therefore denies the same.

166.     The allegations contained in paragraph 166 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 166 of the Complaint, and therefore denies the same.

167.     The allegations contained in paragraph 167 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 167 of the Complaint, and therefore denies the same.

168.     The allegations contained in paragraph 168 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 168 of the Complaint, and therefore denies the same.

169.     The allegations contained in paragraph 169 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 169 of the Complaint, and therefore denies the same.

The allegations set forth in the unnumbered "WHEREFORE" clause following paragraph 169 of the Complaint contain conclusions of law to which no response is required. To the extent that a response is required, Publix denies the allegations in this clause.

### COUNT V: BREACH OF EXPRESS WARRANTIES
### (AGAINST THE J&J DEFENDANTS)

In response to the unnumbered paragraph preceding paragraph 170 of the Complaint, Publix incorporates by reference each and every response contained in paragraphs 1 through 169 as if set forth fully herein.

170.    The allegations contained in paragraph 170 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 170 of the Complaint, and therefore denies the same.

171.    The allegations contained in paragraph 171 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 171 of the Complaint, and therefore denies the same.

172.    The allegations contained in paragraph 172 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 172 of the Complaint, and therefore denies the same.

173.    The allegations contained in paragraph 173 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 173 of the Complaint, and therefore denies the same.

174.    The allegations contained in paragraph 174 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 174 of the Complaint, and therefore denies the same.

175.    The allegations contained in paragraph 175 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix

lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 175 of the Complaint, and therefore denies the same.

176.    The allegations contained in paragraph 176 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 176 of the Complaint, and therefore denies the same.

177.    The allegations contained in paragraph 177 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 177 of the Complaint, and therefore denies the same.

178.    The allegations contained in paragraph 178 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 178 of the Complaint, and therefore denies the same.

The allegations set forth in the unnumbered "WHEREFORE" clause following paragraph 178 of the Complaint contain conclusions of law to which no response is required. To the extent that a response is required, Publix denies the allegations in this clause.

## COUNT VI: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (AGAINST THE J&J DEFENDANTS)

In response to the unnumbered paragraph preceding paragraph 179 of the Complaint, Publix incorporates by reference each and every response contained in paragraphs 1 through 178 as if set forth fully herein.

179.    The allegations contained in paragraph 179 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix

lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 179 of the Complaint, and therefore denies the same.

180.    The allegations contained in paragraph 180 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 180 of the Complaint, and therefore denies the same.

181.    The allegations contained in paragraph 181 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 181 of the Complaint, and therefore denies the same.

182.    The allegations contained in paragraph 182 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 182 of the Complaint, and therefore denies the same.

183.    The allegations contained in paragraph 183 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 183 of the Complaint, and therefore denies the same.

184.    The allegations contained in paragraph 184 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 184 of the Complaint, and therefore denies the same.

185.    The allegations contained in paragraph 185 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 185 of the Complaint, and therefore denies the same.

186.    The allegations contained in paragraph 186 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 186 of the Complaint, and therefore denies the same.

187.    The allegations contained in paragraph 187 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 187 of the Complaint, and therefore denies the same.

The allegations set forth in the unnumbered "WHEREFORE" clause following paragraph 187 of the Complaint contain conclusions of law to which no response is required. To the extent that a response is required, Publix denies the allegations in this clause.

**COUNT VII: BREACH OF IMPLIED WARRANTY OF FITNESS FOR PARTICULAR PURPOSE (AGAINST THE J&J DEFENDANTS)**

In response to the unnumbered paragraph preceding paragraph 188 of the Complaint, Publix incorporates by reference each and every response contained in paragraphs 1 through 187 as if set forth fully herein.

188.    The allegations contained in paragraph 188 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 188 of the Complaint, and therefore denies the same.

34

189.    The allegations contained in paragraph 189 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 189 of the Complaint, and therefore denies the same.

190.    The allegations contained in paragraph 190 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 190 of the Complaint, and therefore denies the same.

191.    The allegations contained in paragraph 191 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 191 of the Complaint, and therefore denies the same.

192.    The allegations contained in paragraph 192 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 192 of the Complaint, and therefore denies the same.

193.    The allegations contained in paragraph 193 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 193 of the Complaint, and therefore denies the same.

194.    The allegations contained in paragraph 194 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix

lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 194 of the Complaint, and therefore denies the same.

195.    The allegations contained in paragraph 195 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 195 of the Complaint, and therefore denies the same.

196.    The allegations contained in paragraph 196 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 196 of the Complaint, and therefore denies the same.

The allegations set forth in the unnumbered "WHEREFORE" clause following paragraph 196 of the Complaint contain conclusions of law to which no response is required. To the extent that a response is required, Publix denies the allegations in this clause.

## COUNT VIII: NEGLIGENCE (AGAINST DEFENDANT IMERYS)

In response to the unnumbered paragraph preceding paragraph 197 of the Complaint, Publix incorporates by reference each and every response contained in paragraphs 1 through 196 as if set forth fully herein.

197.    The allegations contained in paragraph 197 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 197 of the Complaint, and therefore denies the same.

198.    The allegations contained in paragraph 198 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix

lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 198 of the Complaint, and therefore denies the same.

199.    The allegations contained in paragraph 199 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 199 of the Complaint, and therefore denies the same.

200.    The allegations contained in paragraph 200 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 200 of the Complaint, and therefore denies the same.

201.    The allegations contained in paragraph 201 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 201 of the Complaint, and therefore denies the same.

202.    The allegations contained in paragraph 202 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 202 of the Complaint, and therefore denies the same.

203.    The allegations contained in paragraph 203 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 203 of the Complaint, and therefore denies the same.

204.    The allegations contained in paragraph 204 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 204 of the Complaint, and therefore denies the same.

The allegations set forth in the unnumbered "WHEREFORE" clause following paragraph 204 of the Complaint contain conclusions of law to which no response is required. To the extent that a response is required, Publix denies the allegations in this clause.

**COUNT IX: NEGLIGENCE (AGAINST THE J&J DEFENDANTS)**

In response to the unnumbered paragraph preceding paragraph 205 of the Complaint, Publix incorporates by reference each and every response contained in paragraphs 1 through 204 as if set forth fully herein.

205.    The allegations contained in paragraph 205 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 205 of the Complaint, and therefore denies the same.

206.    The allegations contained in paragraph 206 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 206 of the Complaint, and therefore denies the same.

207.    The allegations contained in paragraph 207 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 207 of the Complaint, and therefore denies the same.

208.    The allegations contained in paragraph 208 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 208 of the Complaint, and therefore denies the same.

209.    The allegations contained in paragraph 209 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 209 of the Complaint, and therefore denies the same.

210.    The allegations contained in paragraph 210 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 210 of the Complaint, and therefore denies the same.

211.    The allegations contained in paragraph 211 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 211 of the Complaint, and therefore denies the same.

212.    The allegations contained in paragraph 212 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 212 of the Complaint, and therefore denies the same.

213.    The allegations contained in paragraph 213 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix

lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 213 of the Complaint, and therefore denies the same.

The allegations set forth in the unnumbered "WHEREFORE" clause following paragraph 213 of the Complaint contain conclusions of law to which no response is required. To the extent that a response is required, Publix denies the allegations in this clause.

**COUNT X: FRAUDULENT CONCEALMENT (AGAINST DEFENDANT IMERYS)**

In response to the unnumbered paragraph preceding paragraph 214 of the Complaint, Publix incorporates by reference each and every response contained in paragraphs 1 through 213 as if set forth fully herein.

214.    The allegations contained in paragraph 214 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 214 of the Complaint, and therefore denies the same.

215.    The allegations contained in paragraph 215 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 215 of the Complaint, and therefore denies the same.

216.    The allegations contained in paragraph 216 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 216 of the Complaint, and therefore denies the same.

217.    The allegations contained in paragraph 217 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix

lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 217 of the Complaint, and therefore denies the same.

218.    The allegations contained in paragraph 218 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 218 of the Complaint, and therefore denies the same.

219.    The allegations contained in paragraph 219 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 219 of the Complaint, and therefore denies the same.

220.    The allegations contained in paragraph 220 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 220 of the Complaint, and therefore denies the same.

221.    The allegations contained in paragraph 221 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 221 of the Complaint, and therefore denies the same.

222.    The allegations contained in paragraph 222 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 222 of the Complaint, and therefore denies the same.

223.    The allegations contained in paragraph 223 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 223 of the Complaint, and therefore denies the same.

224.    The allegations contained in paragraph 224 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 224 of the Complaint, and therefore denies the same.

225.    The allegations contained in paragraph 225 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 225 of the Complaint, and therefore denies the same.

226.    The allegations contained in paragraph 226 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 226 of the Complaint, and therefore denies the same.

227.    The allegations contained in paragraph 227 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 227 of the Complaint, and therefore denies the same.

228.    The allegations contained in paragraph 228 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix

lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 228 of the Complaint, and therefore denies the same.

229.    The allegations contained in paragraph 229 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 229 of the Complaint, and therefore denies the same.

230.    The allegations contained in paragraph 230 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 230 of the Complaint, and therefore denies the same.

231.    The allegations contained in paragraph 231 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 231 of the Complaint, and therefore denies the same.

232.    The allegations contained in paragraph 232 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 232 of the Complaint, and therefore denies the same.

233.    The allegations contained in paragraph 233 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 233 of the Complaint, and therefore denies the same.

234.    The allegations contained in paragraph 234 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 234 of the Complaint, and therefore denies the same.

235.    The allegations contained in paragraph 235 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 235 of the Complaint, and therefore denies the same.

236.    The allegations contained in paragraph 236 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 236 of the Complaint, and therefore denies the same.

237.    The allegations contained in paragraph 237 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 237 of the Complaint, and therefore denies the same.

238.    The allegations contained in paragraph 238 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 238 of the Complaint, and therefore denies the same.

239.    The allegations contained in paragraph 239 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix

lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 239 of the Complaint, and therefore denies the same.

240. The allegations contained in paragraph 240 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 240 of the Complaint, and therefore denies the same.

241. The allegations contained in paragraph 241 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 241 of the Complaint, and therefore denies the same.

242. The allegations contained in paragraph 242 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 242 of the Complaint, and therefore denies the same.

243. The allegations contained in paragraph 243 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 243 of the Complaint, and therefore denies the same.

244. The allegations contained in paragraph 244 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 244 of the Complaint, and therefore denies the same.

245.    The allegations contained in paragraph 245 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 245 of the Complaint, and therefore denies the same.

246.    The allegations contained in paragraph 246 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 246 of the Complaint, and therefore denies the same.

247.    The allegations contained in paragraph 247 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 247 of the Complaint, and therefore denies the same.

248.    The allegations contained in paragraph 248 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 248 of the Complaint, and therefore denies the same.

249.    The allegations contained in paragraph 249 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 249 of the Complaint, and therefore denies the same.

250.    The allegations contained in paragraph 250 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix

lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 250 of the Complaint, and therefore denies the same.

251.    The allegations contained in paragraph 251 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 251 of the Complaint, and therefore denies the same.

252.    The allegations contained in paragraph 252 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 252 of the Complaint, and therefore denies the same.

253.    The allegations contained in paragraph 253 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 253 of the Complaint, and therefore denies the same.

254.    The allegations contained in paragraph 254 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 254 of the Complaint, and therefore denies the same.

255.    The allegations contained in paragraph 255 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 255 of the Complaint, and therefore denies the same.

256.    The allegations contained in paragraph 256 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 256 of the Complaint, and therefore denies the same.

257.    The allegations contained in paragraph 257 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 257 of the Complaint, and therefore denies the same.

258.    The allegations contained in paragraph 258 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 258 of the Complaint, and therefore denies the same.

259.    The allegations contained in paragraph 259 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 259 of the Complaint, and therefore denies the same.

260.    The allegations contained in paragraph 260 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 260 of the Complaint, and therefore denies the same.

261.    The allegations contained in paragraph 261 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix

lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 261 of the Complaint, and therefore denies the same.

262.    The allegations contained in paragraph 262 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 262 of the Complaint, and therefore denies the same.

263.    The allegations contained in paragraph 263 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 263 of the Complaint, and therefore denies the same.

264.    The allegations contained in paragraph 264 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 264 of the Complaint, and therefore denies the same.

265.    The allegations contained in paragraph 265 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 265 of the Complaint, and therefore denies the same.

266.    The allegations contained in paragraph 266 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 266 of the Complaint, and therefore denies the same.

267.    The allegations contained in paragraph 267 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 267 of the Complaint, and therefore denies the same.

268.    The allegations contained in paragraph 268 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 268 of the Complaint, and therefore denies the same.

269.    The allegations contained in paragraph 269 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 269 of the Complaint, and therefore denies the same.

270.    The allegations contained in paragraph 270 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 270 of the Complaint, and therefore denies the same.

271.    The allegations contained in paragraph 271 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 271 of the Complaint, and therefore denies the same.

272.    The allegations contained in paragraph 272 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix

lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 272 of the Complaint, and therefore denies the same.

273.    The allegations contained in paragraph 273 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 273 of the Complaint, and therefore denies the same.

274.    The allegations contained in paragraph 274 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 274 of the Complaint, and therefore denies the same.

275.    The allegations contained in paragraph 275 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 275 of the Complaint, and therefore denies the same.

276.    The allegations contained in paragraph 276 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 276 of the Complaint, and therefore denies the same.

277.    The allegations contained in paragraph 277 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 277 of the Complaint, and therefore denies the same.

278.    The allegations contained in paragraph 278 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 278 of the Complaint, and therefore denies the same.

279.    The allegations contained in paragraph 279 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 279 of the Complaint, and therefore denies the same.

280.    The allegations contained in paragraph 280 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 280 of the Complaint, and therefore denies the same.

281.    The allegations contained in paragraph 281 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 281 of the Complaint, and therefore denies the same.

The allegations set forth in the unnumbered "WHEREFORE" clause following paragraph 281 of the Complaint contain conclusions of law to which no response is required. To the extent that a response is required, Publix denies the allegations in this clause.

**COUNT XI: FRAUDULENT CONCEALMENT (AGAINST THE J&J DEFENDANTS)**

In response to the unnumbered paragraph preceding paragraph 282 of the Complaint, Publix incorporates by reference each and every response contained in paragraphs 1 through 281 as if set forth fully herein.

282.    The allegations contained in paragraph 282 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 282 of the Complaint, and therefore denies the same.

283.    The allegations contained in paragraph 283 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 283 of the Complaint, and therefore denies the same.

284.    The allegations contained in paragraph 284 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 284 of the Complaint, and therefore denies the same.

285.    The allegations contained in paragraph 285 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 285 of the Complaint, and therefore denies the same.

286.    The allegations contained in paragraph 286 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 286 of the Complaint, and therefore denies the same.

287.    The allegations contained in paragraph 287 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix

lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 287 of the Complaint, and therefore denies the same.

288.    The allegations contained in paragraph 288 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 288 of the Complaint, and therefore denies the same.

289.    The allegations contained in paragraph 289 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 289 of the Complaint, and therefore denies the same.

290.    The allegations contained in paragraph 290 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 290 of the Complaint, and therefore denies the same.

291.    The allegations contained in paragraph 291 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 291 of the Complaint, and therefore denies the same.

292.    The allegations contained in paragraph 292 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 292 of the Complaint, and therefore denies the same.

293.    The allegations contained in paragraph 293 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 293 of the Complaint, and therefore denies the same.

294.    The allegations contained in paragraph 294 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 294 of the Complaint, and therefore denies the same.

295.    The allegations contained in paragraph 295 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 295 of the Complaint, and therefore denies the same.

296.    The allegations contained in paragraph 296 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 296 of the Complaint, and therefore denies the same.

297.    The allegations contained in paragraph 297 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 297 of the Complaint, and therefore denies the same.

298.    The allegations contained in paragraph 298 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix

lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 298 of the Complaint, and therefore denies the same.

299.    The allegations contained in paragraph 299 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 299 of the Complaint, and therefore denies the same.

300.    The allegations contained in paragraph 300 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 300 of the Complaint, and therefore denies the same.

301.    The allegations contained in paragraph 301 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 301 of the Complaint, and therefore denies the same.

302.    The allegations contained in paragraph 302 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 302 of the Complaint, and therefore denies the same.

303.    The allegations contained in paragraph 303 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 303 of the Complaint, and therefore denies the same.

304.    The allegations contained in paragraph 304 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 304 of the Complaint, and therefore denies the same.

305.    The allegations contained in paragraph 305 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 305 of the Complaint, and therefore denies the same.

306.    The allegations contained in paragraph 306 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 306 of the Complaint, and therefore denies the same.

307.    The allegations contained in paragraph 307 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 307 of the Complaint, and therefore denies the same.

308.    The allegations contained in paragraph 308 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 308 of the Complaint, and therefore denies the same.

309.    The allegations contained in paragraph 309 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix

lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 309 of the Complaint, and therefore denies the same.

310.    The allegations contained in paragraph 310 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 310 of the Complaint, and therefore denies the same.

311.    The allegations contained in paragraph 311 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 311 of the Complaint, and therefore denies the same.

312.    The allegations contained in paragraph 312 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 312 of the Complaint, and therefore denies the same.

313.    The allegations contained in paragraph 313 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 313 of the Complaint, and therefore denies the same.

314.    The allegations contained in paragraph 314 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 314 of the Complaint, and therefore denies the same.

315.    The allegations contained in paragraph 315 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 315 of the Complaint, and therefore denies the same.

316.    The allegations contained in paragraph 316 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 316 of the Complaint, and therefore denies the same.

317.    The allegations contained in paragraph 317 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 317 of the Complaint, and therefore denies the same.

318.    The allegations contained in paragraph 318 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 318 of the Complaint, and therefore denies the same.

319.    The allegations contained in paragraph 319 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 319 of the Complaint, and therefore denies the same.

320.    The allegations contained in paragraph 320 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix

lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 320 of the Complaint, and therefore denies the same.

321.    The allegations contained in paragraph 321 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 321 of the Complaint, and therefore denies the same.

322.    The allegations contained in paragraph 322 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 322 of the Complaint, and therefore denies the same.

323.    The allegations contained in paragraph 323 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 323 of the Complaint, and therefore denies the same.

324.    The allegations contained in paragraph 324 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 324 of the Complaint, and therefore denies the same.

325.    The allegations contained in paragraph 325 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 325 of the Complaint, and therefore denies the same.

326.    The allegations contained in paragraph 326 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 326 of the Complaint, and therefore denies the same.

327.    The allegations contained in paragraph 327 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 327 of the Complaint, and therefore denies the same.

328.    The allegations contained in paragraph 328 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 328 of the Complaint, and therefore denies the same.

329.    The allegations contained in paragraph 329 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 329 of the Complaint, and therefore denies the same.

330.    The allegations contained in paragraph 330 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 330 of the Complaint, and therefore denies the same.

331.    The allegations contained in paragraph 331 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix

lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 331 of the Complaint, and therefore denies the same.

332.    The allegations contained in paragraph 332 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 332 of the Complaint, and therefore denies the same.

333.    The allegations contained in paragraph 333 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 333 of the Complaint, and therefore denies the same.

334.    The allegations contained in paragraph 334 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 334 of the Complaint, and therefore denies the same.

335.    The allegations contained in paragraph 335 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 335 of the Complaint, and therefore denies the same.

336.    The allegations contained in paragraph 336 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 336 of the Complaint, and therefore denies the same.

337.    The allegations contained in paragraph 337 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 337 of the Complaint, and therefore denies the same.

338.    The allegations contained in paragraph 338 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 338 of the Complaint, and therefore denies the same.

339.    The allegations contained in paragraph 339 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 339 of the Complaint, and therefore denies the same.

340.    The allegations contained in paragraph 340 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 340 of the Complaint, and therefore denies the same.

341.    The allegations contained in paragraph 341 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 341 of the Complaint, and therefore denies the same.

342.    The allegations contained in paragraph 342 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix

lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 342 of the Complaint, and therefore denies the same.

343.    The allegations contained in paragraph 343 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 343 of the Complaint, and therefore denies the same.

344.    The allegations contained in paragraph 344 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 344 of the Complaint, and therefore denies the same.

345.    The allegations contained in paragraph 345 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 345 of the Complaint, and therefore denies the same.

346.    The allegations contained in paragraph 346 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 346 of the Complaint, and therefore denies the same.

347.    The allegations contained in paragraph 347 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 347 of the Complaint, and therefore denies the same.

348.    The allegations contained in paragraph 348 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 348 of the Complaint, and therefore denies the same.

349.    The allegations contained in paragraph 349 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 349 of the Complaint, and therefore denies the same.

350.    The allegations contained in paragraph 350 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 350 of the Complaint, and therefore denies the same.

351.    The allegations contained in paragraph 351 of the Complaint are not directed against Publix, and therefore, no response is required. To the extent a response is required, Publix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 351 of the Complaint, and therefore denies the same.

The allegations set forth in the unnumbered "WHEREFORE" clause following paragraph 351 of the Complaint contain conclusions of law to which no response is required. To the extent that a response is required, Publix denies the allegations in this clause.

### COUNT XII: STRICT LIABILITY (AGAINST DEFENDANT PUBLIX)

In response to the unnumbered paragraph preceding paragraph 352 of the Complaint, Publix incorporates by reference each and every response contained in paragraphs 1 through 351 as if set forth fully herein.

352.    Publix denies the allegations in paragraph 352 of the Complaint.

353.    Publix denies the allegations in paragraph 353 of the Complaint.

354.    Publix denies the allegations in paragraph 354 of the Complaint.

355.    The allegations in paragraph 355 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, Publix denies the allegations in paragraph 355 of the Complaint, including the subparts (a) through (j).

356.    The allegations in paragraph 356 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, Publix denies the allegations in paragraph 356 of the Complaint.

357.    Publix denies the allegations in paragraph 357 of the Complaint.

358.    The allegations in paragraph 358 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, Publix denies the allegations in paragraph 358 of the Complaint.

359.    The allegations in paragraph 359 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, Publix denies the allegations in paragraph 359 of the Complaint.

360.    The allegations in paragraph 360 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, Publix denies the allegations in paragraph 360 of the Complaint.

361.    The allegations in paragraph 361 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, Publix denies the allegations in paragraph 361 of the Complaint, including the subparts (a) through (c).

362.    The allegations in paragraph 362 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, Publix denies the allegations in paragraph 362 of the Complaint, including the subparts (a) and (b).

The allegations set forth in the unnumbered "WHEREFORE" clause following paragraph 362 of the Complaint contain conclusions of law to which no response is required. To the extent that a response is required, Publix denies the allegations in this clause.

## COUNT XIII: NEGLIGENCE (AGAINST DEFENDANT PUBLIX)

In response to the unnumbered paragraph preceding paragraph 363 of the Complaint, Publix incorporates by reference each and every response contained in paragraphs 1 through 362 as if set forth fully herein.

363.    Publix denies the allegations in paragraph 363 of the Complaint.

364.    Publix denies the allegations in paragraph 364 of the Complaint.

365.    Publix denies the allegations in paragraph 365 of the Complaint.

366.    The allegations in paragraph 366 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, Publix denies the allegations in paragraph 366 of the Complaint.

367.    The allegations in paragraph 367 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, Publix denies the allegations in paragraph 367 of the Complaint.

368.    The allegations in paragraph 368 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, Publix denies the allegations in paragraph 368 of the Complaint.

369.    The allegations in paragraph 369 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, Publix denies the allegations in paragraph 369 of the Complaint, including the subparts (a) through (c).

370.    The allegations in paragraph 370 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, Publix denies the allegations in paragraph 370 of the Complaint.

371.    The allegations in paragraph 371 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, Publix denies the allegations in paragraph 371 of the Complaint.

372.    The allegations in paragraph 372 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, Publix denies the allegations in paragraph 372 of the Complaint, including the subparts (a) through (c).

373.    The allegations in paragraph 373 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, Publix denies the allegations in paragraph 373 of the Complaint, including the subparts (a) and (b).

The allegations set forth in the unnumbered "WHEREFORE" clause following paragraph 373 of the Complaint contain conclusions of law to which no response is required. To the extent that a response is required, Publix denies the allegations in this clause.

## DAMAGES

374.    The allegations in paragraph 374 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, Publix denies the allegations in paragraph 374 of the Complaint directed at it.

375.    The allegations in paragraph 375 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, Publix denies the allegations in paragraph 375 of the Complaint directed at it.

376.    The allegations in paragraph 376 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, Publix denies the allegations in paragraph 376 of the Complaint directed at it.

377.    The allegations in paragraph 377 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, Publix denies the allegations in paragraph 377 of the Complaint directed at it.

378.    The allegations in paragraph 378 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, Publix denies the allegations in paragraph 378 of the Complaint directed at it.

379.    The allegations in paragraph 379 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, Publix denies the allegations in paragraph 379 of the Complaint directed at it.

380.    The allegations in paragraph 380 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, Publix denies the allegations in paragraph 380 of the Complaint directed at it.

## RELIEF REQUESTED

The allegations set forth in the unnumbered "WHEREFORE" clause preceding paragraph 381 of the Complaint contain conclusions of law to which no response is required. To the extent that a response is required, Publix denies the allegations in this clause:

381.    The allegations in paragraph 381 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, Publix denies same, and specifically denies that Plaintiff is entitled to relief of any type or nature from Publix.

382.    The allegations in paragraph 382 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, Publix denies same, and specifically denies that Plaintiff is entitled to relief of any type or nature from Publix.

383.    The allegations in paragraph 383 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, Publix denies same, and specifically denies that Plaintiff is entitled to relief of any type or nature from Publix.

384.    The allegations in paragraph 384 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, Publix denies same, and specifically denies that Plaintiff is entitled to relief of any type or nature from Publix.

385.    The allegations in paragraph 385 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, Publix denies same, and specifically denies that Plaintiff is entitled to relief of any type or nature from Publix.

386.    The allegations in paragraph 386 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, Publix denies same, and specifically denies that Plaintiff is entitled to relief of any type or nature from Publix.

387.    The allegations in paragraph 387 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, Publix denies same, and specifically denies that Plaintiff is entitled to relief of any type or nature from Publix.

388.    The allegations in paragraph 388 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, Publix denies same, and specifically denies that Plaintiff is entitled to relief of any type or nature from Publix.

389.    The allegations in paragraph 389 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, Publix denies same, and specifically denies that Plaintiff is entitled to relief of any type or nature from Publix.

390.    The allegations in paragraph 390 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, Publix denies same, and specifically denies that Plaintiff is entitled to relief of any type or nature from Publix.

## AFFIRMATIVE AND OTHER DEFENSES

Having answered the allegations in the Complaint and having denied any liability whatsoever, Publix further denies any allegations that have not been expressly admitted and asserts the following affirmative defenses. By asserting the defenses set forth below, Publix does not allege or admit that it has the burden of proof and/or the burden of persuasion with respect to any of these matters. Publix asserts as follows:

## FIRST DEFENSE

The Complaint, and each cause of action thereof, fails to allege facts sufficient to state a cause of action against Publix upon which relief can be granted. Publix reserves the right to move before or at the time of trial to dismiss the Complaint.

## SECOND DEFENSE

Publix preserves all defenses relating to lack of personal jurisdiction and improper venue, including *forum non conveniens*.

### THIRD DEFENSE

The claims asserted in the Complaint are barred, in whole or in part, because the U.S. Food and Drug Administration (FDA) has exclusive or primary jurisdiction over the matters asserted therein.

### FOURTH DEFENSE

The claims asserted in the Complaint are preempted by federal law, including (without limitation) the Federal Food, Drug, and Cosmetic Act ("FDCA").

### FIFTH DEFENSE

To the extent Plaintiff asserts claims that depend solely on violations of federal law, including any claims of a "fraud on the FDA" with respect to Publix's disclosure of information related to the safety of the products, such claims are barred and should be dismissed. *See Buckman Plaintiffs' Legal Comm*., 531 U.S. 341 (2001).

### SIXTH DEFENSE

The activities of Publix alleged in the Complaint conformed with all state and federal statutes, regulations, and industry standards, including the FDA and the FDCA, based upon the state of knowledge existing at the relevant time(s) alleged in the Complaint. Publix fully asserts the benefits of Fla. Stat. § 768.1256 and states that the product(s) at issue complied with mandatory safety standards or regulations adopted and promulgated by the federal government that were applicable to the product at the time of manufacture and that governed the product risk that allegedly caused harm.

### SEVENTH DEFENSE

Plaintiff may not recover from Publix because the methods, standards, or techniques of designing, manufacturing, and labeling of the products at issue complied with and were in

72

conformity with the generally recognized state of the art at the time the products were designed, manufactured, and labeled. Publix invokes Fla. Stat. § 768.1257 and all state of the art defenses applicable to Plaintiff's claims.

## EIGHTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by the applicable statute of limitations, including Florida's four year statute of limitations for product liability actions, Fla. Stat. § 95.11, and the applicable statutes of repose.

## NINTH DEFENSE

Should Publix be held liable to Plaintiff, which liability is specifically denied, Publix would be entitled to a set-off for all sums of money received or available from or on behalf of any tortfeasor(s) for the same injuries alleged in the Complaint. Publix further pleads the benefits of Fla. Stat. § 768.76.

## TENTH DEFENSE

To the extent that Plaintiff's claims have been settled or Plaintiff will in the future settle with any person or entity with respect to the injuries asserted in the Complaint, any liability of Publix, if any, should be reduced accordingly.

## ELEVENTH DEFENSE

Any verdict or judgment that might be recovered by Plaintiff must be reduced by those amounts that have already or will in the future, with reasonable certainty, indemnify Plaintiff in whole or in part for any past or future claimed economic loss from any collateral source such as insurance, social security, workers' compensation, or employee benefit program. To the extent that Plaintiff is seeking recovery for any benefits from any other source for injuries and damages alleged, such benefits are not recoverable in this action under applicable law.

## TWELFTH DEFENSE

Plaintiff's injuries and damages, if any, are barred in whole or in part by the actions, omissions, and/or conduct of third parties over whom Publix had no control or authority and, thus, any recovery should be reduced or barred by such parties' proportionate fault.

## THIRTEENTH DEFENSE

Plaintiff's claims are barred and/or reduced by Decedent's contributory or comparative fault.

## FOURTEENTH DEFENSE

Should Publix be held liable to Plaintiff, which liability is specifically denied, such liability is several, rather than joint, and should be prorated. Publix further pleads the benefits of Fla. Stat. §§ 768.31 and 768.81.

## FIFTEENTH DEFENSE

Pursuant to *Fabre v. Marin,* 623 So. 2d 1182 (Fla. 1993), *Allied-Signal, Inc. v. Fox,* 623 So. 2d 1180 (Fla. 1993), and *Messmer v. Teachers' Ins. Co.,* 588 So. 2d 610 (Fla. 5th DCA 1991), any damages awarded to Plaintiff are subject to apportionment by the jury of the total fault of all participants, including Plaintiff and/or Decedent and any additional entities or persons revealed through discovery. Publix specifically reserves the right to amend this Answer to identify any such parties or non- parties to have such parties or non-parties included on the verdict form pursuant to *Nash v. Wells Fargo Guard Servs., Inc.,* 648 So. 2d 1262 (Fla. 1996).

## SIXTEENTH DEFENSE

Plaintiff's claims are barred by the assumption of the risks alleged in the Complaint.

## SEVENTEENTH DEFENSE

Plaintiff's claims are barred because the risks, if any, associated with the use of products at issue are outweighed by their utility.

**EIGHTEENTH DEFENSE**

Plaintiff's claims are barred, reduced and/or limited pursuant to applicable statutory and common law regarding limitations of awards, caps on recovery, and setoffs.

**NINETEENTH DEFENSE**

If Plaintiff sustained any injuries or damages, such were the result of intervening or superseding events, factors, occurrences or conditions, which were in no way caused by Publix and for which Publix is not liable.

**TWENTIETH DEFENSE**

Plaintiff's claims are barred, in whole or in part, by doctrines of laches, waiver, unclean hands, estoppel and/or ratification.

**TWENTY-FIRST DEFENSE**

To the extent that Plaintiff's claims relate to Publix's advertising, public statements, lobbying, or other activities protected by the First Amendment to the Constitution of the United States or by the Constitution of the State of Florida or that of any other state whose laws may apply, such claims are barred. Plaintiff's claims are also barred in whole or in part by the *Noerr-Pennington* Doctrine.

**TWENTY-SECOND DEFENSE**

Plaintiff's claims are barred, in whole or in part, by Decedent's failure to mitigate any damages allegedly sustained.

**TWENTY-THIRD DEFENSE**

Plaintiff's and/or Decedent's injuries and damages, if any, were the direct result of Decedent's pre-existing medical conditions, idiosyncratic reaction to the products at issue, and/or

occurred by operation of nature or as a result of circumstances over which Publix had and continues to have no control.

### TWENTY-FOURTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by the alteration, modification, misuse or unforeseeable use by Decedent or third parties of the products at issue.

### TWENTY-FIFTH DEFENSE

Plaintiff's claims are barred by the doctrine described in Section 4 of the Restatement (Third) of Torts: Products Liability because the product(s) at issue complied with applicable product safety statutes and administrative regulations.

### TWENTY-SIXTH DEFENSE

The alleged injuries, losses, or damages attributable to the use of the product at issue in this case, if any, were solely caused by and attributable to the abnormal, unforeseeable, unintended, unreasonable, and improper use which was made of said product.

### TWENTY-SEVENTH DEFENSE

Any and all statutory defenses available to Publix pursuant to House Bill 837, signed on March 24, 2023, including sections 768.0701, 768.81, 768.0427, and 768.0706, Florida Statutes (2023).

### DEFENSES RESERVED

Publix hereby gives notice that it intends to rely upon any other defenses that may become available or apparent during the discovery proceedings in this matter, and hereby reserves its right to amend its Answer to assert any such defenses.

### JURY DEMAND

Publix requests a trial by jury on all issues so triable.

76

WHEREFORE, Publix requests that the Complaint and all claims alleged therein be dismissed with prejudice, that Publix be awarded the costs, disbursements, and attorneys' fees incurred in the defense of this action, and that Publix be granted any other relief to which it may be entitled.

Dated: November 14, 2023                    Respectfully submitted,

By:  _/s/ Monica Brownewell Smith_
Monica Brownewell Smith (FBN 1048575)
Julia Stepanova (FBN 1021185)
**BARNES & THORNBURG LLP**
4540 PGA Boulevard, Suite 208
Palm Beach Gardens, FL 33418
Telephone:     (561) 473-7560
Facsimile:      (561) 473-7561
E-Mail:         Mbrownewell@btlaw.com
                Jstepanova@btlaw.com

By:  _/s/ Andrea Cox_
Andrea Cox (FBN 173495)
**LUKS, SANTANIELLO, PETRILLO & COHEN**
6265 Old Water Oak Road, Suite 201
Tallahassee, FL  32312
Telephone:     (850) 385-9901
Email:  ACox@InsuranceDefense.net
        JBarrero@insurancedefense.net

_Counsel for Publix Super Markets, Inc._

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the forgoing was served via automatic email generated by the Florida Courts E-Filing Portal this 14th day of November, 2023, to all counsel of record.

By: __*/s/Julia Stepanova*_____
JULIA STEPANOVA



78

IN THE CIRCUIT COURT OF THE 15th
JUDICIAL CIRCUIT IN AND FOR
PALM BEACH COUNTY FLORIDA

TIMOTHY PIERS DEVALLE,                          ASBESTOS DIVISION
Individually and as Personal Representative
of the Estate of DONNA MARIE DEVALLE,           CASE NO.: 2023-014349

    Plaintiff,

-v-

JOHNSON & JOHNSON, et al.,

    Defendants.

_____/

## NOTICE OF VOLUNTARY DISMISSAL WITHOUT PREJUDICE
## AS TO DEFENDANTS JANSSEN PHARMACEUTICALS, INC., JOHNSON & JOHNSON HOLDCO (NA), INC., and KENVUE, INC.

COMES NOW, Plaintiff, TIMOTHY PIERS DEVALLE, as Personal Representative of the Estate of DONNA MARIE DEVALLE, by and through the undersigned counsel, pursuant to the Florida Rules of Civil Procedure, and hereby files this Notice of Voluntary Dismissal without Prejudice as to Defendants Janssen Pharmaceuticals, Inc., Johnson & Johnson HoldCo (NA), Inc., and Kenvue, Inc., only. Each party shall bear its own fees and costs.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served electronically on counsel of record via Florida's E-Portal this 25th day of March 2024.

Respectfully submitted,

THE FERRARO LAW FIRM, P.A.
*Attorneys for Plaintiff*
600 Brickell Avenue, Suite 3800
Miami, Florida 33131
Telephone (305) 375-0111
Facsimile (305) 379-6222

By: */s/ Marc P. Kunen*
MARC P. KUNEN, ESQ.
Florida Bar No.: 91781
mkunen@ferrarolaw.com

1

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

CASE NO. 50-2023-CA-014349-XXXA-MB (AH)

TIMOTHY PIERS DEVALLE, Individually
and as Personal Representative of the
Estate of DONNA MARIE DEVALLE,

                         Plaintiff,

v.

JOHNSON & JOHNSON;
LTL MANAGEMENT, LLC;
IMERYS TALC AMERICA, INC. f/k/a
      LUZENAC AMERICA, INC. f/k/a
      RIO TINTO MINERALS, INC.;
PUBLIX SUPER MARKETS, INC.,

                        Defendants.

## DEFENDANT LLT MANAGEMENT LLC'S FIRST REQUESTS TO PRODUCE TO PLAINTIFF TIMOTHY DEVALLE

      Defendant LLT Management LLC f/k/a LTL Management LLC, by and through undersigned counsel and pursuant to Florida Rule of Civil Procedure 1.350, hereby serves its First Requests to Produce to Plaintiff, Timothy DeValle, to be answered in writing within thirty (30) days of service hereof.

## DEFINITIONS AND INSTRUCTIONS

      1.    "You" or "your" refers to Plaintiff Timothy DeValle in the above-captioned matter, and Plaintiff's attorneys and other representatives.

      2.    "Decedent" refers to Donna Marie DeValle.

      3.    The terms "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise

4867-8212-3710

be construed to be outside of its scope.

4.    "Product" refers to JOHNSON'S® BABY POWDER and/or SHOWER TO SHOWER® allegedly used by Decedent and referred to in the Complaint.

5.    The terms "any," "all," and "each" shall be construed broadly and as necessary to bring within the scope of the discovery request all responses that otherwise could be construed to be outside of its scope.

6.    The terms "communication" or "correspondence" mean the transmittal of information of any kind, in any form, and by any means.

7.    The term "Complaint" means the Complaint originally filed by Timothy DeValle in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County in connection with the above-captioned action, as well as any amended complaints.

8.    "Identify" when used with respect to a document means to state the type of document (e.g., letter) author, addressee, date and its present location and custodian. When used with respect to a person it means to state his or her name, last known address, and last known place of employment.

9.    The term "document" is used in its broadest sense and means any written, typed, printed, recorded, or graphic matter of any kind, however produced or reproduced, and all non-identical copies thereof, whether different because of notes made thereon or otherwise, including, but not limited to, and by way of example only: letters or other correspondence, messages, telegrams, telexes, memoranda, notations, reports, analyses, summaries, charts, graphs, studies, tabulations, statements, notes, notebooks, work papers, telephone toll records, invoices, books, pamphlets, brochures, press releases, diaries, minutes of meetings or conferences, transcripts of telephone conversations, transcripts of testimony, cost sheets, financial reports,

2

CASE NO. 50-2023-CA-014349-XXXA-MB (AH)

accountants' work papers, opinions or reports of consultants, checks (front and back), check stubs, receipts, ledgers, purchase orders, pictures, photographs, contracts, agreements, advertisements, motion picture films, tapes, tape recordings, videotapes, indices, microfilm, other data compilations, including computer data and files, e-mail messages, social media postings or account data, computer diskettes or the memory units containing such data from which information can be obtained or translated into usable form, drafts of any of the foregoing, English translations or summaries of foreign language documents, and all similar documents.

10.    The term "health care provider" means any hospital, clinic, medical center, physician's office, infirmary, medical or diagnostic laboratory, or other facility that provides medical, dietary, psychiatric or psychological care or advice, and any pharmacy, weight loss center, x-ray department, laboratory, physical therapist or physical therapy department, rehabilitation specialist, physician, psychiatrist, osteopath, homeopath, chiropractor, psychologist, pharmacist, nutritionist, dietitian or other persons or entities involved in Decedent's evaluation, diagnosis, care and/or treatment.

11.    The term "relating to" means comprising, consisting of, concerning, referring to, reflecting, regarding, supporting, evidencing, prepared in connection with, used in preparation for, or being in any way legally, logically, or factually concerned with the matter or document described, referred to, or discussed.

12.    The singular shall include the plural and the plural shall include the singular; the conjunctive shall include the disjunctive and the disjunctive shall include the conjunctive.

13.    These Requests are continuing in nature.  Information sought by these Requests received after Plaintiff serves responses must be disclosed by supplemental responses.

4867-8212-3710

14.     These Requests seek information to the extent the information has not previously been disclosed.

NOT A CERTIFIED COPY

4867-8212-3710

## REQUESTS FOR PRODUCTION OF DOCUMENTS

**Request No. 1:** Produce all documents related to your appointment as Personal Representative of the Estate of Donna Marie Devalle, and all documents related to the administration of the Estate.

**Response:**

**Request No. 2:** Complete and sign the Plaintiff Fact Sheet and authorizations and releases attached hereto as Exhibit A.

**Response:**

**Request No. 3:** Produce all non-privileged documents that you reviewed that assisted you in preparing your answers to LLT's First Set of Interrogatories.

**Response:**

**Request No. 4:** Produce all documents in your possession concerning or relating to talc or ovarian cancer.

**Response:**

**Request No. 5:** Produce all electronic or magnetic data or information in your possession concerning or relating to talc or ovarian cancer. Please produce in the form of a CD or DVD.

**Response:**

**Request No. 6:** Produce all documents concerning JOHNSON'S® Baby Powder, SHOWER TO SHOWER®, or talc, including documents concerning the alleged effects of using JOHNSON'S® Baby Powder, SHOWER TO SHOWER®, or talc that you or your agents or attorneys have received or obtained from any source.

**Response:**

**Request No. 7:** Produce the actual Products identified in your Complaint and alleged in your Complaint to have been defective, together with any packaging, instructions, advertising materials,

4867-8212-3710

pamphlets, articles, promotional materials, documents, records, correspondence, memorandum, or other information with respect to the Products.

**Response:**

**Request No. 8:**  Produce all statements, signed or unsigned, written or otherwise, made by or on your behalf of you, Decedent, or any third-party statements obtained by you relating to this litigation.

**Response:**

**Request No. 9:**  Produce any diaries, calendars, journals, address books, notes, or other types of documents, whether written or electronic and including Internet postings, concerning any issue in this case, including Decedent's health, Decedent's exposure to talc, ovarian cancer, and any injuries you allege as a result of Decedent's alleged exposure to talc.

**Response:**

**Request No. 10:**  Produce all reports, test results, statistical analyses, pamphlets, brochures, articles, literature, websites, or videos relating in any way to this action in your possession or in possession of your attorneys.

**Response:**

**Request No. 11:**  Produce all documents which relate to or on which you rely in support of your claims.

**Response:**

**Request No. 12:**  Produce all documents that relate to when Decedent was made aware that her ovarian cancer could allegedly be caused by her use of the Products at issue in this case.

**Response:**

**Request No. 13:**  Produce copies of any newspapers, magazines, pamphlets, brochures, websites,

journal articles, videos, audio recordings and transcripts of any television, internet or radio programs that you contend show that a talc-based personal care product caused Decedent's ovarian cancer.

**Response:**

**Request No. 14:**  Produce all documents referring to or reflecting any website Decedent visited that contained information regarding ovarian cancer, talc, JOHNSON'S® Baby Powder or SHOWER TO SHOWER®.

**Response:**

**Request No. 15:** Produce a copy of all medical records, reports, and/or documents from any hospital, physician, or other health care provider who treated Decedent for her ovarian cancer or any disease, condition or symptom referred to in any of Interrogatory answers including, but not limited to, all imaging studies (i.e., x-rays, CT scans, MRIs, or other radiographic images) of any part of Decedent's body that relate in any manner to the diagnosis, treatment, care, or management of Decedent's condition and the injuries alleged in your Complaint.

**Response:**

**Request No. 16:** Produce documents reflecting prescriptions for all drugs and medications Decedent used in the ten (10) years prior to her death.

**Response:**

**Request No. 17:** Produce all documents which relate to the elements of damages set forth in your Complaint, including but not limited to medical bills (and any related correspondence), insurance records, pharmacy bills, nursing services, therapy, counseling, and other employed help that you contend were incurred because of Decedent's exposure to the Products at issue, together with any reports, studies, or analyses that set forth in any manner the amount of any future damages.

4867-8212-3710

**Response:**

**Request No. 18:** Produce copies of Decedent's income tax returns for the years 2000 to present, W-2 forms, 1099s, all attachments and schedules thereto, and bookkeeping records.

**Response:**

**Request No. 19:** Produce Decedent's employment records, including employment applications, performance evaluations, paychecks, and paycheck stubs.

**Response:**

**Request No. 20:** Produce all documents relating to any loss of income or disability that you claim.

**Response:**

**Request No. 21:** If Decedent was the claimant or subject of any workers' compensation, social security or other disability proceeding, produce all documents relating to such proceeding.

**Response:**

**Request No. 22:** Produce any written application for any policy of insurance on Decedent's life or health, or for medical or hospital benefits, or for income continuation filed by Decedent or on her behalf.

**Response:**

**Request No. 23:** Produce all documents related to any insurance policy that provided coverage for any of the damages you allege in this action.

**Response:**

**Request No. 24:** Produce copies of all accident or incident reports in which Decedent was involved.

**Response:**

**Request No. 25:** Produce copies of all pleadings, including but not limited to complaints, answers,

NOT A CERTIFIED COPY

answers to interrogatories, deposition notices, transcripts of depositions, settlement papers, releases, stipulations of dismissal and covenants not to sue, in any action for personal injuries by or on behalf of Decedent at any time during her life (excluding the instant lawsuit).

**Response:**

**Request No. 26:** Produce copies of any advertisements or promotions for JOHNSON'S® Baby Powder or SHOWER TO SHOWER® in your possession, as well as any advertisements for any other talc-based products.

**Response:**

**Request No. 27:** Produce all documents relating to Decedent's purchase or acquisition of JOHNSON'S® Baby Powder or SHOWER TO SHOWER®, including but not limited to, receipts, containers, labels, or records of purchase.  If you do not have such documents, please acknowledge this fact explicitly in your response.

**Response:**

**Request No. 28:** Produce all documents in your possession or in the possession of anyone acting on your behalf (not your lawyer) obtained directly or indirectly from any of the Defendants.

**Response:**

**Request No. 29:** Produce all photographs, drawings, journals, slides, videos, DVDs or any other media relating to the allegations in your Complaint, Decedent's alleged injury, or Decedent's life after the onset of her alleged injury, or that you intend to use, or may use, at trial.

**Response:**

**Request No. 30:** Produce an inventory of all pathology in your possession, including all original and recut slides and preserved tissue blocks.  For each slide or block in your possession, identify

the following: (a) the complete accession number; (b) the date of the procedure; and (c) if slide, identify as original H&E, unstained recut or stained recut.

**Response:**

**Request No. 31:** Produce all pathology in your possession, including all original and recut slides and preserved tissue blocks, and produce a completed chain of custody accounting for each slide and block in your possession.

**Response:**

**Request No. 32:** Produce all data, including but not limited to observations, calculations, and results—regardless of how recorded—from any pathology analysis or test performed by any expert witnesses retained by you or on your behalf in this case.

**Response:**

**Request No. 33:** Produce all videotapes and laboratory books documenting sample condition, preparation, testing, and data collection from all destructive testing conducted on Decedent's pathology by any expert retained by you or on your behalf in this case.

**Request No. 34:** Produce all documents or tangible things related to any testing, examination, or analysis conducted on Decedent's preserved tissue in relation to this lawsuit.

**Response:**

**Request No. 35:** Produce all videotapes and laboratory books documenting sample condition, preparation, testing, data collection and results from any testing or analysis of the powder products at issue in this lawsuit performed by any expert retained by you or on your behalf in this case.

**Response:**

**Request No. 36:** Produce all talc and powder products, samples, and materials tested by any expert retained by you or on your behalf in this litigation.

**Response:**

**Request No. 37:**  Produce all documents related to any epidemiological analysis related to your contention that talc specifically caused Decedent's ovarian cancer, including all documents related to any underlying data reviewed in connection with such epidemiological analysis.

**Response:**

**Request No. 38:** Produce all medical or other texts, journals, or treatises which you intend to rely on in cross-examination of any representative of any Defendants or of any expert witness.

**Response:**

**Request No. 39:** Produce the reports and curriculum vitae of all expert witnesses who have reviewed any aspect of this case on your or your attorneys' behalf and who may be asked to testify at the time of trial.

**Response:**

**Request No. 40:**  Produce all other documents and tangible things, including physical models, simulations, cartoons, compilations of data, and other material, prepared by any expert witness who may be asked to testify at the time of trial.

**Response:**

**Request No. 41:**  Produce all documents concerning any communications (including any chat room, e-mail or other electronic communications) between Decedent, you, your attorneys or your agents and any of the following individuals or entities (or employees and agents thereof), relating in any way to JOHNSON'S® Baby Powder, SHOWER TO SHOWER®, or other talc-based personal care products, ovarian cancer, Decedent's exposure to talc, and/or the events allegedly giving rise to this lawsuit:

      a.      Defendants

CASE NO. 50-2023-CA-014349-XXXA-MB (AH)

    b.      manufacturers of any talc-based personal care product;

    c.      other individuals who have used a talc-based personal care product;

    d.      the Food and Drug Administration;

    e.      any other federal or state governmental agency or institution; or

    f.      any healthcare provider, medical facility, ovarian cancer support group, medical researcher, or any other individual or entity.

**Response:**

**Request No. 42:**  Produce all documents received in response to any request or inquiry to any organization, association, or government agency regarding JOHNSON'S® Baby Powder, SHOWER TO SHOWER®, or other talc-based personal care products or ovarian cancer.

**Response:**

**Request No. 43:** Produce all documents or other tangible things in the possession of you or your representatives which are, or appear to be, addressed or furnished to or from Defendants or their subsidiaries, affiliates, agents, servants or employees, and which relate to talc-based personal care products, ovarian cancer, or the subject matter of this action.

**Response:**

**Request No. 44:**  Produce any documents or evidence, including but not limited to documents obtained via subpoena or otherwise from any third party, related to or supporting any claim or allegation that (a) Defendants' talc products were contaminated with asbestos or any other alleged contaminants (including but not limited to alleged heavy metals); (b) Defendants' testing methods for the presence of asbestos or any other alleged contaminants (including but not limited to alleged heavy metals) were inadequate or failed to comply with industry or regulatory standards; or (c) asbestos contamination or any other alleged contaminants (including but not limited to alleged

4867-8212-3710

heavy metals) of Defendants' talc products were casually related to any of Decedent's injuries.

**Response:**

**Request No. 45**:  Any and all documents related to any consumer or customer loyalty accounts or programs, rewards programs, retailer memberships, or other similar consumer or customer programs that Decedent ever had with any of the retailers at which she purchased or obtained any talcum powder products, including JOHNSON'S® Baby Powder or SHOWER TO SHOWER®. This request includes, but is not limited to, any account, program, or membership applications, any account records, any account or membership cards (in any form, including key ring cards), any account documents reflecting products purchased by Decedent, and any other purchase history information.

**Response:**

**Request No. 46**:  Any and all documents related to any retailer or store affiliated or branded credit cards or retailer or store credit or purchasing accounts that pertain to the time periods you allege Decedent purchased or obtained from those retailers any talcum powder products, including JOHNSON'S® Baby Powder or SHOWER TO SHOWER®. This request includes, but is not limited to, any applications for any such credit card or purchasing account, any account records, any account documents reflecting products purchased by Decedent, and any other purchase history information.

**Response:**

Dated: May 17, 2024

Respectfully submitted,

**SHOOK, HARDY & BACON L.L.P.**

*s/ Jennifer A. McLoone*
JENNIFER A. McLOONE
Fla. Bar. No. 029234
jmcloone@shb.com
DANIELLE A. GREENBERG
Fla. Bar No. 1038864
dgreenberg@shb.com
DARIA PIETROPAOLO
Fla. Bar No. 1049460
dpietropaolo@shb.com
Citigroup Center, Suite 3200
201 South Biscayne Blvd.
Miami, Florida 33131-4332
T: (305) 358-5171 | F: (305) 358-7470

***Counsel for Defendant, LLT Management LLC
f/k/a LTL Management LLC***

14

4867-8212-3710

CASE NO. 50-2023-CA-014349-XXXA-MB (AH)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 17, 2024 I electronically filed the foregoing with the Clerk of Court by using the Florida Courts E-Filing Portal, which will send an electronic notice to counsel of record listed on the below Service List.

By: *s/ Jennifer A. McLoone*
Jennifer A. McLoone

Marc P. Kunen, Esquire
**THE FERRARO LAW FIRM, P.A.**
600 Brickell Avenue, Suite 3800
Miami, Florida 33131
T: 305.375.0111
E: mkunen@ferrarolaw.com

*Attorneys for Plaintiff*

Andrea Cox, Esquire
**LUKS SANTANIELLO, PETRILLO & COHEN**
6265 Old Water Oak Road, Suite 201
Tallahassee, Florida 32312
T:  850.385.9901
E:  acox@insurancedefense.net
    jbarrero@insurancedefense.net

Julia Stepanova, Esquire
Monica Brownewell Smith, Esquire
**BARNES & THORNBURG LLP**
4540 PGA Boulevard, Suite 208
Palm Beach Gardens, Florida 33418
T:  561.473.7560
E:  jstepanova@btlaw.com
    monica.brownewell@btlaw.com
    hope.hayes@btlaw.com

*Attorneys for Publix Super Markets, Inc.*

15

4867-8212-3710

# EXHIBIT A

NOT A CERTIFIED COPY



## PLAINTIFF FACT SHEET

Please provide the following information for each individual on whose behalf a claim is being made.  If you are completing this Plaintiff Fact Sheet in a representative capacity, please respond to the remaining questions with respect to the person who used Johnson's Baby Powder and/or Shower to Shower. Whether completing this fact sheet for yourself or for someone else, please assume that "You" means the Johnson's Baby Powder and/or Shower to Shower user.

In filling out this form, please use the following definitions: (1) "**health care provider**" means any hospital, clinic, medical center, physician's office, infirmary, medical or diagnostic laboratory, or other facility that provides medical, dietary, psychiatric or psychological care or advice, and any pharmacy, weight loss center, x-ray department, laboratory, physical therapist or physical therapy department, rehabilitation specialist, physician, psychiatrist, osteopath, homeopath, chiropractor, psychologist, nutritionist, dietician, or other persons or entities involved in the evaluation, diagnosis, care and/or treatment of you; (2) "**document**" means any writing or record of every type that is in your possession, including but not limited to written documents, documents in electronic format, cassettes, videotapes, photographs, charts, computer discs or tapes, and x-rays, drawings, graphs, phone-records, non-identical copies and other data compilations from which information can be obtained and translated, if necessary, by the respondent through electronic devices into reasonably usable form.

> You may attach as many sheets of paper as necessary to fully answer these questions.

**I.     CASE INFORMATION**

1.     Name of person completing this form: _____

2.     If you are completing this Plaintiff Fact Sheet in a representative capacity (e.g., on behalf of the estate of a deceased person), please complete the following:

   a.     Your name: _____

   b.     Current Address: _____

   c.     What is your relationship to the individual you represent: _____

> **THE REST OF THIS PLAINTIFF FACT SHEET REQUESTS INFORMATION ABOUT THE PERSON WHO USED JOHNSON'S BABY POWDER AND/OR SHOWER TO SHOWER**

**II.     PERSONAL INFORMATION**

1.     Name: _____

2.     Maiden or other names used and dates you used those names: _____

_____

3.     Current Address and Date when you began living at this address: _____

_____

4.     Identify each address at which you have resided during the last ten (10) years, and the dates you resided at each one.

| Address | Dates of Residence |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |

5.      Social Security Number:_____

6.      Date and Place of Birth:_____

7.      Date of Death (if applicable):_____

8.      Current Marital Status:_____

9.      Occupation of current spouse:_____

10.    Name(s) of current and former spouse(s), date(s) of marriage(s) and dates the marriage(s) were terminated, if applicable, and the nature of the termination (*e.g.*, death, divorce):

_____

_____

_____

11.    If you have children, please identify each child's name, address and date of birth.

| Child's Name and Address | Date of Birth |
|---|---|
|  |  |
|  |  |
|  |  |

12.    Identify all schools you attended, starting with high school:

| Name of School | Address and Telephone Number | Dates of attendance | Degree Awarded | Major or Primary Field |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

13.              Are you currently employed?   Yes___ No___

If "Yes", please identify your current employer and position there:_____

a.       Did you ever leave this job for a medical reason?   Yes___      No___

*Talc Plaintiff Fact Sheet*
**Page 3**

If "Yes", describe why you left:_____

_____

14.     Please identify the following for each employer you have had:

| Name and Address of Employer | Approx. Dates of Employment | Occupation/Job Title | Rate of Pay or Salary | Reason for Leaving |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

15.     Have you ever served in any branch of the military?  Yes___  No___

     a.     Branch and dates of service: _____

             If "Yes", were you ever were discharged for any reason relating to your medical, physical or psychiatric condition?

             Yes ___ No

             If "Yes", state what that condition was: _____

     b.     Have you ever been rejected from military service for any reason relating to your medical, physical, or psychiatric condition?

             Yes___No___

If "Yes", state what that condition was: _____

16.         Have you applied for workers' compensation, social security, or state or federal disability benefits within the past ten (l0) years?

Yes____    No____

If "Yes", then as to each application, separately state:

a.    Date (or year) of application:_____

b.    Type of benefits: _____

c.    Nature of claimed injury/disability:_____

d.    Period of disability:_____

e.    Amount awarded:_____

f.    Basis of your claim:_____

g.    Was claim denied? Yes____ No____

h.    To what agency or company did you submit your application:

_____

i.    Claim/docket number, if applicable:_____

17.    Have you ever filed a lawsuit other than the present suit, relating to any bodily injury within the past ten (10) years?

Yes____    No____

If "Yes", please explain the nature of the case, where it was filed, and identify your lawyer:

_____

_____

_____

18.    Have ever been involved in any accident or incident in which or as a result of which you suffered any personal injuries other than the injuries complained of in this proceeding?

Yes____    No____

a.    If "Yes", for each injury state:

| Nature of injury | Date of Onset (approx.) | Location | Circumstance |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

19.    In the last 10 years, have you been convicted of or pled guilty to any felony and/or have you been convicted of or pled guilty to any crime that involved an alleged act of dishonesty or providing a false statement?

Yes____  No____

If "Yes", please state the charge to which you pled guilty to or were convicted, as well as the court where the action was pending: _____

_____ _

20.    Have you ever received Medicare, Medicaid or other government medical benefits within the past ten (10) years? Yes ____No _____

If yes, please describe the benefits received:

If yes, are you receiving Medicare benefits now? Yes _____ No _____

If yes, provide your Medicare number: _____

21.             Identify each health insurance carrier that provided coverage for services rendered in relation to your ovarian cancer:

| Insurance Company | Policy Number | Policy Holder | Dates of Coverage |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

### III.   HEALTH CARE PROVIDERS AND PHARMACIES

1.             Identify each doctor or other health care provider who you have seen for medical care and treatment in the past ten (10) years:

| Doctor or Health care Provider's Name | Doctor or Health care Provider's Specialty | Address | Reason for Visit | Approx. Dates/Years of Visits |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

If each of your healthcare providers with whom you have consulted in relation to treatment for ovarian cancer was not identified previously, for each such provider please identify:

| Name and Specialty | Address & Phone Number | Dates of Treatment | Reason for Treatment |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

2.          Identify each hospital, clinic, or health care facility where you were hospitalized (inpatient, out-patient, or emergency room visit) in the past ten (10) years:

| Name | Address and Telephone Number | Admission Date(s) | Reason for Admission Approx dates/years of visits |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

If each of the health care facility from which you received services in relation to your ovarian cancer was not identified previously, for each such facility please identify:

| Name of Facility | Address & Phone Number | Dates of Treatment | Reason for Treatment |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

3.          Identify each pharmacy that has dispensed medication to you in the past ten (10) years:

| Name of Pharmacy | Address and Telephone Number of Pharmacy | Name of medication dispensed | Approx. Dates/Years You Used Pharmacy |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

If each of the pharmacies from which you received services in relation to your ovarian cancer was not identified previously, for each such pharmacy please identify:

| Name of Pharmacy | Address & Phone Number |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

4.     Have you had any communications with your health care providers, orally or in writing, about whether your condition is related to your use of Johnson's Baby Powder and/or Shower to Shower?

Yes____   No____     I don't recall ____

If "Yes", please identify the name, address and approximate date of communication with said health care provider:

_____

_____

5.     Has any health care provider told you your ovarian cancer is related to talc?

Yes____   No____

If yes, please identify the provider, the date on which he/she did so, and the substance of the conversation:_____

6.     Has any health care provider told you your ovarian cancer is related to something other than talc?
Yes____   No____

If yes, please identify the provider, the date on which he/she did so, and the substance of the conversation:_____

IV.    <u>**BABY POWDER AND/OR SHOWER TO SHOWER USE**</u>

1.    Have you ever used Johnson's Baby Powder?  Yes _____ No _____

      If "Yes", identify:

      a)    Date(s) of use:_____

      b)    Please describe the Johnson's Baby Powder product you claim to have used, including a description of the packaging, the size, the scent, and any other identifying characteristics of the product:

          _____
          _____
          _____
          _____

      c)    Please identify the names and addresses of the retailers or wholesalers from whom you purchased Johnson's Baby Powder:_____

2.    Have you ever used Johnson & Johnson Shower to Shower?  Yes _____ No _____

      If "Yes", identify:

      a)    Date(s) of use:_____

      b)    Please describe the Johnson & Johnson's Shower to Shower product you claim to have used, including a description of the packaging, the size, the scent, and any other identifying characteristics of the product:

          _____
          _____
          _____
          _____

      c)    Please identify the names and addresses of the retailers or wholesalers from whom you purchased Johnson & Johnson's Shower to Shower:_____

3.  Provide in the chart below the name and address of each person with personal knowledge of your exposure to Johnson's Baby Powder and/or Shower to Shower.

| Name | Address | Relation to you |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

4.  Have you ever seen any advertisements (*e.g.*, in magazines, television commercials, internet, radio, etc.) for Johnson's Baby Powder or Shower to Shower?

    Yes _____ No _____

    If "Yes," identify the advertisement or commercial, and approximately when you saw the advertisement or commercial:_____

    _____

5.  Please describe when and how you became aware that your ovarian cancer could be caused by your use of Defendants' talc products:

    _____
    _____
    _____
    _____

6.  Other than communications with your attorneys, have you communicated or posted any information regarding talc, Johnson's Baby Powder, Shower to Shower, or ovarian cancer on any websites, chat rooms, blogs, or any other electronic media?

    Yes_____    No _____    I do not recall _____

    If "Yes," set forth the date of the communication, the name of the site, the method of communication, and the substance of the communication: _____

**V.    INJURIES & DAMAGES**

1.  Have you been diagnosed with ovarian cancer? Yes_____ No_____

    If yes, state:

    a) The date of diagnosis:_____

    b) The symptoms you developed:_____

    c) When the symptoms developed and manifested:_____

d) All present complaints:

_____

_____

_____

2.      Are you making a claim for lost wages or lost earning capacity?

              Yes _____ No _____

(a)     If "Yes", state for the last five (5) years the Annual gross income you derived
        from your employment:

| Year | Annual gross income |
|------|---------------------|
|      |                     |
|      |                     |
|      |                     |
|      |                     |
|      |                     |

3.      If you are making a claim for lost wages identify the following for each employer you
        have had in the last five (5) years:

| Name and Address of Employer | Approx. Dates of Employment | Occupation/Job Title | Rate of Pay or Salary | Reason for Leaving |
|------------------------------|------------------------------|----------------------|-----------------------|--------------------|
|                              |                              |                      |                       |                    |
|                              |                              |                      |                       |                    |
|                              |                              |                      |                       |                    |
|                              |                              |                      |                       |                    |

## VI.    FACT WITNESSES

1.    Please identify all persons who you believe possess information concerning your injury(ies) and current medical conditions, other than your health care providers, and please state their name, address and his/her/their relationship to you (attach additional pages as necessary):

| Name | Address | Relationship to You |
|------|---------|---------------------|
|      |         |                     |
|      |         |                     |
|      |         |                     |
|      |         |                     |
|      |         |                     |
|      |         |                     |
|      |         |                     |
|      |         |                     |
|      |         |                     |

## VII.    MEDICAL BACKGROUND OF BODY POWDER USER

A. Current Height: ____ft. ____in.    Current Weight: _____ lbs.
   Highest weight during adulthood:
   Lowest weight during adulthood:

B. Smoking History:

   1.   Do you currently smoke cigarettes?

        Yes __ No __

      If yes, for how long have you smoked?
         -- If yes, how many cigarettes/packs per day have you smoked?
         -- Have your smoking habits changed over time?

   2.   Have you ever smoked cigarettes in the past?

        Yes __ No __

        -- If yes, when did you begin such smoking?

-- How long did you smoke?

-- How many cigarettes/packs per day did you

smoke until you stopped?

C. Drinking History:

    1.   Do you currently drink alcohol (beer, wine, liquor, etc.)?
Yes __ No __    If yes, how many drinks per week? _____

    2.   During the previous twenty (20) years, have you drunk alcohol?
Yes ___ No __
-- If yes, during what period of time did you drink alcohol?
-- How many drinks per week did you consume? ____

D. Menstrual History:

    1.   Date of and age at first menstrual period: _____

    2.   Date of and age at last menstrual period: _____

    3.   Were your menstrual cycles regular:  Yes __    No __

        i.   If yes, average length of cycle:  _____

        ii.   If yes, average length of period:  _____

    4.   Did you ever experience any menstrual problems (including irregular periods, painful periods, or absence of periods?

      a.   If your answer is yes, please give approximate dates and description of such problem(s):
_____

    5.   Did you seek medical treatment or advice for any condition described in your answer to 4, above?  Yes __    No __

      a.   If your answer is yes, please give the name and address of the health care provider consulted, and types of any such treatment(s) given by that provider:
_____

    6.   Menopausal History:

      a.   Age at menopause: _____

b. Menopausal symptoms -- did you experience any menopausal symptoms (e.g., hot flashes/hot flushes, vaginal atrophy, etc.)?  Yes ___    No ___

c. If your answer is yes, please give a description of such problem(s):

_____

d. Did you seek medical treatment or advice for any condition described in your previous answer, above?  Yes ___    No ___

e. If your answer is yes, please give the name and address of the health care provider consulted, and types of any such treatment(s) given by that provider:

_____

E.  Medical History:  If you know, have you ever been diagnosed with any of the following?

| Condition | Yes/No | Date of Diagnosis |
|---|---|---|
| BRCA1 or BRCA2 mutation | | |
| Endometriosis | | |
| Adenomyosis | | |
| Irregular vaginal bleeding | | |
| Rectal bleeding | | |
| Ovarian cysts | | |
| Polycystic ovaries and/or Polycystic Ovarian Syndrome (PCOS) | | |
| Uterine fibroids | | |
| Infertility | | |
| Depression | | |
| Anxiety | | |
| Panic disorder | | |
| High cholesterol | | |
| High blood pressure | | |
| Breast cancer | | |
| Lynch Syndrome | | |
| Other cancer (please specify below): | | |
|     Type of cancer(s): | | |
| Obesity/overweight | | |
| Ostopenia or osteoporosis | | |
| Type II diabetes mellitus | | |
| Type I diabetes mellitus | | |
| Gestational diabetes | | |

NOT A CERTIFIED COPY

F.  <u>*Other than*</u> those injuries that you believe were caused by your use of body powder, do you currently suffer from any physical injuries, illnesses, or disabilities? Yes __ No __

If yes, please identify:

The injury, illness, or disability: _____

Date(s) of onset: _____

Date(s) of diagnosis: _____

Name and address of treating physician:

_____

### Family Medical History

A.  To the best of your knowledge, please indicate whether your *parents, siblings, children, grandparents, aunts, uncles, or cousins* have ever suffered from or been treated for any type of cancer (including but not limited to ovarian cancer or breast cancer):

| Relative's Name | Relation to you | Relative's residence | Type and date of cancer(s) |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

B.  To the best of your knowledge, please indicate whether your *parents, siblings, children, grandparents, aunts, uncles, or cousins* have ever been diagnosed with any genetic mutations, including but not limited to BRCA1 or BRCA2 mutations?

Yes __    No __

If you answer is yes, please identify each such relative's name, relation to you, place of residence:

## VIII.  <u>DOCUMENT DEMANDS</u>

### A. <u>AUTHORIZATIONS</u>

**1)**  <u>**Health care Authorizations**</u> – For each health care provider identified in the responses above, please provide a completed and signed (but undated) Health care Authorization in the form attached as **Exhibit "A."**

**2)**  <u>**Tax Return 4506 and 4506-T IRS Forms**</u> –

a) Only if you answered "Yes" to question V(2) in the Plaintiff Fact Sheet and are asserting a claim for lost wages or a reduction in lost earning capacity, please provide a completed and signed IRS Form 4506 and 4506-T attached as **Exhibit "B"** for each year identified in your answer to question X.4.

b) If you answered "No" to question V(2) in the Plaintiff Fact Sheet and are not asserting a wage loss claim or a reduction in lost earning capacity, you are not required to provide IRS Form 4506 / 4506-T.

**3)**  <u>**Authorizations for the Release of Employment Records**</u> – If you are  asserting a claim for lost wages or a reduction in or lost earning capacity please provide a completed and signed Employment Authorization attached as **Exhibit "C"** for each employer identified in your answer question V(3).

**4)**  <u>**Authorization for Release of Workers' Compensation Records**</u> – If you answered "Yes" to question II(16) in the Plaintiff Fact Sheet, stating that you applied for workers' compensation within the past ten (l0) years, please provide a completed and signed (but undated) Authorization for Release of Workers' Compensation Records for each agency or company you submitted your application to in the last 10 years in the form attached as **Exhibit "D."**

**5)**  <u>**Authorization for Release of Disability Records**</u> - If you answered "Yes" to question II(16) in the Plaintiff Fact Sheet, stating that you applied for disability within the past ten (l0) years, please provide a completed and signed (but undated) Authorization for Release for each agency or company you submitted your application to in the last 10 years in the form attached as **Exhibit "E."**

**6)**  <u>**Educational Records**</u> - If you are asserting a claim for lost wages or a reduction in or lost earning capacity please provide a completed and signed Educational Authorization attached as **Exhibit "F"** for each educational institution for each educational institution that you listed in response to question II(12).

**7)**  <u>**Authorization for the Release of Medicare/Medicaid Records**</u> – Please provide a completed and signed Authorization for the Release of Medicare/Medicaid Records attached as **Exhibit "G"**.

**8)    Authorization for the Release of Social Security Administration Records** – Please provide a completed and signed Authorization for the Release of Social Security Administration attached as **Exhibit "H"**.

## B. OTHER RELEVANT DOCUMENTS

Documents in your possession, including writings on paper or in electronic form (if you have any of the following materials in your custody or possession, please indicate which documents you have and attach a copy of them to this Plaintiff Fact Sheet):

1.    All non-privileged documents you reviewed that assisted you in the preparation of the answers to this Plaintiff Fact Sheet.  Yes _____ No _____

2.    A copy of all medical records and/or documents from any hospital or health care provider who treated you for your ovarian cancer or any disease, condition or symptom referred to in any of your responses to the questions above, including, but not limited to, all imaging studies of any part of your body that relate in any manner to the diagnosis, treatment, care or management of your condition and the injuries alleged in your Complaint.    Yes _____ No _____

3.    If you have been the claimant or subject of any workers' compensation, social security or other disability proceeding, all documents relating to such proceeding. Yes _____ No _____

4.    Copies of advertisements or promotions Johnson's Baby Powder or Shower to Shower.  Yes _____ No _____

5.    All documents relating to your purchase of Johnson's Baby Powder or Shower to Shower, including, but not limited to, receipts, containers, labels, or records of purchase.  Yes _____ No _____

6.    All documents known to you and in your possession which mention Johnson's Baby Powder or Shower to Shower or any alleged health risks or hazards related to said products in your possession at or before the time of the injury alleged in your Complaint, other than legal documents, documents provided by your attorney or documents obtained or created for the purpose of seeking legal advice or assistance.  Yes _____ No _____

7.    All documents in your possession or anyone acting on your behalf (not your lawyer) obtained directly or indirectly from any of the Defendants. Yes _____ No _____

8.    All documents constituting any communications or correspondence between you and any representative of the Defendants.  Yes _____ No _____

9.    All photographs, drawing, journals, slides, videos, DVDs or any other media relating to your alleged injury or your life after the incident.  Yes _____ No _____

10.     Copies of all documents you (and not your lawyer) obtained from any source related to Johnson's Baby Powder or Shower to Shower or to the alleged effects of using Johnson's Baby Powder or Shower to Shower.  Yes _____ No _____

11.     If you claim you have suffered a loss of earnings or earnings capacity, your federal tax returns for each of the last five (5) years or W-2s for each of the last five years.  Yes _____ No _____

12.     If you claim any loss from medical expenses, copies of all bills from any physician, hospital, pharmacy or other health care providers.  Yes _____ No _____

13.     All public statements made by or on behalf of you relating to this litigation in your possession.  Yes _____ No _____

14.     Copies of letters testamentary or letters of administration relating to your status as plaintiff (if applicable).  Yes _____ No _____

15.     Decedent's death certificate and autopsy report (if applicable).  Yes _____ No _____

IX.  **<u>DECLARATION</u>**

     I declare under penalty of perjury that all of the information provided in this Plaintiff Fact Sheet is true and correct to the best of my knowledge, information and belief formed after due diligence and reasonable inquiry, that I have supplied all the documents requested in Part VIII of this Plaintiff Fact Sheet, to the extent that such documents are in my possession or in the possession of my lawyers, and that I have supplied the Authorizations attached to this declaration.

Date:_____

_____
Signature

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

Form Approved
OMB No. 0938-0930
Expires: 11/30/2025

## AUTHORIZATION TO DISCLOSE PERSONAL HEALTH INFORMATION FORM

**This form is used to advise Medicare of the person or persons you have chosen to have access to your personal health information.**

**Where to Return Your Completed Authorization Forms:**

After you complete and sign the authorization form, return it to the address below:

**Medicare CCO, Written Authorization Dept.**
**PO Box 1270**
**Lawrence, KS 66044**

**For New York Medicare Beneficiaries ONLY**

The New York State Public Health Law protects information that reasonably could identify someone as having HIV symptoms or infection, and information regarding a person's contacts. Because of New York's laws protecting the privacy of information related to alcohol and drug abuse, mental health treatment, and HIV, there are special instructions for how you, as a New York resident, should complete this form.

- **For question 2A,** check the box for Limited Information, even if you want to authorize Medicare to release any and all of your personal health information.

- **Then proceed to question 2B.** You may also check any of the remaining boxes and include any additional limitations in the space provided. For example, you could write "payment information".

**Instructions for Completing Section 2C of the Authorization Form:**

*Please select one of the following options.*

- **Option 1** To **include** all information, check the box: "All information, including information about alcohol and drug abuse, mental health treatment, and HIV". Proceed with the rest of the form.

- **Option 2** To **exclude** the information listed above, check the box "Exclude information about alcohol and drug abuse, mental health treatment, and HIV". Then proceed with the rest of the form.

If you have any questions or need additional assistance, please feel free to call us at 1-800-MEDICARE (1-800-633-4227). TTY users should call 1-877-486-2048.

Sincerely,

1-800-MEDICARE
Customer Service Representative

Enclosure

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

Form Approved
OMB No. 0938-0930
Expires: 11/30/2025

## Information to Help You Fill Out the
## "1-800-MEDICARE Authorization to Disclose Personal Health Information" Form

By law, Medicare must have your written permission (an "authorization") to use or give out your personal medical information for any purpose that isn't set out in the privacy notice contained in the Medicare & You handbook. You may take back ("revoke") your written permission at any time, except if Medicare has already acted based on your permission.

If you want 1-800-MEDICARE to give your personal health information to someone other than you, you need to let Medicare know in writing.

If you are requesting personal health information for a deceased beneficiary, please include a copy of the legal documentation which indicates your authority to make a request for information. (For example: Executor/ Executrix papers, next of kin attested by court documents with a court stamp and a judge's signature, a Letter of Testamentary or Administration with a court stamp and judge's signature, or personal representative papers with a court stamp and judge's signature.) Also, please explain your relationship to the beneficiary.

**Please use this step by step instruction sheet when completing your "1-800-MEDICARE Authorization to Disclose Personal Health Information" Form. Be sure to complete all sections of the form to ensure timely processing.**

1. Print the name of the person with Medicare.
   - Print the Medicare number exactly as it is shown on the red, white, and blue Medicare card.
   - Print the birthday in month, day, and year (mm/dd/yyyy) of the person with Medicare.

2. This section tells Medicare what personal health information to give out. Please check a box in 2A to indicate how much information Medicare can disclose. If you only want Medicare to give out limited information (for example, Medicare eligibility), also check the box(es) in 2B that apply to the type of information you want Medicare to give out. Box 2C must be completed by New York Residents.

3. This section tells Medicare when to start and/or when to stop giving out your personal health information. Check the box that applies and fill in dates, if necessary.

4. This section tells Medicare the reason for disclosure.

5. Medicare will give your personal health information to the person(s) or organization(s) you fill in here. You may fill in more than one person or organization.

   If you designate an organization, you must also identify one or more individuals in that organization to whom Medicare may disclose your personal health information.

6. The person with Medicare or personal representative must sign their name, fill in the date, and provide the phone number and address of the person with Medicare.

   If you are a personal representative of the person with Medicare, check the box, provide your address and phone number, and attach a copy of the paperwork that shows you can act for that person (for example, Power of Attorney).

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

Form Approved
OMB No. 0938-0930
Expires: 11/30/2025

7.  Send your completed, signed authorization to Medicare at the address shown here on your authorization form.

8.  If you change your mind and don't want Medicare to give out your personal health information, write to the address shown under number seven on the authorization form and tell Medicare. Your letter will revoke your authorization and Medicare will no longer give out your personal health information (except for the personal health information Medicare has already given out based on your permission).

**You should make a copy of your signed authorization for your records before mailing it to Medicare.**

You have the right to get Medicare information in an accessible format, like large print, Braille, or audio. You also have the right to file a complaint if you feel you've been discriminated against. Visit **Medicare.gov/about-us/accessibility-nondiscrimination-notice** or call 1-800-MEDICARE (1-800-633-4227) for more information. TTY users can call 1-877-486-2048.

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

Form Approved
OMB No. 0938-0930
Expires: 11/30/2025

## 1-800-MEDICARE AUTHORIZATION TO DISCLOSE PERSONAL HEALTH INFORMATION

Use this form if you want 1-800-MEDICARE to give your personal health information to someone other than you.

**1. Print Name** (First, Middle, Last, Suffix) of the person with Medicare

Donna Marie Devalle

| **Medicare Identification Number** (if issued), exactly as shown on the Medicare Card | **Date of Birth** (mm/dd/yyyy) |
|---|---|
| | |

**2. Medicare will only disclose the personal health information you want disclosed.**

**2A: Check only <u>one</u> box below to tell Medicare the specific personal health information you want disclosed:**

☐ Limited Information (go to question 2b)

☒ Any Information (go to question 3)

**2B: Complete only if you selected "limited information". Check all that apply:**

☐ Information about your Medicare eligibility

☐ Information about your Medicare claims

☐ Information about plan enrollment (e.g. drug or MA Plan)

☐ Information about premium payments

☐ Other Specific Information (please write below; for example, payment information)

_____

_____

_____

**2C: NY Residents Only, this section must be completed.**
Please select one of the following options: (Please check <u>only</u> one box.)

☐ Include all information. This includes information about alcohol and drug abuse, mental health treatment, and HIV.

☐ Exclude information about alcohol and drug abuse, mental health treatment, and HIV.

Form CMS-10106 (12/21)

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

Form Approved
OMB No. 0938-0930
Expires: 11/30/2025

**3. Check only <u>one</u> box below indicating how long Medicare can use this authorization to disclose your personal health information** (subject to applicable law—for example, your State may limit how long Medicare may give out your personal health information):

☐ Disclose my personal health information indefinitely

☒ Disclose my personal health information for a specified period only

beginning: _____ (mm/dd/yyyy) and ending: <u>2 yrs after signature date</u> (mm/dd/yyyy)

**4. Fill in the reason for the disclosure (you may write "at my request"):**

Legal

**5. Fill in the name and address of the person or organization to whom you want Medicare to disclose your personal health information. Please provide the specific name of the person for any organization you list below. If you would like to authorize any additional individuals or organizations, please add those to the back of this form.**

Name     Litigation Management, Inc.

Address   7976 Mayfield Road, Suite 150 Chesterland, OH 44026   Phone: 888-803-8706 Fax: 440-484-2055

Email: records@lmi-med.com

Name     _____

Address   _____

**Note: You have the right to take back ("revoke") your authorization at any time, in writing, except to the extent that Medicare has already acted based on your permission. To revoke authorization, send a written request to the address noted below.** Your authorization or refusal to authorize disclosure of your personal health information will have no effect on your enrollment, eligibility for benefits, or the amount Medicare pays for the health services you receive.

Form CMS-10106 (12/21)

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

Form  Approved
OMB No. 0938-0930
Expires: 11/30/2025

**6.**

---

**I authorize 1-800-MEDICARE to disclose my personal health information listed above to the person(s) or organization(s) I have named on this form. I understand that my personal health information may be re-disclosed by the person(s) or organization(s) and may no longer be protected by law.**

| Signature | Telephone Number | Date (mm/dd/yyyy) |
|---|---|---|

**Print the address of the person with Medicare** (Street Address, City, State and ZIP)

☒ Check here if you are signing as a personal representative and complete below.

Please attach the appropriate documentation (for example, Power of Attorney. This <u>only</u> applies if someone other than the person with Medicare signed above.

**Print the Personal Representative's Address** (Street Address, City, State, and ZIP)

Telephone Number Personal Representative: _____

Personal Representative's Relationship to the Beneficiary: _____

---

Form CMS-10106 (12/21)

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

Form  Approved
OMB No. 0938-0930
Expires: 11/30/2025

## 7. Send the completed, signed authorization to:

Medicare CCO, Written Authorization Dept.
PO Box 1270
Lawrence, KS 66044

**Note:** You have the right to take back ("revoke") your authorization at any time, in writing, except to the extent that Medicare has already acted based on your permission. If you would like to revoke authorization, send a written request to the address noted above.

Your authorization or refusal to authorize disclosure of your personal health information will have no effect on your enrollment, eligibility for benefits, or the amount Medicare pays for the health services you receive.



According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0930. The time required to complete this information collection is estimated to average 15 minutes per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850. **DO NOT MAIL APPLICATIONS TO THIS ADDRESS. Mailing your application will significantly delay application processing.**

**AUTHORIZATION FOR RELEASE OF EDUCATIONAL RECORDS**

**To:** _____
Name

_____
Address

_____
City, State and Zip Code

This will authorize you to furnish copies of all school records including, but not limited to, test results, test scores, report cards, or other school grading material, attendance records, physicals and other health-related, including but not limited to any physicians, nursing or allied health professional reports, records or notes, which may be in your possession.

Donna Marie Devalle
_____
*Name of Student*

whose date of birth is _____and whose last 4 of social security number is: _____

You are authorized to release the above records to the following representatives of defendants in the above-entitled matter, who have agreed to pay reasonable charges made by you to supply copies of such records.

Litigation Management, Inc.
_____
**Name of Representative**

Records Requester
_____
**Representative Capacity (e.g., attorney, records requestor, agent, etc.)**
7976 Mayfield Road, Suite 150
_____
**Street Address**
Chesterland, OH. 44026
_____
**City, State and Zip Code**

This authorization does not authorize you to disclose anything other than documents and records to anyone.

This authorization shall be considered as continuing in nature and is to be given full force and effect to release information of any of the foregoing learned or determined after the date hereof. It is expressly understood by the undersigned and you are authorized to accept a copy or photocopy of this authorization with the same validity as through the original had been presented to you.

Date: _____Student/Name_____



**FLORIDA DEPARTMENT OF REVENUE**

| **Request for Copy of Tax Return** |
|---|

DR-841
R. 03/11
Rule 12-22.005
Florida Administrative Code
Effective 05/13

The taxpayer, or authorized representative, must complete this request to obtain a copy of any tax return filed with the Florida Department of Revenue.  An authorized representative must attach a Power of Attorney (DR-835) to this request.

| **Taxpayer Information** | | |
|---|---|---|
| Name of Taxpayer  *Donna Marie Devalle* | | |
| Street or Mailing Address | | |
| City | State | ZIP |
| FEIN or Sales Tax Certificate Number | Florida Identification Number | Telephone Number |
| Type of Return | Tax Period  *2013-2022* | Number of Copies  *1* |

**Authorized mailing address.**  The authorized mailing address need only be completed if the copies of the return(s) requested are to be mailed to an address different from that of the taxpayer.

| **Authorized Mailing Address** | | |
|---|---|---|
| Name  *Litigation Management Inc* | | |
| Street or Mailing Address  *7976 Mayfield Road, Suite 150* | | |
| City  *Chesterland* | State  *OH* | ZIP  *44026* |

I hereby certify that I authorize the release of the above described return(s) and the information contained therein and the mailing thereof.

_____          _____
Signature of Taxpayer or Authorized Representative          Date

_____          _____
Department of Revenue Authorized Signature          Title          Date

**Please keep a copy for your records and send original to:**

**Records Management
MS 1-4364
Florida Department of Revenue
5050 W Tennessee St
Tallahassee, Florida  32399-0158**

NOT A CERTIFIED COPY

**LIMITED AUTHORIZATION TO DISCLOSE HEALTH INFORMATION**
**(Pursuant to the Health Insurance Portability and Accountability Act "HIPAA" of 4/14/03)**

TO:

Patient Name:   Donna Marie Devalle

DOB:

SSN:

   I, _____ (Administrator of the Estate of  Donna Marie Devalle                ),
hereby authorize you to release and furnish to:  Shook, Hardy & Bacon, LLP and/or its duly assigned agents,
including Litigation Management, Inc., copies of the following information:

 * All medical records, including inpatient, outpatient, and emergency room treatment, all clinical charts, reports,
  documents, correspondence, test results, statements, patient registration forms, questionnaires/histories,
  patient consents, office and doctor's handwritten notes, and records received by other physicians. Said
  medical records shall include all information regarding AIDS and HIV status.
 * All autopsy, laboratory, histology, cytology, pathology, radiology, CT Scan, MRI, echocardiogram,
  cardiac catheterization reports and any other test and consulting reports.
 * All radiology films, mammograms, myelograms, CT scans, photographs, bone scans, pathology/cytology/
  histology/autopsy/immunohistochemistry specimens, cardiac catheterization videos/CDs/films/reels, and
  echocardiogram videos.
 * All pharmacy/prescription records including NDC numbers and drug information handouts/monographs.
 * All billing records including all statements, itemized bills, and insurance records.

1.  To  Donna Marie Devalle            's medical provider:  **this authorization is being forwarded by, or on behalf of,
attorneys for the defendants for the purpose of litigation. You are not authorized to discuss any aspect of
the above-named person's medical history, care, treatment, diagnosis, prognosis, information revealed
by or in the medical records, or any other matter bearing on his or her medical or physical condition,
unless you receive an additional authorization permitting such discussion.  Subject to all applicable legal
objections, this restriction does not apply to discussing my medical history, care, treatment, diagnosis,
prognosis, information revealed by or in the medical records, or any other matter bearing on my medical or
physical condition at a deposition or trial.**

2.  I understand that the information in  Donna Marie Devalle            's  health record may include information relating
to sexually transmitted disease, acquired immunodeficiency syndrome (AIDS), or human immunodeficiency virus
(HIV). It may also include information about behavioral or mental health services, and treatment for alcohol and
drug abuse.

3.  I understand that I have the right to revoke this authorization at any time.  I understand that if I revoke this
authorization I must do so in writing and present my written revocation to the health information management
department.  I understand the revocation will not apply to information that has already been released in response to
this authorization.  I understand the revocation will not apply to my insurance company when the law provides my
insurer with the right to contest a claim under my policy.  Unless otherwise revoked, this authorization will expire in
2 years from signature date.

4.  I understand that authorizing the disclosure of this health information is voluntary.  I can refuse to sign this
authorization.  I need not sign his form in order to assure treatment.  I understand I may inspect or copy the
information to be used or disclosed as provided in CFR 164.524.  I understand that any disclosure of information
carries with it the potential for an unauthorized re-disclosure and the information may not be protected by federal
confidentiality rules.  If I have questions about disclosure of my health information, I can contact the releaser
indicate above.

5.  A notarized signature is not required. CFR 164.508.  A copy of this authorization may be used in place of an
original.

Print Name: _____ (Administrator of the Estate of  Donna Marie Devalle     )

Signature:_____    Date_____

Form **SSA-3288** (02-2023) UF
Discontinue Prior Editions
Social Security Administration

Page 1 of 3
OMB No. 0960-0566

# Consent for Release of Information

## Instructions for Using this Form

Complete this form only if you want us to give information or records about you, a minor, or a legally incompetent adult, to an individual or group (for example, a doctor or an insurance company). You may complete this form to release only the minor's non-medical records, if you are the natural or adoptive parent or legal guardian, acting on behalf of a minor child. We require proof of relationship, if you are not the subject of the record. We may charge a fee for providing the information, if you are requesting the information for a purpose unrelated to the administration of a program under the Social Security Act. If you are requesting information, such as a Social Security Statement or benefit verification letter, you can also access this information by creating an account at https://www.ssa.gov/myaccount/.

**NOTE: Do NOT use this form to request:**
- **The release of a minor child's medical records. Instead, visit your local Social Security office or call our toll-free number, 1-800-772-1213 (TTY-1-800-325-0778), or**
- **Detailed information about your earnings or employment history. Instead, complete and mail form SSA-7050-F4. You can obtain form SSA-7050-F4 from your local Social Security office or online at  www.ssa.gov/online/ssa-7050.pdf.**

## How to Complete this Form

We will not honor this form unless all required fields are completed. An asterisk (*) indicates a required field. Also, we will not honor blanket requests for "any and all records" or the "entire file." You must specify the information you are requesting and you must sign and date this form.

- Fill in the name, date of birth, and social security number of the subject of the record.
- Fill in the name and address of the person or organization of where you want us to send the requested information.
- Specify the reason you want us to release the information (e.g., litigation, investigation, determining eligibility for benefits). If you are the natural or adoptive parent or legal guardian, acting on behalf of a minor child or legally incompetent adult, you must state how the release of information is in the best interest of the minor child or legally incompetent adult.
- Check the box next to the type(s) of information you want us to release including specific date ranges, where applicable.

**NOTE:** Unless otherwise specified, the consent form is valid for one-time use only. Also, it is valid for one year from the date of signature, unless you are requesting medical records. A consent form that includes a request for medical records is valid for 90 days from the date of signature.

Send or bring the completed form to the subject of the record's local servicing office. To locate the appropriate servicing office, visit https://secure.ssa.gov/ICON/main.jsp, and input the subject of the record's ZIP code.

Form **SSA-3288** (02-2023) UF

## Consent for Release of Information

You must complete all required fields. We will not honor your request unless all required fields are completed. (*Signifies a required field. **These are not mandatory fields for the consent form to be acceptable. Please complete these fields in case we need to contact you about the consent form).

**TO:  Social Security Administration**

Donna Marie Devalle

| \*Full Name | \*Date of Birth (MM/DD/YYYY) | \*Full Social Security Number |
|---|---|---|

I authorize the Social Security Administration to release information or records about me to:

**\*NAME OF PERSON OR ORGANIZATION:**

Litigation Management, Inc.

**\*ADDRESS OF PERSON OR ORGANIZATION:**
**\*\* PHONE NUMBER OF PERSON OR ORGANIZATION:**

7976 Mayfield Rd.  Suite 150, Chesterland, Ohio  44026

888.803.8706

**\*I want this information released because:**
We may charge a fee to release information for non-program purposes.

Pending litigation - please email (records@lmiweb.com) or fax (440.484.2055) the invoice for records; please include the Packet ID

on all correspondence.

**\*Please release the following information selected from the list below:**
Check at least one box. If requesting medical records, do not check both boxes 7 and 8. We will not disclose records unless you include specific date ranges where applicable.

1. ☐ Verification of Social Security Number

2. ☐ Current monthly Social Security benefit amount

3. ☐ Current monthly Supplemental Security Income payment amount

4. ☒ Social Security benefit amounts from date _____ to date  1/28/2022

5. ☐ Supplemental Security Income payment amounts from date _____ to date _____

6. ☐ Medicare entitlement from date _____ to date _____

7. ☐ Medical records from date _____ to date _____

8. ☒ Complete medical records

9. ☐ Other Social Security record(s) (We will not honor a request for "any and all records" or "the entire file." You must specify which records you are seeking. For example, award/denial notices, benefit applications, appeals)

   Documents/records relating to SSA claims, including, but not limited to, applications, questions, petitions, payment information, transcripts correspondence, findings, hearing information, depositions, reorts, witness statements, expert reports, current developments, non-disablity development, determination records.

**I am the individual, to whom the requested information or record applies, or the parent or legal guardian of a minor, or the legal guardian of a legally incompetent adult. I declare under penalty of perjury (28 CFR § 1746) that I have examined all the information on this form and it is true and correct to the best of my knowledge. I understand that anyone who knowingly or willfully seeks or obtains access to records about another person under false pretenses is punishable by a fine of up to $5,000.**

**\*Signature:** _____    **\*Date:** _____

**\*\*Address:** _____    **\*\*Daytime Phone:** _____

**\*\*Relationship (if not the subject of the record):** _____    **\*\*Daytime Phone:** _____

Witnesses must sign this form ONLY if the above signature is by mark (X). If signed by mark (X), two witnesses to the signing who know the signee must sign below and provide their full addresses. Please print the signee's name next to the mark (X) on the signature line above.

| 1.Signature of witness | 2.Signature of witness |
|---|---|
| Address (Number and street,City,State, and ZIP Code) | Address (Number and street,City,State, and ZIP Code) |

Privacy Act Statement
Collection and Use of Personal Information

The Privacy Act (5 U.S.C. 552a) and Section 205(a) of the Social Security Act, as amended, allow us to collect this information. Furnishing us this information is voluntary. However, failing to provide all or part of the information may prevent us from honoring the request to release information or records about you. We will use the information you provide to respond to the request for Social Security Administration (SSA) records. We may share the information for the following purposes, called routine uses:

• To contractors and other Federal agencies, as necessary, for the purpose of assisting SSA in the efficient administration of its programs.

In addition, we may share this information in accordance with the Privacy Act and other Federal laws. For example, where authorized, we may use and disclose this information in computer matching programs, in which our records are compared with other records to establish or verify a person's eligibility for Federal benefit programs and for repayment of incorrect or delinquent debts under these programs.

A list of additional routine uses is available in our Privacy Act System of Records Notices (SORN) 60-0089, entitled Claims Folders System, as published in the Federal Register (FR) on April 1, 2003, at 68 FR 15784; 60-0320, entitled Electronic Disability Claim File, as published in the FR on December 22, 2003, at 68 FR 71210; and 60-0340, entitled FOIA and Privacy Act Record Request and Appeal System, as published in the FR on July 13, 2016, at 81 FR 45352. Additional information, and a full listing of all our SORNs, is available on our website at www.ssa.gov/privacy.



Paperwork Reduction Act Statement

This information collection meets the requirements of 44 U.S.C. § 3507, as amended by section 2 of the Paperwork Reduction Act of 1995. You do not need to answer these questions unless we display a valid Office of Management and Budget control number. We estimate that it will take about 5 minutes to read the instructions, gather the facts, and answer the questions. You may send comments on our time estimate above to: SSA, 6401 Security Blvd., Baltimore, MD 21235-6401. **Send only comments relating to our time estimate to this address, not the completed form.**

**AUTHORIZATION FOR RELEASE OF <u>INSURANCE RECORDS</u>**

**To:** _____

Name

_____

Address

_____

City, State and Zip Code

This will authorize you to furnish copies of all forms regarding insurance claims applications and benefits and all medical, health, hospital, physicians, nursing or allied health professional reports, records, notes or invoices and bills, which may be in your possession.

Donna Marie Devalle
_____

*Name of Insured*

whose date of birth is _____ and whose last 4 of social security number is: _____

    You are authorized to release the above records to the following representatives of defendants in the above-entitled matter, who have agreed to pay reasonable charges made by you to supply copies of such records.

Litigation Management, Inc.
_____

**Name of Representative**

Records Requester
_____

**Representative Capacity (e.g., attorney, records requestor, agent, etc.)**

7976 Mayfield Road, Suite 150
_____

**Street Address**

Chesterland, OH. 44026
_____

**City, State and Zip Code**

    This authorization does not authorize you to disclose anything other than documents and records to anyone.

    This authorization shall be considered as continuing in nature and is to be given full force and effect to release information of any of the foregoing learned or determined after the date hereof, if is expressly understood by the undersigned and you are authorized to accept a copy or photocopy of this authorization with the same validity as through the original had been presented to you.

_____    _____

Name/Signature                                                      Date

NOT A CERTIFIED COPY

Form **SSA-7050-F4** (11-2022)
Discontinue Prior Editions                                                                                          Page 1 of 4
Social Security Administration                                                                      OMB  No. 0960-0525

# REQUEST FOR SOCIAL SECURITY EARNING INFORMATION

*Use This Form If You Need

**1. Certified/Non-Certified Detailed Earnings Information**
Includes periods of employment or self-employment
and the names and addresses of employers.

**2. Certified Yearly Totals of Earnings**
Includes total earnings for each year but does not
include the names and addresses of employers.

> DO NOT USE THIS FORM TO REQUEST
> YEARLY EARNINGS TOTALS
>
> Yearly earnings totals are free to the public
> if you do not require certification.
>
> To obtain FREE yearly totals of earnings,
> visit our website at www.ssa.gov/myaccount.

### Privacy Act Statement
### Collection and Use of Personal Information

Section 205 of the Social Security Act, as amended, allows us to collect this information. In addition, the Budget and Accounting Act of 1950 and Debt Collection Act of 1982 authorize us to collect credit card information, if you choose to pay for the earnings information you have requested with a credit card. Furnishing us this information is voluntary. However, failing to provide all or part of the information may prevent us from processing your request.

We will use the information to identify your records, process your request, and send the earnings information you request. We may also share the information for the following purposes, called routine uses:

1. To the Internal Revenue Service (IRS) for auditing SSA's compliance with the safeguard provisions of the Internal Revenue Code of 1986, as amended.

2. To contractors and other Federal agencies, as necessary, for the purpose of, assisting the Social Security Administration (SSA) in the efficient administration of its programs.

3. To banks enrolled in the Treasury credit card network to collect a payment or debt when the individual has given his/her credit card number for this purpose.

In addition, we may share this information in accordance with the Privacy Act and other Federal laws. For example, where authorized, we may use and disclose this information in computer matching programs, in which our records are compared with other records to establish or verify a person's eligibility for Federal benefit programs and for repayment of incorrect or delinquent debts under these programs.

A list of additional routine uses is available in our Privacy Act System of Records Notices (SORNs) 60-0059, entitled Earnings Recording and Self-Employment Income System, 60-0090, entitled Master Beneficiary Record, 60-0224, entitled SSA-Initiated Personal Earnings and Benefit Estimate Statement, and 60-0231, entitled Financial Transactions of SSA Accounting and Finance Offices. Additional information and a full listing of all our SORNs are available on our website at www.socialsecurity.gov/foia/bluebook.

**Paperwork Reduction Act Statement -** This information collection meets the requirements of 44 U.S.C. § 3507, as amended by section 2 of the Paperwork Reduction Act of 1995. You do not need to answer these questions unless we display a valid Office of Management and Budget control number. We estimate that it will take about 11 minutes to read the instructions, gather the facts, and answer the questions. *Send only comments relating to our time estimate above to:* SSA, 6401 Security Blvd, Baltimore, MD 21235-6401.

Form **SSA-7050-F4** (11-2022)                                                      Page 2 of 4

# REQUEST FOR SOCIAL SECURITY EARNING INFORMATION

1.  Provide your name as it appears on your most recent Social Security card or the name of the individual whose earnings you are requesting.

First Name:  D o n n a                                                      Middle Initial: M

Last Name:  D e v a l l e

Social Security Number (SSN) ☐☐☐  ☐☐  ☐☐☐☐    One SSN per request

Date of Birth:                          Date of Death:  01/28/2022

Other Name(s) Used
Maiden Name

2. What kind of earnings information do you need? (Choose **ONE** of the following types of earnings or SSA must return this request.)

[x] **Itemized Statement of Earnings $100.00**

(Includes the names and addresses of employers)

If you check this box, tell us why you need this information below.

Year(s) Requested:  2 0 1 3  to  2 0 2 2

Year(s) Requested:  ☐☐☐☐  to  ☐☐☐☐

[x] Check this box if you want the earnings information **CERTIFIED** for an additional $44.00 fee.

☐ **Certified Yearly Totals of Earnings $44.00**

(Does not include the names and addresses of employers)Yearly earnings totals are FREE to the public if you do not require certification. To obtain FREE yearly totals of earnings, visit our website at www.ssa.gov/myaccount.

Year(s) Requested:  ☐☐☐☐  to  ☐☐☐☐

Year(s) Requested:  ☐☐☐☐  to  ☐☐☐☐

3. If you would like this information **sent to someone else**, please fill in the information below.

I authorize the Social Security Administration to release the earnings information to:

Name   Litigation Management, Inc.

Address  7976 Mayfield Road, Suite 150                    State  OH

City  Chesterland                                ZIP Code  44026

4. I am the individual to whom the record pertains (or a person authorized to sign on behalf of that individual). I declare under penalty of perjury that I have examined all the information on this form, and on any accompanying statements or forms, and it is true and correct to the best of my knowledge.

**Signature AND Printed Name of Individual or Legal Guardian**    *SSA must receive this form within 120 days from the date signed*

Date

Relationship (if applicable, you must attach proof)         Daytime Phone:

Address                                         State

City                                           ZIP Code

Witnesses must sign this form ONLY if the above signature is by marked (X). If signed by mark (X), two witnesses to the signing who know the signee must sign below and provide their full addresses. Please print the signee's name next to the mark (X) on the signature line above.

| 1. Signature of Witness | 2. Signature of Witness |
|---|---|
| Address *(Number and Street, City, State and ZIP Code)* | Address *(Number and Street, City, State and ZIP Code)* |

NOT A CERTIFIED COPY

Form **SSA-7050-F4** (11-2022)                                                    Page 3 of 4

## REQUEST FOR SOCIAL SECURITY EARNING INFORMATION

**INFORMATION ABOUT YOUR REQUEST**
You may use this form to request earnings information for one ONE Social Security Number (SSN)

### How do I get my earnings statement?

You must complete the attached form. Tell us the specific years of earnings you want, type of earnings record, and provide your mailing address. The itemized statement of earnings will be mailed to ONE address, therefore, if you want the statement sent to someone other than yourself, provide their address in section 3. Mail the completed form to SSA within 120 days of signature. If you sign with an "X", your mark must be witnessed by two impartial persons who must provide their name and address in the spaces provided. Select **ONE** type of earnings statement and include the appropriate fee.

**1. Certified/Non-Certified Itemized Statement of Earnings**
This statement includes years of self-employment or employment and the names and addresses of employers.

**2. Certified Yearly Totals of Earnings**
This statement includes the total earnings for each year requested but *does not* include the names and addresses of employers.

If you require one of each type of earnings statement, you must complete two separate forms. Mail each form to SSA with one form of payment attached to each request.

### How do I get someone else's earnings statement?

You may get someone else's earnings information if you meet one of the following criteria, attach the necessary documents to show your entitlement to the earnings information and include the appropriate fee.

**1. Someone Else's Earnings**
The natural or adoptive parent or legal guardian of a minor child, or the legal guardian of a legally declared incompetent individual, may obtain earnings information if acting in the best interest of the minor child or incompetent individual. You must include proof of your relationship to the individual with your request. The proof may include a birth certificate, court order, adoption decree, or other legally binding document.

**2. A Deceased Person's Earnings**
You can request earnings information from the record of a deceased person if you are:
• The legal representative of the estate;
• A survivor (that is, the spouse, parent, child, divorced spouse of divorced parent); or
• An individual with a material interest (e.g., financial) who is an heir at law, next of kin, beneficiary under the will or donee of property of the decedent.

You must include proof of death and proof of your relationship to the deceased with your request.

### Is There A Fee For Earnings Information?

Yes. We charge a $100.00 fee for providing information for purposes unrelated to the administration of our programs.

**1. Certified or Non-Certified Itemized Statement of Earnings**
In most instances, individuals request Itemized Statements of Earnings for purposes unrelated to our programs such as a private pension plan or personal injury suit. Bulk submitters may email OCO.Pension.Fund@ssa.gov for an alternate method of obtaining itemized earnings information.

We will **certify** the itemized earnings information for an additional $44.00 fee. Certification is usually not necessary unless you are specifically requested to obtain a certified earnings record.

Sometimes, there is no charge for itemized earnings information. If you have reason to believe your earnings are not correct (for example, you have previously received earnings information from us and it does not agree with your records), we will supply you with more detail for the year(s) in question. Be sure to show the year(s) involved on the request form and explain why you need the information. If you do not tell us why you need the information, we will charge a fee.

**2. Certified Yearly Totals of Earnings**
We charge $44.00 to certify yearly totals of earnings. However, if you do not want or need certification, you may obtain yearly totals *FREE* of charge at www.ssa.gov/myaccount. Certification is usually not necessary unless you are advised specifically to obtain a certified earnings record.

### Method of Payment
**This Fee Is Not Refundable. DO NOT SEND CASH.**

You may pay by credit card, check or money order.
• Credit Card Instructions
Complete the credit card section on page 4 and return it with your request form.

• Check or Money Order Instructions
Enclose one check or money order per request form payable to the Social Security Administration and write the Social Security

### How long will it take SSA to process my request?

Please allow SSA 120 days to process this request. After 120 days, you may contact 1-800-772-1213 to leave an inquiry regarding your request.

Form **SSA-7050-F4** (11-2022)                                                    Page 4 of 4

# REQUEST FOR SOCIAL SECURITY EARNING INFORMATION

- **Where do I send my complete request?**

| Mail the completed form, supporting documentation, and applicable fee to: | If using private contractor such as FedEx mail form, supporting documentation, and application fee to: |
|---|---|
| **Social Security Administration** P.O. Box 33011 Baltimore, Maryland 21290-33011 | **Social Security Administration** P.O. Box 33011 Baltimore, Maryland 21290-33011 |

- **How much do I have to pay for an Itemized Statement of Earnings?**

| **Non-Certified** Itemized Statement of Earnings | **Certified** Itemized Statement of Earnings |
|---|---|
| $100.00 | $144.00 |

- **How much do I have to pay for Certified Yearly Totals of Earnings?**

Certified yearly totals of earnings cost $44.00. You may obtain non-certified yearly totals FREE of charge at www.ssa.gov/myaccount. Certification is usually not necessary unless you are specifically asked to obtain a certified earnings record.

## YOU CAN MAKE YOUR PAYMENT BY CREDIT CARD

As a convenience, we offer you the option to make your payment by credit card. However, regular credit card rules will apply. You also pay by check or money order. Make check payable to Social Security Administration.

| CHECK ONE | ☐ Visa ☒ MasterCard | ☐ American Express ☐ Discover |
|---|---|---|
| Credit Card Holder's Name (Enter the name from the credit card) | | First Name, Middle Initial, Last Name |
| Credit Card Holder's Address | | Number & Street |
| | | City, State, & ZIP Code |
| Daytime Telephone Number | | Area Code |
| Credit Card Number | | |
| Credit Card Expiration Date | | (MM/YY) |
| Amount Charged See above to select the correct fee for your request. Applicable fees are $44.00, $100.00, or $144.00. SSA will return forms without the appropriate fee. | | $ |
| Credit Card Holder's Signature | | Date |

| **DO NOT WRITE IN THIS SPACE OFFICE USE ONLY** | Authorization |
|---|---|
| | Name                                    Date |
| | Remittance Control # |

NOT A CERTIFIED COPY

Form **4506**

(Novmeber 2021)

Department of the Treasury
Internal Revenue Service

# Request for Copy of Tax Return

▶ Do not sign this form unless all applicable lines have been completed.

▶ Request may be rejected if the form is incomplete or illegible.

▶ For more information about Form 4506, visit *www.irs.gov/form4506.*

OMB No. 1545-0429

**Tip: Get faster service:** Online at www.irs.gov, **Get Your Tax Record** (Get Transcript) or by calling **1-800-908-9946** for specialized assistance. We have teams available to assist. **Note:** Taxpayers may register to use Get Transcript to view, print, or download the following transcript types: **Tax Return Transcript** (shows most line items including Adjusted Gross Income (AGI) from your original Form 1040-series tax return as filed, along with any forms and schedules), **Tax Account Transcript** (shows basic data such as return type, marital status, AGI, taxable income and all payment types), **Record of Account Transcript** (combines the tax return and tax account transcripts into one complete transcript), **Wage and Income Transcript** (shows data from information returns we receive such as Forms W-2, 1099, 1098 and Form 5498), and **Verification of Non-filing Letter** (provides proof that the IRS has no record of a filed Form 1040-series tax return for the year you request).

| 1a Name shown on tax return. If a joint return, enter the name shown first. | 1b First social security number on tax return, individual taxpayer identification number, or employer identification number (see instructions) |
|---|---|
| 2a If a joint return, enter spouse's name shown on tax return. | 2b Second social security number or individual taxpayer identification number if joint tax return |

3   Current name, address (including apt., room, or suite no.), city, state, and ZIP code (see instructions)

4   Previous address shown on the last return filed if different from line 3 (see instructions)

5   If the tax return is to be mailed to a third party (such as a mortgage company), enter the third party's name, address, and telephone number.

**Caution:** If the tax return is being sent to the third party, ensure that lines 5 through 7 are completed before signing. (see instructions.)

6   **Tax return requested.** Form 1040, 1120, 941, etc. and all attachments as originally submitted to the IRS, including Form(s) W-2, schedules, or amended returns. Copies of Forms 1040, 1040A, and 1040EZ are generally available for 7 years from filing before they are destroyed by law. Other returns may be available for a longer period of time. Enter only one return number. If you need more than one type of return, you must complete another Form 4506. ▶

**Note:** If the copies must be certified for court or administrative proceedings, check here . . . . . . . . . . . ☐

7   **Year or period requested.** Enter the ending date of the tax year or period using the mm/dd/yyyy format (see instructions).

____ / ____ / _____          ____ / ____ / _____          ____ / ____ / _____          ____ / ____ / _____

____ / ____ / _____          ____ / ____ / _____          ____ / ____ / _____          ____ / ____ / _____

8   **Fee.** There is a $43 fee for each return requested. **Full payment must be included with your request or it will be rejected.** Make your check or money order payable to "United States Treasury." Enter your SSN, ITIN, or EIN and "Form 4506" on your check or money order.

a   Cost for each return . . . . . . . . . . . . . . . . . . . . . .   $          43.00

b   Number of returns requested on line 7 . . . . . . . . . . . . . .

c   Total cost. Multiply line 8a by line 8b . . . . . . . . . . . . . .   $

9   If we cannot find the tax return, we will refund the fee. If the refund should go to the third party listed on line 5, check here . . . . . ☐

**Caution:** Do not sign this form unless all applicable lines have been completed.

**Signature of taxpayer(s).** I declare that I am either the taxpayer whose name is shown on line 1a or 2a, or a person authorized to obtain the tax return requested. If the request applies to a joint return, at least one spouse must sign. If signed by a corporate officer, 1 percent or more shareholder, partner, managing member, guardian, tax matters partner, executor, receiver, administrator, trustee, or party other than the taxpayer, I certify that I have the authority to execute Form 4506 on behalf of the taxpayer. **Note:** This form must be received by IRS within 120 days of the signature date.

☐   **Signatory attests that he/she has read the attestation clause and upon so reading declares that he/she has the authority to sign the Form 4506.** See instructions.

Phone number of taxpayer on line 1a or 2a

**Sign Here**

Signature (see instructions)                                    Date

Print/Type name                                    Title (if line 1a above is a corporation, partnership, estate, or trust)

Spouse's signature                                    Date

Print/Type name

**For Privacy Act and Paperwork Reduction Act Notice, see page 2.**          Cat. No. 41721E          Form **4506** (Rev. 11-2021)

Form 4506 (Rev. 11-2021)                                                                                                      Page **2**

Section references are to the Internal Revenue Code unless otherwise noted.

## Future Developments

For the latest information about Form 4506 and its instructions, go to *www.irs.gov/form4506*.

## General Instructions

**Caution:** Do not sign this form unless all applicable lines, *including lines 5 through 7*, have been completed.

**Designated Recipient Notification.** Internal Revenue Code, Section 6103(c), limits disclosure and use of return information received pursuant to the taxpayer's consent and holds the recipient subject to penalties for any unauthorized access, other use, or redisclosure without the taxpayer's express permission or request.

**Taxpayer Notification.** Internal Revenue Code, Section 6103(c), limits disclosure and use of return information provided pursuant to your consent and holds the recipient subject to penalties, brought by private right of action, for any unauthorized access, other use, or redisclosure without your express permission or request.

**Purpose of form.** Use Form 4506 to request a copy of your tax return. You can also designate (on line 5) a third party to receive the tax return.

**How long will it take?** It may take up to 75 calendar days for us to process your request.

**Where to file.** Attach payment and mail Form 4506 to the address below for the state you lived in, or the state your business was in, when that return was filed. There are two address charts: one for individual returns (Form 1040 series) and one for all other returns.

If you are requesting a return for more than one year or period and the chart below shows two different addresses, send your request based on the address of your most recent return.

### Chart for individual returns (Form 1040 series)

| If you filed an individual return and lived in: | Mail to: |
| --- | --- |
| Florida, Louisiana, Mississippi, Texas, a foreign country, American Samoa, Puerto Rico, Guam, the Commonwealth of the Northern Mariana Islands, the U.S. Virgin Islands, or A.P.O. or F.P.O. address | Internal Revenue Service RAIVS Team Stop 6716 AUSC Austin, TX 73301 |
| Alabama, Arkansas, Delaware, Georgia, Illinois, Indiana, Iowa, Kentucky, Maine, Massachusetts, Minnesota, Missouri, New Hampshire, New Jersey, New York, North Carolina, Oklahoma, South Carolina, Tennessee, Vermont, Virginia, Wisconsin | Internal Revenue Service RAIVS Team Stop 6705 S-2 Kansas City, MO 64999 |
| Alaska, Arizona, California, Colorado, District of Columbia, Hawaii, Idaho, Kansas, Maryland, Michigan, Montana, Nebraska, Nevada, New Mexico, North Dakota, Ohio, Oregon, Pennsylvania, Rhode Island, South Dakota, Utah, Washington, West Virginia, Wyoming | Internal Revenue Service RAIVS Team P.O. Box 9941 Mail Stop 6734 Ogden, UT 84409 |

### Chart for all other returns

| For returns not in Form 1040 series, if the address on the return was in: | Mail to: |
| --- | --- |
| Connecticut, Delaware, District of Columbia, Georgia, Illinois, Indiana, Kentucky, Maine, Maryland, Massachusetts, Michigan, New Hampshire, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Carolina, Tennessee, Vermont, Virginia, West Virginia, Wisconsin | Internal Revenue Service RAIVS Team Stop 6705 S-2 Kansas City, MO 64999 |
| Alabama, Alaska, Arizona, Arkansas, California, Colorado, Florida, Hawaii, Idaho, Iowa, Kansas, Louisiana, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oklahoma, Oregon, South Dakota, Texas, Utah, Washington, Wyoming, a foreign country, American Samoa, Puerto Rico, Guam, the Commonwealth of the Northern Mariana Islands, the U.S. Virgin Islands, or A.P.O. or F.P.O. address | Internal Revenue Service RAIVS Team P.O. Box 6734 Mail Stop 6734 Ogden, UT 84409 |

## Specific Instructions

**Line 1b.** Enter the social security number (SSN) or individual taxpayer identification number (ITIN) for the individual listed on line 1a, or enter the employer identification number (EIN) for the business listed on line 1a. For example, if you are requesting Form 1040 that includes Schedule C (Form 1040), enter your SSN.

**Line 3.** Enter your current address. If you use a P.O. box, please include it on this line 3.

**Line 4.** Enter the address shown on the last return filed if different from the address entered on line 3.

**Note.** If the addresses on lines 3 and 4 are different and you have not changed your address with the IRS, file Form 8822, Change of Address, or Form 8822-B,Change of Address or Responsible Party — Business, with Form 4506.

**Line 7.** Enter the end date of the tax year or period requested in mm/dd/yyyy format. This may be a calendar year, fiscal year or quarter. Enter each quarter requested for quarterly returns. Example: Enter 12/31/2018 for a calendar year 2018 Form 1040 return, or 03/31/2017 for a first quarter Form 941 return.

**Signature and date.** Form 4506 must be signed and dated by the taxpayer listed on line 1a or 2a. The IRS must receive Form 4506 within 120 days of the date signed by the taxpayer or it will be rejected. Ensure that all applicable lines, *including lines 5 through 7,* are completed before signing.



*You must check the box in the signature area to acknowledge you have the authority to sign and request the information. The form will not be processed and returned to you if the box is unchecked.*

**Individuals.** Copies of jointly filed tax returns may be furnished to either spouse. Only one signature is required. Sign Form 4506 exactly as your name appeared on the original return. If you changed your name, also sign your current name.

**Corporations.** Generally, Form 4506 can be signed by: (1) an officer having legal authority to bind the corporation, (2) any person designated by the board of directors or other governing body, or (3) any officer or employee on written request by any principal officer and attested to by the secretary or other officer. A bona fide shareholder of record owning 1 percent or more of the outstanding stock of the corporation may submit a Form 4506 but must provide documentation to support the requester's right to receive the information.

**Partnerships.** Generally, Form 4506 can be signed by any person who was a member of the partnership during any part of the tax period requested on line 7.

**All others.** See section 6103(e) if the taxpayer has died, is insolvent, is a dissolved corporation, or if a trustee, guardian, executor, receiver, or administrator is acting for the taxpayer.

**Note:** If you are Heir at law, Next of kin, or Beneficiary you must be able to establish a material interest in the estate or trust.

**Documentation.** For entities other than individuals, you must attach the authorization document. For example, this could be the letter from the principal officer authorizing an employee of the corporation or the letters testamentary authorizing an individual to act for an estate.

**Signature by a representative.** A representative can sign Form 4506 for a taxpayer only if this authority has been specifically delegated to the representative on Form 2848, line 5a. Form 2848 showing the delegation must be attached to Form 4506.

### Privacy Act and Paperwork Reduction Act Notice. We ask for the information on this form to establish your right to gain access to the requested return(s) under the Internal Revenue Code. We need this information to properly identify the return(s) and respond to your request. If you request a copy of a tax return, sections 6103 and 6109 require you to provide this information, including your SSN or EIN, to process your request. If you do not provide this information, we may not be able to process your request. Providing false or fraudulent information may subject you to penalties.

Routine uses of this information include giving it to the Department of Justice for civil and criminal litigation, and cities, states, the District of Columbia, and U.S. commonwealths and possessions for use in administering their tax laws. We may also disclose this information to other countries under a tax treaty, to federal and state agencies to enforce federal nontax criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism.

You are not required to provide the information requested on a form that is subject to the Paperwork Reduction Act unless the form displays a valid OMB control number. Books or records relating to a form or its instructions must be retained as long as their contents may become material in the administration of any Internal Revenue law. Generally, tax returns and return information are confidential, as required by section 6103.

The time needed to complete and file Form 4506 will vary depending on individual circumstances. The estimated average time is: **Learning about the law or the form,** 10 min.; **Preparing the form,** 16 min.; and **Copying, assembling, and sending the form to the IRS,** 20 min.

If you have comments concerning the accuracy of these time estimates or suggestions for making Form 4506 simpler, we would be happy to hear from you. You can write to:

Internal Revenue Service
Tax Forms and Publications Division
1111 Constitution Ave. NW, IR-6526
Washington, DC 20224.

Do not send the form to this address. Instead, see *Where to file* on this page.

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

CASE NO. 50-2023-CA-014349-XXXA-MB (AH)

TIMOTHY PIERS DEVALLE, Individually
and as Personal Representative of the
Estate of DONNA MARIE DEVALLE,

                    Plaintiff,

v.

JOHNSON & JOHNSON;
LTL MANAGEMENT, LLC;
IMERYS TALC AMERICA, INC. f/k/a
      LUZENAC AMERICA, INC. f/k/a
      RIO TINTO MINERALS, INC.;
PUBLIX SUPER MARKETS, INC.,

                    Defendants.

**DEFENDANT LLT MANAGEMENT LLC'S NOTICE OF SERVICE OF
FIRST SET OF INTERROGATORIES TO PLAINTIFF TIMOTHY PIERS DEVALLE**

Defendant, LLT Management LLC f/k/a LTL Management LLC, by and through
undersigned counsel and pursuant to Florida Rules of Civil Procedure 1.280(b)(5)(A)(i) and 1.340,
hereby gives notice of serving its First Set of Interrogatories to Plaintiff Timothy Piers Devalle to
be answered in writing and under oath within thirty (30) days of service hereof.

Dated: May 17, 2024

[SIGNATURES ON NEXT PAGE]

4875-9269-0623

CASE NO. 50-2023-CA-014349-XXXA-MB (AH)

Respecfully submitted,

**SHOOK, HARDY & BACON L.L.P.**

s/ Jennifer A. McLoone
JENNIFER A. McLOONE
Fla. Bar. No. 029234
jmcloone@shb.com
DANIELLE A. GREENBERG
Fla. Bar No. 1038864
dgreenberg@shb.com
DARIA PIETROPAOLO
Fla. Bar No. 1049460
dpietropaolo@shb.com
Citigroup Center, Suite 3200
201 South Biscayne Blvd.
Miami, Florida 33131-4332
T: (305) 358-5171 | F: (305) 358-7470

*Counsel for Defendant, LLT Management LLC;
f/k/a LTL Management LLC*

2

4875-9269-0623

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 17, 2024 I electronically filed the foregoing with the

Clerk of Court by using the Florida Courts E-Filing Portal, which will send an electronic notice to

counsel of record listed on the below Service List.

*s/ Jennifer A. McLoone*
Jennifer A. McLoone

Marc P. Kunen, Esquire
**THE FERRARO LAW FIRM, P.A.**
600 Brickell Avenue, Suite 3800
Miami, Florida 33131
T: 305.375.0111
E: mkunen@ferrarolaw.com

*Attorneys for Plaintiff*

Andrea Cox, Esquire
**LUKS SANTANIELLO, PETRILLO & COHEN**
6265 Old Water Oak Road, Suite 201
Tallahassee, Florida 32312
T:  850.385.9901
E:  acox@insurancedefense.net
     jbarrero@insurancedefense.net

Julia Stepanova, Esquire
Monica Brownewell Smith, Esquire
**BARNES & THORNBURG LLP**
4540 PGA Boulevard, Suite 208
Palm Beach Gardens, Florida 33418
T:  561.473.7560
E:  jstepanova@btlaw.com
     monica.brownewell@btlaw.com
     hope.hayes@btlaw.com

*Attorneys for Publix Super Markets, Inc.*

3

Filing # 206692205 E-Filed 09/11/2024 05:01:23 PM

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

CASE NO. 50-2023-CA-014349-XXXA-MB (AH)

TIMOTHY PIERS DEVALLE, Individually
and as Personal Representative of the
Estate of DONNA MARIE DEVALLE,

                                    Plaintiff,

v.

JOHNSON & JOHNSON;
LTL MANAGEMENT, LLC;
IMERYS TALC AMERICA, INC. f/k/a
     LUZENAC AMERICA, INC. f/k/a
     RIO TINTO MINERALS, INC.;
PUBLIX SUPER MARKETS, INC.,

                                    Defendants.

**MOTION TO MODIFY SCHEDULING ORDER**

Defendants Johnson & Johnson and LLT Management LLC, f/k/a LTL Management LLC, joined by Defendant Publix Supermarkets Inc., respectfully seek to modify the scheduling order entered sua sponte by this Court in this matter. In support thereof, Defendants state as follows:

1)    This is a wrongful death action in which Plaintiff claims that the Decedent's use of Johnson's Baby Powder resulted in her cancer and January 28, 2022 death.

2)    As such, this is one of many such cases pending nationally, and one of over ten such cases pending in the circuit (others are pending throughout the state as well).

3)    Plaintiff filed his complaint on October 2, 2023.

4)    Upon the filing of the complaint, this Court entered its standard case management order, setting the case for trial March 7, 2025.

4874-0532-1676

CASE NO. 50-2023-CA-014349-XXXA-MB (AH)

5) That Order also contains pretrial deadlines as follows:

| Event | Deadline |
|---|---|
| Deadline to amend pleadings | already passed |
| Resolution of all motions/objections directed to the pleadings(i.e. to dismiss or strike)and pleadings closed | already passed |
| Expert Witnesses and Compulsory Examinations | November 7, 2024 |
| Witness & Exhibit Lists | November 7, 2024 |
| Rebuttal Witness lists | November 27, 2024 |
| Filing Summary Judgment & *Daubert* Motions | December 7, 2024 |
| Discovery Cut-Off | December 7, 2024 |
| Pre-Trial Meet & Confer | February 5, 2025 |
| Deposition Designations | February 15, 2025 |
| Deadline for Mediation | February 25, 2025 |
| Deadlines to hear all motions | March 2, 2025 |
| Jury Instructions and Verdict Form | March 4, 2025 |

6) The Parties have been litigating this and other similar matters diligently but believe that a modification of this Court's existing pretrial and trial deadlines is warranted.

7) In particular, Defendants request that this case be set for the Court's October 2025 trial docket, and that the following pre-trial deadlines be established:

2

4874-0532-1676

CASE NO. 50-2023-CA-014349-XXXA-MB (AH)

| Event | Deadline |
|---|---|
| Deadline to amend pleadings | already passed |
| Plaintiff's expert disclosures | January 10, 2025 |
| Defendants' expert disclosures | February 7, 2025 |
| Plaintiff's rebuttal expert disclosures (if any) | February 21, 2025 |
| Close of Discovery | May 23, 2025 |
| Dispositive motions and *Daubert* challenges | June 20, 2025 |
| Responses to dispositive motions and *Daubert* challenges | July 18, 2025 |
| Replies to dispositive motions and *Daubert* challenges | August 8, 2025 |
| Motions *in limine* | August 15, 2025 |
| Responses to motions *in limine* | August 29, 2025 |
| Replies to motions *in limine* | September 10, 2025 |
| Deposition designations | September 10, 2025 |
| Counter designations and objections to designations | September 15, 2025 |
| Objections to counter designations | September 17, 2025 |
| Pretrial stipulation | September 22, 2025 |
| Mandatory CMC | |
| Calendar call | October 3, 2025 |
| Trial Docket | October 13-November 21, 2025 |

8)    Good cause exists for modification of the deadlines sought.  Plaintiff has sought

an extension of time to respond to Defendants' initial discovery and Defendants have been

3

unable to engage in medical records collection or other fact discovery. That fact discovery must necessarily occur prior to the disclosure of experts and the formulation of expert opinions. In addition, both Parties anticipate the disclosure of numerous experts in this matter, which will require an extended expert discovery period as well as time to complete and hear pretrial briefing.

9)    Because this case was only recently filed, there have been no prior extensions of pretrial deadlines or continuances of trial. Moreover, there is no prejudice to the Parties or the Court in extending the deadlines as set forth herein. Rather, judicial economy and efficiency will be gained by allowing the case to proceed on a workable and efficient schedule.

10)    Good cause also exists to stagger expert disclosures. Staggered disclosures are necessary to allow for orderly expert discovery in this case and would allow Defendants to respond to Plaintiff's expert opinions, while still providing Plaintiff an opportunity to rebut any opinions offered by Defendants' experts. Thus, staggered disclosures serve the interests of judicial economy and efficiency, and do not prejudice Plaintiffs as they will have an opportunity to disclose rebuttal experts.

11)    More specifically, a 30-day time period in between expert disclosures is appropriate to allow Defendants' experts time to analyze and respond to Plaintiff's experts' opinions before their own disclosures, including evaluation of any pathology testing or examination performed by Plaintiff's experts. Thus, Defendants have routinely requested 30 days in between disclosures.

12)    Not only is the value of staggered expert disclosures recognized in the Manual for Complex Litigation, the need for staggering, and in particular 30-days staggering, in this

4

litigation has been recognized and agreed to by other plaintiff counsel in this litigation and has been ordered by other trial courts.

WHEREFORE, for the foregoing reasons, Defendants respectfully request that this Court modify its prior Scheduling Order, consistent with the proposed scheduling order attached as Exhibit A hereto, and enter a uniform trial order resetting this case for the Court's October 2025 docket.


Dated: September 11, 2024

Respectfully submitted,

**SHOOK, HARDY & BACON L.L.P.**

*s/ Jennifer A. McLoone*
JENNIFER A. McLOONE
Fla. Bar. No. 029234
jmcloone@shb.com
DANIELLE A. GREENBERG
Fla. Bar No. 1038864
dgreenberg@shb.com
DARIA PIETROPAOLO
Fla. Bar No. 1049460
dpietropaolo@shb.com
Citigroup Center, Suite 3200
201 South Biscayne Blvd.
Miami, Florida 33131-4332
T: (305) 358-5171 | F: (305) 358-7470

*Counsel for Defendants, Johnson & Johnson and LLT Management LLC f/k/a LTL Management LLC*

4874-0532-1676

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on September 11, 2024 I electronically filed the foregoing

with the Clerk of Court by using the Florida Courts E-Filing Portal, which will send an

electronic notice to counsel of record listed on the below Service List.

*s/ Jennifer A. McLoone*
Jennifer A. McLoone

| | |
|---|---|
| Marc P. Kunen, Esquire<br>**THE FERRARO LAW FIRM, P.A.**<br>600 Brickell Avenue, Suite 3800<br>Miami, Florida 33131<br>T: 305.375.0111<br>E: mkunen@ferrarolaw.com<br><br>*Attorneys for Plaintiff* | Andrea Cox, Esquire<br>**LUKS SANTANIELLO, PETRILLO &<br>COHEN**<br>6265 Old Water Oak Road, Suite 201<br>Tallahassee, Florida 32312<br>T:  850.385.9901<br>E:  acox@insurancedefense.net<br>    jbarrero@insurancedefense.net<br><br>Julia Stepanova, Esquire<br>Monica Brownewell Smith, Esquire<br>**BARNES & THORNBURG LLP**<br>4540 PGA Boulevard, Suite 208<br>Palm Beach Gardens, Florida 33418<br>T:  561.473.7560<br>E:  jstepanova@btlaw.com<br>    monica.brownewell@btlaw.com<br>    hope.hayes@btlaw.com<br><br>*Attorneys for Publix Super Markets, Inc.* |

6

4874-0532-1676

# EXHIBIT A

NOT A CERTIFIED COPY

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

CASE NO. 50-2023-CA-014349-XXXA-MB (AH)

TIMOTHY PIERS DEVALLE, Individually
and as Personal Representative of the
Estate of DONNA MARIE DEVALLE,

                          Plaintiff,

v.

JOHNSON & JOHNSON;
LTL MANAGEMENT, LLC;
IMERYS TALC AMERICA, INC. f/k/a
     LUZENAC AMERICA, INC. f/k/a
     RIO TINTO MINERALS, INC.;
PUBLIX SUPER MARKETS, INC.,

                        Defendants.

## [PROPOSED] AMENDED SCHEDULING ORDER

    This matter having come before the Court on Defendants' Motion to Modify Scheduling

Order, and the Court having reviewed the file, heard argument on _____ and being otherwise

fully versed in the premises, hereby **ORDERS AND ADJUDGES** that this Amended Scheduling

Order will supersede and replace the deadlines set forth in the Court's Uniform Trial Order. The

narrative portions of the Court's original order will remain in place to describe what each deadline

entails.

| Event | Deadline |
|-------|----------|
| Deadline to amend pleadings | already passed |
| Plaintiff's expert disclosures | January 10, 2025 |
| Defendants' expert disclosures | February 7, 2025 |

CASE NO. 50-2023-CA-014349-XXXA-MB (AH)

| Event | Deadline |
|---|---|
| Plaintiff's rebuttal expert disclosures (if any) | February 21, 2025 |
| Close of Discovery | May 23, 2025 |
| Dispositive motions and *Daubert* challenges | June 20, 2025 |
| Responses to dispositive motions and *Daubert* challenges | July 18, 2025 |
| Replies to dispositive motions and *Daubert* challenges | August 8, 2025 |
| Motions *in limine* | August 15, 2025 |
| Responses to motions *in limine* | August 29, 2025 |
| Replies to motions *in limine* | September 10, 2025 |
| Deposition designations | September 10, 2025 |
| Counter designations and objections to designations | September 15, 2025 |
| Objections to counter designations | September 17, 2025 |
| Pretrial stipulation Mandatory CMC | September 22, 2025 |
| Calendar call | October 3, 2025 |
| Trial Docket | October 13-November 21, 2025 |

A separate uniform trial order will issue placing the case on the trial docket, consistent with this Amended Scheduling Order. However, the deadlines in this Amended Scheduling Order will supersede the deadlines in any such trial order.

CASE NO. 50-2023-CA-014349-XXXA-MB (AH)

     **DONE** and **ORDERED** in Chambers in Palm Beach, Florida on this \_\_\_ day of \_\_\_\_\_,

2024.

                  _____

                  REID P. SCOTT
                  CIRCUIT COURT JUDGE

3

Case 3:26-cv-00094-MAS-RLS    Document 1-2    Filed 12/11/25    Page 409 of 516
PageID: 418

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

CASE NO. 50-2023-CA-014349-XXXA-MB (AH)

TIMOTHY PIERS DEVALLE, Individually
and as Personal Representative of the
Estate of DONNA MARIE DEVALLE,

                    Plaintiff,

v.

JOHNSON & JOHNSON;
LTL MANAGEMENT, LLC;
IMERYS TALC AMERICA, INC. f/k/a
    LUZENAC AMERICA, INC. f/k/a
    RIO TINTO MINERALS, INC.;
PUBLIX SUPER MARKETS, INC.,

                    Defendants.

NOT A CERTIFIED COPY

## NOTICE OF BANKRUPTCY FILING AND STAY OF PROCEEDINGS

**PLEASE TAKE NOTICE THAT**, on September 20, 2024 (the "Petition Date"), Red River Talc LLC, a Texas limited liability company ("Red River"), filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"). A copy of the voluntary petition (excluding the attachments thereto) is attached hereto as Exhibit A. Red River's case is captioned In re Red River Talc LLC, No. 24-90505 (CML) (the "Chapter 11 Case").

**PLEASE TAKE FURTHER NOTICE THAT**, (i) Defendant LLT Management LLC f/k/a LTL Management LLC ("LLT"), following a corporate restructuring that was completed on August 19, 2024, ceased to exist; (ii) as a result of the restructuring, Red River was created and is responsible for the claims asserted against LLT in the above-captioned action (this "Proceeding");

4882-0690-3786

and (iii) new entities Johnson & Johnson Holdco (NA) Inc. and Pecos River Talc LLC were also created as part of the same restructuring.

**PLEASE TAKE FURTHER NOTICE THAT**, upon the filing of Red River's Chapter 11 Case on the Petition Date, all claims asserted against Red River in this Proceeding were automatically stayed by section 362 of the Bankruptcy Code (the "Automatic Stay"). The Automatic Stay became immediately effective and, as a result, all claims asserted against Red River in this Proceeding are stayed absent an order of the Bankruptcy Court lifting or modifying the Automatic Stay.

**PLEASE TAKE FURTHER NOTICE THAT**, on September 23, 2024, the Bankruptcy Court entered a temporary order [Adv. Pro. No. 24-03194, Adv. Dkt. 17] (the "Temporary Order"), a copy of which is attached hereto as Exhibit B, pursuant to which the commencement or continuation of any ovarian or other gynecological cancer-related talc claims against certain protected parties (collectively, the "Protected Parties"), each as identified on Annex A to the Temporary Order, is prohibited and enjoined until October 11, 2024. The Protected Parties include Johnson & Johnson and LLT Management LLC f/k/a LTL Management LLC.

**PLEASE TAKE FURTHER NOTICE THAT**, information regarding the status of Red River's Chapter 11 Case may be obtained by (a) reviewing the docket of the Red River Chapter 11 Case at https://www.txs.uscourts.gov/page/bankruptcy-court (PACER login and password required) or free of charge at https://dm.epiq11.com/case/redrivertalc/info; or (b) contacting any of the following counsel for Red River:

> Gregory M. Gordon
> Dan B. Prieto
> Amanda Rush
> JONES DAY
> 2727 North Harwood Street
> Dallas, Texas 75201

2

4882-0690-3786

CASE NO. 50-2023-CA-014349-XXXA-MB (AH)

Telephone: (214) 220-3939
Facsimile: (214) 969-5100
E-mail: gmgordon@jonesday.com
          dbprieto@jonesday.com
          asrush@ jonesday.com

Brad B. Erens
Caitlin K. Cahow
JONES DAY
110 North Wacker Drive, Suite 4800
Chicago, Illinois  60606
Telephone: (312) 782-3939
Facsimile: (312) 782-8585
E-mail: bberens@jonesday.com
          ccahow@jonesday.com

Dated: September 27, 2024.                    Respectfully submitted,

                                             **SHOOK, HARDY & BACON L.L.P.**

                                             *s/ Jennifer A. McLoone*
                                             JENNIFER A. McLOONE
                                             Fla. Bar. No. 029234
                                             jmcloone@shb.com
                                             DANIELLE A. GREENBERG
                                             Fla. Bar No. 1038864
                                             dgreenberg@shb.com
                                             DARIA PIETROPAOLO
                                             Fla. Bar No. 1049460
                                             dpietropaolo@shb.com
                                             Citigroup Center, Suite 3200
                                             201 South Biscayne Blvd.
                                             Miami, Florida 33131-4332
                                             T: (305) 358-5171 | F: (305) 358-7470

                                             ***Counsel for Johnson & Johnson Defendants***

3

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 27, 2024 I electronically filed the foregoing with

the Clerk of Court by using the Florida Courts E-Filing Portal, which will send an electronic notice

to counsel of record listed on the below Service List.

*s/ Jennifer A. McLoone*
Jennifer A. McLoone

Marc P. Kunen, Esquire
**THE FERRARO LAW FIRM, P.A.**
600 Brickell Avenue, Suite 3800
Miami, Florida 33131
T: 305.375.0111
E: mkunen@ferrarolaw.com

*Attorneys for Plaintiff*

Andrea Cox, Esquire
**LUKS SANTANIELLO, PETRILLO &
COHEN**
6265 Old Water Oak Road, Suite 201
Tallahassee, Florida 32312
T: 850.385.9901
E: acox@insurancedefense.net
    jbarrero@insurancedefense.net

Julia Stepanova, Esquire
Monica Brownewell Smith, Esquire
**BARNES & THORNBURG LLP**
4540 PGA Boulevard, Suite 208
Palm Beach Gardens, Florida 33418
T: 561.473.7560
E: jstepanova@btlaw.com
    monica.brownewell@btlaw.com
    hope.hayes@btlaw.com

*Attorneys for Publix Super Markets, Inc.*

4

# EXHIBIT A

NOT A CERTIFIED COPY

NOT A CERTIFIED COPY

| Fill in this information to identify the case: |
|---|

United States Bankruptcy Court for the:

Southern     District of   Texas
                              (State)

Case number (if known): _____ Chapter _11_

☐ Check if this is an amended filing

Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy    06/22

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.

**1. Debtor's name**

Red River Talc LLC

**2. All other names debtor used in the last 8 years**

Include any assumed names, trade names, and *doing business as* names

**3. Debtor's federal Employer Identification Number (EIN)**

9   9   –   4   5   2   8   5   0   8

**4. Debtor's address**

Principal place of business

501    George Street
Number    Street

New Brunswick     NJ     08933
City            State     ZIP Code

Middlesex
County

Mailing address, if different from principal place of business

Number     Street

P.O. Box

City            State     ZIP Code

Location of principal assets, if different from principal place of business

Number     Street

                   Texas
City            State     ZIP Code

**5. Debtor's website (URL)**

https://dm.epiq11.com/redrivertalc

| Debtor | Red River Talc LLC | Case number (if known) |
|--------|---------------------|-------------------------|
| | Name | |

**6. Type of debtor**

■ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

☐ Partnership (excluding LLP)

☐ Other. Specify: _____

**7. Describe debtor's business**

A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

■ None of the above

B. *Check all that apply:*

☐ Tax-exempt entity (as described in 26 U.S.C. § 501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)

☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes .

  6  7  1  9

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

A debtor who is a "small business debtor" must check the first sub-box. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box.

*Check one:*

☐ Chapter 7

☐ Chapter 9

■ Chapter 11. *Check all that apply:*

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,024,725. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ The debtor is a debtor as defined in 11 U.S.C. § 1182(1), its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000, **and it chooses to proceed under Subchapter V of Chapter 11.** If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

■ A plan is being filed with this petition.

■ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

NOT A CERTIFIED COPY

Debtor    Red River Talc LLC
          Name                                          Case number (if known)

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

☑ No

☐ Yes. District _____ When _____ Case number _____
                         MM / DD / YYYY

        District _____ When _____ Case number _____
                         MM / DD / YYYY

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list.

☑ No

☐ Yes. Debtor _____ Relationship _____

        District _____ When _____
                         MM / DD / YYYY

        Case number, if known _____

**11. Why is the case filed in *this* district?**

Check all that apply:

☑ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☑ No

☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (Check all that apply.)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

   What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☑ Other _____

**Where is the property?** _____
                          Number    Street

_____
City                              State ZIP Code

**Is the property insured?**

☐ No

☐ Yes. Insurance agency _____

       Contact name _____

       Phone _____

---

**Statistical and administrative information**

---

NOT A CERTIFIED COPY

Debtor **Red River Talc LLC**
Name

Case number (if known) _____

---

**13. Debtor's estimation of available funds**

Check one:

☑ Funds will be available for distribution to unsecured creditors.
☐ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

---

**14. Estimated number of creditors**

☐ 1-49
☐ 50-99
☐ 100-199
☐ 200-999
☐ 1,000-5,000
☐ 5,001-10,000
☐ 10,001-25,000
☐ 25,001-50,000
☑ 50,001-100,000
☐ More than 100,000

---

**15. Estimated assets**

☐ $0-$50,000
☐ $50,001-$100,000
☐ $100,001-$500,000
☐ $500,001-$1 million
☐ $1,000,001-$10 million
☐ $10,000,001-$50 million
☐ $50,000,001-$100 million
☐ $100,000,001-$500 million
☐ $500,000,001-$1 billion
☐ $1,000,000,001-$10 billion
☑ $10,000,000,001-$50 billion
☐ More than $50 billion

---

**16. Estimated liabilities**

☐ $0-$50,000
☐ $50,001-$100,000
☐ $100,001-$500,000
☐ $500,001-$1 million
☐ $1,000,001-$10 million
☐ $10,000,001-$50 million
☐ $50,000,001-$100 million
☐ $100,000,001-$500 million
☐ $500,000,001-$1 billion
☑ $1,000,000,001-$10 billion
☐ $10,000,000,001-$50 billion
☐ More than $50 billion

---

### Request for Relief, Declaration, and Signatures

WARNING — Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 09/20/2024
MM / DD / YYYY

✗ _____     John K. Kim
Signature of authorized representative of debtor     Printed name

Title Chief Legal Officer

NOT A CERTIFIED COPY

| Debtor | Red River Talc LLC | Case number (if known) |
|---|---|---|
| | Name | |

**18. Signature of attorney**

✗ ___/s/John F. Higgins_____          Date ___09/20/2024_____
Signature of attorney for debtor                                     MM  / DD / YYYY

John F. Higgins
Printed name
Porter Hedges LLP
Firm name
1000      Main Street, 36th Floor
Number      Street
Houston                                                    TX            77002
City                                                          State         ZIP Code

(713) 226-6648                                          jhiggins@porterhedges.com
Contact phone                                            Email address

09597500                                                 TX
Bar number                                               State

NOT A CERTIFIED COPY

## SECRETARY'S CERTIFICATE

September 19, 2024

John K. Kim, in his capacity as Secretary of Red River Talc LLC, a Texas limited liability company (the "Company"), hereby certifies that (1) the resolutions attached hereto as Exhibit A (the "Resolutions") are a complete and accurate copy of the resolutions adopted on September 19, 2024 by the board of managers of the Company related to the authorization of the Company to file a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas (the "Chapter 11 Case") and (2) all the Resolutions are in full force and effect and are all the resolutions adopted in connection with the filing of the Chapter 11 Case as of the date hereof.

[SIGNATURE PAGE FOLLOWS]

NAI-1540518887

IN WITNESS WHEREOF, the undersigned has executed and delivered this certificate as of the date first written above.

RED RIVER TALC LLC,
a Texas limited liability company

By: *John K. Kim*
      Name: John K. Kim
      Title:  Secretary

*[Signature Page to Secretary's Certificate of Company]*

## EXHIBIT A

**Resolutions**



**RED RIVER TALC LLC**

**Resolutions**

**September 19, 2024**

**WHEREAS**, Red River Talc LLC, a Texas limited liability company (the "Company"), the Company's predecessor LLT Management LLC, a Texas limited liability company that was formerly a North Carolina limited liability company named LTL Management LLC ("LLT"), the Company's predecessor Johnson & Johnson Holdco (NA) Inc., a New Jersey corporation that was formerly the direct owner of 100% of the membership interest of LLT ("Old Holdco"), and Johnson & Johnson, a New Jersey corporation and the indirect owner of 100% of the outstanding membership interests of the Company ("J&J"), have, since the dismissal of the prior chapter 11 bankruptcy cases of LLT, engaged in extensive negotiations with counsel representing the vast majority of claimants asserting ovarian and gynecological cancer-related talc claims and a representative for future talc claimants regarding the terms of a prepackaged plan of reorganization that would be implemented under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") to finally and comprehensively resolve all current and future ovarian cancer and other gynecological cancer claims relating to JOHNSON'S® Baby Powder and Shower to Shower by establishing a talc personal injury trust to process and pay such claims;

**WHEREAS**, these negotiations culminated in the development of the Prepackaged Chapter 11 Plan of Reorganization of the Company (the "Original Plan") and LLT commenced solicitation of votes on the Original Plan for and on behalf of the Company on or about June 3, 2024, with the voting period for claimants to accept or reject the Plan ending on July 26, 2024 at 4:00 p.m. (central time) (the "Voting Deadline");

**WHEREAS**, with the requisite acceptance of the Original Plan having been obtained, on August 19, 2024, LLT and Holdco effected a corporate restructuring (the "Pre-Petition Corporate Restructuring") in which, among other things: (1) Old Holdco converted into a Texas limited liability company named J&J Holdco (NA) LLC ("Old Holdco (Texas)"); (2) LLT merged with and into Old Holdco (Texas), with Old Holdco (Texas) as the surviving entity and LLT ceasing to exist; (3) Old Holdco (Texas) effected a divisional merger under Texas law pursuant to which, among other things, (a) Old Holdco (Texas) ceased to exist, (b) three new Texas limited liability companies – the Company, Pecos River Talc LLC ("Pecos") and J&J Holdco (NA) LLC ("New Holdco (Texas)") – were created, and (c) the talc-related liabilities of Old Holdco (Texas) to be resolved pursuant to the Original Plan, as well as other specified liabilities and assets, were allocated to the Company, the other talc-related liabilities of Old Holdco (Texas), as well as other specified liabilities and assets, were allocated to Pecos, and all other liabilities and assets of Old Holdco (Texas) were allocated to New Holdco (Texas); (4) New Holdco (Texas) merged with and into J&J Intermediate Holding Corp, with J&J Intermediate Holding Corp. as the surviving entity and New Holdco (Texas) ceasing to exist and, in connection therewith, J&J Intermediate Holding Corp. changed its name to Johnson & Johnson Holdco (NA) Inc. ("New Holdco"); and (5) New Holdco became the direct owner of 100% of the outstanding membership interests of each of the Company and Pecos;

**WHEREAS**, before and after the Voting Deadline, LLT (until the Pre-Petition Corporate Restructuring was effected), the Company (after the Pre-Petition Corporate Restructuring was effected) and J&J continued to engage in extensive negotiations with certain plaintiff law firms, including The Smith Law Firm, PLLC, to resolve their objections to the Original Plan, as a result of which negotiations an agreement was ultimately reached with The Smith Law Firm, PLLC and memorialized in a Confidential Memorandum of Understanding & Agreement Regarding Talc Bankruptcy Plan Support, effective August 30, 2024 (the "Smith Agreement");

**WHEREAS**, the Original Plan has been amended to incorporate the terms of the Smith Agreement (the Original Plan as so amended, the "Amended Plan");

**WHEREAS**, the Company and New Holdco have entered into: (1) a Second Amended and Restated Indemnity Cost Funding Agreement dated September 19, 2024, pursuant to which, following the Company's commencement of a chapter 11 bankruptcy case, New Holdco is obligated to provide the Company with funding for, among other things, (a) amounts to satisfy the Company's talc-related liabilities in connection with funding of the talc personal injury trust to be created pursuant to the Amended Plan, (b) if the Amended Plan does not become effective and the Company's chapter 11 case is dismissed, amounts to satisfy the Company's talc-related liabilities established by judgment of a court of competent jurisdiction or final settlement, and (c) amounts to satisfy the Company's talc-related liabilities under certain master settlement agreements entered into prior to the Company's commencement of the Company's chapter 11 bankruptcy case, all on the terms and subject to the conditions set forth therein (the "Indemnity Cost Funding Agreement"); and (2) a Second Amended and Restated Expense Funding Agreement dated September 19, 2024, pursuant to which, following the Company's commencement of a chapter 11 bankruptcy case, New Holdco is obligated to provide the Company with funding for, among other things, (a) costs and expenses of the Company incurred during the pendency of the Company's chapter 11 bankruptcy case, (b) costs and expenses of the Company incurred in the ordinary course of business at any time after the Company's chapter 11 bankruptcy case has been closed or, if applicable, dismissed, (c) distributions or other cash payments (excluding trust funding) to be made by the Company pursuant to the Amended Plan, and (d) maintaining a specified minimum amount of cash on hand, all on the terms and subject to the conditions set forth therein (the "Expense Funding Agreement");

**WHEREAS**, in order to effectuate the terms of the Amended Plan, the board of managers (the "Board") of the Company has: (1) carefully reviewed the materials and other information presented by the Company's management and advisors regarding the Company's talc-related liabilities, the Original Plan, the process for, and results of, the solicitation of votes on the Original Plan, the Smith Agreement, the Amended Plan, the Indemnity Cost Funding Agreement, the Expense Funding Agreement and other relevant information; (2) thoroughly evaluated the commencement of a chapter 11 bankruptcy case by the Company; (3) conferred with the Company's management and advisors regarding these matters; and (4) determined that the filing of a voluntary petition for relief under chapter 11 of the Bankruptcy Code is in the best interests of the Company and its stakeholders;

2

**Chapter 11 Filing**

Filing

**NOW, THEREFORE, BE IT RESOLVED**, that, in the judgment of the Board, it is desirable and in the best interests of the Company, its creditors and other interested parties that the Company seek relief under the Bankruptcy Code;

**FURTHER RESOLVED**, that the Company be, and it hereby is, authorized and directed to file a voluntary petition (the "Petition") for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") on such day and at such time as the officers of the Company (collectively, the "Authorized Persons"), or any of them, including the Chief Restructuring Officer of the Company (the "CRO"), may determine and to perform any and all such other acts as the Authorized Persons, or any of them, including the CRO, may determine to be necessary, desirable or appropriate to effect any of the foregoing, with the filing of such Petition or performance of such other acts to be conclusive evidence of such determination; and

**FURTHER RESOLVED**, that the Authorized Persons be, and each of them, including the CRO, hereby is, authorized, directed and empowered, in the name and on behalf of the Company, to:  (1) execute, acknowledge, deliver and verify, and cause to be filed with the Bankruptcy Court, the Petition and all other ancillary documents, with each in such form, as the Authorized Persons, or any of them, including the CRO, may determine to be necessary, desirable or appropriate to carry out the intent and accomplish the purposes of these resolutions; (2) execute, acknowledge, deliver, verify and file, or cause to be filed, all petitions, schedules, statements, lists, motions, complaints, declarations, applications, notices and other papers or documents, with each in such form, as the Authorized Persons, or any of them, including the CRO, may determine to be necessary, desirable or appropriate in connection with the foregoing; and (3) execute, acknowledge, deliver and verify any and all other documents, with each in such form, as the Authorized Persons, or any of them, including the CRO, may determine to be necessary, desirable or appropriate in connection therewith and to administer the Chapter 11 Case, including by executing, acknowledging, delivering, verifying and filing, or causing to be filed, such petitions, schedules, statements, lists, motions, complaints, declarations, applications, notices and other papers or documents as may be determined to be necessary, desirable or appropriate in connection with the Chapter 11 Case; all with the taking of any such action, including any such execution, acknowledgment, delivery, verification or filing, to be conclusive evidence of such determination;

**FURTHER RESOLVED**, that, in addition to advising the Board and other officers of the Company on matters contemplated by that certain agreement with Accordion Partners, LLC dated July 19, 2024 and exercising the powers and duties normally given to a chief restructuring officer and such other powers and duties consistent with the role of chief restructuring officer as from time to time may be assigned to the CRO by the Board, the CRO shall generally assist in the administration of the Chapter 11 Case by executing, acknowledging, delivering, verifying and filing, or causing to be filed, such petitions, schedules, statements, lists, motions, complaints, declarations, applications, notices and other papers or documents as the CRO may determine to be necessary, desirable or appropriate in connection with the Chapter 11 Case (with the taking of

3

any such action, including any such execution, acknowledgement, delivery, verification or filing, by the CRO to be conclusive evidence of such determination), except in cases where such action shall be expressly and exclusively delegated by the Board or the Company's limited liability company agreement (the "LLC Agreement") to some other officer or agent of the Company or shall be required by law to be otherwise effected;

**Retention of Professionals**

**RESOLVED**, that the Authorized Persons be, and each of them, including the CRO, hereby is, authorized, directed and empowered, in the name and on behalf of the Company, to retain (1) Jones Day, (2) Porter Hedges LLP, (3) King & Spalding LLP, (4) Shook, Hardy & Bacon L.L.P., (5) McCarter & English, LLP, (6) Weil, Gotshal & Manges LLP, (7) Skadden, Arps, Slate, Meagher & Flom LLP, (8) Bates White, LLC, (9) Accordion Partners, LLC, and (10) such additional professionals, including attorneys, accountants, financial advisors, actuaries, consultants or agents (together with the foregoing identified firms, the "Professionals"), as the Authorized Persons, or any of them, including the CRO, may determine to be necessary, desirable or appropriate in connection with the Chapter 11 Case and other related matters, and to execute, deliver and perform retention agreements with the Professionals in such form and reflecting such terms as the Authorized Persons, or any of them, including the CRO, may approve, all with the retention of any Professional to be conclusive evidence of such determination and approval; and

**FURTHER RESOLVED**, that the law firms of Jones Day and Porter Hedges LLP and any additional special or local counsel selected by the Authorized Persons, or any of them, including the CRO, be, and each of them hereby is, authorized, directed and empowered to represent the Company, as debtor and debtor in possession, in connection with any chapter 11 bankruptcy case commenced by or against the Company under the Bankruptcy Code, including the Chapter 11 Case.

**General Authority**

**RESOLVED**, that the Authorized Persons be, and each of them, including the CRO, hereby is, authorized and empowered to execute and deliver such additional agreements, instruments and documents, and to take such other actions (including the payment of costs and expenses), in the name and on behalf of the Company, in each case, as the Authorized Persons, or any of them, including the CRO, may determine to be necessary, desirable or appropriate to implement the purposes and intent of the foregoing resolutions, with the execution and delivery of any such agreement, instrument or document or taking of any such action by the Authorized Persons, or any of them, including the CRO, to be conclusive evidence of such determination;

**FURTHER RESOLVED**, that the Authorized Persons be, and each of them, including the CRO, hereby is, authorized and empowered to certify and furnish to any person or entity such copies of the resolutions set forth herein, and to certify to any person or entity that the resolutions set forth herein have been duly adopted by the Board, are in full force and effect and are in conformity with the Certificate of Formation of the Company and the LLC Agreement, as the Authorized Persons, or any of them, including the CRO, may determine to be necessary, desirable or appropriate to implement the purposes and intent of the foregoing resolutions, with

4

the certification and furnishing of such copies or the certification of such matters to be conclusive evidence of such determination; and

**FURTHER RESOLVED**, that, in the event that the Authorized Persons, or any of them, including the CRO, determines a specific form of resolutions is necessary, advisable or appropriate in connection with the implementation of the purposes and intent of the foregoing resolutions, resolutions in such form be, and each of them hereby is, adopted by the Board as if such resolutions were expressly set forth herein and that the Authorized Persons be, and each of them, including the CRO, hereby is, authorized and empowered to certify and furnish to any person or entity copies of such resolutions, and to certify to any person or entity that such resolutions have been duly adopted by the Board, are in full force and effect and are in conformity with the Certificate of Formation of the Company and the LLC Agreement, with the certification and furnishing of such copies or the certification of such matters to be conclusive evidence of such determination.

**Ratification**

**RESOLVED**, that all actions taken in the name and on behalf of the Company prior to the adoption of these resolutions that would have been authorized by the foregoing resolutions had they been taken after the adoption of these resolutions be, and each of them hereby is, approved, adopted, ratified and confirmed in all respects.

5

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| RED RIVER TALC LLC,[1] | Case No. 24-_____ (CML) |
| Debtor. | |

## CORPORATE OWNERSHIP STATEMENT

### RED RIVER TALC LLC

Check one: __X__ DEBTOR ___ PLAINTIFF ___ DEFENDANT ___ OTHER (specify):

*Instructions: Federal Rule of Bankruptcy Procedure 7007.1 requires corporate parties to an adversary proceeding, other than the debtor or a governmental unit, to file a statement of corporate ownership with the first pleading filed. Similarly, Federal Rule of Bankruptcy Procedure 1007(a)(1) requires corporate debtors to file a corporate ownership statement with their petitions containing the information described in Rule 7007.1. Check one of the statements set forth below and provide any information as directed.*

☒ 1. **The following corporations directly or indirectly own 10% or more of any class of the above named corporate debtor's/party's equity interests:[2]**

DePuy Synthes, Inc.
700 Orthopaedic Drive
Warsaw, IN 46582

Janssen Pharmaceuticals, Inc.
1125 Trenton-Harbourton Rd.
Titusville, NJ 08560

Johnson & Johnson
One Johnson & Johnson Plaza
New Brunswick, NJ 08933

---

[1]     The last four digits of the Debtor's taxpayer identification number are 8508.  The Debtor's address is
501 George Street, New Brunswick, New Jersey 08933.

[2]     The corporations are listed in alphabetical order.

Johnson & Johnson Holdco (NA) Inc.
One Johnson & Johnson Plaza
New Brunswick, NJ 08933

Johnson & Johnson International
One Johnson & Johnson Plaza
New Brunswick, NJ 08933

☐ 2.   There are no entities that directly or indirectly own 10% or more of any class of the above
named corporate debtor's/party's equity interests.

Date:  September 20, 2024

/s/ John K. Kim
Signature of Authorized Individual for Corporate
Debtor/Party

John K. Kim
Printed Name of Authorized Individual for Corporate
Debtor/Party

Chief Legal Officer
Title of Authorized Individual for Corporate Debtor/Party

- 2 -

Fill in this information to identify the case:

Debtor name:  Red River Talc LLC

United States Bankruptcy Court for the Southern District of Texas

Case Number (if known): _____

☐ Check if this is an
amended filing

## Chapter 11 Case:  The List of the Top Law Firms With the Most Significant Representations of Parties With Ovarian and Gynecological-Cancer Talc Claims Against the Debtor

The following is an alphabetical list of the top law firms with the most significant representations of parties with ovarian and gynecological-cancer talc claims (the "**Top Talc Counsel List**") against Red River Talc LLC, as debtor (the "**Debtor**") based on volume of claims.  Concurrently with this petition, the Debtor has filed a motion seeking authority to file this Top Talc Counsel List in lieu of a list of the 20 largest unsecured creditors.[1]  This list does not include any person or entity who is an "insider" under section 101(31) of title 11 of the United States Code.  The Top Talc Counsel List was prepared with information available to the Debtor.  The Debtor reserves the right to amend the Top Talc Counsel List based on additional information it may identify.  The information contained in the Top Talc Counsel List shall not constitute an admission by, nor shall it be binding on, the Debtor.

| | Name of law firm and complete mailing address, including zip code | Name, telephone number, and email address of law firm contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | Andrew Thornton Higgins Razmara LLP 4701 Von Karman Avenue Ste. 300 Newport Beach, CA 92660 | Robert Siko (949) 748-1000 rsiko@andrewsthornton.com | Ovarian and Gynecological-Cancer Personal Injury Talc Claims | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 2 | Ashcraft & Gerel 1825 K Street NW, Ste. 700 Washington, DC 20006 | Michelle A. Parfitt (703) 824-4762 mparfitt@ashcraftlaw.com | Ovarian and Gynecological-Cancer Personal Injury Talc Claims | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 3 | Aylstock, Witkin, Kreis & Overholtz PLLC 17 E. Main Street, Ste. 200 Pensacola, FL 32502 | Daniel Thornburgh (850) 202-1010 dthornburgh@awkolaw.com | Ovarian and Gynecological-Cancer Personal Injury Talc Claims | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 4 | Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. 218 Commerce Street Montgomery, AL 36104 | Andy D. Birchfield, Jr. (800) 898-2034 andy.birchfield@beasleyallen.com | Ovarian and Gynecological-Cancer Personal Injury Talc Claims | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 5 | Duncan Stubbs 825 Watters Creek Blvd., #360 Allen, TX 75013 | Matthew R. Stubbs (877) 971-0830 matthew@duncanstubbs | Ovarian and Gynecological-Cancer Personal Injury Talc Claims | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 6 | Johnson Law Group 2925 Richmond, Ste. 1700 Houston, TX 77098 | Basil Adham (713) 626-9336 talc@johnsonlawgroup.com | Ovarian and Gynecological-Cancer Personal Injury Talc Claims | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |

---

[1]  This list is in substantially the same form as Official Bankruptcy Form 204 for chapter 11 cases setting forth the list of creditors, other than insiders, who have the 20 largest unsecured claims against a debtor.

Debtor Name:  Red River Talc LLC                                              Case Number (if known): _____

| Name of law firm and complete mailing address, including zip code | Name, telephone number, and email address of law firm contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 7 The Miller Firm, LLC 108 Railroad Avenue Orange, VA 22960 | Nancy Miller (866) 529-3323 nmiller@millerfirmllc.com | Ovarian and Gynecological-Cancer Personal Injury Talc Claims | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 8 Morelli Law Firm, PLLC 777 Third Avenue, 31st FL New York, NY 10017 | Bennedict Morelli (212) 751-9800 dlamberg@morellilaw.com | Ovarian and Gyncecological-Cancer Personal Injury Talc Claims | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 9 Nachawati Law Group 5489 Blair Road Dallas, TX 75231 | Majed Nachawati (214) 890-0711 mn@ntrial.com | Ovarian and Gynecological-Cancer Personal Injury Talc Claims | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 10 Napoli Shkolnik, PLLC 360 Lexington Avenue, 11th FL New York, NY 10017 | Shayna E. Sacks (844) 860-0949 ssacks@napolilaw.com | Ovarian and Gynecological-Cancer Personal Injury Talc Claims | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 11 Onderlaw, LLC 110 E. Lockwood, 2nd FL ST. Louis, MO 63119 | James G. Onder (314) 963-9000 onder@onderlaw.com | Ovarian and Gynecological-Cancer Personal Injury Talc Claims | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 12 Pulaski Kherkher PLLC 2925 Richmond Avenue Ste. 1725 Houston, TX 77098 | Adam Pulaski (713) 664-4555 adam@pulaskilawfirm.com | Ovarian and Gynecological-Cancer Personal Injury Talc Claims | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 13 Schneider Wallace Cottrell Konecky 2000 Powell Street, Ste. 1400 Emeryville, CA 94608 | Amy Eskin (415) 421-7100 aeskin@schneiderwallace.com | Ovarian and Gynecological-Cancer Personal Injury Talc Claims | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 14 The Smith Law Firm PLLC 300 Concourse Blvd., Ste. 104 Ridgeland, MS 39157 | Allen Smith (601) 952-1422 asmith@smith-law.org | Ovarian and Gynecological-Cancer Personal Injury Talc Claims | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 15 Watts Guerra LLP 811 Barton Springs Rd. #725 Austin, TX 78704 | Mikal Watts (210) 315-4477 mikal@wattsllp.com | Ovarian and Gynecological-Cancer Personal Injury Talc Claims | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |

Fill in this information to identify the case and this filing:

Debtor Name  Red River Talc LLC

United States Bankruptcy Court for the:  Southern          District of  Texas
                                                                    (State)

Case number (If known): _____

## Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors       12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

## Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐ *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)

☐ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)

☐ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

☐ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)

☐ *Schedule H: Codebtors* (Official Form 206H)

☐ *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)

☐ Amended *Schedule* _____

☐ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)

☑ Other document that requires a declaration  List of the Top Law Firms With the Most Significant Representations of Parties With Ovarian and Gynecological-Cancer Talc Claims Against the Debtor

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  09/20/2024          ✖ /s/ John K. Kim
              MM / DD / YYYY                Signature of individual signing on behalf of debtor

                                            John K. Kim
                                            Printed name

                                            Chief Legal Officer
                                            Position or relationship to debtor

NOT A CERTIFIED COPY

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

In re:                                    Chapter 11

RED RIVER TALC LLC,[1]                    Case No. 24-_____ (CML)

        Debtor.

**MASTER CREDITORS LIST**

Red River Talc LLC, as debtor in the above-captioned chapter 11 case (the "Debtor"), filed a petition in this Court on the date hereof for relief under chapter 11 of title 11 of the United States Code (the "Voluntary Petition"). In accordance with Rule 1007(a) of the Federal Rules of Bankruptcy Procedure, the Debtor filed concurrently herewith a matrix of the names and addresses of creditors, potential creditors and other parties in interest (the "Master Creditors List"). The Master Creditors List has been prepared from the books and records of the Debtor or its predecessor, and contains only those parties whose names and addresses were maintained in the databases of the Debtor or its predecessor or were otherwise readily ascertainable by the Debtor prior to the commencement of this chapter 11 case. The Debtor will update the Master Creditors List as more information becomes available.

Contemporaneously with the filing of the Voluntary Petition, the Debtor filed a motion (the "Motion") requesting, among other things, authority to serve all notices, mailings or other documents required to be provided to creditors who are claimants asserting ovarian and gynecological cancer-related talc personal injury claims against the Debtor, through filed lawsuits or otherwise, through counsel (collectively, the "Talc Claimants"), on the Talc Claimants in care of their counsel at such counsel's address in lieu of service on the individual Talc Claimants at their personal addresses. Accordingly, the Master Creditors List includes the addresses of counsel for each of the Talc Claimants rather than the addresses of each individual Talc Claimant. In addition, the Motion requests that, to the extent a pro se Talc Claimant has been identified, the Debtor be authorized to redact such pro se Talc Claimant's contact information and address in documents filed with the Court, including the Master Creditors List. Accordingly, the Master Creditors List does not include such information for the pro se Talc Claimants.

Certain of the creditors listed on the Master Creditors List may not hold outstanding claims against the Debtor and therefore may not be creditors in the Debtor's bankruptcy case. By filing the Master Creditors List, the Debtor is not acknowledging that any listed party is a creditor, nor is it waiving or otherwise affecting its right to object to the extent, validity or enforceability of the claims, if any, held or asserted by the parties listed on the Master Creditors List.

---

[1] The last four digits of the Debtor's taxpayer identification number are 8508. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

Fill in this information to identify the case and this filing:

Debtor Name  Red River Talc LLC

United States Bankruptcy Court for the:  Southern          District of  Texas
                                                                    (State)

Case number (*If known*):  _____

## Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors     12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date.  Bankruptcy Rules 1008 and 9011.

WARNING -- Bankruptcy fraud is a serious crime.  Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.  18 U.S.C. §§ 152, 1341, 1519, and 3571.

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐  *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)

☐  *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)

☐  *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

☐  *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)

☐  *Schedule H: Codebtors* (Official Form 206H)

☐  *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)

☐  Amended *Schedule* _____

☐  *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)

■  Other document that requires a declaration Master Creditors List _____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  09/20/2024          ✖ /s/ John K. Kim
             MM / DD / YYYY           Signature of individual signing on behalf of debtor

                                      John K. Kim
                                      Printed name

                                      Chief Legal Officer
                                      Position or relationship to debtor

NOT A CERTIFIED COPY

# EXHIBIT B

NOT A CERTIFIED COPY

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

September 23, 2024

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| RED RIVER TALC LLC, | Case No. 24-90905 (CML) |
| Debtor. | |
| RED RIVER TALC LLC, | |
| Plaintiff, | |
| v. | Adv. Pro. No. 24-03194 (CML) |
| THOSE PARTIES LISTED IN APPENDIX A TO THE COMPLAINT and JOHN AND JANE DOES 1-1000, | |
| Defendants. | |

NOT A CERTIFIED COPY

## TEMPORARY ORDER (A) DECLARING THAT THE AUTOMATIC STAY APPLIES TO CERTAIN CLAIMS AND CAUSES OF ACTION ASSERTED AGAINST CERTAIN NON-DEBTORS AND (B) EXTENDING THE AUTOMATIC STAY TO CERTAIN NON-DEBTORS

For the reasons stated on the record at the September 23, 2024 hearing, including the administration of justice, it is HEREBY ORDERED THAT:

1.      Pursuant to sections 362(a) and 105(a) of the Bankruptcy Code, the Defendants listed on **Appendix A** to the Complaint and John Does 1-1000 are prohibited and enjoined from commencing or continuing to prosecute any Debtor Talc Claim (as defined in the Complaint) against any of the parties listed on **Annex A** on any theory of liability until October 11, 2024.

2.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Signed: September 23, 2024

Christopher Lopez
United States Bankruptcy Judge

## ANNEX A

**Non-Debtor Affiliates**

ABD Holding Company, Inc.
ABIOMED AUSTRALIA PTY LTD
ABIOMED COMMERCIAL, LLC
Abiomed Europe GmbH
Abiomed Europe GmbH, Aachen, Zweigniederlassung Zug
Abiomed Japan K.K.
ABIOMED R&D, Inc.
ABIOMED SARL
ABIOMED SINGAPORE PTE. LTD.
ABIOMED, Inc.
ABIOMED, LTD.
Acclarent, Inc.
Actelion Pharmaceuticals Ltd
Actelion Pharmaceuticals Trading (Shanghai) Co., Ltd.
Actelion Pharmaceuticals US, Inc.
Actelion Treasury Unlimited Company
AIS GmbH Aachen Innovative Solutions
Albany Street LLC
ALZA Corporation
Alza Land Management, Inc.
AMO (Hangzhou) Co., Ltd.
AMO (Shanghai) Medical Devices Trading Co., Ltd.
AMO ASIA LIMITED
AMO Australia Pty Limited
AMO Canada Company
AMO Denmark ApS
AMO Development, LLC
AMO France
AMO Germany GmbH
AMO Groningen B.V.
AMO International Holdings Unlimited Company
AMO Ireland
AMO Italy SRL
AMO Japan K.K.
AMO Manufacturing USA, LLC
AMO Netherlands BV
AMO Norway AS
AMO Puerto Rico Manufacturing, Inc.
AMO Sales and Service, Inc.
AMO Singapore Pte. Ltd.
AMO Spain Holdings, LLC
AMO Switzerland GmbH
AMO United Kingdom, Ltd.
AMO Uppsala AB
Anakuria Therapeutics, Inc.
AorTx, Inc.

Apsis
Aragon Pharmaceuticals, Inc.
Asia Pacific Holdings, LLC
Atrionix, Inc.
AUB Holdings LLC
Auris Health, Inc.
Bandol Merger Sub, Inc.
BeneVir BioPharm, Inc.
Berna Rhein B.V.
BioMedical Enterprises, Inc.
Biosense Webster (Israel) Ltd.
Biosense Webster, Inc.
Breethe, Inc.
C Consumer Products Denmark ApS
Cerenovus, Inc.
Charm Merger Sub, Inc.
ChromaGenics B.V.
Cilag AG
Cilag GmbH International
Cilag Holding AG
Cilag Holding Treasury Unlimited Company
Cilag-Biotech, S.L.
Coherex Medical, Inc.
Cordis de Mexico, S.A. de C.V.
Corimmun GmbH
CoTherix Inc.
CRES Holdings, Inc.
CrossRoads Extremity Systems, LLC
CSATS, Inc.
DePuy Hellas SA
DePuy International Limited
DePuy Ireland Unlimited Company
DePuy Mexico, S.A. de C.V.
DePuy Mitek, LLC
DePuy Orthopaedics, Inc.
DePuy Products, Inc.
DePuy Spine, LLC
DePuy Synthes Institute, LLC
DePuy Synthes Products, Inc.
DePuy Synthes Sales, Inc.
DePuy Synthes, Inc.
Dutch Holding LLC
ECL7, LLC
ECP Entwicklungsgesellschaft mbH
EES Holdings de Mexico, S. de R.L. de C.V.
EES, S.A. de C.V.

-2-

EIT Emerging Implant Technologies GmbH
Ethicon Endo-Surgery (Europe) GmbH
Ethicon Endo-Surgery, Inc.
Ethicon Endo-Surgery, LLC
Ethicon LLC
Ethicon Sarl
Ethicon US, LLC
Ethicon Women's Health & Urology Sarl
Ethicon, Inc.
Ethnor (Proprietary) Limited
Ethnor del Istmo S.A
Ethnor Farmaceutica, S.A.
Finsbury (Development) Limited
Finsbury (Instruments) Limited
Finsbury Medical Limited
Finsbury Orthopaedics International Limited
Finsbury Orthopaedics Limited
FMS Future Medical System SA
GATT Technologies B.V.
GBSC Division of Janssen Biologics B.V.
GH Biotech Holdings Limited
GMED Healthcare BV
Guangzhou Bioseal Biotech Co., Ltd.
Hansen Medical Deutschland GmbH
Hansen Medical International, Inc.
Hansen Medical UK Limited
Hansen Medical, Inc.
Healthcare Services (Shanghai) Ltd.
I.D. Acquisition Corp.
Innomedic Gesellschaft für innovative Medizintechnik und Informatik mbH
J & J Company West Africa Limited
J&J Argentina S.A.
J&J Pension Trustees Limited
J&J Productos Medicos & Farmaceuticos del Peru S.A.
J.C. General Services BV
Janssen (Scientific Office)
Janssen Biologics B.V.
Janssen Biotech, Inc.
Janssen Cilag Farmaceutica S.A.
Janssen Cilag S.p.A.
Janssen Cilag SPA
Janssen Cilag, C.A.
Janssen Egypt LLC
Janssen Farmaceutica Portugal Lda
Janssen France Treasury Unlimited Company
Janssen Global Services, LLC

-3-

Janssen Inc.
Janssen Irish Finance Unlimited Company
Janssen Japan Treasury Unlimited Company
Janssen Korea Ltd.
Janssen Mexico Treasury Unlimited Company
Janssen Oncology, Inc.
Janssen Ortho LLC
Janssen Pharmaceutica (Proprietary) Limited
Janssen Pharmaceutica NV
Janssen Pharmaceutical K.K.
Janssen Pharmaceutical Sciences Unlimited Company
Janssen Pharmaceutical Unlimited Company
Janssen Pharmaceuticals, Inc.
Janssen Products, LP
Janssen R&D Ireland Unlimited Company
Janssen Research & Development, LLC
Janssen Sciences Ireland Unlimited Company
Janssen Scientific Affairs, LLC
Janssen Scientific Office (Syria)
Janssen Supply Group, LLC
Janssen Vaccines & Prevention B.V.
Janssen Vaccines Corp.
Janssen-Cilag
Janssen-Cilag (New Zealand) Limited
Janssen-Cilag A/S
Janssen-Cilag AG
Janssen-Cilag Aktiebolag
Janssen-Cilag AS
Janssen-Cilag B.V.
Janssen-Cilag d.o.o. Beograd
Janssen-Cilag de Mexico S. de R.L. de C.V.
Janssen-Cilag Farmaceutica Lda.
Janssen-Cilag Farmaceutica Ltda.
Janssen-Cilag GmbH
Janssen-Cilag International NV
Janssen-Cilag Kft
Janssen-Cilag Limited (incorporated in Thailand)
Janssen-Cilag Limited (incorporated in United Kingdom)
Janssen-Cilag Manufacturing, LLC
Janssen-Cilag NV
Janssen-Cilag OY
Janssen-Cilag Pharma GmbH
Janssen-Cilag Pharmaceutical S.A.C.I.
Janssen-Cilag Polska, Sp. z o.o.
Janssen-Cilag Pty Ltd
Janssen-Cilag S.A.

NOT A CERTIFIED COPY

-4-

Janssen-Cilag s.r.o.
Janssen-Cilag, S.A.
Janssen-Cilag, S.A. de C.V.
Janssen-Pharma, S.L.
J-C Health Care Ltd.
Jevco Holding, Inc.
JJ Surgical Vision Spain, S.L.
JJ Surgical Vision Spain, S.L. - Sucursal EM Portugal
JJC Acquisition Company B.V.
JJHC, LLC
JJSV Belgium BV
JJSV Manufacturing Malaysia SDN. BHD.
JJSV Norden AB
JJSV Norden AB, filial i Finland
JJSV Produtos Oticos Ltda.
JNJ Global Business Services s.r.o.
JNJ Holding EMEA B.V.
JNJ International Investment LLC
JNTL (Russia) HoldCo LLC
Johnson & Johnson
Johnson & Johnson (Angola), Limitada
Johnson & Johnson (Australia) Pty Ltd
Johnson & Johnson (Canada) Inc.
Johnson & Johnson (China) Investment Ltd.
Johnson & Johnson (Ecuador) S.A.
Johnson & Johnson (Hong Kong) Limited
Johnson & Johnson (Ireland) Limited
Johnson & Johnson (Kenya) Limited
Johnson & Johnson (Middle East) Inc.
Johnson & Johnson (Mozambique), Limitada
Johnson & Johnson (Namibia) (Proprietary) Limited
Johnson & Johnson (New Zealand) Limited
Johnson & Johnson (Philippines), Inc.
Johnson & Johnson (Private) Limited
Johnson & Johnson (Singapore) HoldCo LLC
Johnson & Johnson (Trinidad) Limited
Johnson & Johnson (Vietnam) Co., Ltd
Johnson & Johnson AB
Johnson & Johnson AG
Johnson & Johnson Bulgaria EOOD
Johnson & Johnson d.o.o.
Johnson & Johnson de Chile S.A.
Johnson & Johnson de Mexico, S.A. de C.V.
Johnson & Johnson de Uruguay S.A.
Johnson & Johnson do Brasil Industria E Comercio de Produtos Para Saude Ltda.
Johnson & Johnson Dominicana, S.A.S.

-5-

Johnson & Johnson Enterprise Innovation Inc.
Johnson & Johnson European Treasury Unlimited Company
Johnson & Johnson Finance Corporation
Johnson & Johnson Finance Limited
Johnson & Johnson Financial Services GmbH
Johnson & Johnson for Export and Import LLC
Johnson & Johnson Gateway, LLC
Johnson & Johnson GT, Sociedad Anónima
Johnson & Johnson Health Care Systems Inc.
Johnson & Johnson Healthcare SPC
Johnson & Johnson Hemisferica S.A.
Johnson & Johnson Holdco (NA) Inc.
Johnson & Johnson Holding GmbH
Johnson & Johnson Holdings (Austria) GmbH
Johnson & Johnson Innovation - JJDC, Inc.
Johnson & Johnson Innovation Limited
Johnson & Johnson Innovation LLC
Johnson & Johnson International
Johnson & Johnson International (Singapore) Pte. Ltd.
Johnson & Johnson International Financial Services Unlimited Company
Johnson & Johnson Irish Finance Company Limited
Johnson & Johnson K.K.
Johnson & Johnson Kazakhstan Limited Liability Partnership
Johnson & Johnson Kft.
Johnson & Johnson LLC
Johnson & Johnson Management Limited
Johnson & Johnson Medical (China) Ltd.
Johnson & Johnson Medical (Proprietary) Ltd
Johnson & Johnson Medical (Shanghai) Ltd.
Johnson & Johnson Medical (Suzhou) Ltd.
Johnson & Johnson Medical B.V.
Johnson & Johnson Medical Devices & Diagnostics Group - Latin America, L.L.C.
Johnson & Johnson Medical GmbH
Johnson & Johnson Medical Greece Single Member S.A.
Johnson & Johnson Medical Korea Ltd.
Johnson & Johnson Medical Limited
Johnson & Johnson Medical Mexico, S.A. de C.V.
Johnson & Johnson Medical NV
Johnson & Johnson Medical Products GmbH
Johnson & Johnson Medical Pty Ltd
Johnson & Johnson Medical S.A.
Johnson & Johnson Medical S.p.A.
Johnson & Johnson Medical SAS
Johnson & Johnson Medical Saudi Arabia Limited
Johnson & Johnson Medical Taiwan Ltd.
Johnson & Johnson Medical, S.C.S.

-6-

Johnson & Johnson Medikal Sanayi ve Ticaret Limited Sirketi
Johnson & Johnson MedTech (Thailand) Ltd.
Johnson & Johnson Medtech Colombia S.A.S.
Johnson & Johnson Medtech CR Limitada
Johnson & Johnson MENA RHQ Limited
Johnson & Johnson Middle East - Scientific Office
Johnson & Johnson Middle East FZ-LLC
Johnson & Johnson Morocco Societe Anonyme
Johnson & Johnson Nordic AB
Johnson & Johnson Pakistan (Private) Limited
Johnson & Johnson Pharmaceutical Ltd.
Johnson & Johnson Poland Sp. z o.o.
Johnson & Johnson Private Limited
Johnson & Johnson Romania S.R.L.
Johnson & Johnson S.E. d.o.o.
Johnson & Johnson S.E., Inc.
Johnson & Johnson SDN. BHD.
Johnson & Johnson Services, Inc.
Johnson & Johnson Sociedade Previdenciaria (Non Profit)
Johnson & Johnson Surgical Vision India Private Limited
Johnson & Johnson Surgical Vision, Inc.
Johnson & Johnson Taiwan Ltd.
Johnson & Johnson Trading Limited
Johnson & Johnson UK Treasury Company Limited
Johnson & Johnson Ukraine II LLC
Johnson & Johnson Urban Renewal Associates
Johnson & Johnson Vision Care (Australia) Pty Ltd
Johnson & Johnson Vision Care (Shanghai) Ltd.
Johnson & Johnson Vision Care Ireland Unlimited Company
Johnson & Johnson Vision Care, Inc.
Johnson & Johnson Vision Korea, Ltd.
Johnson & Johnson, Lda
Johnson & Johnson, S.A.
Johnson & Johnson, s.r.o.
Johnson & Johnson, s.r.o.
Johnson and Johnson Sihhi Malzeme Sanayi Ve Ticaret Limited Sirketi
JOM Pharmaceutical Services, Inc.
Kenvue, Inc.
La Concha Land Investment Corporation
Laminar, Inc.
LLT Management LLC
McNeil Panama, LLC
Medical Device Business Services, Inc.
Medical Devices & Diagnostics Global Services, LLC
Medos International Sarl
Medos Sarl

NAI-1541254106

Medos Sàrl, succursale de Neuchâtel (Branch)
MegaDyne Medical Products, Inc.
Menlo Care De Mexico, S.A. de C.V.
Mentor B.V.
Mentor Deutschland GmbH
Mentor Medical Systems B.V.
Mentor Partnership Holding Company I, LLC
Mentor Texas GP LLC
Mentor Texas L.P.
Mentor Worldwide LLC
Middlesex Assurance Company Limited
Momenta Pharmaceuticals, Inc.
Netherlands Holding Company
Neuravi Limited
NeuWave Medical, Inc.
NuVera Medical, Inc.
Obtech Medical Mexico, S.A. de C.V.
OBTECH Medical Sarl
OMJ Holding GmbH
OMJ Pharmaceuticals, Inc.
Omrix Biopharmaceuticals Ltd.
Omrix Biopharmaceuticals NV
Omrix Biopharmaceuticals, Inc.
Ortho Biologics LLC
Ortho Biotech Holding LLC
Orthospin Ltd.
Orthotaxy
Patriot Pharmaceuticals, LLC
Pecos River Talc LLC
Percivia LLC
preCARDIA
Princeton Laboratories, Inc.
Proleader S.A.
Prosidyan, Inc.
Prosidyan, Inc.
PT Johnson and Johnson Indonesia Two
Pulsar Vascular, Inc.
Regency Urban Renewal Associates
RespiVert Ltd.
Royalty A&M LLC
Rutan Realty LLC
Scios LLC
Serhum S.A. de C.V.
Serotiny, Inc.
Spectrum Vision Limited Liability Partnership
SterilMed, Inc.

-8-

Surgical Process Institute Deutschland GmbH
Synthes Costa Rica S.C.R., Limitada
SYNTHES GmbH
Synthes GmbH
Synthes Holding AG
Synthes Holding Limited
SYNTHES Medical Immobilien GmbH
Synthes Medical Surgical Equipment & Instruments Trading LLC
Synthes Produktions GmbH
Synthes S.M.P., S. de R.L. de C.V.
Synthes Tuttlingen GmbH
Synthes USA Products, LLC
Synthes USA, LLC
Synthes, Inc.
TalCo LLC
TARIS Biomedical LLC
TearScience, Inc.
The Anspach Effort, LLC
Tibotec, LLC
Torax Medical, Inc.
UAB "Johnson & Johnson"
Verb Surgical Inc.
Vision Care Finance Unlimited Company
WH4110 Development Company, L.L.C.
Xian Janssen Pharmaceutical Ltd.
XO1 Limited

NOT A CERTIFIED COPY

## Insurers
A.G. Securitas
Aetna Casualty and Surety (Travelers)
Affiliated FM Ins. Company
AIU Ins. Company
Allianz Ins. Company
American Centennial Ins. Company
American Motorists Ins. Company
American Re-Insurance Company
Assurances Generales De France
Assurantiekantoor VanWijk & Co.
Birmingham Fire Ins. Company
Central National Ins. Company of Omaha
City Ins. Company
Colonia Versicherungs AG, Koln
Drake Ins. Company of New York
Employers Ins. of Wausau
Employers Mutual Casualty Company
Eurinco Allgemeine Versicherungs AG, Dusseldorf
Fireman's Fund Ins. Company
First State Ins. Company
Gibraltar Casualty Company
Granite State Ins. Company
Great Northern Ins. Company
Great Southwest Fire Ins. Company
Groupe Drouot
Harbor Ins. Company
Hartford Accident and Indemnity Company
Home Ins. Company
Ideal Mutual Ins. Company
Industrial Indemnity Company

-10-

Ins. Company of North America
Ins. Company of the State of Pennsylvania
Ins. Corporation of Singapore Limited
Integrity Ins. Company
International Ins. Company
International Surplus Lines Ins. Company
Lexington Ins. Company
London Guarantee and Accident Company of N.Y.
L'Union Atlantique S.A. d'Assurances
Mead Reinsurance Corporation
Middlesex Assurance Company
Midland Ins. Company
Mission Ins. Company
Mission National Ins. Company
Mutual Fire, Marine, & Inland Ins. Company
N.V. Rotterdamse Assurantiekas
N.V. Schadeverzekeringsmaatschappij Maas Lloyd
National Casualty Company
National Union Fire Ins. Company
New Hampshire Ins. Company
North River Ins. Company
Northbrook Excess and Surplus Ins. Company
Northeastern Fire Ins. Company of Pennsylvania
Pacific Employers Ins. Company
Prudential Reinsurance Company
Republic Indemnity Company of America
Republic Ins. Company
Republic Western Ins. Company
Royal Belge I.R., S.A. d'Assurances
Royal Indemnity Company
Royal Ins. Company
Safety Mutual Casualty Corporation
Seguros La Republica SA
Southern American Ins. Company
Transamerica Premier
Transit Casualty Company
UAP
Union Atlantique d'Assurances S.A.
Union Indemnity Ins. Company of New York
Westport/Puritan Ins. Company

-11-

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

CASE NO. 50-2023-CA-014349-XXXA-MB (AH)

TIMOTHY PIERS DEVALLE, Individually
and as Personal Representative of the
Estate of DONNA MARIE DEVALLE,

                             Plaintiff,

v.

JOHNSON & JOHNSON;
LTL MANAGEMENT, LLC;
IMERYS TALC AMERICA, INC. f/k/a
      LUZENAC AMERICA, INC. f/k/a
      RIO TINTO MINERALS, INC.;
PUBLIX SUPER MARKETS, INC.,

                         Defendants.

## SUPPLEMENTAL NOTICE OF BANKRUPTCY FILING AND STAY OF PROCEEDINGS

On September 27, 2024, undersigned counsel filed a *Notice of Bankruptcy Filing and Stay of Proceedings* in this Court ("Notice"), advising that (i) Defendant LLT Management LLC f/k/a LTL Management LLC ("LLT") ceased to exist and Red River Talc LLC ("Red River") was created and is responsible for the claims asserted against LLT in the above captioned action, and (ii) Red River filed a voluntary petition for chapter 11 bankruptcy in the Southern District of Texas ("Bankruptcy Court"). The Notice also advised that, on September 23, 2024, the Bankruptcy Court entered a temporary order ("Temporary Order") prohibiting and enjoining the commencement or continuation of certain talc claims against certain protected parties. The Temporary Order expired by its own terms on October 11, 2024.

Undersigned counsel now gives notice of the Bankruptcy Court's October 24, 2024 *Order Determining that the Automatic Stay Applies and Extends to Certain Non-Debtors* ("October 24

4858-6033-0485 v1

Order") staying the further prosecution of talc-related claims against the Protected Parties, which are identified on Appendix B to the October 24 Order, and includes all Defendants Johnson & Johnson, LLT Management LLC, and Publix Super Markets, Inc., through and including December 2, 2024.  A copy of the October 24 Order, as well as Appendix B to the October 24 Order, is attached hereto as Exhibit A.  As a result of the automatic stay and the October 24 Order, no further action may be taken to prosecute the talc claims against any Protected Party absent further order of the Bankruptcy Court.  The Bankruptcy Court will conduct a hearing on December 2, 2024 to consider whether the October 24 Order should be extended, terminated or otherwise modified.

**PLEASE TAKE FURTHER NOTICE THAT** information regarding the status of Red River's chapter 11 Case may be obtained by (a) reviewing the docket of the Red River Chapter 11 Case at https://www.txs.uscourts.gov/page/bankruptcy-court (PACER login and password required) or free of charge at https://dm.epiq11.com/case/redrivertalc/info; or (b) contacting any of the following counsel for Red River:

> Gregory M. Gordon
> Dan B. Prieto
> Amanda Rush
> JONES DAY
> 2727 North Harwood Street
> Dallas, Texas 75201
> Telephone:  (214) 220-3939
> Facsimile:  (214) 969-5100
> E-mail:  gmgordon@jonesday.com
>          dbprieto@jonesday.com
>          asrush@ jonesday.com
>
> Brad B. Erens
> Caitlin K. Cahow
> JONES DAY
> 77 West Wacker
> Chicago, Illinois 60601
> Telephone: (312) 782-3939

-2-

Facsimile: (312) 782-8585
E-mail: bberens@jonesday.com
ccahow@jonesday.com

Dated:   November 4, 2024

Respectfully submitted:

SHOOK, HARDY & BACON L.L.P.

*/s/ Jennifer A. McLoone*
JENNIFER A. McLOONE
Fla. Bar. No. 029234
jmcloone@shb.com
GREGORY BOULOS
Fla. Bar No. 98455
gboulos@shb.com
DANIELLE A. GREENBERG
Fla. Bar No. 1038864
dgreenberg@shb.com
DARIA PIETROPAOLO
Fla. Bar No. 1049460
dpietropaolo@shb.com
Citigroup Center, Suite 3200
201 South Biscayne Boulevard
Miami, Florida 33131-4332
T: (305) 358-5171 | F: (305) 358-7470

**Counsel for Defendants Johnson & Johnson
and LLT Management LLC**

4858-6033-0485 v1

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 4, 2024 I electronically filed the foregoing with
the Clerk of Court by using the Florida Courts E-Filing Portal, which will send an electronic notice
to counsel of record listed on the below Service List.

*s/ Jennifer A. McLoone*
Jennifer A. McLoone

Marc P. Kunen, Esquire
**THE FERRARO LAW FIRM, P.A.**
600 Brickell Avenue, Suite 3800
Miami, Florida 33131
T: 305.375.0111
E: mkunen@ferrarolaw.com

*Attorneys for Plaintiff*

Andrea Cox, Esquire
**LUKS SANTANIELLO, PETRILLO &
COHEN**
6265 Old Water Oak Road, Suite 201
Tallahassee, Florida 32312
T:  850.385.9901
E:  acox@insurancedefense.net
      jbarrero@insurancedefense.net

Julia Stepanova, Esquire
Monica Brownewell Smith, Esquire
**BARNES & THORNBURG LLP**
4540 PGA Boulevard, Suite 208
Palm Beach Gardens, Florida 33418
T:  561.473.7560
E:  jstepanova@btlaw.com
      monica.brownewell@btlaw.com
      hope.hayes@btlaw.com

*Attorneys for Publix Super Markets, Inc.*

-4-

4858-6033-0485 v1

# EXHIBIT A

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

October 24, 2024

Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | : |
| | : Chapter 11 |
| RED RIVER TALC LLC,[1] | : |
| | : Case No. 24-90505 (CML) |
| Debtor. | : |
| | : |
| RED RIVER TALC LLC, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Adv. Pro. No. 24-03194 (CML) |
| | : |
| THOSE PARTIES LISTED ON | : |
| APPENDIX A TO COMPLAINT | : |
| and JOHN AND JANE DOES 1-1000, | : |
| | : |
| Defendants. | : |

**ORDER DETERMINING THAT THE AUTOMATIC STAY**
**APPLIES AND EXTENDS TO CERTAIN NON-DEBTORS**

(Relates to Docket Nos. 1, 2)

This matter coming before the Court on the *Complaint for Declaratory and Injunctive Relief (I) Declaring That the Automatic Stay Applies to Certain Actions Against Non Debtors, (II) Preliminarily Enjoining Such Actions and (III) Granting a Temporary Restraining Order Pending a Final Hearing* (the "Complaint") and the *Debtor's Emergency Motion for (I) An Order (A) Declaring That the Automatic Stay Applies to Certain Actions Against Non-Debtors, or (B) Preliminarily Enjoining Such Actions and (II) A Temporary Restraining Order Pending a*

---

[1]    The last four digits of the Debtor's taxpayer identification number are 8508. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

*Final Hearing* (the "<u>Motion</u>"), both filed by the above-captioned Plaintiff Red River Talc LLC (the "<u>Debtor</u>"); this Court having reviewed (a) the Complaint, (b) the Motion, (c) the *Declaration of John K. Kim in Support of Debtor's Complaint for Declaratory and Injunctive Relief and Related Motion* (the "<u>Kim Declaration</u>"), (d) the *Declaration of Adam Lisman in Support of Debtor's Complaint for Declaratory and Injunctive Relief and Related Motion* (the "<u>Lisman Declaration</u>"), (e) the *Declaration of John K. Kim in Support of Chapter 11 Case and Certain First Day Pleadings* [Dkt. 17 in No. 24-90505] (the "<u>First Day Declaration</u>") and (f) the *Declaration of Adam C. Silverstein in Support of the Coalition Objection to the Motion* [Dkt. 11] filed in the Chapter 11 Case, together with any responses or answers to the Motion or the Complaint; and having heard the arguments of counsel and considered the testimony of John Kim and evidence adduced at a hearing on October 21, 2024 (the "<u>Hearing</u>"); and this Court having determined that the legal and factual bases set forth in the Complaint, the Motion, the Kim Declaration, the Lisman Declaration, the First Day Declaration and at the Hearing establish just cause for relief granted herein;

   **THE COURT HEREBY FINDS THAT:**

   A.   The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

   B.   This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and this Court may enter a final order consistent with Article III of the United States Constitution.

   C.   Venue for this matter is proper in this District pursuant to 28 U.S.C. § 1409.

   D.   Notice of the Motion and the Hearing was sufficient and appropriate under the circumstances and complied with the requirements of chapter 11 of title 11 of the United States

8172126.2

Code (the "Bankruptcy Code"), the Federal Rules of Bankruptcy Procedure and the Bankruptcy Local Rules for the Southern District of Texas.  No other or further notice is necessary.

        E.      For purposes of this order (this "Order"), "Debtor Talc Claims" means, collectively, any talc-related claim against the Debtor, including all claims relating in any way to talc or talc-containing products or materials that formerly were asserted against (or that could have been asserted against) LLT Management LLC (f/k/a LTL Management LLC) on any theory of liability (whether direct, derivative, joint and several, successor liability or vicarious liability, fraudulent or voidable transfer or conveyance, alter ego or otherwise).  Notwithstanding the foregoing, Debtor Talc Claims do not include:  (a) any claim or demand that (i) alleges that the relevant injured or deceased individual was exposed to talc or the product or material containing talc, as applicable, in Canada or resided in Canada at the time such claim is filed or (ii) was brought, threatened or pursued in any court in Canada; (b) any claim or demand asserted or assertable by or on behalf of any governmental unit under any federal, state, international or foreign consumer or employee protection rule, statute or regulation; and (c) any claim or demand that alleges that the relevant injured or deceased individual developed Mesothelioma[2] or Lung Cancer[3] in connection with such individual's use of talc or a product or material containing talc.

        F.      The Plaintiff in this adversary proceeding is Debtor Red River Talc LLC. The Defendants in this adversary proceeding are those parties listed on Appendix A hereto, as well as John and Jane Does 1-1000.  The Defendants listed on Appendix A are all named plaintiffs in talc-related lawsuits against the Debtor (or for which the Debtor is responsible or alleged to be

---

[2]     "Mesothelioma" means the type of cancer that develops from the mesothelium, i.e., the thin layer of tissue that covers certain internal organs including the pleural, peritoneal, and pericardial cavities.

[3]     "Lung Cancer" means a primary lung cancer (i.e., a lung cancer that originates in the lungs and is unrelated to any previous cancer as opposed to a lung cancer that has spread to the lungs from another part of the body).

responsible) as of or after the Petition Date who sought to hold, or may seek to hold, one or more of the Protected Parties liable for Debtor Talc Claims. The Protected Parties are listed in Appendix B, and their number is substantially less than the number initially proposed by the Debtor. The Debtor agreed to remove its insurers and several hundred of its affiliates and, at the conclusion of the hearing, the Court directed the Debtor to remove Kenvue from the list. Defendants John and Jane Does 1-1000 are prospective plaintiffs who may at any time while the Chapter 11 Case is pending seek to hold one or more of the Protected Parties liable for Debtor Talc Claims.

**For the reasons stated on the record at the Hearing, IT IS HEREBY ORDERED THAT:**

1.      Pursuant to sections 362(a)(1), (3), (6), and 105(a) of the Bankruptcy Code, the Defendants are stayed from commencing or continuing to prosecute any Debtor Talc Claim against any of the Protected Parties on any theory of liability, whether direct, derivative, joint and several, successor liability, vicarious liability, fraudulent or voidable transfer or conveyance, alter ego or otherwise, through and including **December 2, 2024**. The activities temporarily prohibited and enjoined by this Order include, without limitation: (a) the pursuit of discovery from the Protected Parties or their officers, directors, employees or agents; (b) the enforcement of any discovery order against the Protected Parties; (c) further motions practice related to the foregoing; and (d) any collection activity on account of a Debtor Talc Claim against any Protected Party or its officers, directors, employees or agents or its respective assets.

2.      For the avoidance of doubt, (a) the relief ordered herein shall apply to all claims asserted in the Pending Actions identified on Appendix A hereto, regardless of whether any such Pending Action has been removed, remanded, transferred, dismissed and refiled under a different case number or is on appeal; and (b) the relief ordered herein shall not apply to Kenvue, Inc. or its subsidiaries. For further avoidance of doubt, and notwithstanding anything to the

-4-

contrary in this Order, the stay imposed by this Order is intended to apply to all activity in the Pending Actions, whether offensive or defensive, including the pending motion to disqualify, and to remove from the Executive Committee, the Beasley Allen firm in the federal MDL.

3.       This Order is entered without prejudice to the Debtor's right to request that this Court extend this Order to include other entities, persons and actions not previously identified in Appendix A hereto or on Appendix B.  For the avoidance of doubt, the inclusion of a talc-related claim on Appendix A is not an admission that such Defendant holds a currently pending claim against either the Debtor or the Protected Parties.

4.       Any party subject to this Order may seek relief from any of the provisions of this Order for cause shown.  This Order is without prejudice to the Debtor's or others' rights to seek relief pursuant to section 362 of the Bankruptcy Code.

5.       Notwithstanding anything to the contrary in this Order, any party asserting Debtor Talc Claims, without leave of the Court, may take reasonable steps to preserve the testimony of any person subject to this Order who is not expected to survive the duration of this Order or who otherwise is expected to be unable to provide testimony if it is not preserved during the duration of this Order.  Notice shall be provided to the Debtor by notifying counsel for the Debtor of the perpetuation of such testimony, and the parties shall agree on a mutually convenient date as soon as possible after such notice.  The Debtor shall have the right to object to the notice on any grounds it would have had if it were a party to the underlying proceeding and not subject to the terms of this Order, and the Debtor may raise any such objection with this Court.  The use of such testimony in any appropriate jurisdiction shall be subject to the applicable procedural and evidentiary rules of such jurisdiction.  All parties reserve and do not waive any and all objections with respect to such testimony.  Defendants or other individuals asserting Debtor Talc Claims may

-5-

not seek to perpetuate the testimony of representatives, including directors, officers, employees and agents, of the Debtor or the Protected Parties without the consent of the Debtor or an order of the Court. Notwithstanding the foregoing, parties in lawsuits pending in the MDL who wish to preserve the testimony of any person subject to this Order who is not expected to survive the duration of this Order or who otherwise is expected to be unable to provide testimony if it is not preserved during the duration of this Order shall comply with the process outlined in the In Extremis Deposition Protocol entered on January 23, 2017 in the MDL.

6.    This Order shall be immediately effective and enforceable upon its entry.

7.    This Order shall toll any applicable non-bankruptcy law, any order entered in a non-bankruptcy proceeding or any agreement that fixes a period under which an enjoined Defendant is required to commence or continue a civil action in a court other than this Court on any Debtor Talc Claim asserted against the Debtor or any of the Protected Parties until the later of: (a) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or (b) 30 days after the termination or expiration of this Order.

8.    The deadline to file any answer or other response to the Complaint is tolled indefinitely subject to an order of this Court.

9.    The Debtor shall cause a copy of this Order to be served via e-mail, facsimile, hand delivery or overnight carrier on counsel for the known Defendants within three business days of its entry on the Court's docket.

10.    The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

8172126.2

11. This Court retains exclusive jurisdiction over this Order and any and all matters arising from or relating to the implementation, interpretation or enforcement of this Order.

12. The Court will conduct a further hearing on the Complaint and the Motion on **December 2, 2024 at 1:00 p.m. (CT)** at which it will consider whether the relief granted in this Order should be extended, terminated or otherwise modified.

Signed: October 24, 2024

_____
Christopher Lopez
United States Bankruptcy Judge

NOT A CERTIFIED COPY

8172126.2

# **APPENDIX B**

## **Protected Parties**



**Non-Debtor Affiliates**

Janssen Pharmaceuticals, Inc.
Janssen Research & Development, LLC
Janssen Ortho LLC
Johnson & Johnson
Johnson & Johnson Holdco (NA) Inc.
Johnson & Johnson Services, Inc.
LLT Management LLC
Middlesex Assurance Company Limited
OMJ Pharmaceuticals, Inc.
OMJ Scientific Affairs, LLC
Pecos River Talc LLC
Royalty A&M LLC

**Retailers and Indemnified Parties**
7-Eleven
7-Eleven, Inc.
Acme Markets, Inc.
Ahold Delhaize USA, Inc.
Albertsons Companies, Inc.
Alpha Beta Company
Associated Wholesaler Grocers, Inc.
Bartell Drug Company
Bashas', Inc.
Bausch & Lomb Americas Inc.
Bausch & Lomb Incorporated
Bausch + Lomb Corporation
Bausch Health Americas, Inc.
Bausch Health Companies Inc.
Bausch Health US, LLC
BCW LLC
Best Market of Astoria, Inc.
BI-LO, LLC
Bi-Mart Corporation
BJ's Wholesale Club, Inc.
C&S Wholesale Grocers
C&S Wholesale Grocers, Inc.
Classic Pharmacy, Inc.
Cosentino Enterprises, Inc.
Cosentino Group, Inc.
Cosentino Price Chopper
Cosentino's Food Stores
Costco Wholesale Corporation
CVS Health Corporation
CVS Pharmacy, Inc.
Demoulas Super Markets, Inc.
Dierbergs Markets, Inc.
Discount Drug Mart, Inc.
Dollar Tree Stores, Inc.
DRI I, Inc.
Duane Reade, Inc.

-2-

8172126.2

Eckerd Corporation of Florida, Inc.
Family Dollar Stores
Fleming Companies, Inc.
Food 4 Less of California
Food 4 Less of Southern California, Inc.
Foodland
Foodland Super Market, LTD
Food Lion, LLC (subsidiary of Ahold Delhaize USA)
Foot Locker Specialties, Inc., individually and as successor-in-interest to F.W. Woolworth Co.
Foot Locker Specialty, Inc.
Foot Locker, Inc./Woolworth Corporation
Four B Corporation d/b/a Balls Food Stores
Fred Meyer Stores, Inc.
Fruth Pharmacy, Inc.
Gerlands Food Fair, LLC
Gerlands, LLC
Gerlands, LLC/Lewis Food Town, Inc.
Giant Eagle, Inc.
Giant Food of Maryland, LLC
Giant Food Stores, LLC
Grocery Outlet Holding Corporation
Grocery Outlet Inc.
Grocery Outlet, Inc.
HAC, Inc.
H-E-B, LP
HSBC Finance Corporation
Hughes Markets, Inc.
Hy-Vee, Inc.
Jewel Food Stores
Jewel Osco
Jewel Osco Southwest
K&B Corporation
K&B Louisiana Corporation
Kings Park Slope, Inc.
Kings Pharmacy
Kings Pharmacy Holdings, LLC
Kings Third Ave. Pharmacy, Inc.
Knorr Street ShopRite, Inc.
La Luz Market, LTD. Co.
Lewis Food Town, Inc.
Longs Drug Stores California, L.L.C
Longs Drug Stores of Southern California, L.L.C.
Longs Drug Stores, L.L.C.
Lucky Stores, Inc.
Marc Glassman Inc.
Marc Glassman, Inc. d/b/a Marc's Store & Pharmacy
MBF Healthcare Holdings, Inc.
MBF Healthcare Management, LLC
Meijer, Inc.
MMG Equity Partners
Navarro Discount Pharmacies No. 5, LLC
Navarro Discount Pharmacies, LLC
New Seasons Market
Owens & Minor Distribution, Inc.

-3-

A CERTIFIED COPY

Owens & Minor, Inc.
Piggly Wiggly Carolina Co.
Piggly Wiggly Carolina Co., Inc.
Piggly Wiggly Companies, Inc.
Piggly Wiggly, LLC
Piggly Wiggly, LLC (subsidiary of C&S Wholesale Grocers)
Port Jervis Laboratories, Inc., f/k/a Kolmar Laboratories, Inc.
PTI
PTI Royston LLC, a Georgia Limited Liability Co., d/b/a Pharma Tech Industries
PTI Union, LLC d/b/a Pharma Tech Industries
Publix Super Markets, Inc.
Raley's
Ralphs Grocery Company
Randall's Food & Drug LP
Randall's Food Markets, Inc.
Rite Aid
Rite Aid Corporation
Rite Aid Hdqtrs. Corp.
Rite Aid of New York City, Inc.
Rite Aid of New York, Inc.
Rite Aid of Pennsylvania, Inc.
Rite Aid of South Carolina, Inc.
Rouse's Enterprises, L.L.C.
Rouse's Enterprises, L.L.C. d/b/a Rouses Market
Safeway Inc.
Save Mart Supermarkets, Inc.
Save Mart Supermarkets, Inc./Lucky Stores
Schnuck Markets
Schnuck Markets, Inc.
Sedano's Market, Inc.
Shanti Pharmacy Corp.
Shaw's Supermarkets, Inc.
Shop-Rite Supermarkets, Inc. a/k/a Shop Rite of Knorr Street
Smith Food and Drug Center, Inc.
Southeastern Grocers, Inc.
Star Markets Company, Inc.
Stater Bros. Markets
Super Center Concepts, Inc. d/b/a Superior Grocers
Superior Grocers
SuperValu, Inc.
T. Levy Associates, d/b/a Beauty Land Enterprises
T. Levy Associates, Inc. d/b/a Beauty Land Enterprises/Beautyland
Target Corporation
The Bartell Drug Company
The Kroger Company
The Stop & Shop Supermarket Company LLC
The Vons Companies, Inc.
Thrifty Payless, Inc.
Thrifty White Drug
Tops Holding, LLC
Valeant Pharmaceuticals International
Valeant Pharmaceuticals International, Inc.
Valeant Pharmaceuticals North America LLC
Wakefern Food Corp.

-4-

8172126.2

Walgreen Co.
Walgreen Eastern Co., Inc.
Walgreen Pharmacy Strategies, LLC
Walgreens Boots Alliance, Inc.
Walmart Inc.
Wegmans Food Markets, Inc.
Winn-Dixie Stores, Inc.
Woolworth Corporation



-5-

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

CASE NO. 50-2023-CA-014349-XXXA-MB (AH)

TIMOTHY PIERS DEVALLE, Individually
and as Personal Representative of the
Estate of DONNA MARIE DEVALLE,

                         Plaintiff,

v.

JOHNSON & JOHNSON;
LTL MANAGEMENT, LLC;
IMERYS TALC AMERICA, INC. f/k/a
      LUZENAC AMERICA, INC. f/k/a
      RIO TINTO MINERALS, INC.;
PUBLIX SUPER MARKETS, INC.,

                        Defendants.

## SECOND SUPPLEMENTAL NOTICE OF BANKRUPTCY FILING
## AND STAY OF PROCEEDINGS

On September 27, 2024, undersigned counsel filed a *Notice of Bankruptcy Filing and Stay of Proceedings* in this Court ("Notice"), advising that (i) Defendant LLT Management LLC f/k/a LTL Management LLC ("LLT") ceased to exist and Red River Talc LLC ("Red River") was created and is responsible for the claims asserted against LLT in the above captioned action, and (ii) Red River filed a voluntary petition for chapter 11 bankruptcy in the Southern District of Texas ("Bankruptcy Court"). The Notice also advised that, on September 23, 2024, the Bankruptcy Court entered a temporary order ("Temporary Order") prohibiting and enjoining the commencement or continuation of certain talc claims against certain protected parties. The Temporary Order expired by its own terms on October 11, 2024.

On October 24, 2024, the Bankruptcy Court entered an *Order Determining that the Automatic Stay Applies and Extends to Certain Non-Debtors* ("October 24 Order") staying the

further prosecution of talc-related claims against certain Protected Parties through and including December 2, 2024.

Undersigned counsel now gives notice that a hearing was held on December 2, 2024, at which the Bankruptcy Court determined that a further extension of the stay prohibiting and enjoining the commencement or continuation of talc-related claims against certain Protected Parties was warranted. A copy of the *Second Order Determining That the Automatic Stay Applies and Extends to Certain Non-Debtors* entered on December 5, 2024 reflecting this decision ("December 5 Order"), as well as Appendix B to the December 5 Order reflecting the list of Protected Parties, is attached hereto as Exhibit A.

As a result of the automatic stay, the December 2, 2024 Bankruptcy Court ruling and the December 5 Order, no further action may be taken to prosecute the talc claims against any Protected Party absent further order of the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE THAT** information regarding the status of Red River's chapter 11 Case may be obtained by (a) reviewing the docket of the Red River Chapter 11 Case at https://www.txs.uscourts.gov/page/bankruptcy-court (PACER login and password required) or free of charge at https://dm.epiq11.com/case/redrivertalc/info; or (b) contacting any of the following counsel for Red River:

> Gregory M. Gordon
> Dan B. Prieto
> Amanda Rush
> JONES DAY
> 2727 North Harwood Street
> Dallas, Texas 75201
> Telephone: (214) 220-3939
> Facsimile: (214) 969-5100
> E-mail: gmgordon@jonesday.com
>         dbprieto@jonesday.com
>         asrush@jonesday.com

-2-

4920-4171-3925 v1

Brad B. Erens
Caitlin K. Cahow
JONES DAY
77 West Wacker
Chicago, Illinois 60601
Telephone: (312) 782-3939
Facsimile: (312) 782-8585
E-mail: bberens@jonesday.com
ccahow@jonesday.com

Dated:  December 11, 2024

Respectfully submitted:

SHOOK, HARDY & BACON L.L.P.

/s/ Jennifer A. McLoone
JENNIFER A. McLOONE
Fla. Bar. No. 029234
jmcloone@shb.com
GREGORY BOULOS
Fla. Bar No. 98455
gboulos@shb.com
DANIELLE A. GREENBERG
Fla. Bar No. 1038864
dgreenberg@shb.com
DARIA PIETROPAOLO
Fla. Bar No. 1049460
dpietropaolo@shb.com
Citigroup Center, Suite 3200
201 South Biscayne Boulevard
Miami, Florida 33131-4332
T: (305) 358-5171 | F: (305) 358-7470

**Counsel for Defendants Johnson & Johnson
and LLT Management LLC**

4920-4171-3925 v1

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on December 11, 2024 I electronically filed the foregoing with the Clerk of Court by using the Florida Courts E-Filing Portal, which will send an electronic notice to counsel of record listed on the below Service List.

*s/ Jennifer A. McLoone*
Jennifer A. McLoone

Marc P. Kunen, Esquire
**THE FERRARO LAW FIRM, P.A.**
600 Brickell Avenue, Suite 3800
Miami, Florida 33131
T: 305.375.0111
E: mkunen@ferrarolaw.com

*Attorneys for Plaintiff*

Andrea Cox, Esquire
**LUKS SANTANIELLO, PETRILLO & COHEN**
6265 Old Water Oak Road, Suite 201
Tallahassee, Florida 32312
T: 850.385.9901
E: acox@insurancedefense.net
jbarrero@insurancedefense.net

Julia Stepanova, Esquire
Monica Brownewell Smith, Esquire
**BARNES & THORNBURG LLP**
4540 PGA Boulevard, Suite 208
Palm Beach Gardens, Florida 33418
T: 561.473.7560
E: jstepanova@btlaw.com
monica.brownewell@btlaw.com
hope.hayes@btlaw.com

*Attorneys for Publix Super Markets, Inc.*

-4-

4920-4171-3925 v1

# EXHIBIT A

NOT A CERTIFIED COPY

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

December 05, 2024

Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| RED RIVER TALC LLC,[1] | : | Case No. 24-90505 (CML) |
|  | : |  |
| Debtor. | : |  |
|  | : |  |
| RED RIVER TALC LLC, | : |  |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| v. | : | Adv. Pro. No. 24-03194 (CML) |
|  | : |  |
| THOSE PARTIES LISTED ON | : |  |
| APPENDIX A TO COMPLAINT | : |  |
| and JOHN AND JANE DOES 1-1000, | : |  |
|  | : |  |
| Defendants. | : |  |

**SECOND ORDER DETERMINING THAT THE AUTOMATIC STAY
APPLIES AND EXTENDS TO CERTAIN NON-DEBTORS**

(Relates to Docket Nos. 1, 2, 57)

This matter coming before the Court on the *Complaint for Declaratory and Injunctive Relief (I) Declaring That the Automatic Stay Applies to Certain Actions Against Non Debtors, (II) Preliminarily Enjoining Such Actions and (III) Granting a Temporary Restraining Order Pending a Final Hearing* (the "Complaint") and the *Debtor's Emergency Motion for (I) An Order (A) Declaring That the Automatic Stay Applies to Certain Actions Against Non-Debtors, or (B) Preliminarily Enjoining Such Actions and (II) A Temporary Restraining Order Pending a*

---

[1] The last four digits of the Debtor's taxpayer identification number are 8508. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

*Final Hearing* (the "Motion"), both filed by the above-captioned Plaintiff Red River Talc

LLC (the "Debtor"); this Court having reviewed (a) the Complaint, (b) the Motion, (c) the

*Declaration of John K. Kim in Support of Debtor's Complaint for Declaratory and*

*Injunctive Relief and Related Motion* (the "Kim Declaration"), (d) the *Declaration of Adam*

*Lisman in Support of Debtor's Complaint for Declaratory and Injunctive Relief and*

*Related Motion* (the "Lisman Declaration"), (e) the *Declaration of John K. Kim in Support of*

*Chapter 11 Case and Certain First Day Pleadings* [Dkt. 17 in No. 24-90505] (the "First Day

Declaration") and (f) the *Declaration of Adam C. Silverstein in Support of the Coalition*

*Objection to the Motion* [Dkt. 11] filed in the Chapter 11 Case, together with any responses

or answers to the Motion or the Complaint; and having heard the arguments of counsel and

considered the testimony of John Kim and evidence adduced at a hearing on October 21, 2024;

and the Court having entered an order at Dkt. 57 determining that the Automatic Stay applies

and extending to certain non-debtors; and the Court having conducted a further hearing on

December 2, 2024 and determed that a further extension was warranted in this case;

**THE COURT HEREBY FINDS THAT:**

A. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

B. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and this Court

may enter a final order consistent with Article III of the United States Constitution.

C. Venue for this matter is proper in this District pursuant to 28 U.S.C. § 1409.

D. Notice of the Motion and the December 2, 2024 hearing was sufficient and

appropriate under the circumstances and complied with Chapter 11 of the Bankruptcy

-2-

Code (the "Bankruptcy Code"), the Federal Rules of Bankruptcy Procedure and the Bankruptcy Local Rules for the Southern District of Texas. No other or further notice is necessary.

E. For purposes of this order (this "Order"), "Debtor Talc Claims" means, collectively, any talc-related claim against the Debtor, including all claims relating in any way to talc or talc-containing products or materials that formerly were asserted against (or that could have been asserted against) LLT Management LLC (f/k/a LTL Management LLC) on any theory of liability (whether direct, derivative, joint and several, successor liability or vicarious liability, fraudulent or voidable transfer or conveyance, alter ego or otherwise). Notwithstanding the foregoing, Debtor Talc Claims do not include: (a) any claim or demand that (i) alleges that the relevant injured or deceased individual was exposed to talc or the product or material containing talc, as applicable, in Canada or resided in Canada at the time such claim is filed or (ii) was brought, threatened or pursued in any court in Canada; (b) any claim or demand asserted or assertable by or on behalf of any governmental unit under any federal, state, international or foreign consumer or employee protection rule, statute or regulation; and (c) any claim or demand that alleges that the relevant injured or deceased individual developed Mesothelioma[2] or Lung Cancer[3] in connection with such individual's use of talc or a product or material containing talc.

F. The Plaintiff in this adversary proceeding is Debtor Red River Talc LLC. The Defendants in this adversary proceeding are those parties listed on Appendix A hereto, as well as John and Jane Does 1-1000. The Defendants listed on Appendix A are all named plaintiffs in talc-related lawsuits against the Debtor (or for which the Debtor is responsible or alleged to be

---

[2]        "Mesothelioma" means the type of cancer that develops from the mesothelium, i.e., the thin layer of tissue that covers certain internal organs including the pleural, peritoneal, and pericardial cavities.

[3]        "Lung Cancer" means a primary lung cancer (i.e., a lung cancer that originates in the lungs and is unrelated to any previous cancer as opposed to a lung cancer that has spread to the lungs from another part of the body).

responsible) as of or after the Petition Date who sought to hold, or may seek to hold, one or more of the Protected Parties liable for Debtor Talc Claims. The Protected Parties are listed in Appendix B. Defendants John and Jane Does 1-1000 are prospective plaintiffs who may at any time while the Chapter 11 Case is pending seek to hold one or more of the Protected Parties liable for Debtor Talc Claims.

**For the reasons stated on the record at the Hearing, IT IS HEREBY ORDERED THAT:**

1. Pursuant to sections 362(a)(1), (3), (6), and 105(a) of the Bankruptcy Code, the Defendants are stayed from commencing or continuing to prosecute any Debtor Talc Claim against any of the Protected Parties on any theory of liability, whether direct, derivative, joint and several, successor liability, vicarious liability, fraudulent or voidable transfer or conveyance, alter ego or otherwise, through and including **March 15, 2025**. The activities temporarily prohibited and enjoined by this Order include, without limitation: (a) the pursuit of discovery from the Protected Parties or their officers, directors, employees or agents; (b) the enforcement of any discovery order against the Protected Parties; (c) further motions practice related to the foregoing; and (d) any collection activity on account of a Debtor Talc Claim against any Protected Party or its officers, directors, employees or agents or its respective assets.

2. For the avoidance of doubt, (a) the relief ordered herein shall apply to all claims asserted in the Pending Actions identified on Appendix A hereto, regardless of whether any such Pending Action has been removed, remanded, transferred, dismissed and refiled under a different case number or is on appeal; and (b) the relief ordered herein shall not apply to Kenvue, Inc. or its subsidiaries. For further avoidance of doubt, and notwithstanding anything to the

NOT A CERTIFIED COPY

contrary in this Order, the stay imposed by this Order is intended to apply to all activity in the Pending Actions, whether offensive or defensive, including the pending motion to disqualify, and to remove from the Executive Committee, the Beasley Allen firm in the federal MDL.

3. This Order is entered without prejudice to the Debtor's right to request that this Court extend this Order to include other entities, persons and actions not previously identified in Appendix A hereto or on Appendix B. For the avoidance of doubt, the inclusion of a talc-related claim on Appendix A is not an admission that such Defendant holds a currently pending claim against either the Debtor or the Protected Parties.

4. Any party subject to this Order may seek relief from any of the provisions of this Order for cause shown. This Order is without prejudice to the Debtor's or others' rights to seek relief pursuant to section 362 of the Bankruptcy Code.

5. Notwithstanding anything to the contrary in this Order, any party asserting Debtor Talc Claims, without leave of the Court, may take reasonable steps to preserve the testimony of any person subject to this Order who is not expected to survive the duration of this Order or who otherwise is expected to be unable to provide testimony if it is not preserved during the duration of this Order. Notice shall be provided to the Debtor by notifying counsel for the Debtor of the perpetuation of such testimony, and the parties shall agree on a mutually convenient date as soon as possible after such notice. The Debtor shall have the right to object to the notice on any grounds it would have had if it were a party to the underlying proceeding and not subject to the terms of this Order, and the Debtor may raise any such objection with this Court. The use of such testimony in any appropriate jurisdiction shall be subject to the applicable procedural and evidentiary rules of such jurisdiction. All parties reserve and do not waive any and all objections with respect to such testimony. Defendants or other individuals asserting Debtor Talc Claims may

-5-

not seek to perpetuate the testimony of representatives, including directors, officers, employees and agents, of the Debtor or the Protected Parties without the consent of the Debtor or an order of the Court. Notwithstanding the foregoing, parties in lawsuits pending in the MDL who wish to preserve the testimony of any person subject to this Order who is not expected to survive the duration of this Order or who otherwise is expected to be unable to provide testimony if it is not preserved during the duration of this Order shall comply with the process outlined in the In Extremis Deposition Protocol entered on January 23, 2017 in the MDL.

6.      This Order shall be immediately effective and enforceable upon its entry.

7.      This Order shall toll any applicable non-bankruptcy law, any order entered in a non-bankruptcy proceeding or any agreement that fixes a period under which an enjoined Defendant is required to commence or continue a civil action in a court other than this Court on any Debtor Talc Claim asserted against the Debtor or any of the Protected Parties until the later of: (a) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or (b) 30 days after the termination or expiration of this Order.

8.      The deadline to file any answer or other response to the Complaint is tolled indefinitely subject to an order of this Court.

9.      The Debtor shall cause a copy of this Order to be served via e-mail, facsimile, hand delivery or overnight carrier on counsel for the known Defendants within three business days of its entry on the Court's docket.

10.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

11.    This Court retains exclusive jurisdiction over this Order and any and all

matters arising from or relating to the implementation, interpretation or enforcement of this Order.

Signed:  December 05, 2024

_____

Christopher Lopez
United States Bankruptcy Judge

NOT A CERTIFIED COPY

-7-

**APPENDIX B**

**Protected Parties**



**Non-Debtor Affiliates**
Janssen Ortho LLC
Janssen Pharmaceuticals, Inc.
Janssen Research & Development, LLC
Johnson & Johnson
Johnson & Johnson Holdco (NA) Inc.
Johnson & Johnson Services, Inc.
LLT Management LLC
Middlesex Assurance Company Limited
OMJ Pharmaceuticals, Inc.
OMJ Scientific Affairs, LLC
Pecos River Talc LLC
Royalty A&M LLC

**Protected Retailers and Indemnitees**
Acme Markets, Inc.
Albertsons Companies, Inc.
Avon
Bausch & Lomb Americas Inc.
Bausch & Lomb Incorporated
Bausch + Lomb Corporation
Bausch Health Americas, Inc.
Bausch Health Companies Inc.
Bausch Health US, LLC
Caremark PHC LLC
Classic Pharmacy, Inc.
Costco Wholesale Corporation
CVS Health Corporation
CVS Pharmacy, Inc.
Dierbergs Markets, Inc.
Discount Drug Mart, Inc.
Dollar Tree
Dollar Tree Stores, Inc.
Duane Reade, Inc.
Fred Meyer Stores, Inc.
Gelson's Markets
Giant Eagle, Inc.
Giant Food Stores, LLC
Grove Park Pharmacy Home Care, LLC
K&B Louisiana Corporation
Katz & Bestoff Inc.
Kroger Company
La Luz Market, Ltd. Co.
Longs Drug Stores California, L.L.C
Marc Glassman, Inc. d/b/a Marc's Store &
Pharmacy

NOT A CERTIFIED COPY

Micholi, Inc. d/b/a Crown Drug Store
Morgan Pharmacy, Inc.
Navdhan Foods, Inc. a/k/a Ambala, Inc. d/b/a Ambala Cash & Carry
Orange Cut Rate Drugs
PTI, Pharma Tech Industries, or Pharma Tech Industries, Inc.
PTI Royston LLC d/b/a Pharma Tech Industries
PTI Union, LLC d/b/a Pharma Tech Industries
Publix Super Markets, Inc.
Ralphs Grocery Company, Inc.
Rite Aid
Rite Aid Hdqtrs. Corp.
Rite Aid of New York, Inc.
Rite Aid of Pennsylvania, Inc.
Rouse's Enterprises, L.L.C.
Rouse's Enterprises, L.L.C. d/b/a Rouses Market
Safeway Inc.
Save Mart Supermarkets, Inc.
Schnuck Markets
Schwegmann Westside Expressway
Target Corporation
The Kroger Company
The Vons Companies, Inc.
Tops Holding, LLC
Valeant Pharmaceuticals International
Valeant Pharmaceuticals International, Inc.
Valeant Pharmaceuticals North America LLC
Walgreen Co.
Walgreen Eastern Co., Inc.
Walgreens Boots Alliance, Inc.
Walmart Inc.
Winn-Dixie Stores, Inc.

NOT A CERTIFIED COPY

Case 3:26-cv-00094-MAS-RLS    Document 1-2    Filed 12/11/25    Page 480 of 516
PageID: 489

IN THE CIRCUIT COURT OF THE FIFTEENTH
JUDICIAL CIRCUIT IN AND
FOR PALM BEACH COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION: "AH"
CASE NO.: 50-2023-CA-014349-XXXA-MB

TIMOTHY PIERS DEVALLE,
TIMOTHY PIERS DEVALLE,
     Plaintiff/Petitioners
vs.
JOHNSON AND JOHNSON,
JOHNSON AND JOHNSON HOLDCO,
JANSSEN PHARMACEUTICAL INC,
et al.,
     Defendant/Respondents.
_____/

## ORDER STAYING CASE FOR BANKRUPTCY AND
## DIRECTING CLERK TO CHANGE CASE STATUS
(SGBK)

     **THIS CAUSE** came before the Court on **January 13, 2025**. Based upon a review of the file and pursuant to AOSC 16-15 and the Court being otherwise fully advised in the premise, it is

     **ORDERED AND ADJUDGED** that this case will be STAYED FOR RESOLUTION OF THE BANKRUPTCY CASE 24-90505 and CASE 24-03194, both filed in the Southern District of Texas, until **September 5, 2025**.

     The Parties are directed to monitor the bankruptcy and file the appropriate documents with the Clerk and Comptroller immediately upon resolution of the Bankruptcy Case or shall move to extend the stay **prior to the expiration date of September 5, 2025**. It is

     **FURTHER ORDERED AND ADJUDGED** that the Clerk will change the Status of the Case from ACTIVE to INACTIVE using SGBK code for reporting purposes.

     **DONE AND ORDERED** in Chambers, at West Palm Beach, Palm Beach County, Florida.

50-2023-CA-014349-XXXA-MB   01/13/2025
Reid P. Scott  Judge

50-2023-CA-014349-XXXA-MB   01/13/2025
Reid P. Scott
Judge

Case No. 50-2023-CA-014349-XXXA-MB

**COPIES TO:**

| ANDREA COX ESQ | KUKS SANTANIELLO PETRILLO & COHEN 6265 OLD WATER OAK ROAD, SUITE 201 TALLAHASSEE, FL 32312 | ACox@insurancedefense.net JBarrero@insurancedefense.net LuksTALLY-Pleadings@InsuranceDefense.net |
|---|---|---|
| JENNIFER MCLOONE | SHOOK HARDY @ BACON LLP 201 SOUTH BISCAYNE BLVD, SUITE 3200 MIAMI, FL 33131 | jmcloone@shb.com jennifer-mcloone-2769@ecf.pacerpro.com bizquierdo@shb.com |
| JULIA STEPANOVA ESQ | BARNES & THORNBURG LLP 4540 PGA BOULEVARD, SUITE 208 PALM BEACH GARDENS, FL 33418 | julia.stepanova@btlaw.com monica.brownewell@btlaw.com hope.hayes@btlaw.com jstepanova@btlaw.com |
| MARC P KUNEN ESQ | FERRARO LAW FIRM PA 600 BRICKELL AVENUE, SUITE 3800 MIAMI, FL 33131 | mkunen@ferrarolaw.com asuarez@ferrarolaw.com |
| AMANDA RUSH ESQ | JONES DAY 2727 NORTH HARWOOD STREET DALLAS, TX 75201 | gmgordon@jonesday.com dbprieto@jonesday.com asrush@jonesday.com |
| CAITLIN K. CAHOW ESQ | 77 WEST WACKER CHICAGO, IL 60601 | bberens@jonesday.com ccahow@jonesday.com |

NOT A CERTIFIED COPY

IN THE CIRCUIT COURT OF THE
FIFTEENTH JUDICIAL CIRCUIT IN
AND FOR PALM BEACH COUNTY,
FLORIDA

CIRCUIT CIVIL DIVISION

CASE NO. 50-2023-CA-014349-XXXA-
MB (AH)

TIMOTHY PIERS DEVALLE, Individually and
as Personal Representative of the Estate of
DONNA MARIE DEVALLE,

           Plaintiff,

  v.

JOHNSON & JOHNSON; JOHNSON &
JOHNSON HOLDCO (NA) INC., f/k/a Johnson &
Johnson Consumer Inc., individually and as
successor-in-interest to Johnson & Johnson
subsidiary "Old JJCI"; JANSSEN
PHARMACEUTICALS, INC., individually and as
successor in interest to Johnson & Johnson
subsidiaries named Johnson & Johnson Consumer
Inc., both prior to and after its 2021 restructurings
and colloquially known as "Old JJCI and New
JJCI"; KENVUE INC., individually and as
successor-in-interest to Johnson & Johnson
Consumer Inc.; LTL MANAGEMENT, LLC;
IMERYS TALC AMERICA, INC., f/k/a
LUZENAC AMERICA, INC., f/k/a RIO TINTO
MINERALS, INC.; PUBLIX SUPER MARKETS,
INC.,

           Defendants.

_____/

## NOTICE OF APPEARANCE AND DESIGNATION OF E-MAIL ADDRESSES

     PLEASE TAKE NOTICE that Joshua T. Fordin of the law firm of KIRKLAND & ELLIS LLP

hereby enters his appearance as counsel for Defendants JOHNSON & JOHNSON, JOHNSON &

JOHNSON HOLDCO (NA) INC., JANSSEN PHARMACEUTICALS, INC., and KENVUE,

INC. (collectively, the "Johnson & Johnson Defendants")[1] in the above-captioned matter and hereby requests copies of all pleadings, motions, notices, and any other matters that are filed herein.

FURTHER, pursuant to Florida Rule of Judicial Administration Rule 2.516(b)(1)(A), the undersigned counsel for the Johnson & Johnson Defendants designates the following e-mail addresses for service of court documents in this action:

**Joshua T. Fordin**
Primary E-Mail Address: josh.fordin@kirkland.com
Secondary E-Mail Address: emily.malloy@kirkland.com

Dated: September 3, 2025

KIRKLAND & ELLIS LLP
Three Brickell City Centre
98 S.E. 7th Street, Suite 700
Miami, FL 33131

By: /s/ *Joshua T. Fordin*
Joshua T. Fordin
Florida Bar No. 125219
josh.fordin@kirkland.com

---

[1] Defendant LLT Management, LLC f/k/a LTL Management LLC ("LLT") is not one of the Johnson & Johnson Defendants for purposes of this Notice of Appearance, because it is nonexistent and Red River was allocated all of LLT's talc-related liabilities not assigned to Pecos River.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 3, 2025, the foregoing was filed electronically using the Court's electronic filing system, which will send notice and a copy of this filing to all counsel of record listed in the Florida Courts E-Filing Portal.

By: <u>/s/ *Joshua T. Fordin*</u>
   Joshua T. Fordin

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT IN AND FOR PALM BEACH COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION

CASE NO. 50-2023-CA-014349-XXXA-MB (AH)

TIMOTHY PIERS DEVALLE, Individually and as Personal Representative of the Estate of DONNA MARIE DEVALLE,

          Plaintiff,

  v.

JOHNSON & JOHNSON; JOHNSON & JOHNSON HOLDCO (NA) INC., f/k/a Johnson & Johnson Consumer Inc., individually and as successor-in-interest to Johnson & Johnson subsidiary "Old JJCI"; JANSSEN PHARMACEUTICALS, INC., individually and as successor in interest to Johnson & Johnson subsidiaries named Johnson & Johnson Consumer Inc., both prior to and after its 2021 restructurings and colloquially known as "Old JJCI and New JJCI"; KENVUE INC., individually and as successor-in interest to Johnson & Johnson Consumer Inc.; LTL MANAGEMENT, LLC; IMERYS TALC AMERICA, INC., f/k/a LUZENAC AMERICA, INC., f/k/a RIO TINTO MINERALS, INC; PUBLIX SUPER MARKETS, INC.,

          Defendants.

_____/

## **NOTICE OF APPEARANCE AND DESIGNATION OF E-MAIL ADDRESS**

PLEASE TAKE NOTICE that Paige S. Comparato of the law firm of KIRKLAND & ELLIS LLP hereby enters her appearance as counsel for Defendants JOHNSON & JOHNSON, JOHNSON & JOHNSON HOLDCO (NA) INC., JANSSEN PHARMACEUTICALS, INC., and

KENVUE, INC. (collectively, the "Johnson & Johnson Defendants")[1] in the above-captioned matter and hereby requests copies of all pleadings, motions, notices, and any other matters that are filed herein.

FURTHER, pursuant to Florida Rule of Judicial Administration Rule 2.516(b)(1)(A), the undersigned counsel for the Johnson & Johnson Defendants designates the following e-mail address for service of court documents in this action:

**Paige S. Comparato**
Primary E-Mail Address: paige.comparato@kirkland.com

Dated: September 3, 2025

KIRKLAND & ELLIS LLP
Three Brickell City Centre
98 S.E. 7th Street, Suite 700
Miami, FL 33131

By: /s/ Paige S. Comparato
Paige S. Comparato
Florida Bar No. 1002942
paige.comparato@kirkland.com

---

[1] Defendant LLT Management, LLC f/k/a LTL Management LLC ("LLT") is not one of the Johnson & Johnson Defendants for purposes of this Notice of Appearance, because it is nonexistent and Red River was allocated all of LLT's talc-related liabilities not assigned to Pecos River.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 3, 2025, the foregoing was filed electronically using the Court's electronic filing system, which will send notice and a copy of this filing to all counsel of record listed in the Florida Courts E-Filing Portal.

By: <u>/s/ *Paige S. Comparato*</u>
Paige S. Comparato

IN THE CIRCUIT COURT OF THE
FIFTEENTH JUDICIAL CIRCUIT IN
AND FOR PALM BEACH COUNTY,
FLORIDA

CIRCUIT CIVIL DIVISION

CASE NO. 50-2023-CA-014349-XXXA-
MB (AH)

TIMOTHY PIERS DEVALLE, Individually and
as Personal Representative of the Estate of
DONNA MARIE DEVALLE,

              Plaintiff,

   v.

JOHNSON & JOHNSON; JOHNSON &
JOHNSON HOLDCO (NA) INC., f/k/a Johnson &
Johnson Consumer Inc., individually and as
successor-in-interest to Johnson & Johnson
subsidiary "Old JJCI"; JANSSEN
PHARMACEUTICALS, INC., individually and as
successor in interest to Johnson & Johnson
subsidiaries named Johnson & Johnson Consumer
Inc., both prior to and after its 2021 restructurings
and colloquially known as "Old JJCI and New
JJCI"; KENVUE INC., individually and as
successor-in interest to Johnson & Johnson
Consumer Inc.; LTL MANAGEMENT, LLC;
IMERYS TALC AMERICA, INC., f/k/a
LUZENAC AMERICA, INC., f/k/a RIO TINTO
MINERALS, INC.; PUBLIX SUPER MARKETS,
INC.,

              Defendants.

_____/

## **NOTICE OF APPEARANCE AND DESIGNATION OF E-MAIL ADDRESS**

    PLEASE TAKE NOTICE that Calen A. Bennett of the law firm of KIRKLAND & ELLIS LLP

hereby enters his appearance as counsel for Defendants JOHNSON & JOHNSON, JOHNSON &

JOHNSON HOLDCO (NA) INC., JANSSEN PHARMACEUTICALS, INC., and KENVUE,

INC. (collectively, the "Johnson & Johnson Defendants")[1] in the above-captioned matter and hereby requests copies of all pleadings, motions, notices, and any other matters that are filed herein.

FURTHER, pursuant to Florida Rule of Judicial Administration Rule 2.516(b)(1)(A), the undersigned counsel for the above Defendants designates the following e-mail address for service of court documents in this action:

**Calen A. Bennett**
Primary E-Mail Address: calen.bennett@kirkland.com


 Dated: September 3, 2025                    KIRKLAND & ELLIS LLP
                                             Three Brickell City Centre
                                             98 S.E. 7th Street, Suite 700
                                             Miami, FL 33131

                                             By: /s/ Calen A. Bennett
                                             Calen A. Bennett
                                             Florida Bar No. 1037164
                                             calen.bennett@kirkland.com

---

[1] Defendant LLT Management, LLC f/k/a LTL Management LLC ("LLT") is not one of the Johnson & Johnson Defendants for purposes of this Notice of Appearance, because it is nonexistent and Red River was allocated all of LLT's talc-related liabilities not assigned to Pecos River.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 3, 2025, the foregoing was filed electronically using the Court's electronic filing system, which will send notice and a copy of this filing to all counsel of record listed in the Florida Courts E-Filing Portal.

By: <u>/s/ *Calen A. Bennett*</u>
Calen A. Bennett

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION AH
CASE NO. 50-2023-CA-014349-XXXA-MB

TIMOTHY PIERS DEVALLE,
TIMOTHY PIERS DEVALLE,
     Plaintiff/Petitioners

vs.

JOHNSON AND JOHNSON,
JOHNSON AND JOHNSON HOLDCO,
JANSSEN PHARMACEUTICAL INC, et al.,
     Defendant/Respondents.

_____/

### ORDER TO SHOW CAUSE FOR FAILURE TO COMPLY WITH COURT ORDER

**THIS MATTER** came before the Court *sua sponte* following a January 14, 2025, Order Staying Case for Bankruptcy. The Order stayed the case until September 5, 2025, and directed the Parties to monitor the bankruptcies and file appropriate documents upon resolution of the Bankruptcy Cases or shall move to extend the stay prior to the September 5, 2025, expiration date.  Upon review of the file, the Court finds the Parties failed to comply with the January 14, 2025, Order. Therefore, it is

**ORDERED AND ADJUDGED** that the Plaintiff will file a written response **on or before October 24, 2025,** advising the status of the automatic stays and Show Cause why the Plaintiff has failed to comply with the January 14, 2025, Court Order. **Failure to timely comply with this Order will result in the Court entering an Order of Dismissal without prejudice and without further notice or hearing.**

**DONE AND ORDERED** in Chambers, at West Palm Beach, Palm Beach County, Florida.

50-2023-CA-014349-XXXA-MB    10/13/2025
Reid P. Scott
Judge

**COPIES TO:**

| ANDREA COX ESQ | 6265 OLD WATER RD STE 201 TALLAHASSEE, FL 32312 | ACox@insurancedefense.net JBarrero@insurancedefense.net LuksTALLY-Pleadings@InsuranceDefense.net |

Case No. 50-2023-CA-014349-XXXA-MB

| | | |
|---|---|---|
| CALEN A. BENNETT ESQ | 98 SE 7TH ST STE 700<br>MIAMI, FL 33131 | calen.bennett@kirkland.com<br>calenbennett@gmail.com<br>JOSH.FORDIN@KIRKLAND.COM<br>emily.malloy@kirkland.com<br>PAIGE.COMPARATO@KIRKLAND.COM |
| DANIEL J. DIMATTEO ESQ | 600 BRICKELL AVE STE 3800<br>MIAMI, FL 33131 | DJD@FERRAROLAW.COM<br>ddimatteo@ferrarolaw.com<br>pvalencia@ferrarolaw.com<br>lfuentes@ferrarolaw.com<br>mkunen@ferrarolaw.com<br>asuarez@ferrarolaw.com<br>kpaul@ferrarolaw.com |
| IMERYS TALC AMERICA INC | C/O CORPORATION SERVICE COMPANY<br>251 LITTLE FALLS DRIVE<br>WILMINGTON, DE 19808 | |
| JENNIFER MCLOONE ESQ | 201 SOUTH BISCAYNE BLVD STE 3200<br>MIAMI, FL 33131 | JMCLOONE@SHB.COM<br>jennifer-mcloone-2769@ecf.pacerpro.com<br>bizquierdo@shb.com<br>dpietropaolo@shb.com<br>dgreenberg@shb.com<br>NREYES@shb.com<br>cmjordan@shb.com |
| JULIA STEPANOVA ESQ | 4540 PGA BLVD STE 208<br>PALM BEACH GARDENS, FL 33418 | julia.stepanova@btlaw.com<br>monica.brownewell@btlaw.com<br>hope.hayes@btlaw.com<br>jstepanova@btlaw.com |
| AMANDA RUSH ESQ | 2727 N HARWOOD ST<br>DALLAS, TEXAS 75201 | asrush@jonesday.com<br>bberens@jonesday.com<br>ccahow@jonesday.com<br>dbprieto@jonesday.com<br>gmgordon@jonesday.com |

NOT A CERTIFIED COPY

IN THE CIRCUIT COURT OF THE
15TH JUDICIAL CIRCUIT IN AND FOR
PALM BEACH COUNTY, FLORIDA

TIMOTHY PIERS DEVALLE,                            CASE NO: 50-2023-CA-014349-XXXA-MB
Individually and as Personal Representative
of the Estate of DONNA MARIE DEVALLE,

      Plaintiff,

v.

JOHNSON AND JOHNSON
CONSUMER INC., et al.,

      Defendant(s).

_____/

## PLAINTIFF'S RESPONSE TO OCTOBER 13, 2025 ORDER TO SHOW CAUSE

Plaintiff, TIMOTHY PIERS DEVALLE, by and through undersigned counsel, respectfully submits this response to the Court's Order to Show Cause issued on October 13, 2025. The Plaintiff hereby advises the Court that Defendants' petition for Chapter 11 bankruptcy was recently dismissed, the subject automatic stay has been lifted, and the above-referenced action is no longer stayed. Counsel respectfully submits that he did not willfully disregard the Court's January 14, 2025 order and that the failure to comply was due to an administrative error and unintentional oversight.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the above and foregoing was served electronically via email to all counsel of record this 13th day of October 2025.

                        **THE FERRARO LAW FIRM, P.A.**
                        *Attorneys for Plaintiffs*
                        600 Brickell Avenue, Suite 3800
                        Miami, Florida 33131
                        Telephone: (305) 375-0111

Facsimile: (305) 379-6222

*/s/ Daniel J. Di Matteo*
DANIEL J. DI MATTEO, ESQ.
FLORIDA BAR NO.: 114914
ddimatteo@ferrarolaw.com
pvalencia@ferrarolaw.com



IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

CASE NO. 50-2023-CA-014349-XXXA-MB (AH)

TIMOTHY PIERS DEVALLE, Individually
and as Personal Representative of the
Estate of DONNA MARIE DEVALLE,

                           Plaintiff,

v.

JOHNSON & JOHNSON;
JOHNSON & JOHNSON HOLDCO (NA) INC., f/k/a
        Johnson & Johnson Consumer Inc.,
        Individually and as successor-in-interest to
        Johnson & Johnson subsidiary "Old JJCI"
JANSSEN PHARMACEUTICALS, INC., individually
        and as successor in interest to Johnson & Johnson
        subsidiaries named Johnson & Johnson Consumer
        Inc., both prior to and after its 2021 restructurings
        and colloquially known as "Old JJCI and New JJCI";
KENVUE INC., individually and as successor-in-interest
        to Johnson & Johnson Consumer Inc.;
LTL MANAGEMENT, LLC;
IMERYS TALC AMERICA, INC. f/k/a
        LUZENAC AMERICA, INC. f/k/a
        RIO TINTO MINERALS, INC.;
PUBLIX SUPER MARKETS, INC.,

                           Defendants.

## UNOPPOSED MOTION TO WITHDRAW AS COUNSEL

Pursuant to Florida Rules of General Practice and Judicial Administration Rule 2.505(f)(1),

Jennifer A. McLoone, Danielle A. Greenberg, Daria J. Pietropaolo and the law firm of SHOOK,

HARDY & BACON L.L.P., attorneys of record for Defendant JOHNSON & JOHNSON[1],

---

[1] Defendant LLT Management LLC (f/k/a LTL Management LLC) no longer exists and Red River
Talc LLC was allocated all of LLT's talc-related liabilities not assigned to Pecos River—including
ovarian cancer and gynecological cancer related talcum powder liabilities.  Defendants Janssen

CASE NO. 50-2023-CA-014349-XXXA-MB (AH)

respectfully request that this Court enter an Order allowing them to withdraw as counsel. In support thereof, the undersigned state:

1.      Jennifer A. McLoone, Danielle A. Greenberg and Daria J. Pietropaolo of the law firm of SHOOK, HARDY & BACON L.L.P. originally appeared in this matter as counsel for Johnson & Johnson.

2.      Joshua T. Fordin, Paige S. Comparato, and Calen A. Bennett of the law firm of KIRKLAND & ELLIS LLP recently appeared on behalf of Johnson & Johnson and will remain as counsel for Johnson & Johnson going forward.

3.      Accordingly, Jennifer A. McLoone, Danielle A. Greenberg and Daria J. Pietropaolo of the law firm of SHOOK, HARDY & BACON L.L.P. respectfully request to be permitted to withdraw as counsel of record and to be removed from the Court's electronic service notification for this matter.

4.      Johnson & Johnson consents to the withdrawal of Jennifer A. McLoone, Danielle A. Greenberg, Daria J. Pietropaolo and the law firm of SHOOK, HARDY & BACON L.L.P., as counsel in this matter.

5.      No party to this case will be prejudiced by the entry of an order permitting the requested withdrawal and the relief sought will not cause delay.

WHEREFORE, Jennifer A. McLoone, Danielle A. Greenberg, Daria J. Pietropaolo and the law firm of SHOOK, HARDY & BACON L.L.P. hereby request the entry of an order allowing them to withdraw as counsel of record for Johnson & Johnson, relieving Jennifer A. McLoone, Danielle A. Greenberg, Daria J. Pietropaolo and  SHOOK, HARDY & BACON L.L.P. from all further duties,

---

Pharmaceuticals, Inc., Kenvue, Inc., and Johnson & Johnson Holdco (N.A.), Inc., also represented by Withdrawing Counsel, were previously dismissed.

2

obligations, and responsibilities in this case, directing the Clerk of Court to update its records and

attorney information accordingly, and any further relief this Court deems just and proper.

## Rule 1.202 Certification

I certify that prior to filing this motion, I discussed the relief requested in this motion by

email with the opposing party and Plaintiff does not oppose the relief requested herein.

Dated:   October 17, 2025                        Respectfully submitted:

                                                 SHOOK, HARDY & BACON L.L.P.

                                                 /s/ Jennifer A. McLoone
                                                 JENNIFER A. McLOONE
                                                 Fla. Bar. No. 029234
                                                 jmcloone@shb.com
                                                 DANIELLE A. GREENBERG
                                                 Fla. Bar No. 1038864
                                                 dgreenberg@shb.com
                                                 DARIA J. PIETROPAOLO
                                                 Fla. Bar No. 1049460
                                                 dpietropaolo@shb.com
                                                 Citigroup Center, Suite 3200
                                                 201 South Biscayne Boulevard
                                                 Miami, Florida 33131-4332
                                                 T: (305) 358-5171 | F: (305) 358-7470

3

CASE NO. 50-2023-CA-014349-XXXA-MB (AH)

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 17, 2025 I electronically filed the foregoing with the Clerk of Court by using the Florida Courts E-Filing Portal, which will send an electronic notice to counsel of record listed on the attached Service List.

<div align="right">

*s/ Jennifer A. McLoone*
Jennifer A. McLoone

</div>

Daniel Dimatteo, Esquire
**THE FERRARO LAW FIRM, P.A.**
600 Brickell Avenue, Suite 3800
Miami, Florida 33131
T: 305.375.0111
E: ddimatteo@ferrarolaw.com

*Attorneys for Plaintiff*

Andrea Cox, Esquire
**LUKS SANTANIELLO, PETRILLO & COHEN**
6265 Old Water Oak Road, Suite 201
Tallahassee, Florida 32312
T:  850.385.9901
E:  acox@insurancedefense.net
       jbarrero@insurancedefense.net

Julia Stepanova, Esquire
Monica Brownewell Smith, Esquire
**BARNES & THORNBURG LLP**
4540 PGA Boulevard, Suite 208
Palm Beach Gardens, Florida 33418
T:  561.473.7560
E:  jstepanova@btlaw.com
       monica.brownewell@btlaw.com

*Attorneys for Publix Super Markets, Inc.*

Joshua T. Fordin, Esq.
Paige S. Comparato, Esq.
Calen Bennett, Esq.
**KIRKLAND & ELLIS LLP**
Three Brickell City Centre
98 SE 7th Street, Suite 700
Miami, FL 33131
josh.fordin@kirkland.com
paige.comparato@kirkland.com
calen.bennett@kirkland.com

*Counsel for the J&J Defendants*

4

4900-3023-3453

**IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA**

CASE NO. 50-2023-CA-014349-XXXA-MB (AH)

TIMOTHY PIERS DEVALLE, Individually
and as Personal Representative of the
Estate of DONNA MARIE DEVALLE,

                    Plaintiff,

v.

JOHNSON & JOHNSON;
JOHNSON & JOHNSON HOLDCO (NA) INC., f/k/a
    Johnson & Johnson Consumer Inc.,
    Individually and as successor-in-interest to
    Johnson & Johnson subsidiary "Old JJCI"
JANSSEN PHARMACEUTICALS, INC., individually
    and as successor in interest to Johnson & Johnson
    subsidiaries named Johnson & Johnson Consumer
    Inc., both prior to and after its 2021 restructurings
    and colloquially known as "Old JJCI and New JJCI";
KENVUE INC., individually and as successor-in-interest
    to Johnson & Johnson Consumer Inc.;
LTL MANAGEMENT, LLC;
IMERYS TALC AMERICA, INC. f/k/a
    LUZENAC AMERICA, INC. f/k/a
    RIO TINTO MINERALS, INC.;
PUBLIX SUPER MARKETS, INC.,

                    Defendants.

**ORDER GRANTING MOTION TO WITHDRAW**

    **THIS CAUSE,** having come before the Court on SHOOK, HARDY & BACON L.L.P.'s

Motion to Withdraw as Counsel, and the Court having considered the Motion and all other relevant

factors, it is hereby

    **ORDERED AND ADJUDGED** that:

The Motion is GRANTED.  The law firm of SHOOK, HARDY & BACON LLP, and attorneys Jennifer A. McLoone, Danielle A. Greenberg, and Daria J. Pietropaolo, are hereby permitted to withdraw as counsel of record for Johnson & Johnson and are relieved of any and all further duties and responsibilities on behalf of Johnson & Johnson in this case.

The firm of KIRKLAND & ELLIS LLP by and through their attorneys will remain as counsel for this Defendant going forward.


DONE and ORDERED in Chambers at Palm Beach County, Florida.

502023CA014349XXXAMB    10/20/2025
Reid P. Scott    Judge

502023CA014349XXXAMB    10/20/2025
Reid P. Scott
Judge

NOT A CERTIFIED COPY

Case 3:26-cv-00094-MAS-RLS    Document 1-2    Filed 12/11/25    Page 501 of 516
PageID: 510

IN THE CIRCUIT COURT OF THE FIFTEENTH
JUDICIAL CIRCUIT IN AND
FOR PALM BEACH COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION: "AH"
CASE NO.: 50-2023-CA-014349-XXXA-MB

TIMOTHY PIERS DEVALLE,
TIMOTHY PIERS DEVALLE,
    Plaintiff/Petitioners
vs.
JOHNSON AND JOHNSON,
JOHNSON AND JOHNSON HOLDCO,
JANSSEN PHARMACEUTICAL INC, et al.,
    Defendant/Respondents.

_____/

### ORDER FINDING GOOD CAUSE AND ORDER LIFTING STAY FOR BANKRUPTCY AND DIRECTING CLERK TO CHANGE CASE STATUS
#### (BKSTLFT)

    **THIS CAUSE** came before the Court *sua sponte* following an October 13, 2025, Order to Show Cause for Failure to Comply with Court Order. Based upon a review of the file, Plaintiff's October 13, 2025, Response and pursuant to AOSC 16-15 and the Court being otherwise fully advised in the premise, it is

    **ORDERED AND ADJUDGED** that the Court finds **GOOD CAUSE**, and this action will not be dismissed. This case will be no longer be Stayed for Bankruptcy and the stay is Lifted. The Clerk will change the Status of the Case from INACTIVE to ACTIVE using BKSTLFT code for reporting purposes. It is

    **FURTHER ORDERED AND ADJUDGED** that a Uniform Differentiated Case Management Order and Order Setting Trial will be entered by separate Order.

    **DONE AND ORDERED** in West Palm Beach, Palm Beach County, Florida.

50-2023-CA-014349-XXXA-MB    11/19/2025
Reid P. Scott    Judge

50-2023-CA-014349-XXXA-MB    11/19/2025
Reid P. Scott
Judge

**COPIES TO:**

NOT A CERTIFIED COPY

Case No. 50-2023-CA-014349-XXXA-MB

| ANDREA COX ESQ | 6265 OLD WATER RD STE 201 TALLAHASSEE, FL 32312 | ACox@insurancedefense.net JBarrero@insurancedefense.net LuksTALLY-Pleadings@InsuranceDefense.net |
|---|---|---|
| CALEN A. BENNETT ESQ | 98 SE 7TH ST STE 700 MIAMI, FL 33131 | calen.bennett@kirkland.com calenbennett@gmail.com JOSH.FORDIN@KIRKLAND.COM emily.malloy@kirkland.com PAIGE.COMPARATO@KIRKLAND.COM |
| DANIEL J. DIMATTEO ESQ | 600 BRICKELL AVE STE 3800 MIAMI, FL 33131 | DJD@FERRAROLAW.COM ddimatteo@ferrarolaw.com pvalencia@ferrarolaw.com lfuentes@ferrarolaw.com mkunen@ferrarolaw.com asuarez@ferrarolaw.com kpaul@ferrarolaw.com |
| IMERYS TALC AMERICA INC | C/O CORPORATION SERVICE COMPANY 251 LITTLE FALLS DRIVE WILMINGTON, DE 19808 | |
| JULIA STEPANOVA ESQ | 4540 PGA BLVD STE 208 PALM BEACH GARDENS, FL 33418 | julia.stepanova@btlaw.com monica.brownewell@btlaw.com hope.hayes@btlaw.com jstepanova@btlaw.com |
| AMANDA RUSH ESQ | 2727 N HARWOOD ST DALLAS, TEXAS 75201 | asrush@jonesday.com bberens@jonesday.com ccahow@jonesday.com dbprieto@jonesday.com gmgordon@jonesday.com |

NOT A CERTIFIED COPY

Case 3:26-cv-00094-MAS-RLS    Document 1-2    Filed 12/11/25    Page 503 of 516 PageID: 512

IN THE CIRCUIT COURT OF THE FIFTEENTH
JUDICIAL CIRCUIT IN AND
FOR PALM BEACH COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION: "AH"
CASE NO.: 50-2023-CA-014349-XXXA-MB

TIMOTHY PIERS DEVALLE,
TIMOTHY PIERS DEVALLE,
     Plaintiff/Petitioners

vs.

JOHNSON AND JOHNSON,
JOHNSON AND JOHNSON HOLDCO,
JANSSEN PHARMACEUTICAL INC,
et al.,
     Defendant/Respondents.

_____/

## UNIFORM DIFFERENTIATED CASE MANAGEMENT ORDER
## AND ORDER SETTING TRIAL
### (DCMGJT)

### (THIS ORDER IS BEING ENTERED TO COMPLY
### WITH ADMINISTRATIVE ORDER 3.110)

**THIS MATTER** is a Circuit Civil case calling for a jury trial. Pursuant to Fla. R. Gen. Prac. & Jud. Admin. 2.250(a)(1)(B) and 2.545(b), and Fifteenth Judicial Circuit Administrative Order 3.110 (as amended).

It is hereby **ORDERED AND ADJUDGED** that this case is designated to the **GENERAL TRACK** for time to disposition. The deadlines and procedures set forth in this Order will be strictly enforced unless changed by court order.

Consistent with the Professionalism Expectations of the Florida Supreme Court and the Florida Bar, the parties and counsel are expected to govern themselves at all times with a spirit of cooperation, professionalism and civility. They are expected to accommodate each other whenever reasonably possible and eliminate disputes by reasonable agreements. Self-Represented/*Pro Se* Litigants (i.e., those without counsel) are held to the same procedural and legal obligations as are imposed upon counsel.

I. **SCHEDULING**

    A. **Calendar Call**

        **YOU MUST APPEAR FOR A MANDATORY CALENDAR CALL on August 28, 2026 at 08:45 am**. The parties must be ready to try the case by that date. The actual trial period begins on the docket associated with this Calendar Call date as provided in Divisional Instructions or by court order.

Calendar Call may be conducted in person, via Zoom or by e-calendar. All parties are instructed to review the Court's Divisional Instructions for specific procedures at www.15thcircuit.com/divisions.

At the Calendar Call, the Court may conduct a final case management conference. Attorneys who appear for Calendar Call must be prepared on all pending matters and have authority to make representations to the Court and enter into binding agreements concerning motions, issues, and scheduling. These include issues raised by the parties' Pre-Trial Stipulation; trial procedures; jury selection procedures; jury instructions and objections; and the need for any special equipment, courtroom facilities, or interpreters. An appearing attorney must be prepared to advise the Court of all attorneys' availability for trial and future hearings as necessary.

**This Order serves as notice to the parties that failure to attend Calendar Call will result in an Order of Dismissal without prejudice, or entry of default, without further notice or hearing.** *See* **Fla. R. Civ. P. 1.200(j)(6).**

B. **Case Management Deadlines**

The following deadlines strictly apply unless otherwise modified by the Court:

|    | EVENTS | COMPLETION DEADLINE |
|----|--------|---------------------|
| 1. | Service of Complaint | expired or service under extension is only by court order. |
| 2. | Answer and/or initial motions/objections directed to the pleadings (i.e. to dismiss or strike) | expired or completed |
| 3. | Initial Discovery Disclosures | expired or completed |
| 4. | Amendment of pleadings/Adding parties | expired or completed |
| 5. | Resolution of all motions/objections directed to the pleadings and pleadings closed | expired or completed |
| 6. | Disclosure of Expert Witness(es) | February 9, 2026 |
| 7. | Disclosure of Rebuttal Experts | March 11, 2026 |
| 8. | Inspections, Expert Witness Depositions and Compulsory Examinations completed | May 30, 2026 |
| 9. | File Witness & Exhibit Lists | June 9, 2026 |
| 10. | Completion of Discovery relating to Summary Judgment and *Daubert* Motions | May 30, 2026 |
| 11. | File and Serve Motion(s) for Summary Judgment and *Daubert* Motions | June 9, 2026 |
| 12. | File Rebuttal Witness Lists | June 29, 2026 |
| 13. | Completion of All Discovery | July 19, 2026 |
| 14. | Pre-Trial Meet & Confer | July 29, 2026 |

| 15. | File all Pre-Trial Motions (i.e. Motions in Limine) | July 29, 2026 |
|-----|------------------------------------------------------|---------------|
| 16. | Deadline for Mediation | August 18, 2026 |
| 17. | Deposition Designations | August 18, 2026 |
| 18. | File Joint Pre-Trial Stipulation | August 18, 2026 |
| 19. | Deadline to hear ALL Motions | August 23, 2026 |
| 20. | Jury Instructions and Verdict Form | August 25, 2026 |
| 21. | Calendar Call/Trial Ready Date | August 28, 2026 |
| 22. | Trial Period | September 7, 2026 through October 16, 2026 |

**Note: If the above deadlines fall on a weekend or holiday, please refer to Fla. R. Gen. Prac. & Jud. Admin. 2.514.**

The parties are expected to actively manage the case and to confer early and often to ensure compliance with the Florida Rules of Civil Procedure and this order in timely resolving this case. **The parties are encouraged to file, meet, and make disclosures prior to the deadlines imposed above, in order to ensure compliance with the Rules requiring timely disposition of cases.**

The Court may, at any time, modify this Order by entry of: 1) an Amended Trial Order, 2) an Amended Case Management Order; or 3) any other Order intended to establish a modified case resolution schedule, any of which shall supersede the deadlines set forth in this Order. The Court reserves the authority to expedite the trial setting and amend pretrial deadlines accordingly. The Court further retains its discretion to modify any provision herein.

C. **Motions**

Unless court approval is required to set a particular motion for hearing, the parties must expeditiously set all contested motions for hearing. All non-dispositive motions, including motions directed to the pleadings, must be scheduled for hearing within **five (5) days** of filing. Parties shall schedule the hearing for the first vacancy on the Court's docket when all parties are available. **Failure to schedule a hearing within five (5) days may result in the Court deeming the motion(s) abandoned without further notice or hearing.**

The moving party shall be the party responsible for securing the presence of a court reporter. The moving party shall advise all parties in writing in advance of the hearing or trial of the arrangements made, if any, for the presence of a court reporter, or shall advise all parties in advance of the hearing or trial that the moving party has chosen not to obtain a court reporter.

Before filing a non-dispositive motion, the movant must follow Rule 1.202 and Local Rule 4. Failure to comply with the requirements of Rule 1.202 and Local Rule 4 may result in sanctions against the non-compliant party.

Case No. 50-2023-CA-014349-XXXA-MB

The requirements of Rule 1.202 do not apply when the movant or the nonmovant is unrepresented by counsel *(pro se)*.

D.  **Extensions, Modifications and Continuances**

**Extensions of Deadlines Other than Trial/Calendar Call: All motions to extend deadlines must be filed prior to the deadline**. Untimely motions will be denied absent compelling circumstances and a showing of good cause.

The parties must strictly follow Rule 1.200(e) and Administrative Order 3.110 (as amended) when filing motions for extension or modification. If the parties agree, and the extension will not prevent the case from being trial ready by the original Calendar Call date, the parties may file a motion and submit for the Court's consideration an agreed order or proposed Amended DCMO, as applicable under Rule 1.200(e)(1). The motion shall identify which deadlines are requested to be extended and the basis for the request. Each agreed order or Amended DCMO must contain agreed-upon dates for all remaining deadlines and confirm that the Calendar Call date remains as previously set. The Court will accept the amendment or direct the parties to set a DCM Conference. **Agreements to extend the dates for the filing of Summary Judgment and *Daubert* motions, and for completion of discovery, must be set for hearing, and the parties must be prepared to address how the proposed extension will not affect the Calendar Call date**.

**Motions to Continue Trial:** Motions to continue trial must strictly comply with Rule 1.460. **Motions to continue are disfavored and will rarely be granted and then only upon good cause shown. Successive continuances are highly disfavored. Lack of due diligence in preparing for trial is not grounds to continue the case**. Failure to timely complete discovery and/or file a motion for summary judgment shall not be grounds to continue the trial.

E.  **DCM Conferences**

If any party is unable to meet the deadlines set forth in this Order for any reason, including unavailability of hearing time, the affected party must promptly set a DCM conference as described in Administrative Order 3.110 (as amended), identifying the hearing time requested and the pending motion(s). DCM conferences shall be scheduled through online scheduling (OLS) on either the Court's: 1) DCM - Case Management Conference docket; or 2) Uniform Motion Calendar, in accordance with Divisional Instructions.

II.  **UNIFORM PRE-TRIAL PROCEDURE**

A.  **TIMELY SERVICE AND DEFAULTS**

Parties must make reasonable efforts to ensure speedy service. Each return of service must be separately filed for each defendant. If service is not completed within ninety

Case No. 50-2023-CA-014349-XXXA-MB

(90) days, an Order will be issued directing service by the **ONE-HUNDRED TWENTY (120) DAY DEADLINE**. Failure to comply will result in dismissal of the case or party for lack of service. Any motions to extend the deadline for service must specify why service could not have been effectuated, what is being done to effectuate service and request only that amount of additional time necessary.

If all defendants become defaulted, a Motion for Default Final Judgment along with supporting documentation must be filed within **thirty (30) days** of the last default and set for hearing at the next available hearing time.

B.  INITIAL DISCLOSURES

Within **sixty (60) days after service** on a defendant, and except as exempted by Rule 1.280(a)(2) or as ordered by the court, each party must, without awaiting a discovery request, provide to the other parties initial discovery disclosures in compliance with Rule 1.280(a), unless privileged or protected from disclosure.

C.  EXHIBITS AND WITNESSES

No later than **eighty (80) days before Calendar Call**, each party shall file and exchange lists of all trial exhibits, names, and addresses of all trial witnesses. Each party's witness list must include a brief description of the substance and scope of the testimony to be elicited from each witness. Both sides must cooperate in the scheduling of all witness depositions.

Each party's exhibit list shall include each exhibit separately numbered and identified. Generic or prospective designations are not allowed (e.g. insurer's file, documents to be produced, etc.). Each party shall provide for a reasonable time and place for the other parties to review and copy the exhibits.

D.  EXPERT WITNESS DISCLOSURES

In addition to the names and addresses of each expert retained to formulate an expert opinion, as well as any hybrid fact/expert witnesses, no later than **two-hundred (200) days before Calendar Call**, the parties must provide:

1.  The subject matter about which the expert will testify;
2.  The opinions to which the expert will testify;
3.  A summary of the grounds and facts for each opinion; and
4.  A copy of the expert's curriculum vitae.

**Each expert will be limited to testifying only about those matters which have been fully disclosed.**

Parties shall furnish opposing counsel with two (2) alternative dates of availability of all expert witnesses for the purpose of taking their deposition. All parties shall cooperate in the scheduling of expert depositions.

The parties shall also provide answers to standard form expert interrogatories. All reports or other data compiled by each disclosed expert which are intended to be used by the expert and/or referred to during his/her deposition testimony shall be provided electronically to all opposing parties at least 72 hours prior to the date of the scheduled deposition.

**Rebuttal/Responsive Experts**

No later than **one-hundred seventy (170) days before Calendar Call**, the parties shall provide opposing counsel with a written list with the names and addresses of all rebuttal/responsive expert witnesses intended to be called at trial and only those rebuttal/responsive expert witnesses listed shall be permitted to testify. The parties shall also furnish opposing counsel with expert reports or summaries of all rebuttal/responsive expert witnesses' anticipated testimony to the same extent as the expert disclosure requirement above.

Within **thirty (30) days** following this disclosure, the parties shall make their rebuttal/responsive experts available for deposition. The experts' depositions may be conducted without further Court order.

E. REBUTTAL FACT WITNESSES AND EXHIBITS

No later than **sixty (60) days before Calendar Call**, the parties must file and exchange lists of names and addresses of all rebuttal fact witnesses and lists of any rebuttal exhibits.

F. ADDITIONAL EXHIBITS, WITNESSES OR OBJECTIONS

At trial, the parties will be strictly limited to exhibits and witnesses previously disclosed absent agreement of the parties or order of the Court upon good cause shown. A party desiring to use an exhibit or witness discovered after counsel have conferred must immediately furnish the Court and other counsel with a description of the exhibit or with the witness' name and address and the expected subject matter of the witness' testimony, together with the reason for the late discovery of the exhibit or witness. Failure to reserve objections constitutes a waiver. Use of the exhibit or witness may be allowed by the Court for good cause shown.

G. DEPOSITION DESIGNATIONS

No later than **ten (10) days prior to Calendar Call**, each party must serve deposition designations, or portions of depositions, each intends to offer as testimony. No later than **eight (8) days prior to Calendar Call**, each opposing party is to serve any counter (or "fairness") designations, together with objections to the depositions, or portions thereof, originally designated. No later than **five (5) days before Calendar Call**, each party must serve any objections to counter-designations served by an opposing party.

H. DISCOVERY COMPLETION

All discovery relating to Summary Judgment and *Daubert* motions must be completed no later than **ninety (90) days prior to Calendar Call**.

All discovery must be completed no later than **forty (40) days prior to Calendar Call**.

Rulings as to admission on late discovery will be made on a case by case basis. Absent unforeseeable, exigent circumstances, the failure to complete discovery is not grounds for a continuance.

I. COUNSEL MEETING AND PRE-TRIAL STIPULATION

Counsel or the parties, if not represented by counsel, shall meet in person at a mutually convenient time and place no later than **thirty (30) days before Calendar Call** to discuss settlement, simplify the issues, and stipulate to as many facts and issues as possible, and prepare a Pre-Trial Stipulation in accordance with this paragraph.

It shall be the duty of Plaintiff's counsel to see that the Pre-Trial Stipulation is drawn, executed by counsel for all parties, and filed with the Clerk no later than **ten (10) days prior to Calendar Call. UNILATERAL PRE-TRIAL STIPULATIONS ARE DISALLOWED, UNLESS APPROVED BY THE COURT AFTER NOTICE AND HEARING.** If a party does not receive a substantive response to a proposed Pre-Trial Stipulation after good faith effort, such party shall file a unilateral Pre-Trial Stipulation with a certification of all efforts that were made to confer with the opposing party. Counsel for all parties are charged with good faith cooperation in preparing the Pre-Trial Stipulation, and the parties shall make exhibits available for inspection and copying. Failure to cooperate in preparing the Pre-Trial Stipulation may result in striking pleadings, witnesses, or exhibits.

The Pre-Trial Stipulation must contain the following in separately numbered paragraphs:

1. Names and contact information of attorneys to try case.
2. A list of all pending motions requiring action by the Court. **Motions not listed are deemed abandoned or waived**.
3. A statement of estimated trial time, including the total number of trial days anticipated, and the time needed per side for (1) jury selection, (2) opening arguments, (3) each case in chief, and (4) closing arguments.
4. **Statement of the Facts:** A concise statement of the facts in an impartial, easily understandable manner which may be read to the jury.
5. **Statement Facts and Agreed Rules of Law:** A list of any stipulated facts requiring no proof at trial and any agreed rules of law.

Case No. 50-2023-CA-014349-XXXA-MB

6. **Statements of Disputed Law & Fact:** A statement of disputed issues of law and fact that are to be tried.

7. **Witness Lists:** Parties must attach their previously filed Witness Lists, including rebuttal or impeachment witnesses. If any party objects to any witness, such objections must be stated in the Stipulation, setting forth the grounds with specificity. At trial, all parties will be strictly limited to witnesses properly and timely disclosed. Only those witnesses listed by NAME will be permitted to testify at trial.

8. **Exhibit Lists:** Parties must attach their previously filed Exhibit Lists. All exhibits to be offered in evidence at trial must have been made available to opposing counsel for examination. Only those exhibits listed may be offered in evidence. If any party objects to the introduction of any such exhibit, such objection must be stated in the Pre-Trial Stipulation, setting forth the grounds with specificity. Demonstrative exhibits (e.g. PowerPoints, charts, enlargements of exhibits) to be used at a Jury Trial must be displayed to all counsel before being shown to the jury. All exhibits must be pre-marked and numbered consistent with Clerk guidelines.

9. **Jury Instructions:** Counsel must identify all agreed-upon standard jury instructions and all special instructions. Any objections or disputed jury instructions must be attached and identified as to the party that proposed the instruction [indicated in redline/track changes]. Copies of all agreed-upon instructions or disputed instructions must be attached to the Stipulation as one document, redlined as necessary, along with copies of supporting statutory citations and/or case law.

10. **Verdict Forms:** The jury verdict form must be attached and designated as agreed to or disputed.

11. **Peremptory Challenges:** State the number of peremptory challenges for each party.

12. Other agreements or issues for trial, if any.

Failure to file a Joint Pre-Trial Stipulation as provided above may result in Court-imposed sanctions, including dismissal or default without further notice of the Court.

J. <u>MOTIONS</u>

**Summary Judgment and *Daubert* Motions** must be filed at least **eighty (80) days before Calendar Call**. The parties shall confer regarding summary judgment motions to ensure discovery necessary for those motions is completed in advance of their filing.

**ALL MOTIONS** (including dispositive motions and motions in limine), deposition objections, and expert challenges must be filed, served and heard at least **five (5) days before Calendar Call**.

K. <u>PRE-MARKING EXHIBITS</u>

Case No. 50-2023-CA-014349-XXXA-MB

Prior to trial, each party is to mark for identification all exhibits in accordance with the guidelines of the Clerk of Court. Instructions and templates may be found at: www.mypalmbeachclerk.com/departments/courts/evidence-guidelines/civil-evidence.

L.  ENLARGED JURY PANELS

Local Rules require advance approval of the Chief Judge and Jury Office for jury panels exceeding 31 jurors. **To ensure enough jurors are available, requests for enlarged jury panels must be resolved at least six (6) months before Calendar Call**. Failure to timely request an enlarged panel may result in Court-ordered sanctions, including a limitation on peremptory challenges.

M.  INTERPRETERS

Unless otherwise ordered by the Court, it shall be the responsibility of the party who needs the services of an interpreter, whether for a litigant or for a witness, to have a competent interpreter present in court.

N.  JURY INSTRUCTIONS AND VERDICT FORM

A joint set of proposed jury instructions and a proposed verdict form must be provided to the court no less than **three (3) days before Calendar Call** in a printed form appropriate for submission to the jury and in Microsoft Word format.

If there is an objection to a proposed instruction, the instruction should be followed by the specific objection, a brief explanation, and a citation to legal authority. If an alternative or modified instruction is proposed, it should follow the instruction it is intended to replace.

O.  UNIQUE QUESTIONS OF LAW

Prior to calendar call, counsel for the parties are directed to exchange and simultaneously submit to the Court appropriate memoranda with citations to legal authority in support of any unique legal questions that may reasonably be anticipated to arise during the trial.

III. **MEDIATION**

A.  MEDIATION REQUIRED

1.  All parties are required to participate in mediation.
2.  The attendance of counsel who will try the case and representatives of each party with full authority to enter into a complete compromise and settlement is mandatory. If insurance is involved, an adjuster with authority up to the policy limits must attend.
3.  At least one week prior to a scheduled mediation conference, all parties are to

Case No. 50-2023-CA-014349-XXXA-MB

> file with the mediator a brief, written summary of the case containing a list of
> issues as to each party.

4. All communications at the mediation conference are privileged consistent with
   Florida Statutes sections 44.102 and 90.408.

5. The mediator has no power to compel or enforce a settlement agreement. If a
   settlement is reached, it is a responsibility of the attorneys or parties to reduce
   the agreement to writing and to comply with Florida Rule of Civil Procedure
   1.730(b), unless waived.

B. MEDIATION SCHEDULING

**The Plaintiff's attorney is responsible for scheduling mediation**. The parties
should agree on a mediator. If they are unable to agree, any party may apply to the
Court for appointment of a mediator in conformity with Rule 1.720 (j), Fla. R. Civ. P.
The lead attorney or party must file and serve on all parties and the mediator a Notice
of Mediation giving the time, place, and date of the mediation and the mediator's
name.

C. COMPLETION OF MEDIATION BEFORE CALENDAR CALL

Completion of mediation prior to calendar call is a prerequisite to trial and must be
completed no later than **ten (10) days prior to Calendar Call**. If mediation is not
conducted, or if a party fails to participate in mediation, the Court may impose
sanctions, including monetary sanctions, striking pleadings and witnesses, and
dismissal or default without further notice of the Court.

D. OPPOSITION TO MEDIATION

Any party opposing mediation may proceed under Florida Rule of Civil Procedure
1.700(b).

IV. **NON-COMPLIANCE**

**NON-COMPLIANCE WITH ANY PORTION OF THIS ORDER MAY RESULT IN
THE STRIKING OF THE PLEADINGS, WITNESSES, OR EXHIBITS, ENTRY OF
DEFAULT OR DISMISSAL WITHOUT FURTHER NOTICE OF THE COURT, OR
IMPOSITION OF SUCH OTHER SANCTIONS AS IS JUST AND PROPER.**

**DONE AND ORDERED** in West Palm Beach, Palm Beach County, Florida.

Case No. 50-2023-CA-014349-XXXA-MB



50-2023-CA-014349-XXXA-MB      11/20/2025
Reid P. Scott
Judge

**COPIES TO:**

| | | |
|---|---|---|
| CALEN A. BENNETT ESQ | 98 SE 7TH STREET SUITE 700 MIAMI, FL 33131 | calen.bennett@kirkland.com calenbennett@gmail.com JOSH.FORDIN@KIRKLAND.COM emily.malloy@kirkland.com PAIGE.COMPARATO@KIRKLAND.COM |
| DANIEL J. DIMATTEO ESQ | 600 BRICKELL AVE SUITE 3800 MIAMI, FL 33131 | DJD@FERRAROLAW.COM ddimatteo@ferrarolaw.com pvalencia@ferrarolaw.com lfuentes@ferrarolaw.com mkunen@ferrarolaw.com |
| IMERYS TALC AMERICA INC | 251 LITTLE FALLS DRIVE WILMINGTON, DE 19808 | |
| JULIA STEPANOVA ESQ | 4540 PGA BOULEVARD SUITE 208 PALM BEACH GARDENS, FL 33418 | julia.stepanova@btlaw.com monica.brownewell@btlaw.com hope.hayes@btlaw.com jstepanova@btlaw.com |

Case No. 50-2023-CA-014349-XXXA-MB

# ADA NOTICE

This notice is provided pursuant to Administrative Order No. 2.207-7/22

    **"If you are a** <u>**person with a disability**</u> **who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact William Hutchings, Jr., Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."**

    **"Si usted es una** <u>**persona minusválida**</u> **que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N. Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711."**

    **"Si ou se yon** <u>**moun ki enfim**</u> **ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon pou jwen kèk èd. Tanpri kontakte William Hutchings, Jr., kòòdonatè pwogram Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711."**

Filing # 236732978 E-Filed 12/01/2025 01:29:19 PM

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION: AH
CASE NO.: 50-2023-CA-014349-XXXA-MB

TIMOTHY PIERS DEVALLE,
TIMOTHY PIERS DEVALLE,
    Plaintiff/Petitioners

vs.

JOHNSON AND JOHNSON,
JOHNSON AND JOHNSON HOLDCO,
JANSSEN PHARMACEUTICAL INC,
et al.,
    Defendant/Respondents.

_____/

**ORDER RESETTING CASE FOR JURY TRIAL**

    This case is reset for Jury Trial on the Court's Trial Docket sometime between **SEPTEMBER 7, 2026 and OCTOBER 16, 2026 (6-WEEK DOCKET). E-CALENDAR CALL is set for AUGUST 28, 2026. The 6-Week Docket will be posted on the Court's website (15thcircuit.com) on that date. The case will be on call all 6-weeks of the docket. All notices of unavailability/conflict (pre-paid vacation/special set trial settings only) must be filed and provided to the Court TEN (10) days prior to E-Calendar Call to be considered in setting matters on the docket.** The parties shall comply with the previously furnished Uniform Pretrial Procedures in the previous trial order. (TBD RESERVED)

*In accordance with <u>Administrative Order 2.311-2/13</u>, when an attorney is no longer counsel of record on a case, the attorney must update his or her primary and secondary email addresses with the Clerk of Court.(See exhibits attached to A.O. 2.311.)*

    **DONE AND ORDERED** in Chambers, at West Palm Beach, Palm Beach County, Florida.

50-2023-CA-014349-XXXA-MB    12/01/2025
Reid P. Scott    Judge

50-2023-CA-014349-XXXA-MB    12/01/2025
Reid P. Scott
Judge

COPIES TO:

| | | |
|---|---|---|
| CALEN A. BENNETT ESQ | 98 SE 7TH STREET SUITE 700 MIAMI, FL 33131 | calen.bennett@kirkland.com calenbennett@gmail.com JOSH.FORDIN@KIRKLAND.COM emily.malloy@kirkland.com PAIGE.COMPARATO@KIRKLAND.COM |

FILED: PALM BEACH COUNTY, FL, MICHAEL A. CARUSO, CLERK, 12/01/2025 01:29:19 PM

Case No. 50-2023-CA-014349-XXXA-MB

| DANIEL J. DIMATTEO ESQ | 600 BRICKELL AVE SUITE 3800 MIAMI, FL 33131 | DJD@FERRAROLAW.COM ddimatteo@ferrarolaw.com pvalencia@ferrarolaw.com lfuentes@ferrarolaw.com mkunen@ferrarolaw.com |
| IMERYS TALC AMERICA INC | 251 LITTLE FALLS DRIVE WILMINGTON, DE 19808 | |
| JULIA STEPANOVA ESQ | 4540 PGA BOULEVARD SUITE 208 PALM BEACH GARDENS, FL 33418 | julia.stepanova@btlaw.com monica.brownewell@btlaw.com hope.hayes@btlaw.com jstepanova@btlaw.com |

NOT A CERTIFIED COPY